# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **DERRICK DEWAYNE CHARLES,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 09-592** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## <u>AMENDED PETITION FOR A WRIT OF HABEAS CORPUS</u>

### THIS IS A DEATH PENALTY CASE.

Respectfully submitted,

/s/ Randall O. Sorrels
RANDALL O. SORRELS
Federal Bar No. 11115
ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

# TABLE OF CONTENTS

I. Introduction ..................................................................................................1

II. Statement of Jurisdiction.............................................................................5

III. Statement of Procedural History................................................................5

IV. Statement of the Case ...............................................................................7

    A. Who is Derrick Charles?......................................................................7

    B. The Offense .......................................................................................42

    C. Trial Counsel's Deficient Mitigation Investigation ......................46

    D. The Trial of Derrick Dewayne Charles ..........................................70

V. Grounds For Relief and Legal Argument ................................................86

    A. The Controlling Supreme Court Precedent ...................................86

    B. Relief and Unreasonable Application of Clearly Established Law..............93

VI. Conclusion .............................................................................................121

Prayer ..........................................................................................................122

**I.**

**<u>INTRODUCTION AND BRIEF STATEMENT OF FACTS</u>**

Petitioner Derrick Dewayne Charles seeks relief from this Court on the grounds that his Texas death penalty sentence on May 14, 2003 violated his Sixth Amendment guarantee of effective assistance of counsel.  Trial counsel's failure to adequately investigate and present substantial mitigating evidence, and the possibility that one juror would have found that the mitigating evidence justified a "Yes" answer to the mitigation special issue, merits the Court's granting of Petitioner's Writ of Habeas Corpus.

It is undisputed trial counsel failed to investigate and present any of the massive amount of compelling mitigating evidence in Derrick Charles' social history.  Contrary to constitutional norms and local standards of care, trial counsel failed to conduct a reasonable investigation to construct a social history of their 19 year old client, who inexplicably and unforeseeably committed three strangely, violent murders. Additionally, they failed to interview even a fraction of the witnesses necessary to compile an accurate and thorough account of Derrick Charles' background.  Trial counsel never followed up on numerous obvious indicators of the medical and emotional struggles Derrick Charles endured throughout his life.   Nor did they present information critical to understanding Derrick's state of mind on the day of the crime.

Because counsel failed to conduct or commission a social history investigation counsel erroneously believed that Derrick Charles  came from a loving and supportive family which, though not well off, was possessed of sufficient resources to provide for everyone.  Derrick Charles was raised in extreme poverty by an undiagnosed schizophrenic, unemployable mother and an abusive, neglectful, unemployed, and alcoholic stepfather.  His mother's severe and

debilitating mental illness rendered her unable to not only adequately care for her son, but also unable to obtain the necessary mental health care Derrick so desperately needed.

Derrick's home was a violent chaotic place in which, as a child, he witnessed his schizophrenic mother stab his alcoholic stepfather – not an oasis of tranquility Derrick's trial counsel believed it to be.  This "home setting" was not a stranger to Derrick's family.  Like the mental illness and poverty that pervaded Derrick's family, the domestic violence was part of a multi-generational pattern.  As a child, Derrick's mother – who, along with her 7 siblings and 2 parents, lived in a 4-room shack without electricity or running water – witnessed her mother shoot and kill her father, a physically abusive alcoholic.  Likewise, Derrick's formative years were marred by violence, poverty, abuse, neglect, and severe mental illness.

Had trial counsel merely exercised diligence with respect to the leads provided to them, they would have discovered a trove of evidence that painted a very different picture Derrick's life and dispelled their misguided belief that Derrick suffered from no mental health problems and was simply a poorly behaved kid despite the loving attention and guidance from his supportive family.

Trial counsel's failure to investigate – particularly after they instilled into the venire panel during voir dire the expectation that mitigating evidence would be presented at trial – left the jury to believe there were no mitigating circumstances in Derrick Charles' life, and thus no reason to answer "yes" to the mitigation special issue, which would have automatically resulted in a life sentence.  Not only does the evidence listed below comprise a powerful case for a "yes" answer to the second special issue, it would have deflected the impact of the State's "aggravating" evidence because it provided a clear explanation for Derrick's behavior: he was severely mentally ill but untreated.

Had trial counsel adequately performed their duties, they would have learned:

●     Derrick Charles was born premature and suffered from seizures during infancy;

●     Derrick Charles' biological father abandoned him;

●     There was a multi-generational pattern of severe mental illness, cognitive deficits, seizure disorder, and substance abuse in Derrick Charle's family ;

●     Derrick Charles' mother suffered from severe mental illness which included psychosis, psychotic behavior, and depression during Derrick Charles' childhood; ;

●     Derrick Charles himsefl suffered from serious mental illness requiring two psychiatric hospitalizations as a child;

●     Derrick Charlees had long-standing and severe cognitive impairments;

●     Derrick Charles exhibited long term and significant limitations in academic functioning;

●     Derrick Charles' childhood was marked by poverty and instability;

●     Derrick Charles witnessed serious incidents of domestic violence between his mother and stepfather, who both drank heavily;

●     Derrick Charles was the victim of physical and emotional abuse at the hands of his stefpfather;

●     Derrick Charles' family, including his mentally ill mother, failed to protect him from childhood abuse and neglect; and

●     On the night of the underlying offense, Mr. Charles was under the influence of a highly potent dissociative drug, which can cause violent and unpredictable behavior

None of this evidence was presented to the jury. Instead of offering a persuasive case of mitigation, giving the jury a context in which to understand the otherwise inexplicable crime to which Derrick pled guilty, the defense argued just one mitigating circumstance in justification of a "yes" answer to the mitigation question: Derrick Charles' young age at the time of the crime.

The stark difference between the almost complete absence of a case in mitigation at trial and the compelling social history, which provides a basis for a "life sentence" answer to one of the two questions put to the jury, undermines confidence in the outcome of Derrick Charles' trial. Because there is a reasonable probability that, presented with this information, at least one juror would have answered "yes" to the mitigation question, Derrick Charles' death sentence was secured in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

## II.
## STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 2241(d); § 2254.  Mr. Charles was indicted and sentenced to death for the offense of capital murder in the 184th District Court of Harris County, Texas, which is in the Southern District of Texas. Petitioner is in the custody of the Texas Department of Criminal Justice pursuant to this judgment and death sentence.   Under 28 U.S.C. § 2244(d)(1), a petition filed on or before February 27, 2009, is timely.

## III.
## STATEMENT OF PROCEDURAL HISTORY

Petitioner Derrick Dewayne Charles pleaded guilty on May 6, 2003, to the offense of capital murder under TEX. PENAL CODE § 19.03(a)(7)(A) (intentionally or knowingly causing the death of more than one person during the same criminal transaction).  On July 8, 2002, Petitioner signed a written statement confessing to the offense.

The court's charge instructed the jury to find Mr. Charles guilty and submitted two special issues pursuant to TEX. CODE CRIM. PROC. art. 37.071, sec. 2(b)(1) and 2(e)(1)(CR.–241, 248–250).  On May 14, 2003, the jury found Mr. Charles guilty, found that he posed a future

danger, and found that no mitigating evidence or circumstances existed to warrant the imposition of a life sentence rather than the death penalty. Mr. Charles was sentenced to death.

Petitioner sought direct review of his conviction on February 10, 2004. The State's brief on direct appeal was filed on May 12, 2004. Mr. Charles's conviction and sentence were affirmed on direct appeal on February 2, 2005.

Prior to the conclusion of direct review, Petitioner filed a State Application for Writ of Habeas Corpus in the convicting court on September 24, 2004. A hearing on the State Application was conducted by that court on November 20, 2006. On April 25, 2007, the convicting court signed the Respondent's Proposed Findings of Fact and Conclusions of Law in whole and recommended that the Texas Court of Criminal Appeals deny habeas corpus relief.

On February 27, 2008, the Texas Court of Criminal Appeals denied relief to Petitioner. The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law with the following exceptions:

1.    The portion of Finding of Fact Number 52 stating, "[T]rial counsel exercised due diligence in attempting to locate Petitioner's Gulf Pines Hospital records;"

2.    Finding of Fact Number 119 which concludes that Mr. Charles is not deemed to have been significantly limited in social and leisure areas and that Mr. Charles's adaptive behavior is determined not to have been deficient.

3.    Conclusion of Law Number 9 which states that "[b]ecause appellate counsel complained on direct appeal about the constitutionality of the Texas death penalty scheme based on an alleged lack of meaningful appellate review of the special issues, the applicant cannot present his habeas claims of alleged ineffective assistance of appellate counsel for not presenting on direct appeal the claim that the trial court erred in denying the applicant's pretrial motions challenging the constitutionality of the Texas death penalty scheme."

The original petition was due for filing in the United States District Court for the Southern District of Texas Houston Division no later than February 27, 2009.  On February 2, 2009, Petitioner filed an Unopposed Motion for a Scheduling Order (Docket Item #14).  On February 3, 2009, this Court granted Petitioner's motion and ordered that Petitioner could amend his petition once on or before June 27, 2009 without leave of court, and Respondent shall not file an answer to the original petition before that date (Docket Item #15).  This original petition for writ of habeas corpus was timely filed in the United States District Court for the Southern District of Texas Houston Division on February 26, 2009. On June 2, 2009, Petitioner filed a second Unopposed Motion for a Scheduling Order (Docket Item #5) seeking to extend the deadline to amend the original petition.  On June 4, 2009, this Court granted Petitioner's motion and ordered that Petitioner could amend his petition once on or before September  22, 2009 without leave of court, and Respondent shall not file an answer to the original petition before that date (Docket Item #7).

**IV.**
**STATEMENT OF THE CASE**

A.      WHO IS DERRICK DEWAYNE CHARLES?

Derrick Dewayne Charles was born on September 6, 1982, to Nancy Phillips and Donald Ray Whitley.[1]  Nancy Phillips was 19 years old and unwed at the time of Derrick's birth.  *See Exhibit A,* Gulf Pines Hospital Records of Derrick Charles (hereinafter "Gulf Pines Records").  She was a ninth grade drop out when Derrick was born.  *See* Exhibit B, Houston Northwest Medical Center Psychiatric Records of Nancy Phillips (hereinafter "Houston Northwest Records").  One year earlier, at the age of eighteen, she gave birth to Christopher Charles,

---

[1] Transcripts of Trial Cited as example "RR.XX-2";Transcripts of Habeas Hearing Cited as example "State Habeas Hearing at 10"

Derrick's half-brother.  *See Exhibit A,* Gulf Pines Records.  Mr. Charles and Christopher have different biological fathers.

### 1. Derrick Charles Was Born Premature and Suffered from Seizures During Infancy.

Derrick Charles was born premature, weighing approximately *three to four pounds. See Exhibit A,* Gulf Pines Records.  Derrick remained under a doctor's care for the first month of his life because of his underdevelopment and jaundice. *See Exhibit C*, Affidavit of Leroy Phillips (hereinafter "Leroy Phillips Affidavit"). In addition, he suffered from seizures when he was an infant.  *See Exhibit A,* Gulf Pines Records.  On March 9, 1993, when Derrick was ten  years old, family members provided a description of one of Derrick's seizures.  They noted that when Derrick was a baby, he "went completely stiff" and his "pupils went back in head." *Id.*   It was also reported that Derrick sustained a head injury as a young child.  *Id.*   Dr. Lawrence Ginsberg, a psychiatrist who treated Derrick from March 8, 1993, to February 27, 1996, found Derrick's medical history to be "remarkable."  *Id.*

### 2. Derrick Charles Was Abandoned by His Biological Father.

Donald Ray Whitley, Derrick's biological father, left Nancy Phillips before his son was born.  He failed to provide any support, financial or otherwise, to Derrick. *Id.*  During a 1996 psychiatric hospitalization, Derrick's mother reported that she had been sexually abused by Derrick's biological father.[2]  *See Exhibit B,* Houston Northwest Records.  Derrick met his father for the first time as a teenager.  *See Exhibit D*, Transcript of Patillo Investigation Company Interviews, (hereinafter "Patillo Interviews"); *See Exhibit QQ,* Declaration of Christopher

---

[2] Harris County District Clerk records show convictions of Mr. Whitley of cocaine-related offenses on at least five occasions (Cause No. 968598; Cause No. 1147233; Cause No. 1078698; 1101021; and Cause No. 1177292). `

Charles (hereinafter "Christopher Charles Declaration").  Even then, their contact was almost nonexistent. *Id.*  Derrick was raised by his mother and stepfather Leroy Phillips.

### 3.   Derrick Charles Grew Up In a Chaotic Home Environment Where Alcohol Abuse, Domestic Violence, Physical Abuse, Emotional Abuse and Social Isolation Were Commonplace.

Derrick's childhood was characterized by extreme adversity.  From a young age, he witnessed frequent episodes of domestic violence between his mother and stepfather, who both drank heavily.  In addition, Derrick himself, was the victim of physical abuse and emotional abuse at the hands of his stepfather.   Tragically, no one was there to protect Derrick.

#### a.   Substance Abuse

Family members report that Derrick's mother and stepfather drank heavily during Derrick's childhood.  Lawrence Charles, a cousin with whom Derrick grew up noted, "As far as I can remember, Derrick's mother and stepfather drank every day, they were alcoholics."  *See Exhibit PP,* Declaration of Lawrence Charles (hereinafter "Lawrence Charles Declaration").  Likewise, Lincoln Charles, Derrick's maternal uncle, and Christopher Charles, Derrick's brother, reported that Nancy and Leroy drank heavily on a daily basis. *See Exhibit OO,* Declaration of Lincoln Charles (hereinafter "Lincoln Charles Declaration"); *See Exhibit QQ, Christopher Charles Declaration*.

#### b.   Domestic Violence

Derrick's mother and stepfather fought frequently when they drank.   Christopher provided the following description of the episodes of domestic violence which Derrick and Christopher witnessed as children:

> My mother and stepfather would get into constant fights and arguments.  They would go around tearing things up at the house, cursing and fighting.  When they argued, they would throw glasses,

> beer bottles, and damage pictures and dishes.  They would also hit each other.  They would use their fists and objects, including knives, when they fought.  My mother and stepfather fought every week.  I remember them fighting ever since Derrick and I were kids.
>
> A lot of fights between my mother and stepfather were because my stepfather wouldn't pay the bills.  My stepfather was an alcoholic and he would use his money to buy liquor and cigarettes.

Christopher Charles Affidavit.

Lawrence Charles recalled, "My auntie Nancy and Derrick's stepfather were always fighting.  I saw a lot of fights between them."  Lawrence Charles Affidavit.  According to Lawrence, Derrick's mother would cry when Leroy would hit her.  *Id.*  Lawrence also remembered that when he was seven or eight years of age, he witnessed Derrick's stepfather hitting and pushing Nancy down.  *Id.*  In response, Christopher, Derrick's brother, jumped on Leroy.  *Id.*  Lawrence noted that Nancy and Leroy fought "because they were both drunk."  *Id.* In addition, Christine Bickham, Lawrence's Mother, reported that Nancy and Leroy, who drank throughout Derrick's childhood, were "constantly cursing and arguing." *See Exhibit NN*, Declaration of Christine Bickham (hereinafter "Christine Bickham Declaration").

Lincoln Charles, Derrick's maternal uncle, stated that he remembers Leroy complaining all the time that he could not sleep at night because Derrick's mother "would jump up and down his back all night accusing him of cheating on her.  They would be fighting all the time." *See Exhibit OO, Lincoln Charles Declaration*.

Leroy himself acknowledged that his relationship with Derrick's mother was marked by episodes of domestic violence which Derrick and his brother witnessed.  He stated,

> Derrick and his brother witnessed numerous violent episodes between me and Nancy.  Once when Derrick was about 12, Nancy stabbed me in the groin with a pair of scissors as both boys stood

watching.  On another occasion, I asked her to cook dinner after I had come home for work and she came at me with a knife.  She would also hear voices and think I was conspiring against her and throw cups and plates at me, or hit me with a broom handle.  Both boys witnessed these incidents.

*See Exhibit C,* Leroy Phillips Affidavit.

### c.      Physical and Emotional Abuse

Derrick and his brother suffered severe physical and emotional abuse at the hands of their

stepfather.  Christopher Charles explained,

All through our lives, our stepfather did not want Derrick and me around.  Our stepfather would get mad at any time.  He was abusive.  Throughout our lives our stepfather didn't care for us.  I know he didn't care for us because he would say it all the time.  He would call us names like "faggot", "stupid", "dickhead", and "retarded." And things like that.  He would beat us with switches and extension cords.
. . .

Our stepfather didn't want us to be there with my mother.  When I was about fourteen or fifteen years old, Derrick and I were left to live by ourselves in an apartment because our stepfather took our mother to another apartment clear across town.  My stepfather made my mother move out.  My brother and I were left to fend for ourselves.  I think we were left alone for about a month.  I think my mother finally came back because someone in her family made her come back to get us.

*See Exhibit QQ, Christopher Charles Declaration.*

Lawrence Charles, a cousin, provided the following description of the home environment,

Derrick's stepfather abused Derrick and Chris. He would beat them with extension cords, belts and switches . . . . I remember seeing big whelps on Derrick and Chris from the beatings.

One time, Derrick told me that when he was getting out of the shower, his stepfather beat him with cable cords.

I also remember that one time, Chris, Derrick, and I got home around 7:00 p.m.  We were playing basketball outside.  Derrick's

stepfather came outside with a knife and started poking holes in our basketball because we had gotten home around 7:00 p.m. That's the kind of person he was.  I was about ten years old when this happened.

When Derrick was about 14 years old, his stepfather kicked Derrick and Chris out of the house.  Chris went to Shepherd to live with his grandmother, but Derrick didn't have anywhere to go.  He was left to fend for himself.  Derrick was out there hustling, trying to make it on his own.

See Exhibit PP, Lawrence Charles Declaration.

Christine Bickham, maternal aunt, commented that Derrick was rejected all of his life and that he did not get the love he needed at home.  *See Exhibit NN, Christine Bickham Declaration.* It was her belief that Leroy didn't want children.  *Id.*

### d.      Corroborating Information in Psychiatric Records

Psychiatric records from Derrick's 1993 Gulf Pines Hospital stay (discussed at length *infra*) contain significant corroborating information regarding family's dysfunction.   Derrick reported witnessing violent behavior between his mother and stepfather.  *Id.*   He confided in medical staff that he had seen his stepfather hit his mother.   *Id.* During Derrick's subsequent psychiatric hospitalization at Gulf Pines Hospital in 1995 (discussed at length *infra*) the following information regarding the family environment was noted in the records:

An adult in the home did not know the whereabouts of the child: Sometimes

Family members argued a lot: Sometimes

Family members felt close to one another: Never

Family members got angry a lot or lost their temper: Often

Family members could communicate or talk freely with one another:  Never

Family members yelled, swore, or said mean things to each other: Often

> Family members gave each other emotional support or helped each other out when things went wrong: Never
>
> Family members found a way to solve their problems: Never
>
> Family members got so angry that they hit, punched or threw things at each other: Often
>
> Family members felt physically safe with one another: Never

*Id.* With respect to Derrick's relationship with his mother and father/father figure, the following notations were made:

> The child and parent did things together: Never
>
> The child talked to the parent or asked for help with problems: Never
>
> The parent talked to the child or asked for help with problems: Never

*Id..*

With respect to Nancy Phillips' functioning the preceding three months, the following factors were noted:

> Abused drugs or alcohol
>
> Was nervous or depressed a lot or had intense mood swings
>
> Was very distressed or upset by things that happened in his/her own life

*Id..*

Nancy Phillips' psychiatric records (discussed at length *infra*) are consistent with Derrick's reports of domestic violence.  During her own psychiatric 1996 hospitalization which occurred less than one year after Derrick's second hospitalization, Nancy reported being emotionally abusive to her children when feeling overwhelmed. *See Exhibit B,* Houston Northwest Records.  She also reported to medical staff that her husband Leroy Phillips was sexually aggressive, as well as physically and emotionally abusive towards her.  *Id.*  Nancy

-13-

disclosed three prior separations from her spouse and indicated that her husband drinks. *Id*. Hospital staff provided Nancy with information regarding counseling resources for domestic violence-related problems at the time of her discharge. *Id*.

The family's violent home environment is also documented in Houston Police Department records. On March 13, 1991, when Derrick was merely eight years old, the police responded to a disturbance involving Derrick's stepfather and Lincoln Charles, Derrick's uncle. *See Exhibit G*, Houston Police Department Offense Report of Incident Between Leroy Phillips and Lincoln Charles. According to the offense report, a fight ensued over money that Lincoln Charles owed Derrick's mother. *Id*. Lincoln Charles cut Derrick's stepfather with a knife during the altercation. *Id*. While the police were investigating the incident, Derrick's mother and a cousin began fighting. Derrick's mother and her cousin were arrested. *Id*.

### e. The Family Failed to Protect its Children.

Tragically, no one was there to protect Derrick from the abuse and neglect he endured as a child. By all accounts, his own mother, who suffered from severe mental illness, was unable to provide a secure and stable environment for her son. Lawrence commented, "My auntie Nancy . . . turned against her kids." *See Exhibit PP*, Lawrence Charles Declaration. He explained, "She didn't really do anything when her husband beat Derrick and Chris or when her husband kicked them out of the house. Derrick's stepfather always controlled my auntie Nancy." *Id*.

Likewise, Christopher, had the following to say about his mother,

> Leroy was running everything in the house. If my mom did something he didn't like, he would get mad. If my mom cooked dinner and fed Derrick and I before Leroy ate, he would come home and destroy the food, throw it away and punish us for no reason.
> . . .

> When our stepfather was abusive to us, my mother wouldn't say
> anything.  He was the man of the house.

*See Exhibit QQ, Christopher Charles Declaration.*

Christine Bickham noted that Derrick's mother did not know how to take care of her son.

*See Exhibit NN, Christine Bickham Declaration.*

Psychiatric staff who treated Derrick as a child also noted concerns about Nancy's parenting abilities.  A Master Licensed Social Worker who completed a psychosocial assessment on Derrick in 1995 identified Nancy's lack of parenting skills as an area of concern.  Houston Northwest Medical Center Records. She stated, "[Derrick's] mother appears to struggle greatly with ineffective parenting skills."  *Id.*  Nursing staff also noted "limited insight on parents [sic] part."  *Id.*

Derrick's extended family also failed to provide Derrick with the security and stability he so desperately lacked. Derrick's own grandmother rejected him.  As early as October, 2000, Derrick and his mother informed juvenile authorities that his grandmother did not like him as much she liked Chris, Derrick's brother.  *See Exhibit N*, Texas Youth Commission Records of Derrick Charles (hereinafter "TYC Records").  Family members consistently state that while Chris was able to seek refuge at his grandmother's house, Derrick was not welcome in her home. Unlike Derrick, Christopher lived with his grandmother for extended periods of time.

Christine Bickham stated,

> Nancy's family didn't want Derrick either.  Derrick's brother,
> Chris, was loved and accepted by Nancy's family, but Derrick
> wasn't.  Derrick couldn't come to their house, he couldn't stay in
> Shepherd.  I don't know why Derrick was not accepted by Nancy's
> family, but I know that it hurt Derrick very much.  I could see the
> hurt in his eyes.  Derrick was always looking for love.

*See Exhibit NN, Christine Bickham Declaration.*

Similarly, Leroy reported that while Nancy's family welcomed Christopher, they rejected Derrick. *See Exhibit C*, Leroy Phillips Affidavit. According to Leroy, this troubled Derrick a great deal. *Id.*

Christopher himself acknowledged the disparate treatment. Although he did not know why his brother was not allowed to stay with his grandmother, he recognized that the grandmother's rejection caused a great deal of pain for Derrick. *See Exhibit QQ, Christopher Charles Declaration.* He stated,

> All throughout our lives, all throughout our childhood, we were never too happy, but I think Derrick got the worst treatment because he had to live with my mother and stepfather all the time. Ever since I can remember, Derrick seemed sad. He was just lost because he had no one to turn to. I worried about him.

*Id.*

Neither his grandmother nor any other family member intervened to protect Derrick. Lincoln Charles, maternal uncle, noted that he was not close to Derrick when Derrick was growing up because he (Lincoln) was doing his "own thing". *See Exhibit OO, Lincoln Charles Declaration.* He explained that he was "drinking all the time" and "running around with women". In fact, Lincoln reported to the trial investigator prior to Derrick's trial that he did not have extensive contact with Derrick. *See Exhibit D*, Patillo Interviews.

Lawrence Charles, cousin, stated,

> Our aunts and uncles knew what was happening at Derrick's place because family members used to talk bad about Derrick's stepfather, but my auntie's sisters and brothers didn't really do anything to help Derrick.

*See Exhibit PP*, Lawrence Charles Declaration.

Similarly, Christopher Charles described his aunts and uncles as the "hi and bye" kind. He explained,

> My grandmother didn't like our stepfather. I think that everyone in the family knew how our stepfather treated us and the problems we were having in the home, but no one really said anything about it. My mother is from the country and all the family members knew that Leroy drank but their attitude was 'It's up to your mother.'

*See Exhibit QQ, Christopher Charles Declaration*. It was not a close family, according to Christopher, "[t]hey were in different places doing their own thing. We didn't really communicate." *Id.*

The family's isolation also deprived Derrick of a safety net outside the family. According to Christopher, he and Derrick did not have friends as kids because his stepfather did not let them go outside. *See Exhibit QQ, Christopher Charles Declaration*. Christopher also noted that he and Derrick were not close to any teachers due to the family's frequent moves. *Id.*

**4.    Derrick Charles' Childhood Was Marked by Poverty and Frequent Moves.**

In addition to the abuse and neglect Derrick suffered as a child, he endured a life marked by unrelenting poverty. Christopher provided the following description of the family's economic hardships:

> A lot of the fights between my mother and stepfather were because my stepfather wouldn't pay the bills. My stepfather was an alcoholic and he would use his money to buy liquor and cigarettes. We moved a lot when I was growing up because my parents couldn't pay the bills. When my mother would realize there was no money for the bills, she would go off the deep end. She would start to call her relatives to see if they could give her money.

> When we were growing up, we didn't get anything from our stepfather. We had to find it ourselves. We didn't have toys. Our mother and stepfather didn't buy us clothes. Sometimes there was no food in the house.

*See Exhibit QQ, Christopher Charles Declaration*.   Leroy not only squandered the family's resources on alcohol, but he also stole from the children.  Christopher stated,

> I remember that one time my stepfather stole money my grandmother had given me to buy my school lunch.  He used the money to buy liquor.  Every time my grandmother gave me money, I saved it because I knew I wasn't going to get any from my parents.

*Id.*

Lawrence Charles confirmed that Derrick's stepfather, who spent his money on alcohol, failed to provide financial assistance to Nancy.  *See Exhibit PP*, Lawrence Charles Declaration. Lawrence recalled that at times, he gave Derrick and Christopher his clothes because they did not have clothes of their own.  *Id.*

Likewise, Lincoln Charles reported that Derrick and his family experienced money problems.  He stated:

> When Derrick was a kid, Derrick's family moved around a lot and money was sometimes low.  The reason I know that Derrick's family was having money problems is because sometimes I would tell my sister that I wanted to come over to get something to eat and she would tell me that food was getting low.  Whenever she would say this, I would not come to their house.  Sometimes I would loan money to Leroy and Nancy.

Declaration of Lincoln Charles.  Lincoln further mentioned that in 2000, Leroy quit his job with Northwest Ministries simply because his employer placed another employee in higher position than Leroy.  *Id.*  Lincoln, who has worked for the same employer for twelve years, noted that he would never quit his job for the reasons that Lincoln quit his job.  *Id.*

Leroy himself acknowledged the family's ongoing financial struggles.  He stated, "As Derrick grew up, our family frequently had to rely on welfare.  We moved around a lot because our family got evicted.  Money was always a problem." *See Exhibit C*, Leroy Phillips Affidavit.

Records pertaining to Derrick's mother and to Derrick confirm that Derrick's childhood was, in fact, marked by poverty.  To say that Nancy Phillips' employment history is dismal is an understatement.  At the time that her son was on trial for the underlying offense, Nancy's entire employment history consisted of only *one* job.  *See Exhibit F*, Social Security Records of Nancy Phillips.  According to Social Security Administration records, Nancy's lifelong earnings totaled a mere $182.75.  *Id.*  The family relied on Food Stamps, Aid to Families with Dependent Children (AFDC), Supplemental Security Income (SSI), as well as a "Housing Allowance" for survival. *See Exhibit B,* Houston Northwest Records.

A psychosocial assessment completed on Derrick during his psychiatric hospitalization at Gulf Pines Hospital in 1993 (discussed at length *infra*) included the following information, "It does appear that [Derrick] comes from a very deprived background, therefore does not get a lot of opportunities to expand his leisure and recreational interests." *See Exhibit A,* Gulf Pines Records.  During the assessment, Nancy Phillips informed psychiatric staff that the apartments in which the family resided were "so rough" that she did not allow Derrick to go outside to play with other children.  *Id.*  Nancy also reported that Derrick and his family "don't do a lot of family things together other than maybe go to a flea market together once in a while."  *Id.*  Additionally, social work staff made the following observation, "The family and the patient may experience a certain amount of distress in the process of getting treatment considering that their finances are so limited they may have some difficulty following through with aftercare recommendations . . . ." *Id.*

**5.    Nancy Phillips' Own Childhood Was Characterized by Alcohol Abuse, Poverty, and Severe Trauma.**

Derrick's mother herself endured a childhood characterized by alcohol abuse, poverty, and severe trauma.  Nancy is one of nine children born to Herman and Dorothy Charles.  *See Exhibit OO, Lincoln Charles Declaration*.  She was born in Shepherd, Texas.

Lincoln, Nancy's brother, described their  father (Derrick's maternal grandfather) as a severe alcoholic who exhibited violent behaviors and who was not able to meet his family's basic needs.  Nancy, who was born in 1962, grew up in a house with no running water or electricity. *See* Lincoln Charles Affidavit.  At times, there was no food in the house.  *Id.*  Lincoln provided the following description of the home environment in which Derrick's mother was raised:

> My father worked pouring concrete, he was a cement finisher, but he drank up all of the money.  My father drank every day and he would come home after drinking all night.  When my father came home drunk, he wanted to fight everyone. He wanted to fight my mother, he even wanted to fight us children.  He wanted to fight all night long.  I remember my father throwing me out on the porch on my head a couple of times.  That man was something.  One time, my father knocked down his own mother and broke her arm.

*Id.*

The violence in the home culminated in Nancy's mother *killing* Nancy's father, which Nancy witnessed.  On November 12, 1977, when Nancy was fifteen years of age, Dorothy Charles shot Herman Charles with a .32 pistol.  *See Exhibit H*, Death Certificate of Herman Charles. According to the autopsy report, Herman Charles sustained three gunshot wounds, with the fatal shot being to his chest.  *See Exhibit I*, Autopsy Report of Herman.  Herman's blood alcohol level was .183 at the time of his death.  *Id.*

Following the homicide of Herman Charles, Nancy's mother was arrested.  Nancy and her siblings were separated and sent to live with different relatives. Nancy was taken in by an aunt in Houston.  *See Exhibit OO, Lincoln Charles Declaration*.

Nancy's psychiatric records (discussed at length *infra*) are peppered with references to her traumatic childhood.   During a 1996 psychiatric hospitalization, she disclosed a history of neglect, physical abuse, emotional abuse, as well as sexual abuse. *See* Houston Northwest Medical Records.   In addition, Nancy reported to mental health providers that she recalled witnessing "a lot of fights" between her father, a heavy drinker, and her mother. *Id*.   She further revealed that when she was a teenager, she witnessed her mother killing her father. *Id*.   Nancy attributed a lot of problems in her life to the fact she witnessed her father's homicide, for which she never received treatment. *Id.*

### 6.      Derrick Charles Has Suffered from Mental Illness Since a Young Age.

On March 8, 1993, Derrick, who was merely ten years old at the time, was referred to Dr. Lawrence Ginsberg, psychiatrist.  *See Exhibit L*, Letter of Dr. Ginsberg to State Habeas Counsel (hereinafter "Ginsberg Letter").   According to medical records:

> [Derrick] had been violent towards his peers at home and at school.  He had been depressed in school.  [Derrick] loses his temper, argues with adults, he refuses his chores, he is easily annoyed, he is angry, and resentful and blames others for his actions. [Derrick] has been suspended from school.

*See Exhibit A,* Gulf Pines Records.

Derrick displayed behaviors consistent with mental illness long before he was seen by Dr. Ginsberg.  He engaged in fire-setting behavior at the age of 3.  *Id.*  In addition, Derrick received mental health services at school starting in first or second grade.   *Id.* He continued to receive services from school counseling personnel during the two years preceding his initial evaluation with Dr. Ginsberg.  *Id.*

### 7.      Derrick Charles Was Hospitalized In Gulf Pines Hospital, a Psychiatric Facility, When He Was Merely Ten Years Old.

On March 9, 1993, only one day after seeing Dr. Ginsberg for the first time, Dr. Ginsberg recommended that Derrick be hospitalized at Gulf Pines Hospital, a psychiatric facility.  *Id.*  At intake, Derrick's mood and affect were "flat " and "depressed."  *Id.*  He was also observed to be "lethargic."  *Id.*  Derrick received the following provisional diagnosis:

> Axis I:        Oppositional Defiant, Disorder
>                Depressive Disorder, Not Otherwise Specified
>
> Axis II:       No Diagnosis
>
> Axis III:      Rule Out Partial Complex Seizure Disorder

*Id.*

Admissions staff documented the following rationale for inpatient treatment:

– Potential danger to self/others/property;

– Behavior control needed for effective treatment;

– Severe, incapacitating anxiety/depression;

– Failure of outpatient/extended care management (school counseling); and

– Severely impaired social/family/occupational functioning.

*Id.*

When asked about his feelings regarding inpatient treatment, Derrick, who was only in third grade at the time, stated he was "scared."  *Id.*

On March 10, 1993, a day after he was hospitalized, Derrick underwent a psychological evaluation by Karan Redus, Ph.D.  Dr. Redus made the following observations:

> [D]errick made very little eye contact and he verbalized very little and only in response to examiner questions.  During the testing, on several occasions questions had to be repeated as it seemed as if he had not heard the questions at all.

*Id*.  She went on to state:

> Derrick . . . appeared to have very low self esteem and . . . ***appeared to be experiencing irritating or painful affect that was interfering with his perceptual and/or meditational activities***.  He displayed a marked tendency to narrow or simplify stimulus fields and to hastily or haphazardly scan his environment. ***Because he may miss, neglect or distort critical cues or bits of information, this style can create the potential for a higher frequency of behaviors that do not coincide with social demands or expectations***. It also appeared that Derrick was likely to have difficulty in modulating affect and is more inclined to display feelings and be less concerned about modulating those displays.  He may have a sense of helplessness or discouragement about his relationships to the world and may expect gloomy outcomes regardless of his efforts.  Some of his responses suggested that problems with impaired perceptual accuracy could be due either to attention and concentration problems, neurological problems or decompensation and internal preoccupation related to depressive affect. ***He did give an unusually large number of responses to portions of the testing, which can be associated with a Bipolar process.  This along with significant impairments in his cognitive processing suggest that he will need to be monitored for this possible development of more significant affective and cognitive disturbances.***  Also further testing could rule out the presence of neurological problems.

*Id*. (emphasis added).

Dr. Redus' diagnostic impressions included the following:

>   Axis I:        Oppositional Defiant Disorder
>                  Depressive Disorder, NOS
>                  Features of Attention Deficit Disorder
>
>   Axis III:      Rule Out Seizure Disorder

*Id.*

Dr. Ginsberg anticipated that Derrick would require inpatient treatment for 2 to 3 weeks.

*Id.*  Derrick, however, was prematurely yanked from treatment on March 11, 1993, only two days after admission.  *Id.*  The day after Derrick was admitted for inpatient treatment, his stepfather contacted Dr. Ginsberg's office by telephone to report that his wife was not adjusting well to Derrick's hospitalization and that she wanted Derrick discharged from Gulf Pines Hospital.  *See Exhibit J*, Dr. Lawrence Ginsberg Records of Derrick Charles (hereinafter "Ginsberg Records").

According to Gulf Pines Hospital discharge documents, Derrick was, in fact, sent back to the physically and emotionally dangerous environment at the request of his mother, who stated she "missed" her son.  *Id.*

Progress notes reflect Derrick's family was warned "that patient has potential to hurt/harm himself or others may hurt/harm him."  *See Exhibit A,* Gulf Pines Records.  Dr. Ginsberg recommended outpatient psychiatric care as well as counseling

### 8. Derrick Charles' Family Failed to Comply with Derrick's Outpatient Treatment Plan Following His Hospitalization.

Naturally, Derrick was recommended for outpatient psychiatric care as well as counseling upon this discharge from Gulf Pines Hospital.  Notwithstanding the recommendations for outpatient treatment immediately following Derrick's hospitalization, Derrick's family did not return to Dr. Ginsberg for approximately two years.

On February 21, 1995, Derrick was once again taken Dr. Ginsberg.  *See Exhibit J,* Ginsberg Records.  According to psychiatric records, Derrick's behavior "[had] gotten completely out of hand" during the previous few months.  It was also noted that Derrick's behavior "[went] in cycles."  *Id.*  Derrick was diagnosed with Oppositional Defiant Disorder and Depressive Disorder Not Otherwise Specified.  In addition, Dr. Ginsberg ordered an EEG in order to rule out seizure disorder.  *Id.*  Although the results of the EEG and the EKG were within normal limits, Dr. Ginsberg opined that Derrick was suffering from Attention Deficit Disorder and Major Depressive Disorder.  *Id.*  On March 14, 1995, Dr. Ginsberg prescribed Impipramine (antidepressant) to Derrick.  *Id.*

Between March of 1995 and September of 1995, Derrick was seen on a relatively consistent basis by Dr. Ginsberg.  *Id.*  His response to treatment, however, was inconsistent.  At

times, Derrick's mother reported improvement in his functioning. *Id.* Other times, she informed psychiatric staff that Derrick's medication was wearing off and that behavioral problems persisted. *Id.* In September of 1995, the behavioral manifestations of his mental illness escalated to the point of requiring psychiatric hospitalization.

**9.     Derrick Charles Was Hospitalized in Gulf Pines Hospital for a Second Time When He Was Thirteen Years Old.**

On September 20, 1995, Derrick was seen emergently for psychiatric care at Gulf Pines Hospital just prior to admission. *See Exhibit A,* Gulf Pines Records. At intake, Derrick's mother informed psychiatric staff that her son had been exhibiting "decreased amounts of sleep, irritability, labile mood, crying spells, impaired memory, and impaired concentration." *Id.* She also reported that Derrick would beat his head against the wall and would not respond to her redirection. *Id.* According to Nancy, she had to hold Derrick's head until he stopped. In addition, Derrick had been exhibiting violent and disruptive behaviors in school. *Id.* When Derrick was expelled from school for the fourth time, he had threatened to flatten the tires of a teacher's car. *Id.* He had been fighting, using profane language, and had been "insultive" at school. *Id.*

Medications prior to admission included Imipramine, an antidepressant, and Ritalin, a medication utilized for the symptomatic management of Attention-Deficit/Hyperactivity Disorder and Sleep Disorders. *Id.*

It was noted that Derrick's affect was "blunted" and his mood was "depressed" at intake. *Id.* Dr. Ginsberg made the following observations of Derrick's mental status on admission, "Mr. Charles refused to talk. He put his hands over his eyes to avoid me seeing that he was crying. He also put his shirt over his head so that he could hide his tears. He also had poor eye contact."

*Id.* Nursing staff observed the following: "[Derrick] withdrawn, often with hysterical crying, and seldom verbalizes.  Intermittently punches things/wall and bangs head when angry.  Crying loudly and fighting on admission." *Id.*

Dr. Ginsberg diagnosed Derrick with Major Depression, Recurrent and Rule Out Partial Complex Seizure Disorder on admission.  *Id.*  Derrick was continued on Imipramine and, in addition, Dr. Ginsberg prescribed Mellaril for agitation.  *Id.*

With respect to Derrick's depressive behaviors, he received a nursing diagnosis of "ineffective individual coping" as related to "feelings of depression," "withdrawn behavior," "low self esteem," "agitation," and "feelings of worthlessness" as evidenced by "anxiety/agitation,"  "decreased motor activity,"  "sleep disturbance," "difficulty concentrating," and "parent/child conflict." *Id.*  Derrick also received a nursing diagnosis of  "potential for injury to others and destruction of property" as related to "history of violence," "feelings of anger/fear," "low self esteem," "agitation," "lack of impulse control," "disordered thoughts," "non-compliance to medication" as evidenced by "destruction or property," "physical acts of violence towards others," "verbally aggressive statements,"  "poor coping skills," "impulsivity," and "threatening combative behavior." *Id.*

On September 22, 1995, two days after being admitted to Gulf Pines Hospital, Derrick underwent a psychological evaluation by Michelle F. Larrow, Ph.D. *Id.*  Dr. Larrow made the following observations: "[Derrick's] affect was flat and depressed and he avoided eye contact. *Id.*  He had trouble with psychomotor tasks and rotated figures." *Id.*  Her report contained the following summary of her evaluation:

> On this testing, his intelligence testing was measured to be in the intellectually deficient range.  It would probably be in the borderline range if he were not having so many psychological problems.  He has a strength in abstract reasoning,

although it is still below average. His freedom from distractibility is poor.  His word knowledge and general knowledge are very low and suggest learning problems and cultural impoverishment.  His social understanding is also well below average, although he did not show any antisocial tendencies in his responses.  ***His perceptual organization skills are extremely poor, especially his visuo-motor coordination and visual integration. He rotates figures, writes upside down, and distorts figures.  These results suggest he may have some organic damage that is contributing to his problem with behavior control.***  However, it is unlikely that all of his current problems are explained by neurological problems.

Derrick's testing also shows him to be depressed and have poor self esteem. . . .  He also has some anxiety that may be due to depression and feelings of guilt.  He withdraws socially in response to feeling poorly about himself.  He does not seem to be getting his needs met by his family.  He may act angrily as a defense against feelings of sadness and rejection.  It also likely that his trouble controlling his anger may have a neurological component [sic].

*Id.* (emphasis added).

Mr. Charles received the following diagnosis:

| | |
|---|---|
| Axis I: | Major Depressive Disorder, Recurrent, Severe Without Psychotic Features |
| Axis II: | Borderline Intellectual Functioning |
| Axis III: | Question of some organic brain injury |
| Axis IV: | Family conflict; separation of parents |

*Id.*

Derrick remained in the hospital for over two weeks. *Id.*  He was discharged on October 6, 1995. *Id.*  During the course of his hospitalization, he received individual therapy, family therapy, group therapy, and activities therapy in addition to pharmacotherapy. *Id.*  According to medical records, Derrick made progress in his treatment plan. *Id.*  Dr. Ginsberg noted, "During the course of hospitalization, [Derrick] achieved a stabilization of mood and resolution of his depressive symptomatology.  He was able to look at intrapsychic as well as family of origin

issues." *Id.*  His prognosis at discharge was "fair to good with continued outpatient treatment." *Id.*

Derrick received a final diagnosis of Major Depression, Recurrent. *Id.*  He was prescribed Imipramine for depression at discharge. *Id.*  In addition, Dr. Ginsberg recommended that he continue with outpatient individual and family therapy with Jan Richards, LPC. *Id.*

As with Derrick's 1993 hospitalization records, records pertaining to Derrick's 1995 hospitalization contained extensive information regarding family dynamics.  According to the records, Mr. Charles and his family were experiencing recent stressors at the time that Mr. Charles required inpatient treatment. *Id.*  Derrick's mother and stepfather had separated. *Id.*  In addition, "[Derrick's] brother was living with their grandparents and this was causing a great deal of stress in [Derrick]." *Id.*

**10.    Derrick Charles' Family Failed to Comply with His Outpatient Treatment Plan Following His Second Psychiatric Hospitalization.**

As noted previously, Derrick Charles was discharged from Gulf Pines Hospital on October 6, 1995.  Notwithstanding Dr. Ginsberg's recommendation for outpatient treatment to include psychiatric medications as well as individual and family therapy, Derrick's family took him to only two appointments with Dr. Ginsberg after his release. *See Exhibit L,* Ginsberg Letter.  Derrick was seen by Dr. Ginsberg's office on December 5, 1995 and February 27, 1996. *See Exhibit J*, Ginsberg Records.  His mother failed to take him to his scheduled visits on January 4, 1996 and January 22, 1996. *Id.*  In addition, his mother cancelled Derrick's appointment on March 25, 1996.  It was never rescheduled. *Id.*

From 1996 to 1998, Derrick, who was not being treated for his psychiatric problems, exhibited an utter inability to adapt to the varying demands imposed by the community.  He

exhibited extremely impaired functioning at school.  According to school records, Derrick was repeatedly disciplined for infractions such as, "excessive tardies, tardy abuse, unauthorized area, class disruption, disrespectful, not dressing in P.E." *See Exhibit M*, Klein Independent School District Records of Derrick Charles (hereinafter "Klein ISD Records"). Disciplinary reports also include references to "disobedience, serious persistent misbehaviors, and class disruption." *Id.*

In addition, Derrick became involved with the criminal justice system.  His first referral occurred on March 5, 1996. *See Exhibit N,* TYC Records..  From March of 1996 to October of 1998, Derrick had a total of nine separate referrals to juvenile authorities, some arising out of the same alleged transactions. He was placed on probation as well as boot camp. *Id.*

### 11. Derrick Charles' Mother Suffered From Severe Depression and Psychotic Behavior During Derrick's Childhood.

Derrick's mother herself struggled with severe depression and psychotic behavior during Derrick's childhood.

#### a. Nancy Phillips' Severe Mental Illness.

In 1992, when Derrick was ten years old, his mother was hospitalized following a suicide attempt by overdose. *See Exhibit B,* Houston Northwest Records.  According to her medical records, Nancy took an overdose of over the counter medications because she was experiencing other psychiatric symptoms. *Id.*  Nancy reported being fearful that her husband was poisoning her. *Id.*

On November 10, 1996, when Derrick was fourteen years old, Nancy was once again taken to the emergency room of Houston Northwest Medical Center. *Id.*  This time, Nancy was experiencing auditory, visual, and olfactory hallucinations; paranoia; and mood swings. *Id.* Nancy complained of being depressed, having a poor appetite and experiencing difficulty

sleeping. *Id.*   She informed the medical staff that she had not eaten in three weeks.[3] *Id.* Approximately one week prior to being hospitalized, Nancy had shut herself in her house and "would not get out at all."  According to medical records, Nancy "stated that she was afraid that some people were following her into the closet and that they were going to harm her." *Id.*  Nancy was also unable to perform household tasks. *Id.*  Leroy Phillips informed the hospital that Nancy had threatened to kill herself. *Id.*  Medical personnel noted that Nancy presented all the signs of depression.   According to Leroy, Nancy's symptoms had been worsening over a six-month period. *Id.*

Nancy related to psychiatric staff that "strange things were happening to her." *Id.* Nancy's hallucinations consisted of feeling "someone kept trying to get her in a closet to take a bath, go outside in the rain, smelled a strange odor, felt like someone kissing her, pulling her." *Id.* She also stated, "Something kept pulling me in the closet and bathroom, kissing me, put out shampoo for me to wash with.  Smelled strong odor and so went out in the rain.  Ran out of room as door opened after being closed, cable box fell off T.V." *Id.*  Nancy further reported that "[I]t happens at night that she smells alcohol from the man in her room, that she has not seen the 'man' but that the alcohol smell was close to her." *Id.*  Nancy also stated that "at home she felt like being sucked in the bathroom and someone kissing her." *Id.*  She further stated, "It is like somebody be pulling me against the wall."   While discussing her hallucinations, Nancy commented, "I don't know what is going on, can't figure it out." *Id.*

---

[3] Nancy fainted two days after she was admitted for psychiatric care.  It was the opinion of the physician at the hospital that the fainting episode was due to poor food and fluid intake.  Nancy reported a similar fainting incident one week earlier.

Following a preliminary evaluation in the emergency room, Nancy was admitted into the hospital for psychiatric treatment. *Id.* She remained hospitalized for one week. She received the following diagnosis at admission:

| | |
|---|---|
| Axis I: | Psychosis NOS. Rule out major depression with psychotic features |
| Axis II: | Deferred |
| Axis III: | No major illness |
| Axis IV: | Relationship, financial and occupational problems |
| Axis V: | GAF: 20/unkown |

Initially, Nancy was prescribed Activan for acute agitation and Trazadon for insomnia. *Id.*

During a psychiatric staffing on November 11, 1996, medical staff noted that Nancy's mood was "depressed," her affect was "flat," her behavior was "withdrawn," her thought process was "impaired," and her intellectual functioning "slow." *Id.* It was further noted that Nancy's insight was "poor" and that she was "low functioning." *Id.* At times, Nancy was observed to exhibit "childlike mannerism" and "giddy" behavior which was considered "inappropriate." *Id.* Medical staff considered her affect to be "inappropriate" as she laughed when discussing sad thoughts. *Id.* On November 12, 1996, Nancy's was prescribed Zoloft (antidepressant) and Risperdal, an antipsychotic. *Id.*

Nancy left the hospital on November 17, 1996, one day prior to her scheduled discharge date. *Id.* Her final diagnosis was Major Depressive Affective Disorder, Single Episode, Severe, with Psychotic Behavior and Unspecified Psychosis. *Id.* She was prescribed Risperdal, an antipsychotic medication, and Zoloft, an antidepressant, at discharge. *Id.*

Christine Bickham confirmed that Nancy was indeed exhibiting bizarre behavior prior to her 1996 hospitalization. She stated,

> I remember that before Nancy was hospitalized I was over at her house and she was acting very strange. We were watching T.V. and Nancy was walking around, she kept talking to herself, she kept saying that a singer on T.V. was her son. Nancy kept saying that her children were not her children. I remember Derrick and Chris saying that their mother had been acting strange. That same day I opened the refrigerator and Nancy rushed over to the refrigerator and Nancy said, "Don't go in there, close the door." I thought this was strange and I even told my husband that there was something wrong with Nancy. Nancy had never done this before. She was sober that day.

*See Exhibit NN, Christine Bickham Declaration.*

According to Medicaid records, Nancy received a diagnosis of Schizoaffective Disorder, Bipolar Disorder, and Depressive Disorder following her 1996 psychiatric hospitalization. *See Exhibit O*, Medicaid Records of Nancy Phillips. From the time that Derrick was fifteen years of age until his trial, his mother was under the psychiatric care of Red Oak Psychiatric Associates in Houston, Texas. *See Exhibit P*, Red Oak Psychiatric Associates Records of Nancy Phillips. The initial psychiatric assessment by Red Oak Psychiatric Associates was completed on June 16, 1998. *Id.* During the assessment it was noted that Nancy's speech was "somewhat slowed-quiet-responds in full sentences but doesn't offer much spontaneously," her thought process was "simple, but logical," her concentration was "mildly impaired-slowed," her intellectual functioning appears "below average." During the five years preceding Derrick's trial, his mother was prescribed at least three psychiatric medications: Risperdal, an antipsychotic, as well as Zoloft and Trazodone, antidepressants. *Id.*

At times, Nancy was not compliant with her psychiatric treatment. For example, on March 18, 1999, Nancy was seen by Dr. Skiba of Red Oak Psychiatric Associates. *Id.* Nancy had

been out of medication for one month and had "started getting sick." *Id.*  Nancy had failed to make a follow up appointment because she had misplaced Dr. Skiba's telephone number. *Id.* The following notation was made in the record, "apparently the family is not supportive" *Id.*

A 2004 psychological evaluation of Nancy corroborates her long-standing and severe mental illness. *See Exhibit Q*, Confidential Psychological Evaluation Clinical Interview & Mental Status of Nancy Phillips.  Nancy reported experiencing tactile as well as auditory hallucinations. During her evaluation, Ms. Phillips reported that she experiences a human figure touching her in her closet on a daily basis.  She informed the evaluator that she feels the figure touching her and trying to kiss her. The evaluator further noted, "She also has paranoid thought processes and believes strangers watch her and occasionally follow her home.  She isolates herself from others and feels uneasy and nervous around crowds.  She also reported depression for many years which she attributes to her mental illness and interpersonal difficulties with her family.  She is easily frustrated and frequently isolates herself in her room." *Id.*  With regard to her activities of daily living, the following was noted, "She does not shop independently but usually accompanies her husband to the grocery store.  However, she often stays in the car due to her paranoia and fear of crowds.  She does not have a driver's license . . . . She spends a typical day watching [sic] television, doing household chores, and talking on the telephone with her sister-in-law." *Id.*  In addition, Nancy reported that she has no friends. *Id.* Intelligence was estimated to be Borderline to Low Average. *Id.*  The evaluator's diagnostic impressions were "Schizophrenia, Paranoid Type, under medical control, Provisional, pending receipt of records documenting impairment." *Id.*

Nancy's mental illness was so severe that the Social Security Administration deemed her disabled for approximately five years preceding Derrick's trial.  *See Exhibit N,* TYC Records.

b.      A Family History of Mental Illness.

Derrick's mother is not the only maternal relative with a psychiatric history. There is, in fact, a familial history of mental illness, cognitive deficits, seizure disorder, and substance abuse. On February 21, 1995, the following history was noted by Dr. Lawrence Ginsberg: "Depression-Mom; Bipolar-Cousin; Alcoholism-Mom; Mental Retardation-Aunt, Uncle . . . Seizures-Aunt, Cousin." Derrick's psychiatric records contained the following notations regarding his maternal grandmother: "Period of intense depression, suicide attempt, intense mood swings." *See Exhibit J*, Ginsberg Records.  It was also noted that Derrick's maternal grandfather suffered from alcoholism, and that maternal cousins had been diagnosed with attention deficit disorder or hyperactivity. *Id.*

Prior to trial, Dorothy Charles, Derrick's maternal grandmother, informed the defense investigator that she had a son and a daughter who were born premature. She went on to state that her son who was born premature was "handicapped" and could not do "nothing for himself." *See Exhibit D,* Patillo Interviews.

Christine Bickham, a maternal aunt, acknowledged that she has suffered from auditory and visual hallucinations as well as severe depression. *See Exhibit NN, Christine Bickham Declaration*.  Records pertaining to Christine corroborate her reported history of mental illness. According to records from Cypress Creek Hospital, Ms. Bickham "has been receiving care for her psychotic disorder since her late twenties." *See Exhibit RR,* Cypress Creek Hospital Records of Christine Bickham.  Records further reveal that in 1996, seven years *prior* to Derrick's trial, Ms. Bickham was diagnosed with Major Depressive Disorder with Psychotic Features. *See Exhibit SS,* Dr. Eileen K. Starbranch records of Christine Bickham. Also noteworthy is the fact

that Christine's father, who was Nancy Phillips' nephew, died of alcoholism at the age of 38. *See* Cypress Creek Hospital Records of Christine Bickham.

Lawrence Charles, Christine's son, also has a significant history of mental illness. Psychiatric records pertaining to him reveal that in 2001, two years *prior* to Derrick's trial for the underlying offense, Lawrence was diagnosed with Mood Disorder Due to Diffuse Cognitive Impairment, with Cyclical and Psychotic Features as well as Mild Mental Retardation.  *See Exhibit TT,* Red Oak Psychiatric Associates Records of Lawrence Charles.

In addition, San Jacinto County District Clerk files pertaining to Joyce Faye Charles, Derrick's maternal aunt, reveal that Joyce has also experienced mental health problems.  In 1990, Joyce was charged with burglary of a habitation. *State of Texas v. Joyce Faye Charles*, Cause No. 6792, 258th District Court, San Jacinto County, Texas.  She was found incompetent to stand trial. *See Exhibit K,* San Jacinto County Clerk Files finding Joyce Faye Charles incompetent to stand trial.  The court dismissed charges on a motion by the State.  *Id.*

With regard to the familial history of substance abuse, Lincoln acknowledged that he has struggled with alcoholism in the past.  *See Exhibit OO, Lincoln Charles Declaration*.  He also described his own father (Derrick's maternal grandfather) as a severe alcoholic.  *Id.*

### 12.    Derrick Charles Has Had Long-Standing and Severe Cognitive Impairments.

In addition to constant struggles with mental illness, Derrick Charles has had extensive severe cognitive impairments.  Documentation of Derrick's substandard intellectual functioning dates back to 1993, when Derrick was in third grade.  During Derrick's 1993 hospitalization at Gulf Pines Hospital, he was administered the Wechsler Intelligence Scale for Children-Revised (WISC-R), a general test of intelligence for children. *See Exhibit A,* Gulf Pines Records.  Derrick

obtained a Full Scale IQ of 77, falling well below the average of normal average intelligence.[4]

*Id.*

Approximately two-and-a-half years later, on September 23, 1995, Derrick was administered the Wechsler Intelligence Scale for Children-Third Ed. (WISC III).  *Id.*  This time, Derrick obtained a Full Scale IQ of 69. *Id.*  Dr. Larrow, the psychologist who completed the evaluation, noted that Derrick tested in the "intellectually deficient" range of intelligence. *Id.* She noted that even in the absence of psychological problems, Derrick's optimal functioning would be in the "borderline range." *Id.*  She made the following observations regarding Derrick's intellectual functioning:

> Derrick was below average on most tasks . . . . His word knowledge and general knowledge are especially poor. . . . He was also below average on tasks that tap freedom from distractibility.  His social knowledge is also poor, although contrary to expectations, there were no signs of antisocial behavior in his responses.  Most of the time, Derrick still tends to think concretely and his knowledge of the world is limited.
>
> He exhibited extreme problems with integrating visual-motor knowledge.  He also had problems analyzing a design into component parts and reproducing it; he showed rotations and poor gestalt. . . . On the Bender, his made 6 errors, all of which are significant of brain injury.  He rotated figures, distorted what he saw, and lost the gestalt of figures.  **These errors correspond to an age equivalent of about 6 years.**[5]  Derrick also wrote his name upside down and said he could not write it the right way.  His human figures were similarly quite primitive for his age.
>
> *Id.*

Dr. Larrow concluded, "Taken together, this profile of ***his results suggest the strong possibility that he has some organic damage that is contributing to his behavioral problems***. At the very least, he has a severe learning disability." *Id*. (emphasis added).

---

[4] By definition, an IQ score of 100 is average.

[5] Derrick was we *twelve* at the time.

Derrick exhibited long term and significant limitations in academic functioning. Derrick's protracted substandard performance in school was consistent with his cognitive impairments.  He failed first grade. *Id.*  As a third grade student, Derrick was placed in special education. *Id.*  Despite the fact that he was receiving special education services, his grades were below average. *Id.*  Approximately six months into third grade, Derrick was administered an educational assessment. *Id.*  He scored below average on all subjects.  In Letter-Word Identification, Derrick was functioning at the first grade level; in Passage Comprehension, Derrick was functioning at the first grade level; in Calculation, Derrick was functioning at the second grade level; in Math Reasoning, Derrick was functioning at the second grade level; in Written Language, Derrick was functioning at the second grade level; in Written Language, Derrick was functioning at the second grade level; in Broad Reading, Derrick was functioning at the first grade level; and in Broad Math, Derrick was functioning at the second grade level. *Id.* The evaluator noted that Derrick required special assistance in academic settings. *Id.*

As a sixth grade student, Derrick failed to meet the minimum requirements for "Math Mastery" as well as "Reading Mastery" on the TAAS test. *Id.*

Derrick was still in special education in seventh grade. During the first semester of the 1995/1996 school year, his grades were consistently substandard.  He obtained the following grades: Science: 50; Reading: 80; Math: 50; Texas History: 70; English: 70; and Pre-Voc: 50. *Id.* On October 2, 1995, a Gulf Pines Hospital teacher noted that Derrick was functioning "well below grade level." *Id.*

During the 1997/1998 school year, Derrick was attending Alief Learning Center as an eighth grade student. He obtained 70's in all academic subjects (English Language Arts, Earth Science, and U.S. History & Citiz.).  *See Exhibit M, Klein ISD Records.*

-37-

Derrick was enrolled in ninth grade at Klein Forest High School from August 25, 1998, to October 8, 1998.  During the first grading period, he obtained the following grades:  English I: 21; Public Speaking: 60; U.S. History: 6; Algebra I: 43; Int. Psy/Chem: 50; Physical Education: 64.  His grades at withdrawal were as follows: Physical Education: 0; Public Speaking I: 0; Algebra I: 40; English I: 0; U.S. History: 0; and Introductory Physics/Chemistry: 0. *Id.*

On November 19, 1998 , during his stay at the Texas Youth Commission, Derrick underwent Academic Achievement Testing.  Derrick, who was ***sixteen years old and*** in ***eighth grade*** at the time, tested at the ***second grade level*** in Reading; at the ***third grade level*** in Math Computation; at the the ***second grade level*** in Applied Math; at the the ***third grade level*** in Total Math; at the ***second grade level*** in Language;  and at the ***fifth grade level*** in Spelling.  *See Exhibit N,* TYC Records.  Derrick was diagnosed with Reading Disorder, Mathematics Disorder, and Disorder ofWritten Expressionby state authorities. *Id.*  He dropped out of school in 10th grade.

### 13.    Derrick Charles Exhibited Symptoms of Mental Illness During His Placement at TYC.

In 1998, Derrick's inability to conform his behavior to social norms culminated in removal to a Texas Youth Commission (TYC) facility. *See Exhibit N,* TYC Records. According to TYC records, Derrick Charles was "trespassing on school grounds while suspended from his home school. *Id.*  He allegedly took "items from teachers' purses which did not belong to him." *Id.*  Harris County Juvenile Court found that Derrick engaged in delinquent conduct for the offenses of Burglary and Theft and committed him to TYC. *Id.* On October 30, 1998, Derrick was placed at the Marlin Orientation and Assessment Unit of TYC. *Id.*

On November 13, 1998, Derrick underwent a "Psychological Update."  At the time of Derrick's psychological evaluation, he exhibited symptoms that were strikingly similar to those his mother had exhibited two years earlier when she was hospitalized in a psychiatric facility. According to the report of Derrick's psychological evaluation:

> [Derrick] was observed to appear extremely guarded and suspicious during the assessment, of which was noted during his previous evaluation.  Derrick was also noted to exhibit some speech deficits, as articulation was, at times, inaudible.  He was asked to repeat his statements often throughout the assessment for examiner verification of his remarks . . . . Derrick was minimally verbally responsive, which seemed to suggest a degree of suspiciousness, and noted and what appeared to be fearfulness . . . ***Derrick reported that he often experiences auditory and tactile hallucinations.  Derrick seemed cautions in relating this information and reported that he has not informed anyone else of his "voices."  He stated that he is unable to distinguish what the voices are saying to him, but that other people talking to him appear to be in the distance and mumbled***.  He further stated that the last time he heard voices was two days ago.  He claimed that he has experienced these hallucinations for the past year.  ***Derrick stated that the tactile hallucinations involve him feeling as if someone is touching him all over his body at different times. He stated that experiencing the hallucinations had angered him, as well as causing fear***.  He further indicated that he has been experiencing sleep problems, as he reported the voices have been waking him up at different times during the night.  It was interesting to note that Derrick was observed several times throughout the assessment to pull and slightly tug at his right ear and he did not appear conscious of this behavior.  It was noted in previous evaluation that Derrick's mother has been diagnosed with Schizophrenia and manages her symptoms by taking medication . . . . ***He does not meet the diagnostic criteria at this time for thought disorders or personality disorders, but this may change, as there is a possibility further symptoms could emerge and become more defined***.

*Id.*

On December 4, 1998, Derrick was placed in Jefferson County State School, now Al Price State School.  *Id.*  Derrick remained in the care of the State for approximately two years. Although Derrick reported experiencing auditory and visual hallucinations and the State knew that Derrick's mother had been diagnosed with schizophrenia, the State inexplicably failed to

obtain Derrick's prior psychiatric history.  Furthermore, juvenile authorities did not provide any psychiatric services to Derrick.

Derrick exhibited severely impaired functioning during his two-year placement at Jefferson County State School.  Indeed, the State would rely on Derrick's TYC behaviors which were similarly remarkable to those behaviors previously requiring two psychiatric hospitalizations, to argue at Derrick's trial that Mr. Charles should die.  *See infra generally pages 64-65*.

On October 4, 2000, approximately two months before his release from TYC, Derrick asked Simona McCowan, his caseworker, for a referral "to psychology so that he could take medication again."  *Id.*  On the same day, Derrick's mother informed Ms. McCowan that Derrick had been placed on medication at a very young age for hyperactivity and that the medication seemed to help. *Id.*  She further explained that Derrick's behavior seemed to worsen when his medication was discontinued.  *Id.*  He was not seen by the psychology department until November 6, 2000.  "[Derrick] was referred to psychology to be considered for psychotropic medication for hyperactivity. *Id.* This request was initially made by his mother to smooth the transition from TYC back into the community." *Id.* Relying on the opinion of Ms. McCowan, who had no mental health expertise, and whose supervisors had noted concerns that she was too argumentative with youth, the psychology department determined that Derrick was not in need of psychiatric medication.  *See Exhibit N,* TYC Records; *See Exhibit S*, Texas Youth Commission Employee Data Sheet of Simona McCowan; *See Exhibit T,* Texas Youth Commission Summary Appraisal Forms of Simona McCowan.  Ms. McCowan, who testified for the State at Derrick's trial, opined that "[Derrick's] hyperactivity was not interfering with his ability to progress through the phase system." *See Exhibit N,* TYC Records.  For purposes of determining whether

Derrick was in need of psychiatric medication, Ms. McCowan stated, "He doesn't give me any problems in group and for the most part does okay." *Id.* For purposes of determining whether Derrick should be executed, Ms. McCowan testified extensively as to the behavioral difficulties that Mr. Charles was experiencing during his placement at TYC. *See infra page 64.*

Derrick received little to no family support during his placement in TYC. During the two years that Derrick was placed out of his home, his family visited only once. *See Exhibit N,* TYC Records. Like the psychiatric staff that had previously treated Derrick, juvenile justice authorities recognized that Nancy, as well as her husband, were ill-equipped to properly handle Derrick's behavioral symptoms. State officials made the following observations the day Derrick was admitted to TYC: "The home is marked by a parent and step-parent who lack effective communication and discipline with Derrick, resulting in he having no set rules or sanctions to follow and therefore leading to misconduct." *Id.* Derrick was released to the same family that had previously failed to adequately meet his needs. Derrick was released on juvenile parole to the care of Mr. and Mrs. Phillips. *Id.*

Following his release from TYC on December 5, 2000, Derrick continued to exhibit impairments in judgment, behavior, and ability to cope with the various demands of life. Almost immediately after his discharge from the Jefferson State School, Derrick failed to comply with the conditions of release. *Id.* In addition, he exhibited an inability to function at school. *See Exhibit U*, High Point North School Records of Derrick Charles.

On March 7, 2001, Derrick was arrested for burglary. *See Exhibit V*, TDCJ Classification Records of Derrick Charles. Two days later, on March 9, 2001, Derrick pled guilty to burglary of a habitation with intent to commit theft. *Id.* He was sentenced to serve three years in TDCJ. *Id.* During a diagnostic screening interview, Derrick informed TDCJ officials that he had suffered

from seizures as a young child and that he had been prescribed Ritalin at the age of 12 or 13. *See Exhibit X,* UTMB Managed Care/TDCJ Records of Derrick Charles.   In addition, he reported that he had been a patient in a mental institution for behavioral problems in 1995 or 1996.  *Id.* He provided the name of Gulf Pines Hospital to the interviewer. *Id.*  Noted on TDCJ's "Master Problem List" was Derrick's history of depression. *Id.*  No mental health services were provided to Derrick during his incarceration.

Derrick Charles was paroled from TDCJ on December 6, 2001. *Id.*  Approximately seven months later, on July 7, 2002, he was arrested for the offense for which he was sentenced to death.

**B.     THE OFFENSE**

The murders of Myeisha Bennett, Brenda Bennett, and Obie Bennett on July 2, 2002 were horrific and tragic.

It is undisputed Derrick Charles confessed to the triple homicide, but neither he nor anyone else could explain why it happened. It is similarly undisputed that Derrick's counsel made no effort to provide an explanation of, or context for, this crime.  Most importantly, the story told *supra* was never told to the jury.

Derrick Charles described the events of that day in his written statement (RR.XXIV-State's Exhibit 2).  Derrick, only 19 years old at the time, arrived at around 9:00 AM on July 2, 2002 at Myeisha's home in Houston. *Id.*  Derrick spent most of the day with Myeisha in the bedroom of her house, where they had sex and then "just chilled out," watching television and "surfing" the internet. *Id.*  At some point during the day, Obie Bennett, Myeisha's 78 year old grandfather whom "was there all this time," departed to the grocery store. *Id.* When Obie returned, Derrick and Myeisha went to her bathroom where she took a shower while Derrick sat

and talked to her. *Id.* After the shower, they returned to Myeisha's bedroom where they had sex once more. *Id.*

At around 4:30 PM, Myeisha's mother, 46 year old Brenda Bennett, arrived to take her daughter to perform mandatory community service (RR.XVI-65-66). Brenda never entered the house but merely honked her horn for Myeisha to come out. By this time, Obie Bennett had retreated to the garage behind the house to perform some woodworking. (RR.XXIV-State's Exhibit 2). Derrick remained in Myeisha's bedroom watching television after she left. *Id.* After Myeisha left, Derrick smoked a "swisher" cigar filled with marijuana. Derrick purchased this cigar prior to going to Myeisha's house that morning. Derrick went to a nearby apartment complex and purchased the cigar from a person he had never seen before. "I saw a guy standing outside who asked me if I wanted to buy a "sherm,"[6] which I thought was a swisher. I had never seen this guy before, but the price was good so I bought the swisher." *See Exhibit II,* Unsworn Declaration of Derrick Dewayne Charles (hereinafter "Derrick Charles Declaration"). Derrick was unaware of any substance in the cigar other than marijuana. However, he began to have a reaction unlike anything he had ever experienced, "As I was about to leave her house, I started to feel it kicking in. But this wasn't like anything I had ever smoked before. I felt a rush of a rush of energy and felt like I just had to get it out." *Id.*

Shortly thereafter, Derrick heard the garage door closing and walked to the bedroom door. Obie Bennett had just returned into the house and walked towards the bathroom across from Myeisha's bedroom. (RR.XXIV-State's Exhibit 2). Obie was surprised to see Derrick still in the

---

[6]     In Houston, a "sherm" is the street jargon for a Swisher Sweet small cigar that has had the tobacco removed and replaced with cannabis. It is then soaked in a solution of a volatile solvent in which phencyclidine ("PCP") has been dissolved. It is then allowed to dry. Later, it is smoked, vaporizing the cannabinoid components of the marijuana ($\triangle$ -9 tetrahydrocannabinol, and others) and the PCP, which is then inhaled into the lungs and absorbed directly into the bloodstream. *See Exhibit R,* Affidavit of Dr. Terry Rustin at 4.

house but "wasn't upset." *Id.*  He asked Derrick what he was doing but Derrick didn't respond. Obie "turned as though he was leading to the front door." *Id.*  As Obie attempted to open the door, Derrick pushed it closed and locked it. *Id.*

At this point, for reasons that were never explained by anything presented by either side at trial, Derrick and Mr. Bennett got into a physical altercation.  "I just exploded and began beating up on him." *See Exhibit II,* Derrick Charles Declaration.  They began to wrestle into the living room.  "He was hitting me back but I couldn't feel a thing.  I was like Superman.  I felt unstoppable.  I have never felt energy like that before.  I have used drugs that gave me energy, but these made me want to hurt someone." *Id.*  Derrick assaulted him with a lamp, his fists, and trophies that were on a nearby table. (RR.XXIV-State's Exhibit 2).  Once he stopped responding, Derrick detached the cord from the lamp and wrapped it around his neck "several times until he stopped breathing." *Id.*  He then pulled Mr. Bennett's body in to the kitchen and laid newspaper over the blood that had accumulated in the living room from the struggle. *Id.*

Derrick could not understand or explain why he had killed Mr. Bennett.  After pulling Mr. Bennett's body into the kitchen, Derrick sat on the couch in the living room.  He began to feel remorse and fear because of his actions:

> "I was scared because I don't know what just came over me.  I started to feel bad because of what I had just done.  I just sat there because I had never done something this serious in all my life."

Derrick periodically returned to the kitchen to see Mr. Bennett's body:

> "I stood over him and said, "Lord, forgive me." I even said that I was "sorry."  Then, I would return to the sofa and sit there.  I sat there and returned to her grandfather's body was scared because I don't know what just came over me. I started to feel bad because of what I had just done.  I just sat there because I had never done something this serious in all my life."

*Id.*

At about 11:00 PM, Myeisha and Brenda Bennett returned home.  When they entered the house, Derrick locked the door behind them, ordered both of them to crawl along the hallway floor to the living room and then on to the bathroom where they were to lie down. *Id.*  Derrick retrieved duct tape which he used to bind both of the women's hands behind their backs. *Id.*  Derrick cut a sock in half and stuffed each woman's mouth and taped the mouth shut.  *Id.*

Derrick then moved Myeisha Bennett into her bedroom. *Id.*  Derrick strangled her with a power cord that he cut from her stereo.  Derrick then hit her in the face repeatedly with a car stereo speaker.  Derrick explains in his written statement that he did not want to do this, "I told her that I still loved her and that I didn't mean for this to happen like this." *Id.*  He then dropped a television set on her head multiple times. *Id.*

Derrick walked into the bathroom next to Obie Bennett's room, and filled the bathtub halfway. *Id.*  He pushed Brenda Bennett into bathroom and into the bathtub.  Derrick retrieved the television set which he had dropped on Myeisha's head just minutes earlier and attempted to electrocute her to death by plugging it in and throwing it in the bathtub. *Id.*  Throughout all of this, Brenda "kept asking why I was doing this.  I told her that I couldn't really tell her. *Id.* Because I really didn't know why I was doing this." *Id.*  When the electrocution attempt failed, Derrick tied an extension cord in a slipknot around her neck "so when I pulled on it, it would tighten" and pulled Brenda from the bathtub into the hallway with the extension cord. *Id.*

Even as he repeated to Brenda that he "loved her daughter a lot," Derrick penetrated her vaginally and anally with a wooden handle that he had removed from a plunger. *Id.*  Derrick then retrieved Brenda Bennett's keys and exited the home without confirming if she had stopped

breathing. *Id.* An autopsy introduced at trial concluded that her death was caused by "strangulation with blunt impact trauma." (RR.XXV-State's exhibit 104).

## C.     TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION.

The defense of Derrick Charles was pitiful, disjointed, and substandard. It was not the comprehensive team approach mandated by the applicable constitutional and professional standards of care. While ***the State presented 35 witnesses and 148 exhibits over five days of testimony*** from a clearly extensive investigation, lead counsel Connie Williams and second chair James Sid Crowley, after conducting a scant pretrial investigation into a narrow and limited number of sources – from whom they failed to elicit any of the compelling mitigation available, presented a case largely thrown together at the last minute consisting of ***a mere four witnesses at trial in a presentation that lasted less than two hours***. All of the testimony was about future dangerousness, the defense presented no mitigating evidence whatsoever. Of the four witnesses, one (Dr. Quijano) was briefed about the case for the first time on the morning he testified, and a second (Mr. Allen) was contacted for the first time the day before he testified. Because they failed to conduct an adequate mitigation investigation, the defense was unprepared to present evidence or argument relevant to the most important question before Derrick Charles' jury: the mitigation special issue.[7]

---

[7] Pursuant to TEX. CODE. CRIM. PROC. art. 37.071 (Vernon's 2003), Mr. Charles' fate hinged on the jury's answer to two questions or special issues, the "future dangerousness" special issue and the mitigation special issue:

    (1)      whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and,

    (2)      whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*Id.* at art. 37.071 § 2. A "yes" answer to the first question and a "no" answer to the second question results in the

1.       **Lead Counsel Connie Williams Failed to Perform a Mitigation Investigation.**

Lead counsel Connie Williams was appointed to represent Derrick Charles on July 10, 2002.  According to Williams, an investigation into Derrick's case began within two weeks of his appointment.  The investigation Williams conducted consisted of him talking with the defendant "numerous times about the instant offense, potential witnesses for guilt/innocence and punishment, and the pending trial." *See Exhibit Y*, Connie Williams Affidavit on 11/17/06.  In addition to talking to his client, Williams spoke with a few members of Derrick's family to gather information for the guilt/innocence phase and evidence that Derrick was a good guy to present as mitigating evidence.  *Id.*, *See* State Habeas Hearing at 62.       Other than this meager effort, the sole additional task related to mitigation performed by Mr. Williams was to seek the appointment of Dr. Jerome Brown.   However, as described *infra*, Mr. Williams significantly undermined his own expert by failing to provide Dr. Brown with the necessary raw materials for a competent evaluation.

As a result of his negligible investigative efforts, Mr. Williams conducted Derrick's trial in complete ignorance of his client's compelling social history.  At the time of trial, Mr. Williams believed that Derrick's "mother and father . . . were very caring, cared for him."  *See* State Habeas Hearing at 75.  He believed that Derrick's family "weren't wealthy people, but they seemed to be getting along."  *Id.* at 91.  He believed that Derrick's stepfather, Leroy Phillips, had a "regular job" and "he took care of [Derrick] well."  *Id.* at 92.  It was Mr. Williams' understanding that Derrick's family had been "supportive" of him.  *Id.* at 76.  Reliable social

---

imposition of the death penalty.  Thus, if the client is convicted, capital defense counsel have two opportunities to make a case for life.  Mr. Charles' defense counsel, because they failed to adequately investigate the case, unreasonably squandered one of them.

history records readily available at the time of Derrick's trial confirm that Mr. Williams could not have been more misinformed about his client's background. *See supra.*

This "defense" was no defense at all, and violated Derrick Charles' Constitutional rights. The failure to present Derrick's life history as detailed above was not a matter of strategy, it was product of trial counsel's ignorance.

### 2.    Patillo Investigation Company Failed to Perform the Work Necessary to Compile a Social History of Derrick Charles.

Connie Williams employed the services of private investigator Joe Patillo to interview witnesses and obtain records.  A review of Patillo's voucher and the transcripts of the interviews conducted by his employees reveals that they focused almost exclusively on just two areas of interest: (1) guilt/innocence issues, including Derrick's arrest; and, (2) finding people who would say "good" things about Mr. Charles.  The transcripts of the few interviews conducted by Patillo and his associate, Tina Jackson, also confirm that they lacked skills necessary for mitigation investigation.  This is to be expected because Joe Patillo and his employees, as trial counsel well knew, were not mitigation specialists.[8]

---

[8] As Mr. Williams testified in the state habeas corpus hearing:

> Q:          Now, Mr. Patillo is not a mitigation specialist, is he?
>
> Mr. Williams:    No, sir.

State Habeas Hearing at 32.  Mr. Williams also acknowledged being aware that a mitigation specialist possesses a "level of expertise *greater than* "what an investigator may have to see if there are some mitigation issues."  *Id*. at 34.  Counsel's appreciation that Patillo was not a mitigation specialist, *and not functioning as one*, is also evident from the fact that on February 26, 2003, trial counsel informed the trial court that he had yet to hire a mitigation specialist.  Mr. Patillo began his work on the case in July of 2002.

In fact, Mr. Patillo's application for a investigator's license does not reflect any mental health or social work training.  *See Exhibit MM,* Private Investigator licensing application for Joe Patillo.  Prior to becoming an investigator, Patillo was an airport policeman and a security guard in a dry cleaning establishment.  *Id.*

For example, when interviewing Derrick's mother, the investigator asked *just one* question related to mitigation, and never even explained that issues such as mental illness or placement in special education would be mitigating and thus very important to Derrick's defense. *See* Exhibit D, Patillo Interviews.  Not surprisingly, despite the fact that Derrick's mother could have imparted a lot of valuable information, all the investigator managed to learn is Derrick's mother thought he was "sweet" and that Derrick was having trouble sleeping in the jail.  The work of Patillo Investigation Company was below any reasonable standard of care for mitigation specialists and could not reasonably considered a substitute for a mitigation investigation.

On July 28, 2002, Tina Jackson, on behalf of Patillo Investigation Company, began the investigation with an interview of Derrick in the Harris County Jail. *Id.* The bulk of the interview focused exclusively on the facts surrounding his arrest and the offense.  Jackson inquired as to whether he had ever been diagnosed with a mental illness. *Id.*  Derrick replied that he had and directed Jackson to his family members for more information. *Id.*  Jackson elicited the names of a number of family members but, as seen below, her interviews of those people were similarly focused on the facts of the crime and the events surrounding Derrick's arrest. *Id.*   In passing, as the interview was wrapping up, she asked for the names of Derrick's former schools and any places that he may have worked. *Id.*  Ms. Jackson's interview was superficial and hasty.

On August 5, 2002, Ms. Jackson conducted separate interviews with Nancy and Leroy Phillips. *Id.*  The interview with Nancy Phillips focused on the relationship between Derrick and Myeisha Bennett and the events on the day of his arrest. *Id.*   At the close of the interview, Ms. Jackson asked the client's mother her one and only mitigation-related question: "if there was one thing you could tell the courts about your son to get him a lesser sentence or to exonerate him

altogether, what would that be?" Nancy Phillips replied that Derrick was a "very sweet person" and that he was experiencing sleeping problems while in the Harris County Jail. *Id.*

The interview with Leroy Phillips was another instance very early in the case in which the defense team was notified of Derrick's prior hospitalizations. *Id.* When asked whether Derrick was mentally ill, Leroy informed Ms. Jackson that Derrick was treated in Gulf Pines Hospital by Dr. Lawrence Ginsberg. *Id.* Leroy stated that Dr. Ginsberg's diagnosis was that Derrick was "just acting out and he was coming into the adolescence stage," but any competent mitigation specialist would have pursued these records – especially in light of Leroy's statement that "mental illness runs in [Derrick's] mother's side of the family." *Id.* The remainder of the interview addressed prior incidents with law enforcement and accusations of Derrick causing the Nancy and Leroy to be evicted because Derrick was breaking into their neighbor's home. *Id.* Oddly and significantly, all references to Derrick's mental illness were omitted from the summaries in the statement of charges given to Connie Williams. *See Exhibit E*, Statement of Charges of Patillo Investigation Company (hereinafter "Patillo Charges").

On August 6, 2002, Tina Jackson conducted interviews with uncle Lincoln Charles, brother Christopher Charles, and a phone interview with cousin Lawrence Charles. *See* Exhibit D, Patillo Interviews. The interview with Lincoln Charles dealt solely with the events of Derrick's arrest and events surrounding an altercation between Derrick, Christopher, and Lincoln in which Lincoln accused them of stealing his pager and a scuffle ensued. *Id.* The interview with Christopher Charles, again, focused on the events surrounding Derrick's arrest. *Id.* Jackson also inquired into Derrick's relationship with Myeisha and whether or not there was any restraining order on Derrick to which Christopher was unaware. *Id.* Jackson concluded the day with a brief phone interview with Lawrence Charles in which he revealed that Derrick and Lawrence met

Myeisha Bennett in an internet chat room. *Id.*  Nothing that could be construed as mitigating or character evidence was pursued or elicited in any of these three interviews. *Id.*

The final interview conducted by Patillo Investigation Company was a phone interview with grandmother Dorothy Charles on August 10, 2002. *Id.*  This interview revealed further information about the mental illness in the Charles family. *Id.*  Dorothy said that one of her children, Derrick's uncle, was so mentally handicapped that "he can't do nothing for himself." *Id*.  He was born two months prematurely.  Dorothy had another child, one of Derrick's aunts, who was born three months prematurely and is also mentally impaired.  *Id.*  **Dorothy believed that Derrick too suffered from mental illness**. *Id.*  Additionally, Dorothy informed the investigator that she "kept him about two or three days" when he was growing up. *Id.*  She was unaware of the details of his family as he grew up.  *Id*.

In addition to the six interviews conducted between July 28, 2002 and August 10, 2002, Patillo also reported the following actions on unidentified dates in his summaries in his statement of charges:

1. Spoke with Nancy and an aunt at the aunt's home about the incident and informing them that Derrick needed them present during his trial.

2. Spoke with three of Derrick's former teachers "and they acted like they really didn't want to talk."   The investigator found that Derrick was problematic in school and the teachers felt that they could only recount things that would hurt him.

3. Spoke with his aunt and nephew, whom informed the investigator of Derrick's temper.  But, based on his upbringing "to them, he wouldn't have done this."

4. Returned to an unidentified school campus "and hung around with hopes of getting some kids that would say good things about Derrick."   The investigator spoke with at least ten different students "and they all said that he was a person that demanded his

own."  They were not surprised that he may have committed the offense.  "There was no good statements among them."

5.      The investigator attempted to contact relatives of the Bennett family whom refused to talk.

6.      The investigator then returned to the office to "type the documents up." This action was billed for eight hours.

*See Exhibit E*, Patillo Charges.

In total, Patillo Investigation Company logged a paltry 48 hours of work, which including eight hours of report writing and driving 355 miles. *Id.*  Apparently, even though Leroy Phillips supplied the investigators with the name of Derrick's treating physician, it never occurred to them during their alleged search for the Gulf Pines records to simply call Dr. Ginsberg and inquire after the documents.  Despite the investigators' failure to take this very elementary investigative step, Mr. Williams swore that Joe Patillo "convinced me that if [the Gulf Pines records] did exist, they were not to be found."[9] *See Exhibit Y*, Affidavit of Connie Williams

---

[9] As recounted by the mitigation specialist retained by state habeas, the records were easily found:

Derrick's records from Gulf Pines Hospital were obtained in the following manner:

We had the name of Derrick Charles' psychiatrist, Dr. Ginsberg, from Derrick's mother, and ***from the interview that trial counsel's investigator did with Derrick's stepfather***.  I obtained Dr. Ginsberg's notes from his office, which is in Houston.  Dr. Ginsberg's notes referenced Gulf Pines Hospital, and indicated that Derrick had been hospitalized there when he was 10 years old and again when he was 13.  Of course, Derrick's mother and father both told me about Derrick's hospitalization at Gulf Pines.

Gulf Pines Hospital had closed.  I called Dr. Ginsberg's office to determine how to get the records from the hospital.  His office referred me to the Brown School in Austin.  They ordered the records, which were delivered to [state habeas counsel's] office.

There was no difficulty at all in obtaining these records.  They were readily available.

*See Exhibit W*, Affidavit of Bette Burke.

-52-

9/22/04.  Neither Connie Williams, nor anyone at Patillo Investigation Company, ever attempted to contact Dr. Ginsberg regarding Derrick.[10]

### 3.  Sid Crowley Failed to Perform Any Work Related to the Mitigation Special Issue.

The second chair lawyer, Sid Crowley, did virtually nothing to prepare the punishment phase of Derrick's trial.  In his voucher to the court, Mr. Crowley averred that he spent 143

---

[10] During the state habeas corpus hearing, Mr. Williams' initial, off-the-wall justification for his failure to call Dr. Ginsberg in order to find the Gulf Pines records was *because* he could not find the Gulf Pines records:

| Q: | Now did you call Dr. Ginsberg? |
|---|---|
| Williams: | No, sir. |
| Q: | Why not? |
| Williams: | *Because the records hadn't been found* and the report that the parents had given me about the case . . . . |

State Habeas Hearing at 28.  However, as Mr. Williams subsequently conceded, he knew that Dr. Ginsberg was a psychiatrist or psychologist who had examined Derrick when he was taken to the hospital, *id.*, and there was no "trial strategy involved" in not calling Dr. Ginsberg.  *Id.* at 29.

After conceding that there was no strategy involved in his failure to call Dr. Ginsberg, Mr. Williams gamely proffered another *post hoc* justification for his failure to call Dr. Ginsberg.  Mr. Williams testified that he did not call Dr. Ginsberg because Derrick's parents told him prior to trial that Derrick had been in the hospital for just a brief two-day visit because he was acting out and not because of any mental illness.  *Id.* at 29-31.

This assertion appears for the first time in an affidavit drafted by the State for Mr. Williams on the eve of the November 20, 2006, state habeas corpus hearing.  State Habeas Hearing at Exhibit 8 (November 17, 2006, Affidavit of Connie Williams).  This was Mr. Williams' third affidavit in the case, and the second that he signed for the State.

Apparently, the State's post-conviction counsel had not consulted the trial record before helping Mr. Williams with his 2006 pre-hearing affidavit.  On the first day of trial, after Derrick pled guilty, the trial court inquired whether Mr. Charles had ever been "in a mental hospital or suffered from mental illness."  16 RR 14.  Mr. Williams informed the court: "Well, he was in a hospital *being treated for depression*, Your Honor, for *15 days at one time*."  *Id.* (emphasis added).  Thus, at the time of trial, Mr. Williams clearly knew that Derrick had been in the hospital for much longer than just two days, and the reason for the lengthy commitment was, in fact, for depression. Mr. Williams testified at the state habeas hearing that he considers major depression, which was one of Derrick's diagnoses, to be a mental disorder.

That Mr. Williams would later twice testify, under oath, to different facts in an attempt to rationalize his omissions during trial severely undermines his credibility.  Had the trial court scrutinized the record instead of merely adopting *verbatim* the findings written by the same prosecutor who drafted Mr. Williams' statement, perhaps it would have found him less credible in this and other matters.

hours on Derrick's case.  *See Exhibit AA*, Payment Voucher filed by Sid Crowley.  Mr. Crowley spent seventy-five (75) hours picking the jury, forty-eight (48) hours in trial, and five (5) hours in a pre-trial hearing. *Id.*  Of the ***fifteen (15) total hours*** Mr. Crowley spent preparing for trial: ten (10) hours were devoted to the reading the prosecution's file; five (5) were devoted to preparing Dr. Quijano's testimony; and, ***zero*** hours were devoted to developing mitigating evidence. *Id*.

Moreover, Mr. Crowley did not begin briefing Dr. Quijano for his testimony – the ***sole*** task accomplished by Crowley related to developing any evidence on behalf of the client – until the morning he put Dr. Quijano on the stand. *See Exhibit AA*, RR.-XXII *In Camera* Hearing at 4 (hereinafter *In Camera* Hearing).   Mr. Crowley essentially began his punishment-phase investigation the day before his client was sentenced to death.

By Crowley's own admission, Dr. Quijano's testimony was "not personalized" but "generic testimony about recidivism rates and not anything specifically about the defendant." *Id.* at 5.   In an on-the-record colloquy about the admissibility of his testimony, the trial court characterized the testimony as "***marginally relevant***," and of "***very little probative value.***" (RR.-XX-92).  The judge even noted that she would not have admitted some of the testimony if the State had objected to it.  Not only did the State not object, the prosecutor said he was "okay" with giving Dr. Quijano a "free pass" on cross-examination on the most devastating line of examination available to the State: Dr. Quijano's testimony in other cases about race and future dangerousness. (RR.-XX-91).  Clearly, neither the State nor the trial court felt that Dr. Quijano's testimony advanced the defense case in the slightest.

Mr. Crowley wholly failed to devote any time to compiling social history information, he failed to interview any witnesses, he failed to perform any investigation into issues that could have helped explain the crime or Derrick's life history.

Even if Mr. Crowley had devoted every minute of his 15 hours of out-of-court trial preparation time to developing the mitigating evidence of Derrick Charles, he would have barely scratched the surface of the vast amount of mitigating evidence available to the defense.  Instead, his trial preparation consisted solely of 10 hours reading the State's file and 5 hours preparing expert generic testimony about future dangerousness from a thoroughly discredited psychologist. Consistent with his approach in other cases, Mr. Crowley waited literally until the last minute – the morning of the testimony – before attempting to prepare Dr. Quijano and/or provide him with information about Derrick's case.   He then presented "marginally relevant" testimony wholly unconnected to Derrick.

In his portion of the closing argument, Mr. Crowley never referred to any mitigating evidence, he never asked the jury to return a "yes" answer to the mitigation special issue, he in fact never even **mentioned** the existence of the mitigation special issue.

In short, from beginning to end, Mr. Crowley's contribution to developing the mitigation case amounted to none whatsoever – again a violation of Derrick Charles' Constitutional rights.

### 4.    Approval of Funding for a Mitigation Specialist.

In addition to the services of Mr. Patillo and Dr. Brown, attorney Connie Williams planned to add a mitigation specialist to the defense team, a role that was clearly left unfulfilled by any other member.  Mr. Williams notified the trial court of his intention to request funding for a mitigation specialist and, on a November 4, 2002, in an order granting funds for Patillo's services, the trial court noted that "Mr. Williams plans to ask for mitigation specialist.  To re-approach if additional funds needed."   *See Exhibit EE*, Order for Defendant's Motion for Investigative Fee in Indigent Case (emphasis in original).

Almost four months later – and just 32 days before the start of the trial – Mr. Williams had yet to retain a mitigation specialist, even though he had been appointed to the case for over seven months.  On February 26, 2003, Mr. Williams and the trial prosecutor appeared before the judge in a pretrial hearing.  *See Exhibit FF*, February 26, 2003 Pretrial Hearing.  The court inquired whether Mr. Williams needed further funding. *Id*. at 4.  Mr. Williams responded that Sid Crowley was "working some parts of the mitigation" and that "Sid is looking to the possibility of getting mitigating, some mitigation specialist to assist us with that process," so the defense might need more funds.[11] *Id*. at 4-5.

Even in the absence of a defense request, Judge Krocker orally approved $5,000 for a mitigation specialist and told Mr. Williams that if he wanted "to spend more than $5,000, you need to then see the Court."  Despite the trial court's approval of funding for a mitigation specialist, Williams **never filed a motion for funding nor did he ever hire a mitigation specialist to assist with the investigation**.[12]

---

[11] When Mr. Williams informed the trial court that Mr. Crowley was "looking into the possibility" of "getting some mitigation specialist" to assist the defense, he must have been referring to Dr. Quijano, who is not a mitigation specialist and was brought in only to give generic testimony (about Texas prisons) totally unconnected to Mr. Charles.  In fact, Dr. Quijano never even met Mr. Charles and his work had nothing to do with mitigation.  Thus, either Mr. Williams was either mistaken about the scope of his co-counsel's work or was not sufficiently informed as to what type of expert Mr. Crowley had procured.

[12] Mr. Williams is aware that a mitigation specialist is a mandatory element of every capital defense team, but he may not have been aware of it at the time of Derrick's trial.  At the 2006 post-conviction hearing, when Mr. Williams was asked whether he used mitigation specialists in capital cases in his current cases, the following colloquy ensued:

Williams:     I don't have any capital cases in which the State is seeking the death penalty at this time.  However, I have attended numerous hours of instruction in capital murder cases *since that time* [*i.e.* Mr. Charles' trial] and read the mandates of the A.B.A. and 2006 adoption of those guidelines.

Q:     Have you read those?

Williams:     Yes.

Q:     Okay.  And the A.B.A. – and this is included in our application – they mandate that as part of the Defense team, you utilize an investigator **and** a mitigation specialist, don't

5.       **The Defense Psychologist Was Never Provided a Social History or Relevant Mental Health Records.**

On November 4, 2002, the trial court granted Connie Williams' Motion to Appoint a Psychologist to Assist in Evaluation, Preparation and Presentation of Defense.  The trial court approved $1800 for the services of clinical psychologist Dr. Jerome B. Brown to examine Derrick Charles.

Mr. Williams testified that any information he gathered about his client was passed on to Dr. Brown.  State Habeas Hearing at 58.  Specifically, with respect to mitigating evidence, Mr. Williams testified that it would have been his role to gather the evidence and then provide it to Dr. Brown:

> Bob Wicoff:           Okay.  When we are talking about mitigating evidence and you're talking about you would have then given that information to somebody else to see what they could do with it, *you conducted your own mitigation investigation then*?
>
> Mr. Williams:        Yes.

*Id.* (emphasis added).  Thus, Dr. Brown's role on the defense team was not to investigate and compile mitigating evidence; that responsibility remained with Mr. Williams.

Dr. Brown met with Derrick on December 11, 2002.  On April 18, 2003, *17 days after jury selection had begun* and just 19 days before the taking evidence would begin, Dr. Brown "administered a battery of psychological tests" on Derrick  *See Exhibit GG*, May 14, 2003 Letter from Dr. Jerome Brown (hereinafter "Brown letter").   Additionally, he met with Derrick's

---

they?

Williams:       Yes. *That's what I have learned*.

State Habeas Hearing at 40 - 41.  As described more fully below, the constitutional requirement that capital defense counsel direct a comprehensive mitigation investigation dates back to the 1970's and, by the time of Mr. Charles' trial, it was below the national and local standards of care to fail to hire a mitigation specialist.  Regardless, nobody associated with Mr. Charles' defense – Mr. Williams, Mr. Crowley, Mr. Patillo, Dr. Brown or Dr. Quijano –

parents on March 17, 2003, and reviewed a number of records provided to him by Williams, including records from the "Texas Youth Counsel, Harris County Jail, various schools the defendant attended, and the Harris County medical examiner, as well as the defendant's written statement concerning the incident in question." *Id*.

Notably, Dr. Brown never received any records from Dr. Ginsberg or Gulf Pines Hospital. Nor was he provided with any of the voluminous documents that recount Derrick's long history of mental illness. As Dr. Brown averred in the state post-conviction proceedings:

> If these records had been available to me when I conducted my evaluation of Derrick on December 11, 2002 and April 18th, 2003, there would have been justification and support for further evaluation to rule out the possibility of organic brain damage and/or mental retardation. At the time of my original evaluation, there was no evidence to suggest that either one of these might have been present, or that they might have affected his behavior and thinking at the time he committed the offenses. However, the recent records provided clearly suggest that these possibilities existed and should have been pursued through additional neurological, neuropsychological and intelligence testing.

* * * *

> It is my opinion that, had these records been in my possession at the time of my original evaluation, I would have requested additional funding and time from the court to conduct the additional testing and evaluation to pursue the reasonable possibility of these mitigating factors being present.

> *Id.*

Instead, however, Dr. Brown was of little use to the defense. Initially, as reflected in Dr. Brown's report to trial counsel, the referral question from Mr. Williams "was to determine if any information could be developed that might be mitigating to the defendant's punishment." *Id*. Because Dr. Brown is not a lawyer, let alone one certified to defend capital cases, it was improper to pose a *legal* referral question to Dr. Brown. Dr. Brown clearly did not understand

---

performed the constitutionally-required mitigation function.

-58-

what mitigation meant.  For example, although Dr. Brown reported that Derrick was intoxicated on "marijuana laced with embalming fluid" at the time of the offense, he mistakenly believed that Derrick's impairment at the time of the crime was not mitigating because it "was voluntary on his part."  *Id*.  This was both factually and legally erroneous.

As Derrick told his trial investigator, he bought the marijuana from someone on the street he did not know. *See* Exhibit D, Patillo Interviews.  Derrick Charles **did not know** that it had been soaked in embalming fluid.  *Id*.  Moreover, when asked whether he smokes embalming fluid, he told the investigator that he did not. *Id*. As Derrick later described it (after being interviewed by a proper mitigation specialist trained to conduct such an investigation):

> As I was about to leave her house, I started to feel it kicking in.  But this wasn't like anything I had ever smoked before.  I felt a rush of energy and felt like I just had to get it out.  Mysehia's grandfather was walking to the door with me and put his hand on my shoulder.  I just exploded at that point and began beating up on him.  He was hitting me back but I couldn't feel a thing.  I was like Superman.  I felt unstoppable.  I have never felt energy like that before.  I have used drugs that gave me energy, but these made me want to hurt someone.  At one point, when I looked in the mirror, I saw a black demon with red eyes of fire.

*See Exhibit II,* Derrick Charles Declaration.  As trial counsel knew,[13]  Dr. Brown was legally wrong because such intoxication, even if voluntary, *is quintessentially mitigating*.

More importantly, Dr. Brown concluded that "[u]nfortunately, the information **now available** does not provide any evidence that might be considered mitigating in this examiner's opinion.  Beyond a possible diagnosis of Attention Deficit Disorder, he does not reveal any evidence of mental illness or other types of mental disorder or mental defect that might be offered on his behalf."  *See Exhibit GG,* Brown Letter (emphasis added).  Dr. Brown's report goes on to state that there " was nothing else offered in his history by the defendant or by his

---

[13] Mr. Williams testified that he read all of the reports provided by the Patillo investigators.

parents that would be of use in his defense, including the possibility of brain tissue trauma, childhood abuse, deprivation, or traumatic life events." *Id.*

Even if Dr. Brown's myopic understanding of mitigation was legally correct,[14] because trial counsel failed investigate Derrick's social history and obtain the Gulf Pines records, Dr. Brown was deprived of information that would have prevented him from incorrectly cataloging the ***absence*** of mitigating circumstances he would have clearly deemed to be significant. As described more thoroughly *supra*, Derrick had a history of head trauma and there were numerous indicators of organic brain damage. Derrick was raised in abject poverty and the deprivation is documented throughout his life history records. And Derrick's life was filled with traumatic events. As the records reflect, throughout a childhood dominated by a low-functioning schizophrenic mother and an alcoholic step-father, Derrick witnessed numerous acts of violence – including seeing his mother stab his father in the groin. *See supra.*

Dr. Brown has acknowledged, had he been provided with the Gulf Pines records, he would have done a more thorough evaluation. *See Exhibit HH,* Affidavit of Dr. Jerome Brown. But, even without this acknowledgment, the gaps in Dr. Brown's knowledge of Derrick's life – a direct consequence of trial counsel's failure to obtain the Gulf Pines records – undermined accuracy and integrity of his findings. As such, Dr. Brown's 2003 post-trial report is an indictment of trial counsel's anemic investigative efforts and not, as it was plainly intended to be, an excuse for their failure to present mitigating evidence.[15]

---

[14] Undersigned counsel in no way faults Dr. Brown for his interpretation of the legal concept of mitigation. It was the responsibility of trial counsel to make this determination. By failing to at least explain to Dr. Brown that mitigation encompasses a far broader range of issues and circumstances, defense counsel allowed their expert to labor under a flawed understanding of the law that necessarily circumscribed his understanding of what constitutes mitigating evidence.

[15] Dr. Brown issued his one-page report to counsel on May 14, 2003. This was one day *after* Judge Krocker took *in camera* testimony to inoculate the record against a claim of ineffective assistance of counsel, and on the same day the case was submitted to jury. In other words, counsel had almost concluded their defense of Mr. Charles but had just

### 6. Connie Williams Has a History of Performing Inadequate Investigations of His Clients in Preparation of the Mitigating Evidence Special Issue.

Connie Williams had a pattern and practice of performing incomplete research and investigation into the discovery of mitigating circumstances for presentation during the punishment stage of a trial. While Mr. Williams has represented an extremely large number of defendants in capital murder cases (by his own claim, over 30 in which the state sought the death penalty), a handful of cases illustrate Mr. Williams' utter failure to conduct an adequate mitigation investigation. A review of his performance in these cases reveals a pattern that includes:

- Failing to employ the services of a qualified mitigation specialist to assist him in developing a mitigation defense;

- Personally assessing his client's mental health rather than utilizing the services of a qualified mental health professional and obtaining an professional assesment; and

- Routinely seeking exclusively positive and/or favorable evidence and testimony from his clients' family and friends rather than seeking any and all evidence and testimony to illustrate the complete picture of his clients' social history.

Despite the ABA Guidelines requiring the assistance of a mitigation specialist on the defense team in order to conduct a complete investigation into the mental and social history of the defendant to discover mitigating evidence, records indicate that Connie Williams has seldom

---

begun their defense of their deficient performance in his case. Given the timing, there was no conceivable benefit to Mr. Charles – in whose interests counsel were still obligated to act until the trial was over – to generating an expert report purporting to conclude that there was nothing mitigating about the defendant. In fact, typically, when an expert comes back with findings completely adverse to the client, counsel acting in the client's best interest relieve the expert from further duty without with asking for a written report. And, perhaps, that was the initial response of Mr. Charles' counsel.

The only possible benefit of this *post hoc* report would redound to trial counsel needing to justify their failure to proffer a case in mitigation. Because Mr. Williams and Mr. Crowley had in fact already begun such a campaign on the previous day, the most reasonable deduction from the record is that – like the highly unusual *in camera* proceeding convened by Judge Krocker, and perhaps even in response to it – this report was generated to deflect blame for counsel's deficient performance.

used a mitigation specialist in any of his cases.  Alternatively, Mr. Williams has routinely employed private investigators to discover the facts of his clients' crimes and any information "that might mitigate [the client's] punishment." *See Exhibit UU,* Affidavit of Joe Patillo from *Ex Parte Geno Capoletti Wilson* (herein "Patillo Affidavit from Wilson").  In every case, there is no evidence that the private investigators were ever trained to properly elicit information and identify mitigating evidence.  While a qualified mitigation specialist will elicit both positive and negative information about a client in order to illustrate a complete social history of the client, Mr. Williams' investigators constantly sought only positive evidence. *See Exhibit UU,*  Patillo Affidavit from *Wilson*, *See Exhibit E*, Patillo Charges, *See Exhibit VV,* Affidavit of Connie Williams from *Ex Parte John Reyes Matamoros* (herein "Williams Affidavit for *Matamoros*"). There is no indication investigators followed up on information elicited when it was "negative" or incomplete. *See Exhibit E*, Patillo Charges. It was common practice for investigators to simply conclude their investigation and file a report to Mr. Williams or his co-counsel.

In Derrick Charles' case, Mr. Williams believed that Derrick did not suffer from mental retardation.  His belief was based solely on his interaction with Derrick in jail interviews. Mr. Williams stated that he had Derrick read back to him motions which he had prepared, and Mr. Williams believed that Derrick did not suffer from any mental retardation based on this alone. This was not the first time that Mr. Williams made his own diagnosis regarding his clients' mental health based solely on his personal observations.

In his representation of John Reyes Matamoros, Mr. Williams failed to investigate his history of mental illness. In his affidavit, Mr. Williams testified that while he did not ask Matamoros directly whether he had a history of mental illness, Mr. Williams "had a lot of experience being around defendants who were mentally impaired, retarded, or even insane [and

he] . . . observed no such characteristics in Mr. Matamoros." *See Exhibit VV,* Williams Affidavit for *Matamoros.* During his representation of Derrick Sean O'Brien, Mr. Williams "never suspected that O'Brien was incompetent to stand trial or that he suffered from any mental health problems or mental retardation" after having "numerous conversations" with his client. *See Exhibit WW,* Affidavit of Connie Williams from *Ex Parte Derrick Sean O'Brien* (herein "Williams Affidavit from *O'Brien*"). A psychiatric evaluation of his client which was not sought by Mr. Williams until the same month of trial would reveal significant events which may have contributed to psychological suffering in O'Brien. Had Mr. Williams consulted a trained psychiatrist initially, he may have received this report in time to actually follow up on it. While representing Robert Mitchell Jennings, Mr. Williams failed to present evidence that Jennings was mentally impaired. *See Exhibit YY*, Affidavit of Connie Williams from *Ex Parte Robert Mitchell Jennings* (hereinafter "Williams Affidavit from *Jennings*). Mr. Williams would explain that "it was a consequence of our lack of knowledge of any diagnosed mental impairment, *and the absence of him exhibiting any mental aberration during our contact with him.*" *Id.*(emphasis added). Once again, had Mr. Williams employed the services of a trained psychologist, he would have discovered a 1978 psychological evaluation of his client which revealed his impoverished upbringing, that he was conceived as a result of rape, that his mother had a drug addiction, and that he was in the mild mentally retarded range of intelligence. *Id.*

In the case of Derrick Charles, investigator Joe Patillo talked with teachers and students at school campuses hoping to find people who "would say good things about Derrick." *See Exhibit E,* Patillo Charges. This is another common characteristic of Connie Williams and his defense teams. Rather than gathering and reporting on all aspects of his clients psychosocial histories, Mr. Williams would seek exclusively positive and/or favorable evidence and testimony from his

clients' family and friends. In his representation of Derrick Sean O'Brien, Mr. Williams "asked O'Brien if there were any friends or family members who would say positive or favorable things about him." *See Exhibit WW,* Williams Affidavit from *O'Brien*.  Mr. Williams' co-counsel interviewed several of his client's family members. Mr. Williams believed that their testimony would not have mitigated his punishment because they had nothing positive to say. *Id.*  The only testimony that Mr. Williams found helpful was that of O'Brien's mother. *Id.*  However, Mr. Williams did not call the mother at trial because O'Brien did want her to testify and be subject to cross examination, or at least that was his *post hoc* rationale for his failure to present the witness. *Id.*

In his representation of Willie Tyrone Trottie, Mr. Williams met with his client a mere two times before trial. *See Exhibit XX,* Affidavit of Willie Tyrone Trottie. The initial meeting was very brief and took place while Trottie was still in the hospital recovering from gunshot wounds. *Id.*  At this meeting, Willaims asked his client to "write down what happened since he did not want me to take the time during that meeting to explain in detail the information I might have to provide to him." *Id.*  A second meeting took place weeks later where Mr. Williams returned to pick up the notes and briefly review them with his client.  Mr. Williams did not meet with Trottie again until trial commenced. *Id.*  Their conversations prior to trial "did not exceed an hour in length in total." *Id.*

Additionally, Mr. Williamshas developed a reputation for failing to comply with some of the most basic rules of law practice.  On November 23, 1998, Connie Williams was issued a probated sentence of eighteen months for professional misconduct stemming from his failure to transfer funds and deeds into the account of his client Alma F. Edwards in 1992. *See Exhibit ZZ,* Judgment, Findings of Facts and Conclusions of Law of Connie Williams.  Mr. Williams was

subpoenaed to appear before the District 5 Grievance Committee on April 24, 1996. *Id.* He failed to appear. A hearing was held on January 8, 1998 in which the committee found that misconduct had occurred. They continued the matter pending Mr. Williams' timely completion of fifteen hours of MCLE within three months. *Id.*  A subsequent hearing in May continued the matter in order to extend the deadline until September for Mr. Williams to complete the required MCLE hours. *Id.*  After failing to comply with the grievance committee's requests, Mr. Williams was issued a probated sentence of eighteen months for professional misconduct in which time he was required to attend rehabilitation sessions of the Professional Enhancement Program as determined by the panel. *Id.*

Mr. Williams' representation of clients on direct appeal has also been problematic and led to censure by the courts. He has failed to timely file a brief in at least five separate instances. Courts have order Connie Williams to file and show cause in *State v. Jennings*, AP-70,911 (Tex. Crim. App. – 1992), *State v. Wilkerson*, AP-71,309 (Tex. Crim. App. – 1992); *State v. Trottie*, AP-71,793 (Tex. Crim. App. – 1994), *State v. McCullum*, AP-72,315 (Tex. Crim. App. – 1996), and *State v. Wilson*, AP-73,747 (Tex. Crim. App. – 2000). *See Exhibit AAA,* Orders for Connie Williams to Show Cause in the Appeals of *Wilkerson, Trottie, McCullum, and Wilson*.

**7.     Sid Crowley Has Been Found Ineffective for Similar Performances in Another Capital Case and Has a Disciplinary History with the State Bar of Texas.**

Much like Connie Williams, Sid Crowley's abysmal, wait-until-the-last-minute performance is not unique to his representation of Derrick Charles.  On December 15, 2005, the 130th Judicial District Court of Matagorda County, Texas found that **prior** to commencement of trial, Mr. Crowley provided ineffective assistance of counsel to Francisco Castellano who was indicted of the offense of capital murder.  *See Exhibit BB, State v. Francisco Castellano*, Trial

Cause No. 05-138, 130th Judicial District Court of Matagorda County, Texas.  On May 5, 2005, Mr. Crowley was appointed to represent Mr. Castellano as first chair.  Tommy James Stickler was appointed as second chair.  Prior to November 23, 2005, nearly seven months after appointment of counsel, no motions had been filed by Mr. Castellano's defense.  No funds had been sought by the defense for investigation, mitigation, or experts.[16]  Mr. Castellano had been visited at the jail only once by each attorney.  No one from the defense had asked Mr. Castellano for records releases.  The physical evidence had not been examined and no witnesses for the state had been interviewed.

During a status conference on November 23, 2005, Mr. Crowley, lead counsel, represented to the court that he would be prepared to proceed to trial on March 6, 2006.  The court ordered Mr. Crowley to appear on December 15, 2005, to demonstrate that the case would be ready for trial on March 20, 2006, or show cause as to why he should not be found ineffective.  On December 15, 2005, Mr. Stickler, second chair counsel, filed a Motion to Continue, concluding that the defense could not be prepared to effectively represent Mr. Castellano in a capital trial on March 20, 2006.  Mr. Crowley refused to join Mr. Stickler's continuance motion.

After conducting an *ex parte* proceeding with Mr. Stickler and Mr. Crowley on December 15, 2005, the court found that Mr. Crowley had provided ineffective assistance of counsel to Mr. Castellano.  *Id.* at 10-16.  The court rendered its finding from the bench stating in relevant part:

> [T]he court concludes that Mr. Crowley's defense provided to the defendant to date has been ineffective and that his plan for providing a defense to the defendant would be ineffective if allowed to be put into place.  And so, I am reaching the conclusion that Mr. Crowley is ineffective in his defense of Mr. Castellano.

---

[16] As noted above, more than seven months after the appointment of Mr. Charles' case, no request had been made for a mitigation specialist.  Even though the trial court explicitly provided funding to trial counsel, they failed to use it to advance Mr. Charles' case

And I find no authority that would compel a court to allow an attorney to remain on a case when the court has concluded that the plan for providing a defense is ineffective as a matter of Federal constitutional law.  So, therefore, I am removing and will remove Sidney Crowley as first chair counsel and as counsel for the defendant Francisco Castellano on grounds of ineffectiveness and will make appointment of a substitute first chair attorney immediately at the conclusion of this hearing.

I am also ordering and will order and have the order served on Mr. Crowley an order that he appear and show cause why he should not be held in Contempt of Court for substantially interfering with the administration of justice in this case. And the court finds that there is reason to believe that Mr. Crowley is in Contempt of Court because the obligations of an attorney who's been appointed to represent any criminal defendant are very clear.  And the obligations of an attorney who seeks an appointment and is appointed as . . . first chair counsel for a defendant who is charged with capital murder and who stands trial with his life at stake has obligations which are known and are assumed by that attorney seeking that appointment and accepting that appointment; and that any attorney who seeks such an appointment and accepts such an appointment knows and understands the significant investment that is made by the courts . . . and also from the defendant, who can look forward, potentially, in a case of ineffective counsel to years of incarceration, not knowing his ultimate fate; that to accept such an appointment and to progress in a case in the way that this case has been progressed shows nothing but contempt for the court, contempt for the legal system . . . .

And we all know, as we sit here, that the court, who's primary interest is in ensuring a fair trial be had in the case, regardless of what is charged or what is sought, will have to grant the continuance.  If I didn't think that it was important enough that he have effective counsel, I wouldn't be taking this step here today . . . .

To say that the administration of justice in the 130th District Court has been substantially affected in an adverse way by the failure of even an attempt to prepare this case for trial, at the appointed date of March 20, 2006, is exactly the type of interference with the administration of justice that the laws of contempt and inherent powers of the court are designed—are designed to protect against.

*Id.* at 10-13.

Noting that effective counsel would join second chair's Motion to Continue, the court

removed Mr. Crowley from the case and appointed new first chair counsel on December 15,

2005.  New counsel for Mr. Castellano reached a plea agreement with the State in November,

2007.  In exchange for pleading guilty to several offenses, the State waived the death penalty for Mr. Castellano.

At the time that Mr. Crowley accepted appointment to represent Mr. Castellano, Mr. Crowley had received notice that he was being sued by the Commission for Lawyer Discipline of the State Bar of Texas for his mishandling of the appeal of George S. Guo in *The State of Texas v. George S. Guo*, Trial Cause No. 0032362, 240th Judicial District Court of Fort Bend County, Texas.  *See Exhibit CC,* Petitioner's Original Disciplinary Petition *Commissioner for Lawyer Discipline v. James S. Crowley*, Cause No. 05-CV-140898, 240th Judicial District Court of Fort Bend County, Texas.  According to the Petition filed by the Commission of Lawyer Discipline, Mr. Crowley was appointed to handle the appeal of Mr. Guo on September 5, 2003. *Id* at 2.  By operation of law, the Appellant's brief was due on or about October 6, 2003. *Id.*  Mr. Crowley admittedly failed to timely file Appellant's brief on or about October 6, 2003, stating that "I was occupied with several other matters." *Id.*  Mr. Crowley also failed to file Motion to Extend Time to file Appellant's brief on or before October 21, 2003. *Id.*  Furthermore, Mr. Crowley failed to apprise Mr. Guo regarding the status of his appeal and failed to notify Mr. Guo that he failed to timely file Appellant's brief. *Id.* at 2-3.   In March, 2004, Mr. Guo sent two written correspondences to Mr. Crowley demanding that he file the exceedingly late Appellant's Brief. *Id.* at 3. On or About March 12, 2004, Mr. Crowley filed a Motion to Extend Time to File Appellant's Brief with the 13th Court of Appeals. *Id.*  The time was extended to April 8, 2004. *Id.*  Mr. Crowley did not file the Appellant's brief until April 29, 2004. *Id.*

On May 26, 2006, the 240th Judicial District Court of Fort Bend County, Texas found that Mr. Crowley had committed professional misconduct in connection with his representation of Mr. Guo. *See Exhibit DD,* Agreed Judgment of Public Reprimand, Cause No. O5-CV-140898,

240th Judicial District Court of Fort Bend County, Texas.  Specifically, the court found that Mr.

Crowley  had  violated  the  following  rules  of  the  Texas  Disciplinary  Rules  of  Professional

Conduct:

1.01(b)(1)    [in representing a client, neglecting a legal matter
entrusted to a client or clients];

1.01(b)(2)    [in representing a client, frequently failing to carry
out completely the obligations owed  to a client or
clients]; and

1.03(a)    [failing to keep a client reasonably informed about
the status of a matter and failure to promptly comply
with reasonable requests for information].

*Id.* at 2.

The court entered a judgment of public reprimand against Mr. Crowley on May 26, 2006.

*Id.*

Indeed, Mr. Crowley's lack of diligence is legendary among Texas capital counsel.  In

their  report  *Lethal  Indifference:  The  Fatal  Combination  of  Incompetent  Attorneys  and

Unaccountable Courts in Texas Death Penalty Appeals,* the Texas Defender Service found Mr.

Crowley to be among the worst.

In *Ex Parte Nenno*, state habeas counsel filed a petition consisting of eight pages
and two record-based claims.[17]

This same lawyer has represented four other death row inmates.  After filing a ten-
page petition in *Ex Parte Rousseau,* the lawyer swore in an affidavit, "At the time
that I was appointed, I did not know how to litigate a capital habeas corpus case
and was not aware of the need to investigate facts outside of the trial record.  I
also did not have enough time to devote to the case.  As such, my representation
of [the inmate] consisted of reading the trial record, meeting with [the inmate],
conducting legal research on the claims I had identified from the record and
drafting an application."[18]

---

[17] Ex Parte Nenno, Writ No. 50, 598, (Tex. Crim. App. Nov. 14, 2001).

[18] Affidavit of CCA appointed State Habeas Counsel, Rousseau v. Johnson, No. 00-CV-27 (S.D. Tex).

This lawyer was also appointed and filed writs in *Ex Parte Villareal*,[19] a nine page petition, containing no extra record claims or materials, *Ex Parte Arthur*,[20] a 14-page writ containing no supporting exhibits, and the lawyer co-authored another nine page writ in *Ex Parte Smith*.[21]  This lawyer was appointed to represent Smith five months *before* being appointed to the case referenced above in which he conceded his inexperience and unawareness of the basic requirements of competent representation.

*Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals*, The Texas Defender Service, 2002 (*See* http://www.texasdefender.org/publications.htm).

## D.    THE TRIAL OF DERRICK DEWAYNE CHARLES.

### 1.    Voir Dire.

Jury selection began on April 1, 2003.  During voir dire, Mr. Williams and Mr. Crowley led prospective jurors to expect a mitigation case during the punishment phase which was subsequently never presented.  Both Mr. Williams and Mr. Crowley devoted significant time during jury selection to questioning each venireperson, ***including all who served on the jury and the alternate juror***, about mitigating evidence.  Sid Crowley cited a list of examples of mitigating evidence to every venireperson he questioned and routinely referenced examples from his prior cases. Despite constant questioning on the subject, Mr. Williams and Mr. Crowley would later provide the jury with ***no*** mitigating evidence at trial. (RR.V-77-78; 174-176; RR.IV-88-90;  RR.VII-73-79;  RR.IX-32-35;  RR.X-92-95;  135-136;  RR.XI-65-66;  RR.XII-47-48; RR.XIII-70; 93-94; RR.XXIV-66-69;95-96).

The following are representative examples of defense counsel's voir dire questioning about mitigating evidence:

---

[19] Writ No. 50,599 (Tex. Crim. App. Oct. 31, 2001).
[20] Application for Writ of Habeas Corpus, No. 763189 (Tex. Dist. Ct. 180th Jud. Dist. Nov. 17, 1999).
[21] Writ No. 48,130 (Tex. Crim. App. Jan. 17, 2001).

1.  During the questioning of Ronald Kobialka, whom would later become the foreperson of the jury, Sid Crowley specifically asked him if anything stood out in his mind that he would want to hear in regards to mitigating evidence. Venireperson Kobialka replied that he would want to know about "the state of the defendant, Okay? *Was he somehow in some way impaired*?"  Sid Crowley presented him with several examples of possible mitigating evidence that were very similar to circumstances in Derrick Charles' life – *young age, mental condition, abuse, drugs*.  He also recounted one of his previous cases in which defendant's mother had set her son's clothes on fire as another example (RR.VI-88-89);

2.  During the questioning of Robert Griffith, who later served on the jury, Connie Williams described a capital murder case as a "unique situation where you get to hear just about everything that ever happened from somebody, where they grew up, what kind of kid they were like, the whole thing." (RR.V-174).

3.  During the questioning of Melissa Martinez, who later served on the jury, Sid Crowley listed several possible mitigating types of evidence.  He explained that there is no distinct definition of mitigating evidence and it is in the eye of the juror.  He then recounted his previous cases in which defendant's mother had set her son's clothes on fire as another example (RR.IX-34-35).

By the end of the extensive questioning on the subject during voir dire, alternate juror Thomas Gregory Mayo expected mitigating evidence to be an important piece of the presentation of the defense at trial.  *See Exhibit JJ,* Affidavit of alternate juror Thomas Gregory Mayo (hereinafter "Mayo Affidavit").

### 2.      Derrick Charles Surprisingly Pleads Guilty.

Connie Williams discussed the strategy of a guilty plea with Derrick, "I talked to the defendant, as we had talked about it previously, because of his confessions, the possibility of pleading guilty and not going before the jury asserting you're not guilty and letting them hear your confession and DNA proof and the position that would put you in" (RR.-XXII-6).  Despite encouragement from his family to plea guilty, Derrick told Mr. Williams that "he wanted to fight

it. This was about two hours before we started trial" (RR-XXII-6). However, to the surprise of the defense team, Derrick Charles decided to plead guilty to the charges on the opening day of the trial, May 6, 2003 (RR.-XVI-10).

After the guilty plea, the trial court admonished Derrick in a bench discussion between the Court, Derrick Charles, Connie Williams, and prosecutor Troy Cotton. During this bench discussion, it was clear that Mr. Williams was very aware of Derrick's prior hospitalization:

| | |
|---|---|
| THE COURT: | Have you ever been mentally ill, Derrick Charles? Ever been in a mental hospital or suffered from mental illness? |
| THE DEFENDANT: | I don't know. |
| THE COURT: | Excuse me? |
| THE DEFENDANT: | I don't know. |
| MR. WILLIAMS: | During our research and investigation, we found that he has not, however he was evaluated one time. **Well, he was in a hospital being treated for depression. Your Honor, for 15 days at one time.** |
| THE COURT: | What year was that? |
| MR. COTTON: | 1995. |
| MR. WILLIAMS: | 1995, Your Honor. I don't know. I don't know what year it was. |
| THE COURT: | All right. I didn't know it was a mental institution, I thought it was something else. And, Mr. Cotton is your impression that the defendant was treated for depression around 1995. |
| MR. COTTON: | Yes, Your Honor.[22] |

---

[22] What is readily apparent from this exchange is that defense counsel, the prosecution, and even Judge Krocker knew – prior to trial – that Derrick had been committed to a hospital. Apparently, Judge Krocker was expecting to elicit a "no" when she asked whether Derrick had been in a mental hospital because, when it did not come, she remarked: "I didn't know it was a mental institution, I thought it was something else."

| THE COURT: | Anything more recent than 1995, to indicate that he suffers from depression? |
|---|---|
| MR. WILLIAMS: | No ma'am.  There has been an evaluation since that time as to his ability to do school work and that had no indication of retardation or mental illness.[23] |
| THE COURT: | All right. Thank you. Derrick Charles, have you ever been schizophrenic or bipolar, anything like that? |
| THE DEFENDANT: | No, ma'am.[24] |
| THE COURT: | Other than the time . . . is 1995 about right when you were in the hospital? |
| THE DEFENDANT: | Yes, ma'am. |

(RR.XVI-14-15).

### 3.     The State's Case at Trial: A Focus on the Crime and Prior Criminal History.

The State produced 35 witnesses and 148 exhibits during its five days of testimony.  The State was fully prepared to try both the guilt and the punishment phase of the trial.  When Derrick Charles unexpectedly pleaded guilty at trial, the State altered its focus to the punishment phase.  Staggering amounts of evidence of the murders of Myeisha Bennett, Brenda Bennett, and Obie Bennett on July 2, 2002, were presented to the jury.  Despite Derrick Charles' guilty plea, the State presented witnesses ranging from responding officers to friends of the victims to forensics experts and exhibits such as crime scene photographs and Derrick Charles' written statement that focused on the crime itself.  In addition to witnesses and evidence of the crime itself, the State presented the jury with witnesses and evidence documenting Derrick Charles' prior criminal history.

---

[23] The social history records reveal that Mr. Williams was once against mistaken about his client's social history and, in fact, there were numerous indicators of mental health problems.  *See supra.*

[24] While in the psychiatric hospital, Derrick was medicated with potent anti-psychotic drugs.

Given the nature of the crime, one might expect Derrick Charles to have a violent criminal history.  On the contrary, Derrick's criminal history, while comprising of several incidents, was devoid of any real violence.  His criminal history included repeated juvenile offenses and a single three year burglary sentence as an adult.  His past criminal history consisted of minor crimes and disruptions which could be characterized more as a nuisance caused by behavioral and mental disorders than as a violent, cold blooded killer.  The State produced a juvenile history of incidents through witnesses from law enforcement and Texas Youth Commission personnel.  However, the State could only produce a single instance of a victim who suffered a minor physical injury and no instance in which Derrick Charles used a deadly weapon.

The State presented the jury with the following evidence of incidents in which Derrick Charles was involved as a juvenile:

1.     Simona Cowen, a Texas Youth Commission (TYC) caseworker at the Al Price State Juvenile Correctional Facility, first worked with Derrick Charles when on December 17, 1998 when he was 16 years old. (RR.XVIII-80).  She testified that Derrick Charles was cited for numerous infractions throughout his nearly two year stay at the Al Price facility. These infractions were limited to being out of dress code, being in unassigned areas, talking without permission, and periodically cursing and threatening staff. (RR. XVIII-105).  However, Derrick Charles completed the required 4 phases of the program and was released on December 5, 2000.  Additionally, she admitted that Derrick Charles "had a good sense of humor when he is feeling well" and "he would have good days" too, where he will do the team jobs, he will be in dress code, he will behave himself orderly."  She admitted that he had even been considered for a promotion. (RR.XVIII-121).

2.     Karen Holt, a teacher at the Al Price State Juvenile Correctional Facility, recalled an incident on May 26, 1999 when Derrick Charles and another student "were racing around wildly under the dorm porch screaming, yelling, pushing, shoving, shouting, throwing, among other things." (RR.XVIII-129).  She testified of a second incident on September 13, 2000 when she reprimanded him for having a contraband bottle of Windex.  He responded by cursing and threatening to kill her.  Derrick Charles was restrained by staff members. (RR.XVIII-130-132).

3.    Jerry Boydson, another teacher at the Al Price State Juvenile Correctional Facility, stated that Derrick Charles was "angry a lot of times."  However he agreed that there were "days when he displayed a more cooperative attitude" (RR.XIX-14) and agreed that there were days when Derrick Charles was "pleasant." (RR.XIX-40).  He also recalled a fight in which 20-40 students were involved.  He saw Derrick Charles restrained during the fight.   However, he could not say with any certainty whether Derrick Charles was involved in the fight or had just walked up. (RR.XIX-41-42).

4.    Derrick Charles was arrested for criminal trespass of a vacant apartment along with at least seven other individuals when he was fourteen years old. (RR.XIX-46).

5.    Derrick Charles was also arrested when he was fourteen for assault of Lincoln Charles and resisting arrest. (RR.XIX-49-53).

6.    Derrick Charles was also arrested when he was fourteen for theft of a compact disc player and burglary of a habitation. (RR.XIX-95).

7.    Derrick Charles was arrested for theft of a cellular phone when he was fifteen.   The charges were subsequently upgraded to burglary of a building. (RR.XIX-115).

8.    Lloyd Bailey, a probation officer for Harris County Juvenile Probation Department supervising Derrick Charles during 1998, stated that Derrick Charles failed to report to him and complete the conditions of his probation. (RR.XIX-105).

9.    Sheila Horn, a former TYC correctional officer whom oversaw the dorm Derrick Charles was assigned to, wrote up Derrick Charles for several incidents involving being out of dress code and disruptive behavior. Derrick Charles responded to these reprimands with vulgarity and on one occasion told her that he was "going to catch a murder case in here." (RR.XIX-119, 121-129).  However, she admitted that this behavior was commonplace in the facility and, in fact, there were incidents of students actually assaulting TYC personnel.  She admitted that Derrick Charles never assaulted her. (RR.XIX-139-140).

**4.    An Apathetic Defense of Derrick Charles Focused Exclusively on Future Dangerousness.**

On May 12, 2003, Connie Williams and Sid Crowley presented Derrick's defense.

Counsel declined to give an opening statement, something considered by many trial advocacy

experts to be one of the most important parts of a trial. Instead, Mr. Williams proceeded directly to the four witnesses whom all focused on the future dangerousness special issue.  This defense took less than two hours.

Sergeant David Davis, Jr., of the Grievance and Disciplinary Section of Harris County Sheriff's Office, gave extremely brief testimony about Derrick Charles' behavior during his confinement to the Harris County Jail since his arrest for the offense. (RR.XX-24-29).   No records were introduced into evidence during his testimony nor was it concluded that Sgt. Davis had ever actually even met Derrick Charles.  Sgt. Davis' stated records show that Derrick Charles was charged with destruction of county property and refusal to obey an order while in the general population of the Harris County Jail. (RR.XX-28-29).  Both were non-violent infractions.  He did not elaborate on the details of either infraction but admitted that the punishment for each was not considered major.  The apparent purpose of Sgt. Davis' testimony was to explain that, although Derrick Charles' behavior while in confinement may have been disruptive, it was non-violent and did not pose a danger.  Sgt. Davis' testimony was relevant to the future dangerousness special issue, not mitigation.

Shaun Clifton, a TYC correctional officer, ran the dorm to which Derrick Charles was assigned and worked with him on almost a daily basis.  He testified Derrick Charles "wasn't like the worst kid in the dorm or he wasn't really all that bad." (RR.XX-25).  According to Clifton, Derrick was a fun kid who had "little temper tantrums as far as cursing people out."  *Id.*  On cross examination, he explained that TYC employees are "told when you're going into training that you will be cursed out," and that cursing out by students is a normal part of the process.  He further stated that, upon his release, Derrick Charles had changed. (RR.XX-41).  Shaun Clifton's

testimony served to refute the testimony of other TYC employees whom had previously testified for the State.  Again, this testimony was relevant to the future dangerousness special issue.

Dr. Walter Quijano, a clinical psychologist and expert in future dangerousness, was called by Sid Crowley.  He testified whether someone fitting Derrick Charles' general profile would be likely or not to commit acts of violence once imprisoned (RR.XX-49-117).   Dr. Quijano admitted that he never met nor studied Derrick Charles.  He simply conducted a telephone conversation with Mr. Crowley prior to his appearance.  At 10:00 AM, on the morning of his testimony, he studied the facts surrounding Derrick Charles (RR.XX-98).  Mr. Williams later explained that Dr. Quijano simply "plugged" the facts of Derrick Charles into his studies for his testimony.   Dr. Quijano presented no information on Derrick Charles' background.   His testimony was solely for the purposes of the future dangerousness special issue.  Dr. Quijano concluded that Derrick Charles fit the profile of someone who would not be likely to commit violent acts once imprisoned.

Finally, Connie Williams called Kenneth Allen, a TYC correctional officer.  As of May 13, 2003, the day before Mr. Allen testified, trial counsel had no idea what this witness would say because he had never interviewed him.  (RR.-XXI-10).  In fact, counsel had yet to locate him. *Id*.  In seeking a continuance, Mr. Williams admitted that he did not even know whether Allen "would be a good witness or not": "I don't know what this witness would be except that the defendant believes that he would give testimony favorable to him." *Id*.

Allen was a shift supervisor for Derrick Charles' dorm at the Jefferson County State School during his stay.  He testified Derrick Charles was "more mouthy than anything" and would appear to be upset on certain days, but nothing out of the ordinary (RR.XXIII-7-8).  He also testified Derrick Charles "was one of my better students that I had at Al Price." *Id.* at 9.

However, the State did elicit from Allen that he had written up Derrick Charles 14 times during his stay at the facility for disruptions *Id.* at 12. Like Shaun Clifton, Allen's testimony was directed at refuting the testimony of prior TYC personnel presented by the State.  Allen did not present any testimony relating to Derrick Charles' background nor was there any indication that he was aware of Derrick Charles' background prior to his placement in the Jefferson County State School.

It is undisputed neither Mr. Williams nor Mr. Crowley ever provided any mitigating evidence at trial.  Three of the four witnesses called by the defense testified on Derrick Charles' lack of a violent history during his stay in the Jefferson County State School and during his stay in the Harris County Jail.  The only other witness, clinical psychologist Walter Quijano, was presented as an apparent attempt to quell the notion that someone with the general profile similar to Derrick Charles would be a future danger in prison.  None of the four witnesses testified as to Derrick Charles' history prior to the age of fourteen.  Of the four witnesses, at least two were brought in only at the very last minute.

### 5.    Unprecedented *In Camera* Hearing.

The dismal performance of counsel with respect to mitigation was so salient that, even before the defense had finished its case, the trial judge convened an unprecedented *in camera*, *ex parte* hearing with defense counsel in an apparent attempt to "shore up the record." *See Exhibit AA, In Camera* Hearing.  Notably, Derrick Charles was not present for this hearing and thus had no ability to respond to the assertions of his counsel.  The record is not clear whether the hearing was convened by Judge Krocker[25] or at the request of counsel.  What is clear is that, even before

---

[25] Judge Jan Krocker, a former Harris County prosecutor who presided over Mr. Charles' trial, has achieved notoriety for her potentially improper, pro-prosecution actions in a capital case.  *See* Steve McVicker, *Experts Question Judge's Ethics / They Say a Line was Crossed When She Intervened in an Inmate's Appeal*, Houston

Chronicle, Feb. 13, 2005, at B1; *see also The Worst Judges in Texas*, The Texas Observer, Feb. 10, 2006 (available on Westlaw at 2006 WLNR 6823593).

In 2004, on year after presiding over Mr. Charles' case, Judge Krocker was presiding over another capital trial. While serving as a judge in the death penalty trial of Edgardo Cubas, Judge Krocker attempted to intervene in the federal habeas corpus proceedings of another death-sentenced prisoner, Martin Draughon, whom she had prosecuted in the 1980's. *Experts Question Judge's Ethics*, at B1. Although she was denied permission by the federal court to appear as a party, she was permitted to submit evidence. *Id*.

Thus, while serving as a judge, Judge Krocker was also investigating and gathering evidence to defeat the habeas claims of a death-sentenced prisoner. Moreover,

> [a]mong the witnesses from whom Krocker obtained statements were people who could find themselves testifying in her court in the future. They included the former Houston Police Department firearms examiner who did the ballistics work in the Draughon case, a current HPD firearms examiner, an employee of the Harris County District Clerk's Office, a lieutenant from the Sheriff's Office, an HPD captain and a forensic analyst from the county Medical Examiner's Office.

*Id*.

Although Judge Krocker perceived no impropriety in her conduct, counsel for Mr. Cubas disagreed:

> "By resuming the practice of law in a prosecutorial capacity . . . in another death-penalty case while presiding over the (Cubas) case, the trial court deprived (Cubas) of an impartial and disinterested tribunal, thereby offending a principle of justice so rooted in tradition and conscience of the American people as to violate the fundamental aspect of (due process)," attorney Kurt Wentz wrote in his appeal.

Steve McVicker, *Defense Seeks New Trial for One East End Killer / Judge Was Not 'Impartial' During Trial, Attorney Says*, Houston Chronicle, Dec. 27, 2005, at B1.

> These criticisms of Judge Krocker's pro-prosecution partisanship were echoed by experts in the field: "It raises a question about the judge's ability to be impartial and unbiased," said Seana Willing, executive director of the State Commission on Judicial Conduct, speaking hypothetically. "These are things we expect, and (that) are required, of our judicial officers, especially when they have criminal jurisdictions."

*Experts Question Judge's Ethics*, at B1.

A Houston Chronicle editorial expressed similar concerns: "The [C]ommission [on Judicial Conduct] should closely examine Krocker's actions, and take whatever action may be called for. Defendants and their attorneys need to be assured that when they enter Krocker's court, they aren't facing two prosecutors, one of whom just happens to be wearing robes and sitting on the bench." Editorial, *Judge with an Agenda / Jurist Involvement in a Death Row Case She Prosecuted Raises Questions of Ethics and Fairness*, Houston Chronicle, Feb. 15, 2005, at B8.

Judge Krocker stated that the unprecedented pre-verdict, *in camera* proceeding – **from which even Derrick Charles was excluded** – to record strategic reasons for trial counsel's omissions was "easier than coming back years later and having to write an affidavit." Hearing Held in Chambers at 14. Thus, even before the jury sentenced Derrick Charles to death, Judge Krocker anticipated a challenge to the attorneys' effectiveness and allowed them – out of the presence of the client – to record a response. In light of her fact gathering for the prosecution in other capital cases while serving as a judge, Judge Krocker's conduct here could reasonably be construed as a partisan

the defense rested and presented argument to the jury, an attempt was made to inoculate the record against a subsequent claim of ineffective assistance of counsel for the failure to present mitigating evidence.

On May 13, 2003, the day before the defense presented its fourth and final mitigation witness and the case was argued to the jury, the following colloquy occurred:

| | |
|---|---|
| THE COURT: | I have spoken with the defense, and it's my understanding that you-all will put some things on the record in-camera or in chambers concerning your trial strategy in this matter about your decision to plead – the defendant's decision to plead guilty and also your decisions of which witnesses to call and not to call, is that correct? |
| MR. WILLIAMS: | Yes, ma'am.  As a matter of fact, we'd like to do that when the court reporter is free. |
| THE COURT: | Why don't we do that now. |
| MR. WILLIAMS: | Okay. |
| THE COURT: | That will be done.  And I will order that sealed in the clerk's office after it's transcribed.  ***So it will be there should it ever be an issue***.  So we can do that at this time.  Any other housekeeping matters while the jury is out? |
| MR. OWMBY: | None from us, Your Honor. |

(RR.-XXI-41-42)(emphasis added).

Judge Krocker opened the hearing by stating: "We're here privately in chambers.  And, of course, the only ones present are the two defense lawyers, Mrs. Lee [the court reporter], and myself.  Of course, the State is not present.  Mr. Crowley, is there something wish to put on the record concerning trial strategy?"  *See Exhibit AA*, *In Camera* Hearing at 4.

---

attempt to defeat Derrick Charles' subsequent challenges to his conviction.

Mr. Crowley responded that, even though the defense expert Walter Quijano testified that Mr. Crowley had contacted him on the morning of his testimony, Mr. Crowley had in fact contacted Dr. Quijano two weeks prior to the day he testified.[26]  *Id*.  Mr. Crowley testified that he was familiar with Quijano because he used him in another case.  However, Mr. Crowley did not give Quijano any information about the facts of Derrick's case **until the morning Quijano testified**.  *Id*.  Mr. Crowley noted that Quijano's testimony was "generic testimony about recidivism rates and not anything specifically about the defendant," *Id*. at 5, to which Judge Krocker responded by prompting: "I take it that was a matter of trial strategy?"  *Id*.  Mr. Crowley adopted Judge Krocker's characterization.

Lead counsel Connie Williams was next to enter his self-serving statements.  First, he addressed Derrick's guilty plea by assuring the trial court that, although he had advised Derrick to do it, he did not know in advance that Derrick would enter a plea of guilty.  *Id*. at 5-6.  Mr. Williams then changed the subject: **"I guess another matter of concern would be the lack of witnesses, or in mitigation, lack of family member testimony."**  *Id*. at 7 (emphasis added).

Mr. Williams testified that he had given Jerome Brown, the defense expert, everything they had.  *Id*.  This information included Derrick's confession to the crime, a synopsis of the offense, the extraneous juvenile offenses the prosecution would introduce at trial, and Derrick's records from the juvenile facilities.  *Id*.  Additionally, Dr. Brown talked to Derrick's parents.  *Id*.  Dr. Brown reported that Derrick would be dangerous in the future, and thus the defense elected not to call him as a witness. *Id*. at 8.

---

[26] If Mr. Crowley had contact with Dr. Quijano two weeks prior to trial, it must have been relatively brief.  In his bill for his services in the case, Dr. Quijano claimed he spent a total of two hours on the case, including both his consultation with defense counsel and his testimony.  (Exhibit AA at 5).  Moreover, the two hours Dr. Quijano devoted to the case were on May 12, 2003, the day he testified.  Other than the two hours on the day of his testimony, the only sole other item on his bill is an $8 parking receipt.  *Id*.  Whatever time he spent on the case prior

Of course, because the defense team failed to conduct a social history investigation, Dr. Brown, as he later averred, was deprived of critical information that would have resulted in a more mental health investigation.  However, in the course of rationalizing the absence of mitigation, Mr. Williams also misstated the evidence and wrongly told the court that no psychological evidence was available to the defense.  For example, Mr. Williams informed the court that Derrick's juvenile records reflected that he was examined by a psychologist because he was hearing voices, but then asserted that "upon an examination, they found no evidence of mental disorder of any kind, and suspected he was probably just covering his bad behavior with an excuse of hearing voices." *Id*. at 8.  Mr. Williams' disparaging description of Derrick is false and flatly contradicted by the very records to which he refers.  *See supra at 31-35.*  Either Mr. Williams was not familiar with the records, or he mischaracterized them to justify his lack of effort.

Mr. Williams next explained that, even though Derrick Charles had been committed to a mental hospital for a couple of weeks, the client's parents – one of whom he knew to be schizophrenic – had told him that it was only because Derrick had been "acting out" and thus "it really didn't have anything to do with mental illness."  *See Exhibit AA*, *In Camera* Hearing at 8. Putting aside the facially incredible notion that doctors would commit an indigent child to an extensive stint in a mental hospital ***as a disciplinary measure***, trial counsel's delegation of responsibility for the failure to obtain Derrick's records to his parents (one schizophrenic, the other an alcoholic) demonstrates an appalling failure to comprehend the duty of defense counsel to conduct a thorough social history investigation.

---

to the day of his testimony must have been not worth billing for.

Even more astonishing was trial counsel's reaction to indications of mental illness in Derrick's family.   Mr. Williams knew Derrick's mother was a schizophrenic.   Instead of investigating areas such as how being raised by an untreated schizophrenic affected Derrick, how Nancy Phillips' untreated schizophrenia impacted her ability to nurture and raise a child, the existence of any hereditary components of her disease, counsel simply decided that Ms. Phillips was too fragile to withstand cross-examination, as if her frailty would have hurt Derrick's case. *Id*. at 8-9.

Mr. Williams testified that he did not call Derrick's aunt because she was aware that Derrick had experienced a visual hallucination during the crime in which he looked in the mirror and saw a totally black figure with eyes of fire.   Instead of seeing any potential mental health implications from this hallucination during the crime, Mr. Williams talked to lay people who suggested that he "get a [C]atholic priest to come down and talk about exorcism."   *Id*. at 11. However, Mr. Williams "didn't see how" the exorcism testimony "would fit with the tests at the courthouse to be admissible evidence.  And for those reasons, he did not call Derrick's aunt.   *Id*. at 11-12.

Mr. Williams concluded that because the very few family members with whom he spoke would be confronted during cross-examination with the grisly facts from the crime and they did not have anything "really good" to say about the defendant, he didn't call them.   *Id*. at 12.  He added that Derrick Charles seemed be able to read the pretrial motions.   *Id*. at 14.

The hearing ended with Judge Krocker thanking counsel and explaining the purpose of the proceeding: "Thank you.  I appreciate you taking the time to put this on the record.  I think while it's fresh in everyone's mind, it's always easier than coming back years later and having to write an affidavit.  Thank you, gentleman."   *Id*.

Thus, even before the conclusion of the trial, Derrick's trial counsel – with the assistance of the trial court – had adopted an adversarial posture toward their client. Moreover, despite the fact that Derrick had not asserted any claim of ineffective assistance of counsel and trial was on-going, his lawyers readily breached their duty of loyalty to their client, revealed privileged attorney/client communications, and disclosed their work product and trial strategy. Derrick was excluded from the hearing, was not represented by counsel who would protect his interests, and had no opportunity to question his attorneys as they made a record against his interests.

The very fact that attorneys would preemptively assume a defensive stand against their own client and engage in an unprecedented, mid-trial, Star Chamber-like hearing, or that a trial court would conduct one, is an indicator that someone appreciated the fact that the defense counsel's performance – as evidenced by their failure to present make a case for a "yes" answer to the mitigation special issue – was facially deficient.

### 6.    Closing Arguments.

Prosecutor Joseph Owmby began the State's closing arguments. He recounted the story of the offense to the jury. (R.R.XXIII-28-30). Then Owmby addressed Derrick Charles as a future danger. He pointed out Dr. Quijano did not know the facts of the offense when making his testimony. *Id.* at 31. He concluded Derrick constituted a future danger to society because of the character of the offense. *Id.* Furthermore, Owmby asserted the only reason Derrick pleaded guilt was to attempt to escape the consequences of the offense. *Id.* at 32-33.

Both Connie Williams and Sid Crowley's closing arguments focused on the future dangerousness special issue. Mr. Crowley argued first and focused his entire fifteen minute argument on whether Derrick Charles posed a future danger. He acknowledged that the testimony of the TYC personnel showed that Derrick Charles was continuously rude, used

profanity, and threatened people, but Derrick Charles never inflicted physical harm to anyone. *Id.* at 33-45.  He recalled Dr. Quijano's testimony about the remote likelihood of someone fitting Derrick Charles' general profile posing a future danger in prison. *Id.*  **Mr. Crowley never once mentioned the mitigation special issue nor did he refer to any mitigating evidence**.

Mr. Williams spent his entire closing argument recalling that none of the testimony brought forth ever showed an instance in which Derrick Charles inflicted physical harm to anyone.  *Id.* at 45-55.  He only briefly mentioned Derrick Charles' young age in a feeble attempt to offer the jury some reason to return a "yes" answer to the mitigation question.  *Id.* at 52.

Prosecutor Troy Cotton finished the State's closing arguments with an attack on the future dangerousness claims.  He referenced the many threats that Derrick made while in TYC *Id.* at 55-56.  Derrick was characterized as a defiant person whom no one could order around. Cotton framed Derrick as cold blooded killer "who was through talking" and was going to start acting. *Id.* at 57.  Again, Cotton reminded the jury of the facts of the crime and portrayed Derrick as an angry young man carefully exacting a calculated revenge on the Bennetts. *Id.* at 60-65. Cotton reviewed Derrick's criminal history portraying Derrick as someone who would learn and manipulate the system in order to get out of it. *Id.* at 72.  Finally, ***Cotton explicitly pointed out the defense failed to produce any mitigating evidence***.  *Id.* at 79-80.  He acknowledged the only thing close to mitigating evidence that Mr. Williams or Mr. Crowley presented was Derrick's young age.  He asserted to the jury the defense did not produce any mitigating evidence because none existed and Derrick did not have a good character. *Id.* at 79-80.

## E.    SUMMARY

Connie Williams and Sid Crowley failed to conduct an adequate investigation of Derrick Charles in preparation of the punishment phase of his trail. They ignored the blatantly obvious

-85-

signs that their client's social history was littered with mental illness, violence, poverty, and drug abuse.  At trial, Williams and Crowley led the jury to believe that mitigating evidence would be presented.  After the state presented an extensive 5 day case for the death of Derrick Charles, Williams and Crowley presented a defense that lasted less than two hours which included no mitigating evidence.  Before the jury could levy a verdict and before Derrick could even contemplate any sort of claim against his attorneys for their ineffective performance, Williams and Crowley were setting forth their defense in an unprecedented *In Camera* hearing. Because the jury never heard any of the volumes of mitigating evidence of his life, they had no choice but to sentence Derrick Charles to death.

**V.**
**GROUNDS FOR RELIEF**
**AND LEGAL ARGUMENT**

**A.   THE CONTROLLING AND CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.**

Because trial counsel failed to adequately investigate mitigating evidence in support of a life sentence, and there is a reasonable probability that but for their errors and omissions one juror would have returned a "yes" answer to the mitigation special issue, Derrick Charles was deprived of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

In determining whether trial defense counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing, this Court must apply the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms." *Id.* at

688. In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

Second, the defendant must satisfy the prejudice requirement by showing "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

From 2000 to 2005, the Supreme Court accepted three cases to address effective representation at the sentencing phase of a capital trial. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). This trio of decisions addressed death penalty cases tried in the 1980's, and the Supreme Court held in each instance that the clearly established law of *Strickland*, mandated a finding of ineffective assistance of counsel and thus the AEDPA posed no bar to relief.

The significance of these decisions cannot be overstated. While they are not ground-breaking in the sense that they represent the clearly established law, they are a detailed set of instructions to lower courts on the proper application of *Strickland* to capital sentencing proceedings. That the Court deemed such instruction necessary is evident from the fact that it devoted its scarce resources to taking – not one but – three, relatively speaking, unremarkable capital cases and modeling how to adjudicate claims of ineffective assistance of counsel. The Court scrupulously enforced the right to effective assistance of counsel in capital sentencing proceedings, even under the deferential scheme of AEDPA.[27]

---

[27] The Court's dissatisfaction with capital representation is clear from the Justices' contemporaneous extrajudicial remarks. An article reporting on the *Wiggins* oral argument noted:

> The case comes as the Supreme Court is paying heightened attention to the death penalty, with a special focus on the quality of the lawyers that capital defendants typically receive. In recent years,

Just as its decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004), *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), and *Brewer Quarterman*, 550 U.S. 286 (2007), reanimated the rule of *Penry v. Lynaugh*, 492 U.S. 302 (1989), after a decade-and-a-half of lower court precedent had rendered it essentially dead letter, this trio of decisions reflects the Court's strong dissatisfaction with the direction of lower court Sixth Amendment jurisprudence during the 16 years following *Strickland*.  They likewise overturn a vast body of inconsistent lower court cases that had accumulated during the interim.

After a brief review of these decisions, Petitioner will summarize the relevant holdings and then apply them to his case.

### 1.   *Williams v. Taylor*, 529 U.S. 362 (2000)

In *Williams,* the Supreme Court addressed:

> [W]hether Terry Williams' constitutional right to the effective assistance of counsel as defined in *Strickland v. Washington* was violated, and whether the judgment of the Virginia Supreme Court refusing to set aside his death sentence 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' within the meaning of 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. III).

*Williams*, 529 U.S. at 367 ( citing *Strickland* v. *Washington,* 466 U.S. 668).  Thus, the Supreme Court assessed Mr. Williams' 1986 trial through the prism of clearly established Supreme Court precedent as of the Virginia Supreme Court's 1997 decision to deny habeas corpus relief.

Terry Williams confessed to murdering Harris Stone because Mr. Stone would not lend

---

two Supreme Court justices have suggested in public comments that defendants facing a death sentence need better lawyers.

Justice Ruth Bader Ginsburg  has said she has yet to see a death penalty defendant who was well represented at trial.  Justice Sandra Day O'Connor, often at odds with Ginsburg ideologically, has suggested that lawyers representing capital defendants should be required to meet minimum standards.

Jan Crawford Greenburg, "*Court Studies Quality of Capital Cases Justices Focus on Effective Counsel for*

him "a couple of dollars." *Id*. at 367-68. According to Williams' confession, he had gone to Stone's house to see Stone's daughter, Dee Dee, but she was not there. Mr. Stone was lying on a bed, alone and very drunk. After Stone refused to loan Williams a couple of dollars, Stone "laid back like he had passed out." *Id*. at 368 n.1. Williams searched the house for a weapon and found a mattock, which is a tool for digging out stumps. *Id*. Williams returned to the room in which Stone was lying on the bed, fatally beat the helpless Stone with the mattock, took $3.00 from his wallet, and left him there "still grasping for breath." *Id*.

In addition to the cold-blooded beating death of a defenseless man for $3.00, the prosecution proved an extensive case in aggravation. Williams had been convicted of armed robbery in 1976 and grand larceny in 1982. *Id*. at 368. One month after murdering Mr. Stone in 1985, Williams committed "two auto thefts and two separate violent assaults on elderly victims." *Id*. In the first assault, Williams "started a fire outside of the victim's residence before attacking and robbing him." Four months later, Williams "brutally assaulted an elderly woman" and left her in a vegetative state from which she was not expected to recover. *Id*.

The jury also heard that, while awaiting trial for capital murder, Williams was convicted of arson for setting fire to the jail. *Id*.

Finally, two expert witnesses "testified that there was a high probability that Williams would pose a serious continuing threat to society.[28] *Id*. at 368-69.

---

*Defendants*," Chicago Tribune, Mar. 25, 2003, available at 2003 WLNR 15284160.

[28] The Fourth Circuit summed up the case in aggravation in this way:

> ***The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams's life***. Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.

*Williams v. Taylor*, 163 F.3d 860, 868 (C.A.4 1998) (emphasis added).

During the sentencing phase of the trial, Williams' counsel presented the testimony of Williams' mother, two neighbors, and a taped statement by a psychiatrist. *Id*. at 369.

The Supreme Court concluded that trial counsel's performance was below professional norms because they failed to investigate and discover extensive records describing Mr. Williams' childhood. *Id*. at 395. This failure was not based on any strategic calculation. Counsel mistakenly believed that any such records would not have been admissible. *Id*.

The Court noted, as is frequently true of a capital defendant's juvenile history, that "not all of the additional evidence was favorable to" the defendant. *Id*. at 396. In fact, Williams' records revealed additional criminal offenses for which he was incarcerated as a juvenile, including aiding and abetting larceny at age 11, pulling a false fire alarm at age 12, and breaking and entering at age 15. *Id*. However, the failure to introduce records that were never located and reviewed by trial counsel could not have been based on strategic considerations related to the negative information in the records:

> [T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession. Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their ***obligation*** to conduct a thorough investigation of the defendant's background. *See* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980).

*Id*. (emphasis added).

After concluding that counsel's failure to conduct a thorough social history investigation was deficient, the Court determined that Williams was prejudiced by his counsels' omissions. Available social history records contained compelling information about Williams' background:

> [T]he jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the

social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

Counsel failed to introduce available evidence that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. They failed to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, or the testimony of prison officials who described Williams as among the inmates "least likely to act in a violent, dangerous or provocative way." Counsel failed even to return the phone call of a certified public accountant who had offered to testify that he had visited Williams frequently when Williams was incarcerated as part of a prison ministry program, that Williams "seemed to thrive in a more regimented and structured environment," and that Williams was proud of the carpentry degree he earned while in prison.

*Id*. at 395-96 (citations and footnote omitted).

When assessing the potential impact of the mitigating evidence, the *Williams* Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness or the prosecution's case for death eligibility:

While [evidence of Williams' voluntary surrender, co-operation with the police and remorse], coupled with the prison records and guard testimony, may not have overcome a finding of future dangerousness, the graphic description of Williams' childhood, filled with abuse and privation, *or* the reality that he was "borderline mentally retarded," might well have influenced the jury's appraisal of his moral culpability. *See Boyde v. California*, 494 U.S. 370, 387, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The circumstances recited in his several confessions are consistent with the view that in each case his violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation. ***Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case***.[29]

*Id*. at 398 (emphasis added). The Court made it clear that prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. The question is not whether there is

---

[29] This is particularly true in Texas cases because the jury is asked to assess the defendant's future dangerousness in the first special issue. The jury proceeds to the second special issue only if it unanimously determines that the defendant may pose a future danger. The second special issue is an entirely separate and distinct inquiry into the

sufficient evidence to justify a death sentence, *see e.g. Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (the *Brady* and *Strickland* prejudice test is "not a sufficiency of evidence test"), it is whether the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398.

As the Court noted, **either** Williams' tragic childhood **or** his borderline mental retardation was sufficient to justify a finding of *Strickland* prejudice, *id.*, even though the prosecution proved that Williams was very dangerous defendant who had repeatedly committed vicious crimes.

The Virginia Supreme Court's finding of no prejudice "was unreasonable in at least two respects." *Id.* at 397. First, it had mistakenly read *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as having grafted on an additional requirement to *Strickland*'s outcome determinative test for prejudice. *Id.* Second, "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id.* at 397-98; *see also id.* at 416 (O'Connor, J., concurring) (the Virginia Supreme Court's application of *Strickland* was unreasonable because of the "failure to consider the totality of the omitted mitigation evidence.").

## 2. *Wiggins v. Smith*, 539 U.S. 510 (2003)

In the October 2002 term, the Court revisited the issue of capital defense investigation and representation in *Wiggins v. Smith*, 529 U.S. 510 (2003). Wiggins was convicted of drowning 77-year-old Florence Lacs in her bathtub and ransacking her apartment. *Id.* at 514. In preparation for the sentencing proceeding, trial counsel investigated and developed mitigating evidence, including "psychological reports and expert testimony demonstrating Wiggins' limited

---

defendant's moral culpability in light of any mitigating evidence.

intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other."   *Id.* at 516.   "At no point did [trial counsel] proffer any evidence of petitioner's life history or family background."   *Id.*

In post-conviction proceedings, Wiggins "challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background."   *Id.* Additionally, Wiggins:

> presented testimony by Hans Selvog, a licensed social worker certified as an expert by the court.   Selvog testified concerning an elaborate social history report he had prepared containing evidence of the severe physical and sexual abuse petitioner suffered at the hands of his mother and while in the care of a series of foster parents.   Relying on state social services, medical, and school records, as well as interviews with petitioner and numerous family members, Selvog chronicled petitioner's bleak life history.
>
> According to Selvog's report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage.   Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner-an incident that led to petitioner's hospitalization.   At the age of six, the State placed Wiggins in foster care.   Petitioner's first and second foster mothers abused him physically [] and, as petitioner explained to Selvog, the father in his second foster home repeatedly molested and raped him.   At age 16, petitioner ran away from his foster home and began living on the streets.   He returned intermittently to additional foster homes, including one in which the foster mother's sons allegedly gang-raped him on more than one occasion.   After leaving the foster care system, Wiggins entered a Job Corps program and was allegedly sexually abused by his supervisor.

*Id.* at 516-17 (citations omitted).

Wiggins trial counsel acknowledged that he did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose."   *Id.* at 517.

The Maryland Court of Appeals held that trial counsel made "'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Id.* at 518 (quoting *Wiggins v. State,* 724 A.2d 1, 15 (Md. 1999)). Trial counsel "knew of Wiggins' unfortunate childhood" and had "'social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation.'" *Id.* (quoting *Wiggins*, 724 A.2d at 15). The Maryland court "acknowledged that this evidence was neither as detailed nor as graphic as the history elaborated in the Selvog report but emphasized that 'counsel *did* investigate and *were* aware of appellant's background.'" *Id.* (quoting 724 A.2d at 16 (emphasis in original)). Because counsel knew that "at least one uncontested mitigating factor – Wiggins' lack of prior convictions – would be before the jury should their attempt to disprove Wiggins' direct responsibility for the murder fail," the state court concluded that trial counsel "'made a reasoned choice to proceed with what they thought was their best defense.'" *Id.* (quoting 724 A.2d at 17).

The federal district court granted habeas corpus relief but the Fourth Circuit reversed, holding that counsel "had made a reasonable strategic decision to focus on petitioner's direct responsibility." *Id.* at 519. Counsel knew "at least some details of Wiggins' childhood," though the Fourth Circuit "acknowledged that counsel likely knew further investigation 'would have resulted in more sordid details surfacing.'" *Id.* Counsel's knowledge was thus sufficient to make an informed strategic decision. *Id.*

Justice O'Connor, writing for a seven-member majority of the Court, concluded that Kevin Wiggins' counsel were ineffective during his 1989 capital trial because their investigation failed to satisfy *Strickland*'s performance standards, and the Maryland court's conclusion to the contrary was objectively unreasonable.

After identifying the two-part *Strickland* test as controlling, the Court emphasized:

> Our opinion in *Williams v. Taylor* is illustrative of the proper application of these standards.  In finding Williams' ineffectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'  529 U.S., at 396, 120 S.Ct. 1495 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980)) . . . .  In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same 'clearly established' precedent of *Strickland* we apply today.

*Id*. at 522.

Because Wiggins' complaint was that his counsel failed to conduct a thorough social history investigation, the Court's "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgmen[t],' is not whether counsel should have presented a mitigation case.  Rather, [the Court] focus[ed] on whether the ***investigation*** supporting counsel's decision not to introduce mitigating evidence of Wiggins' background ***was itself reasonable***."  *Id*. at 522-23 (quoting *Strickland*, at 691) (citations omitted and emphasis added and in the original).

The Court then cataloged the investigative efforts of Wiggins' counsel.  Counsel retained a psychologist who evaluated Wiggins and determined that he had a low IQ, "difficulty coping with demanding situations," and features of a personality disorder.  *Id*. at 523.  Counsel had a pre-sentencing report, which included a one-page personal history noting Wiggins' "misery as a youth," his self-reported "disgusting" background, and noting that he had spent most of his life in foster care.  *Id*.  Counsel also located and obtained Baltimore's Department of Social Services records documenting Wiggins' placements in foster care.  *Id*.

The Court held that "counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989."

*Id*. at 524.  The Court explained:

> [S]tandard practice in Maryland in capital cases at the time of Wiggins' trial included the preparation of a social history report.  Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report.  Counsel's conduct similarly fell short of the standards for capital defense work articulated by the – American Bar Association (ABA) standards to which we long have referred as "guides to determining what is reasonable."  *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495.  The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).

*Id*. (citations omitted).   More specifically, the Court faulted counsel for obtaining only a rudimentary understanding of the client's social history, from a narrow range of sources, before making their allegedly strategic decision:

> Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.  *Cf. id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . . . .  Investigation is essential to fulfillment of these functions").

*Id*. at 524-25.

Further, "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered in the DSS records."  *Id*. at 525.  The documents collected by counsel revealed that Wiggins' "mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for

days without food." *Id*.

The Court also scrutinized counsels' conduct of the case and concluded "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id*. at 526. For example, in her opening statement counsel entreated the jury to consider Wiggins' "difficult life," even though they later failed to present any details of Wiggins' history. *Id*.

After reviewing counsel's actions before and during the trial, the Court concluded: "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id*. at 526-27.[30]

The Court faulted the state court for "assum[ing] that because counsel had *some* information with respect to petitioner's background – the information in the PSI and the DSS records – they were in a position to make a tactical choice not to present a mitigation defense." *Id*. 527 (emphasis in the original). "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate

---

[30] The Supreme Court's willingness to subject the state court's finding of trial strategy to careful scrutiny in light of the actual record, and determine that it is more likely a *post hoc* rationalization of trial counsel's conduct, is consistent with the Supreme Court's admonition that the AEDPA "deference" does not require judicial abdication:

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In *Wiggins*, as in *Miller-El*, the Supreme Court demonstrated how to apply the AEDPA. A state court finding of trial strategy does not insulate counsel's performance from federal review. Federal courts must scrutinize the finding in light of the record as a whole.

further." *Id*.

Rejecting the dissent's contention that the Court's "hands are tied, under § 2254(d), 'by the state court's factual determinations that Wiggins' trial counsel *did* investigate and *were* aware of [Wiggins'] background,'"[31] the Court held that:

> [T]he Maryland Court of Appeals' application of *Strickland*'s governing legal principles was objectively unreasonable. Though the state court acknowledged petitioner's claim that counsel's failure to prepare a social history "did not meet the minimum standards of the profession," the court did not conduct an assessment of whether the decision to cease all investigation upon obtaining the PSI and the DSS records actually demonstrated reasonable professional judgment. The state court merely assumed that the investigation was adequate. In light of what the PSI and the DSS records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. The Court of Appeals' assumption that the investigation was adequate thus reflected an unreasonable application of *Strickland.* 28 U.S.C. § 2254(d)(1) . . . . As we established in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S., at 690-691, 104 S.Ct. 2052

*Id*. at 527-28 (citations omitted). In other words, the state court unreasonably applied *Strickland* because it was excessively deferential to counsel's invocation of strategy by failing to examine whether they were justified in making such decisions.

Because the state courts never reached the prejudice inquiry the Supreme Court reviewed the question of prejudice *de novo*. The Court described the evidence counsel failed to discover as "powerful." *Id*. at 534. The social worker reported, based on his conversations with Wiggins' family, that Wiggins:

> experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case.

---

[31] *Wiggins*, at 528 (internal quotation marks omitted).

*Id.* at 535.  The Court concluded that Wiggins had "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability."  *Id.*

Thus, **despite** the trial lawyers' testimony regarding strategic reasons for not further pursuing mitigating evidence, the Court held that "[g]iven both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form."  *Id.*  "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."  *Id.* at 536.

Finally, the Court noted that in reaching its conclusion, "we need not, as the dissent suggests make the state-law evidentiary findings that would have been at issue at sentencing. Rather, we evaluate the totality of the evidence – 'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*' *Williams v. Taylor,* 529 U.S., at 397-398, 120 S.Ct. 1495 (emphasis added).'" *Id.* (citations omitted).

### 3. *Rompilla v. Beard*, 545 U.S. 374 (2005)

Two years later, in *Rompilla*, the Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. at 377.

Ronald Rompilla was sentenced to death for the 1988 murder of James Scanlon.  Mr. Scanlon was discovered dead outside of his bar, he had been stabbed repeatedly and then set on fire.  One of the three aggravating factors justifying Mr. Rompilla's death sentence was that the

murder was committed by torture.  *Id*. at 378.  In finding the evidence sufficient justify the jury's

finding of a torture-killing, the state court cited to the medical examiner's testimony:

> Dr. Isidore Mihalakis, a forensic pathologist, testified at the sentencing hearing
> that the victim was alive during the infliction of almost all of the injuries that he
> received.  These injuries included abrasions, lacerations, blunt force injuries, a
> fractured nose, and multiple stab wounds.  Dr. Mihalakis further testified that the
> number and location of the various wounds on the victim's body were indicative
> of injuries that were inflicted with the intent of causing pain.

*Commonwealth v. Rompilla*, 653 A.2d 626, 634 (Pa. 1995) (citations omitted).  In addition to

torture, the jury also found that the murder was committed in the course of another felony and

that Rompilla had a "significant history of felony convictions indicating the use or threat of

violence." 534 U.S. at 378.  In support of the latter aggravating factor, the prosecution presented

evidence of a burglary and that Rompilla raped a woman at knifepoint.  An assistant district

attorney read the rape victim's testimony to Rompilla's jury in the sentencing phase of his capital

trial.  653 A.2d at 633.

The defense case at punishment "consisted of relatively brief testimony: five of his family

members argued in effect for residual doubt, and beseeched the jury for mercy, saying that they

believed Rompilla was innocent and a good man.  Rompilla's 14-year-old son testified that he

loved his father and would visit him in prison." 545 U.S. at 378.

Rompilla sought post-conviction relief in state court on the basis that the defense failed to

present "significant mitigating evidence about Rompilla's childhood, mental capacity and health,

and alcoholism," but the state court deemed sufficient trial counsels' investigation.  *Id*.

The federal district court held that the state court had unreasonably applied *Strickland* and

granted habeas corpus relief.  "The court found that in preparing the mitigation case the defense

lawyers had failed to investigate 'pretty obvious signs' that Rompilla had a troubled childhood

and suffered from mental illness and alcoholism, and instead had relied unjustifiably on Rompilla's own description of an unexceptional background." *Id*. at 379. A divided panel of the Third Circuit reversed. The panel acknowledged that trial counsel failed to discover mitigating evidence located in Rompilla's school, medical, police, and prison records, but it held that – based on the information they had – trial counsel were justified in failing to look. *Id*. Thus, unlike *Wiggins*, in which counsel ignored obvious leads, Rompilla's counsel did enough to reasonably conclude that further investigation would be a waste of limited resources. *Id*.

The Supreme Court observed at the outset that:

> This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.

*Id*. at 381. In particular, Rompilla himself was not helpful:

> "Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was "bored being here listening" and returned to his cell. To questions about childhood and schooling, his answers indicated they had been normal, save for quitting school in the ninth grade. There were times when Rompilla was even actively obstructive by sending counsel off on false leads."

*Id*. (citations omitted).

Yet, even without promising leads, the Court found trial counsels' investigation deficient because they failed to examine the public files on Rompilla's prior conviction that they knew would be used to justify a death sentence. *Id*. at 383.

> "Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's

> prior conviction for rape and assault, and would emphasize his violent character
> by introducing a transcript of the rape victim's testimony given in that earlier trial.
> There is no question that defense counsel were on notice, since they acknowledge
> that a "plea letter," written by one of them four days prior to trial, mentioned the
> prosecutor's plans."

*Id*. at 383-84 (citations omitted).  It was clear from the record that counsel failed to review these

files prior to trial.  *Id*. at 384-85.

       The Court deemed it a given that reasonably diligent would obtain all available evidence

related to the prosecution's case in aggravation:

> The prosecution was going to use the dramatic facts of a similar prior offense, and
> Rompilla's counsel had a duty to make all reasonable efforts to learn what they
> could about the offense.  Reasonable efforts certainly included obtaining the
> Commonwealth's own readily available file on the prior conviction to learn what
> the Commonwealth knew about the crime, to discover any mitigating evidence the
> Commonwealth would downplay, and to anticipate the details of the aggravating
> evidence the Commonwealth would emphasize. Without making reasonable
> efforts to review the file, defense counsel could have had no hope of knowing
> whether the prosecution was quoting selectively from the transcript, or whether
> there were circumstances extenuating the behavior described by the victim.

*Id*. at 385-86 (footnotes omitted).  The Court again relied on the ABA Guidelines for the standard

of care.  *Id*. at 387.

       The Court emphatically rejected state courts' conclusion that trial counsel were excused

from looking at the case files based on their other efforts to seek mitigation:

> We think this conclusion of the state court fails to answer the considerations we
> have set out, to the point of being an objectively unreasonable conclusion.  It
> flouts prudence to deny that a defense lawyer should try to look at a file he knows
> the prosecution will cull for aggravating evidence, let alone when the file is sitting
> in the trial courthouse, open for the asking.  ***No reasonable lawyer would forgo
> examination of the file thinking he could do as well by asking the defendant or
> family relations whether they recalled anything helpful or damaging in the
> prior victim's testimony***.  Nor would a reasonable lawyer compare possible
> searches for school reports, juvenile records, and evidence of drinking habits to
> the opportunity to take a look at a file disclosing what the prosecutor knows and
> even plans to read from in his case . . . .  But looking at a file the prosecution says
> it will use is a sure bet: whatever may be in that file is going to tell defense

counsel something about what the prosecution can produce.

*Id*. at 389 (emphasis added).

The Court next turned to the prejudice inquiry, which it addressed *de novo* because the Pennsylvania courts never reached it.  Had counsel inspected the files on Rompilla's prior conviction, they would have discovered "a range of leads that no other source had opened up." *Id*. at 390.  Additionally, the information would have dislodged the incomplete and/or inaccurate information provided by Rompilla and his family:

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.  With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case.  Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Id*. at 391.  Counsel would have learned that:

> Rompilla's parents were both severe alcoholics who drank constantly.  His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems.  His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her.  His parents fought violently, and on at least one occasion his mother stabbed his father.  He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks.  All of the children lived in terror.  There were no expressions of parental love, affection or approval.  Instead, he was subjected to yelling and verbal abuse.  His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled.  He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone.  They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

*Id*. at 391-92 (quoting 355 F.3d at 279 (Sloviter, J., dissenting)).

Further, the Court noted that trial counsels' mental health experts were deprived of this

information but the experts assisting post-conviction counsel had it and,

> [F]ound plenty of "'red flags'" pointing up a need to test further.  355 F.3d, at 279
> (Sloviter, J., dissenting).  When they tested, they found that Rompilla "suffers
> from organic brain damage, an extreme mental disturbance significantly impairing
> several of his cognitive functions."  *Ibid*.  They also said that "Rompilla's
> problems relate back to his childhood, and were likely caused by fetal alcohol
> syndrome [and that] Rompilla's capacity to appreciate the criminality of his
> conduct or to conform his conduct to the law was substantially impaired at the
> time of the offense."  *Id.,* at 280 (Sloviter, J., dissenting).

*Id*. at 392.  Thus, counsels' failure to investigate and provide the available information to their

mental health experts derailed the effectiveness of the experts as well.

Rompilla was plainly harmed by counsels' failure to take the simple step of reviewing

available documents that would have led to a compelling case in mitigation:

> This evidence adds up to a mitigation case that bears no relation to the few naked
> pleas for mercy actually put before the jury, and although we suppose it is possible
> that a jury could have heard it all and still have decided on the death penalty, that
> is not the test.  It goes without saying that the undiscovered "mitigating evidence,
> taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's]
> culpability," *Wiggins v. Smith,* 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams
> v. Taylor,* 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different
> result if the evidence had gone in is "sufficient to undermine confidence in the
> outcome" actually reached at sentencing, *Strickland,* 466 U.S., at 694, 104 S.Ct.
> 2052.

*Id*. at 393.  And for the third time in a relatively brief span, the Supreme Court reversed a death

sentence because the trial counsel failed to provide effective representation when preparing for

sentencing, and the state court decision to the contrary was unreasonable.

These cases have clarified considerably the "clearly established law" applicable to capital

cases adjudicated in state court after *Strickland*.  The following principles are inherent in

*Strickland* and its progeny:

**<u>Performance</u>:**

- Capital defense is sufficiently specialized and regulated to have a national

standard, reflected both in the 8th Amendment and the ABA guidelines. *Rompilla*, 545 U.S. at 387; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 397.

● While there is no set of per se rules or checklist for capital representation, defense counsel must – in every case – engage in a thorough social history investigation. The ABA guidelines reflect the "well-defined norms" of the national standard for mitigation investigation, and thus the floor below which local practices may not descend. *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.

● Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation. *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527-28.

● The fact that counsel performed some, or even extensive investigation, does not preclude a finding of deficient performance with respect to further investigation they reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388-89; *Wiggins*, 539 U.S. at 527, 534.

● Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

● The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation. Counsel must, at a minimum, secure the information in possession of law enforcement. *Rompilla*, 545 U.S. at 385-87.

**<u>Prejudice</u>:**

● Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability. *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

● The operative question is whether there's a reasonable probability that one juror would have voted differently. *Wiggins*, 539 U.S. at 537.

● When assessing prejudice from counsel's error or omissions, reviewing courts must look at all of the evidence in the aggregate, including the evidence adduced at trial and the evidence adduced in post-conviction proceedings. *Wiggins*, at 536; *Williams*, at 397-98.

● Courts should not focus on trial counsel's post-trial statements regarding whether they would have used the mitigating evidence adduced in post-conviction proceedings, the relevant inquiry is whether a competent attorney would have

introduced it. *Wiggins*, 539 U.S. at 535.

- The failure to discover mitigation undermines the outcome even in highly aggravated cases. The failure to provide any context or explanation for an aggravated case may render the proceeding unreliable. The idea that considerable aggravation is a *per se* bar to finding prejudice is no longer viable after *Williams* and *Rompilla*, both of which were highly aggravated cases.

- Prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. *Williams*, 529 U.S. at 398.

- Courts must look at all consequences that would have flowed from competent performance, including the impact on the work of expert witnesses. *Rompilla*, 545 U.S. at 592-93.

- When assessing prejudice federal courts need not make the state-law evidentiary findings that would have been at issue at sentencing, courts merely evaluate the totality of the evidence adduced at trial and in the habeas proceedings. Thus, a petitioner can use reliable hearsay to prove prejudice. *Wiggins*, 539 U.S. at 536.

To the extent that many lower court decisions failed to derive these principles, they are no longer valid precedent. Federal courts adjudicating claims of ineffective sentencing-phase defense in capital cases should be wary of relying on decisions made without the benefit of the Supreme Court's guidance in *Williams*, *Wiggins*, and *Rompilla*.

**B.     DERRICK CHARLES IS ENTITLED TO RELIEF AND THE STATE COURT'S DECISION TO THE CONTRARY WAS AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED LAW.**

Applying the above principles to Derrick Charles' case, it is plain that he is entitled to relief and that the state court decision to the contrary was unreasonable.[32]

**1.     DEFICIENT PERFORMANCE: Defense Counsel's Failure to Conduct an Adequate Mitigation Investigation and to Obtain Information and Documentation Regarding Mr. Charles' Psychiatric Hospitalizations was Below an Objective Standard of Reasonableness Pursuant to Prevailing**

---

[32] The trial court merely signed off on the prosecution's proposed findings of fact and conclusions of law. The CCA, however, rejected the finding that trial counsel were diligent with respect to locating the Gulf Pines Hospital records. Thus, the question of counsel's performance with respect to this aspect of the investigation is before this Court *de novo*.

**Professional Norms.**

In capital sentencing, the United States Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina,* 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio,* 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Id.* at 604. Likewise, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma,* 455 U.S. 104, 114 (1982), such as a "troubled youth," *Id.* at 107.[33]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina,* 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting

---

[33] In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance"; his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence"; he was "emotionally disturbed"; "his mental and emotional development" were less than his 16-years-of-age; and he "had a sociopathic or antisocial personality disorder." *Id.* at

*Lockett*, 438 U.S. at 604).  *See also Lambright v. Schriro*, 490 F.3d 1103, 1115 (9th Cir. 2007) ("If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history, as well as his positive character traits, would not be considered, even though some of these factors, both positive and negative, might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant").

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty.  *Woodson*, 428 U.S. at 304.  A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation."  *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[T]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").

The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that

107.

information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community. *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, Advocate in Residence: *The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)). In short, the prevailing professional norms in 2003 when Mr. Charles was tried required, at minimum, that counsel attempt through the mitigation investigation and presentation of evidence to provide some "explanation for petitioner's criminal propensities and some basis for the exercise of mercy." *In re Lucas*, 94 P.3d 477, 481 (Cal. 2004). *See also Caro v. Woodford*, 280 F.3d 1247, 1258 (9th Cir. 2002) ("A little explanation can go a long way" and might make "the difference between life and death").

As described above, the ABA Guidelines provide the framework within which counsel performs in ensuring that constitutionally relevant and necessary evidence is presented to the sentencing jury. Under the ABA Guidelines, investigation for the penalty phase of a capital trial "should begin immediately upon counsel's entry into the case," 1989 Guideline 11.4.1A; 1989 Guideline 11.8.3A, and should be conducted with the assistance of "trained investigators," 1989 Guideline 8.1 Commentary (quoting Goodpaster, *Effective Assistance of Counsel in Capital Cases*, 58 N.Y.U. L. Rev. 299, 344-45 (1983)), such as a "mitigation specialist," 2003 Guideline 4.1.A.1.[34]

Regardless of whether counsel retains a mitigation investigator or a specialist to prepare the social history report and present testimony, the "investigation should comprise efforts to

---

[34] "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; . . . and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation." 2003 Guideline 4.1 Commentary.

-109-

discover all reasonably available mitigating evidence . . . ."  1989 Guideline 11.4.1C.  "This duty is intensified (as are many duties) by the unique nature of the death penalty."  1989 Guideline 11.4.1 Commentary.

In fulfilling counsel's duties, the Guidelines specify that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)."  1989 Guideline 11.4.1.D.2.  Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death."  1989 Guideline 11.4.1.D.3.  Counsel's duty "is not discharged merely by conducting a limited investigation."  *Lambright*, 490 F.3d at 1120. Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial."  *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

In addition to the standard of care inherent in *Strickland* and its progeny, as well as the ABA guidelines, the standard of care in Texas at the time of Derrick's 2003 trial may inform this Court's assessment.  The standard with respect to mitigation in capital cases is clear from continuing legal education seminars predating Derrick's trial, and they clearly embodied the constitutionally mandated duties of capital defense counsel described by the Supreme Court and the ABA.  For example, materials distributed at a February, 2001, seminar in Austin, Texas, explain that ***every*** capital defense team ***must*** include a mitigation specialist:

> In a death case, the ultimate goal is the preservation of the client's life.  The entire preparation of the case must be directed to that end.  Because of this all-important goal, these cases are, in essence, prepared in reverse order.  Regardless of guilt,

> the attorneys must aim their efforts from the beginning at saving, the client's life. For this reason and because the death penalty is, in part, a sociological issue, counsel must include human service professionals on the defense team. ***The mitigation specialist is the first, and usually most important, expert that should be consulted in every capital case***. They should have both sound, clinical skills for interviewing and assessment and a thorough working knowledge of the court system.

*See Exhibit KK,* "The Team Concept in a Capital Case" at 2 (emphasis added). Because a mitigation specialist is an indispensable member of every capital defense team, the trial court granted funds for one ***before*** Mr. Charles' trial counsel filed a motion requesting one.

A mitigation specialist is not a guilt/innocence investigator, nor is the role of one synonymous with a mental health expert. A mitigation specialist performs critical functions that are very distinct from other members of the defense team. *Id.* at 3-8. One of the crucial functions of a mitigation specialist is to develop the social history that will be relied upon by the attorneys and mental health experts:

> The largest role of the mitigation specialist is that of a psycho-social investigator. The complete social investigation compiled by the mitigation specialist is the base upon which a successful mitigation is built.

\* \* \* \*

> The social history helps the attorney understand the client and what happened and aids the attorney in explaining to the court and jury what the client is about and why. ***The social history also contains invaluable information for other team members, such as the psychologists and psychiatrists. This material guides the lawyers and mental health experts in determining what to test for and why***.

*Id.* at 4 (emphasis added).

Because the mitigation specialist plays such a critical role in preparing for sentencing, the standard of care requires entrusting the social history investigation only to someone with the appropriate expertise and training:

> "The lawyer must also take care in hiring the mitigation specialist. This is not

someone who will just go out and talk to people.  This should be a professional who is trained in conducting mitigation investigations.  This can be a licensed social worker with an MSW or Ph.D.  This is an expert.  Someone who can testify at trial as to her findings, conclusions and opinions.

* * * *

A mitigation specialist should possess an understanding of the psycho-social aspects of human development, human relations skills, and management skills. Try to select a mitigation specialist with a background in any combination of clinical social work, counseling other human service professions coupled with some sort of forensic or criminal justice knowledge."

*Id.* at 2 – 3.

Social history investigation in every case requires *both* interviewing numerous individuals *and gathering a broad range of documents*.  These interrelated processes are time-consuming and must be started long before trial:

A complex, multilayered analysis of the client's life – a social history – helps the jury to understand the causes of the violence they examined in the guilt phase of the capital trial.  As Professor Craig Haney has observed, social histories are not excuses, they are explanations.  ***A key element in social history investigation is the collection of reliable, objective documentation about the client and his or her family***.  This record gathering needs to be accomplished confidentially, using broad authorizations for release of confidential information signed by the client, parents, siblings, caretakers, and significant others.  The safest policy is to get everything, not to self-censor.  A hospital may ask, for example, "Do you really want *dental* records?" What relevancy might dental records have to mitigation or mental health claims?  In one case, they uncovered a powerful story of neglect: the client, at age eight, was taken to a hospital emergency room by a school teacher because his teeth had rotted from malnutrition and poor hygiene.  ***The search for records typically includes birth certificates and genealogical archives; prenatal, birth, and pediatric charts; physicians, hospitals, and mental health records; school, social service agency, juvenile court, employment, Social Security, and workers compensation files; military records; marriage and divorce files; death and autopsy records; correctional, probation and parole records; court files and litigation records***.  Investigating the capital client's biography is a sensitive, complex, and cyclical process.  It is cyclical, rather than linear, because witnesses will need to be re-interviewed when new information has been discovered.  As veteran mitigation specialist Lee Norton observes:

The investigation is not complete until the information uncovered becomes redundant and provides no new insight.  It is insufficient to talk to witnesses only once because each new individual recalls different facts and

> anecdotes; if an aunt provides an account of a head injury which the mother forgot to mention, it is necessary to go back to the mother to ask about it. Similarly, an interview may reveal records that must be obtained, which in turn raise new questions, questions which necessitate interviewing several witnesses again.

*See Exhibit LL,* 2001 Stetler article at pp. 10-11.

This Court need not linger long on the question of deficient performance. As described, *supra*, trial counsel failed to attempt a small fraction of the work mandated by prevailing professional norms reflected in the decisions of the Supreme Court, the ABA Guidelines, and/or contemporaneous local practice. Nor did counsel hire someone else to do it, even though the trial court essentially threw funding at counsel. ***Nobody*** fulfilled this function during Derrick's trial. Thus, even though counsel were confronted with numerous leads about compelling mitigating evidence, none of them were pursued.

The deficient mitigation investigation by Wiggins' trial counsel was more ambitious than the investigation in this case. Derrick Charles' counsel ***wholly*** failed to undertake the basic mitigation investigation required in all capital cases and thus never compiled a social history. Their failure is all the more profound because they learned from numerous sources that Derrick had been hospitalized for psychiatric illness ***and*** the name of Derrick's treating physician, Dr. Ginsberg. Derrick's grandmother told trial counsel's investigator that she though Derrick was mentally ill. As state post-conviction counsel demonstrated, the only tool necessary to follow-up on these multiple leads all converging on the same set of documents was ***the phonebook***. As Derrick's trial counsel candidly acknowledged – and as his ineffectual, half-hearted stab at obtaining the records demonstrates – he had ***no strategic reason for failing contact Derrick's***

***treating physician*** to learn more about the hospitalization.[35]

Derrick's aunt informed trial counsel that Derrick was experiencing visual hallucinations during the crime itself. Instead of following this lead and/or presenting this important information to the jury, counsel actually mocked his client's mental illness – on the record – by joking he would have brought in a Catholic priest to talk about exorcisms but he did not think the testimony would be admissible. This was trial counsel's "strategic reason" for not calling the aunt to testify.

Counsel also knew that Derrick was hearing voices during a prior incarceration but incorrectly determined that he had been "faking." Likewise, he knew Derrick's mother was a schizophrenic.

Each of these leads should have been followed. However, to fail to follow all of these leads as well as pursue information about Derrick's two mental health hospitalizations is undeniably deficient. As in *Wiggins*, "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered." 539 U.S. at 525.

The defense failure to investigate a mitigation case was not a strategic decision. Throughout their often conflicting testimony regarding their *post hoc* justifications for their omissions, counsel have repeatedly affirmed that if they had had mitigating evidence, they would have used it. Moreover, "[t]he record of the actual . . . proceedings underscores the

---

[35] As described above, in state post-conviction proceedings, trial counsel – after confessing having no strategic reason for not contacting Dr. Ginsburg – offered a *post hoc* rationale: he thought Mr. Charles' hospital stay was a brief two-day visit. However, during trial, counsel stated on the record that Mr. Charles had been hospitalized for 15 days for depression. Thus, at the time he tried the case, counsel knew there was at least one lengthy hospitalization for mental illness, yet he failed to call the treating physician, whose name had been supplied to him by both Mr. Charles and his step-father.

Moreover, as the Supreme Court has made clear, "[n]o reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations" about these documents. *Rompilla*, 545 U.S. at 389.

-114-

unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment," *Wiggins*, 539 U.S. at 526, because counsel questioned all of the jurors during voir dire about their ability consider mitigating evidence.

Trial counsel's failure is particularly troubling in light of the fact that the trial court offered them *at least* $5000.00 for a mitigation specialist.  As trial counsel has acknowledged, Mr. Patillo was not a mitigation specialist, and a mitigation specialist possesses a "level of expertise" ***greater than*** "what an investigator may have to see if there are some mitigation issues."  State Habeas Hearing at 34.

Counsel were also provided with another lead that cried out for further investigation: Derrick Charles had smoked marijuana on the day of the crime that, unbeknownst to him, was laced with "embalming fluid."  Unlike the defendant in *Williams* – who engaged in a continuing spree of violent crimes – the crime in this case was completely uncharacteristic of Mr. Charles. He had no history of violent crimes, nor was he violent while incarcerated after the crime.

The best explanation of this crime is that Derrick's reaction to the drugs, coupled with his mental illness, set him off.  Trial counsel inexplicably failed to investigate this lead, ***even though*** their whole, albeit anemic, defense case was allegedly geared to demonstrating that Mr. Charles would not pose a future danger.

Counsel's utter failure to investigate screamingly obvious leads to mitigating information about their client and the crime was deficient.

### 2.  PREJUDICE: The totality of the mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability.

For a successful claim of ineffective assistance of counsel, Derrick Charles must also

show the deficient performance of his trial counsel prejudiced his defense creating a reasonable probability that the result of the proceeding would have differed but for trial counsel's errors. *Strickland v. Washington*, 466 U.S. at 687, 694.   A "reasonable probability" is a probability sufficient to undermine this Court's confidence in the outcome of the proceeding.  *Id*.  Is there a reasonable probability that the available mitigating evidence would have caused at least one juror to have struck a different balance?  *Rompilla*, 545 U.S. at 393.

Wiggins' trial counsel informed the jury during opening statements that they would hear evidence of the defendant's life history.  However, trial counsel introduced none.  *Wiggins*, 539 U.S. at 515.  The Supreme Court concluded that the combination of referring to defendant's life history during the opening statement and failing to confront the jury with considerable mitigation evidence at trial led to "a reasonable probability that [the jury] would have returned a different sentence." *Id*. at 536.

Like the trial counsel in *Wiggins*, Mr. Williams and Mr. Crowley led the jury to expect a mitigation case that was never presented by devoting significant time during jury selection, questioning each venireperson, including all who served on the jury and the alternate juror, about mitigating evidence.   Sid Crowley cited a list of examples of mitigating evidence to every venireperson he questioned and routinely referenced examples from his prior cases.  Despite constant questioning on the subject, Mr. Williams and Mr. Crowley failed to provide the jury with any mitigating evidence at trial.  *See* RR.V-77-78; 174-176; RR.IV-88-90; RR.VII-73-79; RR.IX-32-35;   RR.X-92-95;   135-136;   RR.XI-65-66;   RR.XII-47-48;   RR.XIII-70;   93-94; RR.XXIV-66-69;95-96; *see supra*.

The impact of such extensive questioning on the subject led alternate juror Thomas Gregory Mayo to expect mitigating evidence to be a significant factor in the trial. *See Exhibit JJ,*

Mayo Affidavit.  It is clear from Mr. Williams' and Mr. Crowley's questioning during jury selection that every member of the prospective jury fully expected to hear mitigating evidence at trial.  When no mitigation evidence was presented, they were left to believe that none existed. *See Exhibit JJ,* Mayo Affidavit (alternate juror stating "…having been asked by the defense lawyer about my feelings concerning mitigation evidence during the jury selection phase of the trial, I fully expected that issue to be a big part of the trial.  However, when no mitigation evidence was presented, I assumed that none existed.")

In his closing statement, the prosecutor did not hesitate to highlight the fact that trial counsel did not introduce mitigating evidence.  "Issue Number Two, are there any sufficient mitigating reasons why this defendant should get life instead of death?  They want to say one, ***not a mental deficiency, or because he was high on alcohol or dope at the time of the crime***, because he is 19." (RR.XXIII-77-78) (emphasis added).  Of course, all of the potential mitigating factors enumerated by the prosecutor were true of Mr. Charles, but the defense failed to develop and present it.  The prosecutor continued by highlighting that the defense failed to present any teachers or family members to talk about Derrick Charles, only "some people from TYC and a doctor who doesn't know him."  *Id.* at 79-80.

This Court should contrast the ***total absence of a mitigation case*** to the voluminous compelling mitigating evidence now before it.

The prejudicial effect of trial counsel's most salient failure – not following up on the Gulf Pines hospitalizations – is similar to prejudice from Rompilla's lawyers' failure to review the prosecution files.  Had trial counsel inspected the files on Derrick's hospitalizations, they would have discovered "a range of leads that no other source had opened up."  *Rompilla*, 545 U.S. at 390.  As in *Rompilla*,

> The accumulated entries would have destroyed the benign conception of Rompilla's upbringing . . . counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.  With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case.  Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Id*. at 391.

Petitioner will not repeat all of the compelling mitigating evidence in these records, the information is described *supra*.  However, it is important to understand that these records contained more than the history of Derrick's debilitating and severe mental illness.  These records contained a wealth of other mitigating information, including:

- Derrick Charles was born premature, weighing approximately three to four pounds.

- Derrick suffered from seizures when he was an infant.

- Derrick sustained a head injury as a young child.

- Dr. Lawrence Ginsberg, a psychiatrist who treated Derrick from March 8, 1993, to February 27, 1996, found Derrick's medical history to be "remarkable."

- Derrick received mental health services at school starting in first or second grade.

- Derrick was experiencing severe, incapacitating anxiety/depression at age 10.

- Derrick's mother informed psychiatric staff that her son, by age 13, had been exhibiting "decreased amounts of sleep, irritability, labile mood, crying spells, impaired memory, and impaired concentration."  She also reported that Derrick would beat his head against the wall and would not respond to her redirection.  She had to hold Derrick's head until he stopped.

- Derrick's mental illness was so severe that he was psychiatrically hospitalized at the age of ten and again at the age of thirteen.

- Dr. Ginsberg noted a family history full of mental health problems: "Depression-Mom; Bipolar-Cousin; Alcoholism-Mom; Mental Retardation-Aunt, Uncle . . .

Seizures-Aunt, Cousin."   Derrick's psychiatric records contained the following notations regarding his maternal grandmother: "Period of intense depression, suicide attempt, intense mood swings."   It was also noted that Derrick's maternal grandfather suffered from alcoholism, and that maternal cousins had been diagnosed with attention deficit disorder or hyperactivity.

●   Derrick obtained a Full Scale IQ of 69.   Dr. Larrow, the psychologist who completed the evaluation, noted that Derrick tested in the "intellectually deficient" range of intelligence. she noted that even in the absence of psychological problems, Derrick's optimal functioning would be in the "borderline range."

●   Derrick's psychological testing errors made at age 13 corresponded to an age equivalent of about 6 years.

●   Derrick's testing results suggested the strong possibility that he had some organic damage that was contributing to his behavioral problems.

●   Derrick reported frequent violence in the home.

●   Family members did not feel physically safe with one another.

●   Derrick's mother  abused alcohol; was nervous or depressed a lot or had intense mood swings; was very distressed or upset by things that happened in his/her own life.

●   Derrick came from a very deprived background, Derrick's mother  informed psychiatric staff that the apartments in which the family resided were "so rough" that she did not allow Derrick to go outside to play with other children.

●   Psychiatric staff were concerned that Derrick's family would be unable to follow-through with recommendations for psychiatric treatment because the family's finances were so limited.

In short, these records alone would have alerted counsel to Derrick's mental illness, his significant deficits in cognitive functioning, a family history of mental illness, violence in the home rising to a level at which Derrick did not feel safe (this is a red flag for abuse), and poverty.

Further, as in *Rompilla*, trial counsels' mental health expert, Dr. Brown, was deprived of this information containing plenty of "red flags" 545 U.S. at 392.   As described, *supra*, trial counsel's mental health expert has testified that had he been presented with the Gulf Pines

records he would have done more work to confirm Derrick's mental impairments.  Just as the evaluations of the three mental health experts who examined Rompilla at trial were undermined by the absence of information, so too was the work of Dr. Brown.

Additional prejudice ensues from failing to develop and present information that, immediately before the crime, Mr. Charles – likely without knowing it – ingested "a highly potent dissociative drug, which can cause violent and unpredictable behavior."[36]

As described, *supra*, Mr. Charles' trial attorneys learned well in advance of trial that their client had smoked marijuana "swisher" which, unknown to Derrick, was soaked in "embalming fluid."  Even though trial counsel at times seemed overwhelmed by the inexplicable facts of the crime, they did nothing with this piece of information regarding Derrick's state of mind at the time of the crime.

According to Dr. Terry Rustin, M.D., an expert in addiction medicine located in Houston, Texas, this is a small cigar filled with cannabis which is then soaked in a solution of a volatile solvent (such as ether or methyl alcohol or acetone) in which phencyclidine ("PCP") has been dissolved.  The street term for the fluid is "embalming fluid."  It is smoked after the fluid has dried.  Heating the cigar vaporizes the cannabis and the PCP, which is then inhaled into the lungs and absorbed directly into the bloodstream.  *See Exhibit R,* Report of Dr. Terry Rustin at 4.

Dr. Rustin further explained the effects of phencyclidine include generalized stimulation, quickly changing moods from calm to violent, often within a few seconds, absence of pain sensation, a sense of great power and strength, a loss of inhibitions, altered perception of self. *Id.* at 5.  As Dr. Rustin observed, Derrick's description of the crime in his unsworn declaration is "consistent with the use of phencyclidine (PCP), a highly potent dissociative drug, which can

cause violent and unpredictable behavior." *Id.* Dr. Rustin explained that Derrick's description of the crime is consistent with phencyclidine use as follows:

A.    He describes a feeling of agitation and increased energy, and an inability to stay still ("I felt a rush of energy and felt like I just had to get it out . . .")

B.    He describes rapidly alternating mood states, from calm to violent. ("I would go crazy and act really violent and then calm down and realize what I had done and feel sad.  Then I would get violent again.")

C.    He describes an absence of pain sensation ("He was hitting me back but I couldn't feel a thing.")

D.    He describes a delusion of great power and strength ("I was like Superman.  I felt unstoppable . . .")

E.    He describes an altered perception of self ("At one point, when I looked in the mirror, I saw a black demon with red eyes of fire.")

*Id.*

In the absence of this evidence, Derrick's jury was left with no mitigation or explanation whatsoever for the otherwise incomprehensible crime described to them in tremendous detail throughout the course of the prosecution's thorough presentation, thus the jury had no choice under the law but to sentence Derrick Charles to death.  Even "[a] little explanation can go a long way" and might make "the difference between life and death," *Caro v. Woodford*, 280 F.3d at 1258, here there was a compelling case for a life sentence that has yet to be heard by a jury.

## VI.
## CONCLUSION

The consequence of counsel's failure to investigate Derrick's social history and the evidence of his drug use on the day of the crime cannot be overstated:

This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test.  It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Derrick Charles'] culpability," *Wiggins v. Smith,* 539 U.S., at 538, 123 S.Ct. 2527 (quoting

---

[36] *See Exhibit R,* Affidavit of Dr. Terry Rustin.

*Williams v. Taylor,* 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland,* 466 U.S., at 694, 104 S.Ct. 2052.

*Rompilla*, 545 U.S. at 393.

Mr. Charles has been deprived of his Sixth Amendment right to effective counsel, he respectfully asks this Court to restore that right by granting his application for a writ of habeas corpus.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Charles prays that this Court:

1.     Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.     Grant such other relief as law and justice require.

Respectfully submitted,

/s/ Randall O. Sorrels_____
RANDALL O. SORRELS
Federal Bar No. 11115
ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

-122-

## CERTIFICATE OF SERVICE

I hereby certify that on this September 22, 2009, a copy of this motion and the proposed order were served on the Respondent via Electronic Delivery at the following address:

Assistant Attorney General Fredericka Sargent
Office of the Attorney General
Capital Litigation Division
P.O. Box 12548
Austin TX, 78711-2548
fredericka.sargent@oag.state.tx.us


/s/ Randall O. Sorrels
RANDALL O. SORRELS
Federal Bar No. 11115
ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**