IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK DEWAYNE CHARLES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CASE NO. 09-592 |
| | § | **CAPITAL LITIGANT** |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER AND MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

Petitioner Derrick Dewayne Charles was properly convicted and sentenced to die for the horrific murder of fifteen-year-old Myeshia Bennett, her mother, Brenda Bennett, and her grandfather, seventy-seven-year-old Obie Bennett, during the same criminal transaction. He now challenges his presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Charles fails to demonstrate that he is entitled to federal habeas relief.

## CHARLES'S ALLEGATION

In a single allegation, Charles contends that his Sixth Amendment right to the effective assistance was denied because trial counsel failed to conduct a thorough enough investigation into his background and/or present certain

mitigating evidence to the jury.     But as demonstrated below, Charles has not established the state courts were objectively unreasonable in their rejection of this claim.   Moreover, much of the evidence Charles presents to this Court was not presented to the state courts, rendering it unexhausted.   In any event, the claim is without merit.   The Director denies all allegations of fact made by Charles except those supported by the record and those specifically admitted herein.[1]

## STATEMENT OF THE CASE

Having been indicted on charges of capital murder, Charles was convicted and sentenced to death for the brutal murder of Myeshia Bennett, her mother, Brenda Bennett, and her grandfather, Obie Bennett, during the same criminal transaction.   CR 1-2 (indictment), 254-58 (judgment).[2]   The Court of Criminal Appeals upheld Charles's conviction and death sentence.   *Charles v. State*, No.

---

[1]      Copies of Charles's state court records have been previously filed with the Court.

[2]      "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "RR" refers to the "Reporter's Record," the state record of transcribed trial and punishment proceedings, preceded by the volume number and followed by the internal page number(s).   "SX" and "DX" refer to the State's exhibits and the defense's exhibits, respectively, admitted during the trial.   "SHCR" refers to the state habeas Clerk's Record, the transcript of pleadings an documents filed in the trial court, preceded by volume number and followed by page number(s). "SHRR" refers to the "Reporter's Record" of the evidentiary hearing held during the state habeas proceedings, preceded by volume number and followed by page number(s).

74,694 (Tex. Crim. App. 2005).

While his direct appeal was pending, Charles filed an application for state habeas relief. I SHCR 2. After an evidentiary hearing on his claim of ineffective assistance for failing to investigate and/or present mitigating evidence, the state habeas court entered findings of fact and conclusions of law denying relief. IV SHCR 1016-053, 1054-055 (order). However, after its own review of the record, the Court of Criminal Appeals expressly rejected the trial court's finding as to counsel's failure to discover the Gulf Pines Hospital records.[3] *Ex parte Charles*, No. 67,717-01 (Tex. Crim. App. May 24, 2006), Order at 2. The court nevertheless denied Charles's state habeas application based on the remainder of the trial court's findings of fact and conclusions of law. *Id.*

## STATEMENT OF FACTS

### I. The State's Case for Future Dangerousness

After Charles pled guilty to the crime of capital murder[4]—murdering Brenda Bennett, her fifteen-year-old daughter Myeshia Bennett, and her father, seventy-seven-year-old Obie Bennett, in the same criminal transaction—the State proceeded to put on its case-in-chief for punishment, starting with the facts

---

[3] The court also rejected one of the trial court's conclusions of law, but that conclusion was not related to the claim alleged in the instant petition. *Ex parte Charles*, No. 67,717-01, Order at 2.

[4] 16 RR 10-19.

of the murders.

Brenda had last been seen on the evening of July 2nd, when she attended Bible study with Myeshia. *Id.* at 62-63, 68. The Reverend Charles Taylor, Brenda's next-door neighbor, saw her car in the driveway around 9:30 on the evening of July 2nd, but it was gone the next day. *Id.* at 71-72.

On the morning of July 6, 2002—after Mae Bennett Hall, Brenda's sister, had not been able to reach Brenda for three days—Mae drove over to Brenda's house. 16 RR 77-79. As Mae approached the house, she noticed three newspapers—"two discolored, one that was just delivered"—laying in the yard, and she "noticed the smell." No one answered the door, and she could not see that anyone was home. Mae also noticed that Brenda's car was not in the driveway. *Id.* at 79-80. After leaving and discussing the matter with her brother, Mae returned to the house, and again, no one answered when she knocked. *Id.* at 80-81. Mae then went to her oldest daughter's home, and the two went back to Brenda's house together. By this time, the police had been called. *Id.* at 82.

Once officers gained entrance in to the home, Brenda's body was found first. She had been bound and gagged; her pants and underwear had been cut off, and her mouth had been taped shut. A cord was wrapped around her neck. *Id.* at 127-30, 135-36. Myeshia's body was discovered in one of the bedrooms.

Her hands had been tied behind her back, and officers also believed she had been gagged at one point because a gag with duct tape on it was found in the room. *Id.* at 135-36. Obie was found in the kitchen; an electrical cord was wrapped around his neck. *Id.* at 119-21.

Charles initially denied any involvement in the murders, but he did admit that he and Myeshia had recently ended a one-and-a-half year relationship. 17 RR 86-88; *see* SX 2A. After Charles was told that his bloody clothes had been found at his parents' home, Charles said, "You got me," and gave a second statement that was read for the jury:

> I had known Myeshia Bennett for approximately two years. I met her through a cousin of mine by the name of Lawrence Charles. We dated for about a year and a half. It would have been two years this December. We broke up about a month ago. I believe it was in June. It really wasn't a bad break up. I guess we just got tired of each other. Earlier this year, Myshia's mother, Brenda, caught Myeshia and I in bed with another - - with one another. However, we were not having sex.
>
> We have had sex before, but on that - - this particular day, we did not have sex. If I remember, I believe the date was March 31st. Brenda told me to get out. She also asked for my ID, and I gave it to her.
>
> The three of us left the house that day and went to the Fifth Ward. Brenda was looking for Myeshia's daddy. She couldn't find him. We went and got some donuts, then went back to the house where Brenda called the police. That day, we were driving in Brenda's maroon Dodge Stratus. Me and Myeshia continued to speak to one another from time to time. Two Fridays ago, Myeshia asked me to bring her cousin's Play Station CDs back. Her cousin P.J. had wanted his games back. I was going to bring them Friday,

but she asked me to not come on Friday because her mom was off from work. So I told her that I would come on Wednesday. So when Wednesday came, I went to Myeshia's house on the bus. I got there at about 9:00 a.m., Wednesday morning. This day -- this was the day before the 4th of July.

When I got there that morning, Myeshia let me in. She was wearing only a white shirt and white boxer shorts. We went inside her room, and she laid down on the bed. I laid beside her, and we fooled around for about an hour. We kissed and touched one another. This included inside and outside of our clothing.

At times, Myeshia would guide my hand away from certain areas of her body, but I would try several times until she would let me touch her. As we continued to fool around, Myeshia and I had sex. Myeshia even performed oral sex on me. Towards the end, I ejaculated on myself. I pulled out and ejaculated on my stomach.

Myeshia got up from the bed and walked to the kitchen. I followed her into the kitchen and continued talking to her. I asked Myeshia to cut the computer on so we could surf the Internet. We watched a little bit of television in her room after this and just chilled out. We watched some Jenny Jones and Ricky Lake. Myeshia's grandfather who was there all this time then left. I think he went grocery shopping. When her grandfather left, it was just me and Myeshia. We started to wrap each other in some white and gray colored tape. I think the gray tape was duct tape.

We placed the tape on each other's wrist areas so that they were in front of our bodies. Then I placed some duct tape around Myeshia's mouth and around her head. Myeshia even did this to me. After we played with the tape, Myeshia's grandfather came home from the store. Myeshia went to take a shower, and I followed her inside the bathroom. I didn't take a shower with her, but I just sat in there, and we talked.

While were inside the bathroom, one of Myeshia's friends came. I don't know her name, but I do know it was one of her friends. I thought it was Myeshia's mother, so I hid behind the shower curtain. By this time, Myeshia was out of the shower and

getting dressed. Her friend didn't stay long. Me and Myeshia went back to her room and just hung out. We even had sex a second time, but it was real quick because her mom was supposed to be coming home. At about 4:30 p.m., Myeshia's mother arrived, but she never came inside.

She was outside in the driveway honking the horn for Myeshia. Myeshia said that she was going to work. She said she worked at a Jack in the Box, but I didn't know about it. She and her mother left, and I decided to stay in Myeshia's room. Her grandfather was in the garage doing some type of woodwork. I stayed inside her room watching television. I only watched television for a few minutes.

At about 5:30 this same evening, I heard the outside garage door closing. So I got up and walked to Myeshia's bedroom doorway. I could hear Myeshia's grandfather open the door from the garage to the house. After he came inside, he went into the kitchen for just a little bit. I stayed in Myeshia's doorway. Myeshia's grandfather started to walk towards the bathroom located across from Myeshia's bedroom. When he turned, he saw me and said, "Hey," like he was surprised to see me, but he wasn't upset. He asked what I was doing, but I never answered him. He turned as though he was leading to the front door. He opened the door, and I pushed the door closed and locked it. This, this - - this is when Myeshia's grandfather and me started to wrestle. We struggled in the hallway and ended up on the little black sofa inside the living room. I reached for a lamp that was next to the little black sofa and hit Myeshia's grandfather on the head. After that, we were still struggling and ended up on the floor. Here, I was able to hit him with my fist several times in the face. I got a couple of trophies that were located on the table next to the brown sofa. I started to hit her grandfather over the head. He was still trying to fight back, but I continued hitting him with the trophies. There was blood all around his head, and he just went out. Then I reached for the cord on the lamp that I had used to hit Myeshia's grandfather. I don't know if I pulled the cord off the lamp or I cut it, but I wrapped the cord around her grandfather's neck. I wrapped it around several times until he stopped breathing.

I pulled her grandfather's body into the kitchen where he was found. Then I got some newspaper and laid it on top of the blood in the living room. While I was laying these newspaper pages over the blood, I started to kick the trophies that I used to hit her grandfather to the side. I sat on the couch in the living room. I was scared because I don't know what just came over me. I started to feel bad because of what I had just done. I just sat there because I had never done something this serious in all my life.

At times, I went to the kitchen to see her grandfather because I just couldn't believe what I had just done. I stood over him and said, "Lord forgive me." I even said that I was sorry. Then I would return to the sofa and sit there. I sat there and returned to her grandfather's body several times until about 10:00. Myeshia and her mother returned from work where - - wherever they went at about 11:00 p.m. Myeshia got out of the car first. She walked up and unlocked the front door to the house. I was waiting behind the front door when she walked in. I grabbed her arm and pulled her into the her room. I told her not to leave. At first, she didn't say anything. When her momma came in, Myeshia came to the hallway. Brenda said, "What's going on?" Myeshia said, "He's going to kill us; do everything he says." I turned and locked the front door - - front [door] after Brenda walked inside. I told both of them to go on the hallway floor. Then I told them to crawl to the living room. I told them to get up and go by the bathroom and lie down. I told them not to say anything. I told them not to move, and that I would be right back. This is when I went and got the gray duct tape. I came back and tied up Myeshia's hands first. I wrapped Myeshia's hands behind her several times. I also did the same to her momma. I went to the bathroom and got a sock. I cut this sock in two and placed one in each of their mouths. Then I placed tape on top and around their mouth and head. I asked Myeshia to get up off the floor, and we went inside her bedroom. Myeshia was trying to tell me to take her and not kill her mother. Even though she had this sock and tape on her mouth, I could tell what she was trying to say. Myeshia would tell me that she loved me, and I told her it was too late. I told her to lie down beside her bed. I cut a piece of the extension cord from her stereo, which was in front of her bedroom window. I cut the extension cord with what I thought was scissors. After that, I placed the extension cord around her neck. I placed it

around her neck really tight, hoping that she would stop breathing. It didn't seem like Myeshia wanted to die because she was still moaning - - I told Myeshia, "I guess you don't want to die." So I reached for one of her car speakers located inside a Nike shoe box. I took the speaker out and hit her in the face several times. It was something I didn't want to do. I told her that I still loved her and that I didn't mean for this to happen like this. Then I reached for the television set in her room. I raised the television set above Myeshia and dropped it on her head a couple of times. At this point, Myeshia stopped breathing. Myeshia's mother was still in the hallway. It seemed as though she was praying to herself. I walked into the bathroom located next to Myeshia's grandfather's room. I flipped on the light and started to fill the bathtub. I filled it half way and returned to the hallway where Myeshia's mother was lying. I told Myeshia's mother to go in the bathroom. She kept asking me why I was doing this. I told her that I couldn't really tell her because I really didn't know why I was doing this.

I pushed Myeshia's mother into the bath - - bathroom and into the tub. I went and got the same television I dropped on Myeshia's head and returned to the bathroom. I wanted to see if the cord would stretch across the bathroom and into the bathtub. The cord was too short. I located a power strip that connected to the computer and returned to the bathroom. I plugged the power strip into the wall and connected the television to it. Then I placed the television inside the bathtub, but it didn't do anything. I wanted to electrocute Myeshia's mother to death. I found an extension cord inside Myeshia's room and returned back to the bathroom her mother was in. I placed the extension cord around her neck one time but tied a slipknot so that when I pulled on it, it would tighten. I was able to pull Myeshia's mother into the hallway, and she started to make a noise. I told her mother that I loved her daughter a lot. Then I searched her pockets to see if she had any money. Then I asked for her car keys, and she said that they were in the door. I didn't start to search for the keys until I left. I walked back to the bathroom in the hallway and got a stick from the plunger. I took the stick off the rubber piece and went in the hallway. I placed this stick inside Myeshia's mother's ass and pussy. I did this one time in each area.

After I placed the plunger in these areas, I found the keys to the car. I locked the front door and left before checking to see if Myeshia's mother stopped breathing. I got inside Myeshia's mother's maroon Dodge Stratus and drove off. I drove straight to my mother's house and took a shower. I changed clothes because the clothes I had on at Myeshia's house were bloody. I left these bloody clothes at my mother's house. I placed my pants inside a bag and placed the pants on my brother and sister's shelf. The shelf is located in their bedroom. I [my] left shoes by the kitchen table and told my mother I was fixing to leave. I was still driving Myeshia's mother's car at the time, and I continued to drive around for several hours. Then I got on 59 and drove north. I drove to my grandmother's house to see my brother, Chris. My grandmother's house is in Shepherd, Texas, near Livingston. I got there about 4:00 a.m. I stayed there until about 9:00 a.m. I just wanted to visit with my uncle and grandmother. Me and my brother drove back to Houston from Shepherd this Thursday morning. He asked me where I got the car, and I told him that it was my girlfriend's car. When we got back to Houston, we got a room at the LaQuinta motel where I was arrested. We first stayed in room 148 then changed to room 156. We changed this past Saturday. I had driven the car a few times while we were staying at the LaQuinta but did not drive it on Sunday. I was going to drive, but something told me not to drive it. I never told anyone what I had done.

17 RR 90-100; SX 2. Everything in Charles's statement was corroborated by the physical evidence. *See generally* 16 RR 119-21, 127-31, 132-33, 135-36, 153; 17 RR 208-09 (Brenda's cause of death), 211-12 (Brenda's injuries as a result of the sexual assault), 201, 214-15 (cause of death as to Myeshia and Obie).

The State continued its case-in-chief with evidence of Charles's criminal history. Charles had prior convictions for trespassing (17 RR 43-46), assault (*id.* at 135-36), burglary of a habitation (*id.* at 77-79), burglary of a building (*id.* at

92-94), theft, and resisting arrest.[5]

During his time in TYC, Charles failed to follow the rules, threatened teachers, and generally did not behave well. The jury heard testimony indicating that he had physically threatened at least one teacher: Charles had dropped a pencil on the floor but refused to pick it up. When the teacher bent down to do so, Charles picked up a chair and held it an upright position. He only put the chair down after an officer entered the classroom. 19 RR 167-70.

The jury also heard testimony that Charles threatened to kill a TYC teacher when she caught him in a lie,[6] and several staff members were needed to control Charles when tried to run at her. 18 RR 130-32. He threatened yet another TYC staff member when she reprimanded him for a dress code violation, telling her he would kill her if he was in the free world.[7] *Id.* at 126. He threatened this same teacher again during a group session, saying he was going to "catch a murder case." *Id.* at 121. And the teachers were not the only victims of Charles's rage. Students also suffered his wrath. Charles tired to

---

[5]     *See also* 18 RR 7-11; SX 141 (stipulation of evidence), 142 (same).

[6]     This after he had told the same teacher to mind her "own fucking business" when she referred him to security for running and screaming in the classroom. 18 RR 129-30.

[7]     This after he had said "fuck you" and told the same staff member to "shut up bitch" during a previous conversation about violating the dress code. *Id.* at 116-20.

kick another TYC detainee while that detainee was being restrained and held on the ground by a TYC staff member. *Id.* at 7, 37.

Simona Cowan, a TYC caseworker, testified that Charles committed numerous rules violations: being in unassigned areas, cursing and threatening staff, being out of dress code, refusing to attend group, and talking during quiet time. Indeed, he was written up over 100 times and sent to lockdown twenty-times while in TYC. Cowan also stated that Charles had bragged about selling drugs to make money prior to his incarceration. *Id.* at 105-07, 109.

Charles also had problems following the rules while on parole. Once released from TYC, Charles failed to keep weekly appointments and failed to participate in all of the required programs. 16 RR 193-95, 201. And after being released to parole from TDCJ, Charles never reported to his parole officer after their initial meeting. *Id.* at 206.

Finally, A.P. Merillat, a senior criminal investigator for the special prosecution unit, testified in rebuttal. He explained that inmates sentenced to capital life are not housed separately—or classified separately—from other inmates. Rather, classification and housing assignments are dictated entirely by behavior. Merillat further explained that over a ten-year period, 140 inmates had escaped from Texas prisons, including capital-life sentenced inmates. 21 RR 20-28. He went on to tell the jury that neither administrative segregation nor

increased security eliminated violence; indeed, more opportunity existed for civilians to be injured in these areas because the medical staff must come to the prisoners. *Id.* at 23-30.

## II.    The Defense's Case in Mitigation

The defense's case was focused on the future dangerousness special issue. First, during the cross-examination of the State's witnesses, defense counsel was able to elicit (1)  that Charles did not resist arrest and was, in fact, cooperative during his interview with police, (2) that he readily consented to give a DNA sample, (3) that he asked the Lord's forgiveness during the commission of the murders, (4) that Charles showed remorse afterwards, (5) that he was provoked before the assault on his uncle, (6) that he was usually released from TYC security in less than an hour—once after only ten minutes—where he could have been kept for up to forty-five days, (7) that he was most often written up at TYC for use of profanity and not following orders, common occurrences among juveniles, (8) that Charles never physically assaulted a TYC staff member, and (9) that Brenda's sister had forgiven Charles for the murders.  17 RR 38-43, 66, 139-41; 18 RR 119-22; 19 RR 131-41; 20 RR 20-21.

During the defense's case-in-chief, the jury heard from a TYC corrections officer who described Charles as a fun kid and someone who could make others laugh.  Charles helped with other kids at times and was not the worst kid.  20

RR 35-36.   Another TYC corrections officer said that Charles often helped with other students.   *Id.*   at 9-11.   The jury also heard evidence that while incarcerated awaiting trial, Charles only had two minor infractions for which he he received minimal punishment.   *Id.* at 25-29.

Dr.  Walter Quijano, the defense's last witness,  testified regarding TDCJ's security measures and classification system.   He explained to the jury that these things  would  have  a  direct  impact  on  Charles's  future  dangerousness—they would potentially lessen it.   *Id.* at 49-86.

In the end, Defense counsel's closing argument attempted to persuade the jury that even though Charles was "recalcitrant, refused to follow orders," "rude, used profanity, threatened people," he was not a physically violent nineteen year old.   No evidence established that he had "physically assaulted someone, caused bodily injury, or any type of physical pain to anyone."   23 RR 35; *see also id.*  at 36-37, 49.   Indeed, counsel also  argued that Charles would "mellow out" over time.   *Id.*  at 35-36.[8]  Finally, defense counsel told the jury that a life sentence was far worse than the death penalty because he would have to spend at least forty years in a world

> surrounded by concrete walls, razor wire, [concertina] wire, stell
> bars, where you have to wear a uniform; you get up when you're

---

[8]      The jury was instructed that a life sentence meant Charles would have to serve forty calendar years before becoming eligible for parole.  CR 245.

told; go to bed when you're told; eat when you're told; you work when you're told, day after day after day. In a world where it's gray concrete, steel bars, wire, you don't get up to got to the convenience store to get a can of beer if you want. You don't go to the ball game.

*Id.* at 42; *see also id.* at 43-44 (giving the jury a reference for what forty years really is).[9]

## III.   Defense Counsel's Explanation of the Punishment-Trial Strategy

At the close of the evidence but before closing arguments were given, defense counsel explained their trial strategy with respect to the mitigation evidence on the record during an in camera hearing with the trial judge.[10]  *See generally* 22 RR (Petitioner's Exhibit (PX) AA).  Regarding certain family members who were not called to testify, counsel explained:

The mother was not called for several reasons.  Number one, she didn't want to be called, because she suffers from schizophrenia and she didn't think she could handle cross-examination. . . .

Other reasons why I would not have called her is because at one point in time when Derrick was a juvenile and they were doing [a] psychological evaluation and doing [a] probation evaluation in

_____

[9]    While summarizing the closing arguments of both the defense and the State, Charles says that the prosecutor "explicitly pointed out the defense failed to present any mitigating evidence." Petition at 85.  But that is *not* what the prosecutor did.  Rather, he argued, "Look at his character.  They have the same subpoena power as us.  Did you see any teachers in here, any family members in here to talk about the good character of Derrick Charles?  No.  Not a one." 23 RR 79.  And for this, counsel has provided a completely reasonable explanation that is fully supported by the record.

[10]    Defense counsel also explained that stipulations regarding Charles's prior criminal convictions were entered into to "circumvent certain testimony in this case." 18 RR 10-11.

juvenile court, she was interviewed and told the interviewee that he was physically abusive to her and her husband. I certainly didn't want that before the jury that he was at home hitting them and trying to hit them, his own parents. . . .

The stepfather was not called because he is too much a part of the offense. The stepfather is the one who turned in the bloody clothes. The stepfather is the one who turned him in because he found stolen property in his car. The stepfather was present when he tried to disarm the police officer after assaulting Lincoln Charles. The stepfather was present when he resisted arrest of the officer after the chase following the assault of Lincoln Charles, and would have testified that he was standing there telling Derrick, "Don't fight. Derrick, don't fight. Please don't resist them." And he did.

So for those reasons, I didn't want to call him to testify because I didn't see - - he had nothing good to say, except, "I tried my best to raise this kid. And we had him put in boot camp and done this and that, and I have turned him in for stealing, turned in the clothes," I didn't see where it would help us at all. . . .

There were no other witnesses available. There was a grandmother that he had some dealings with, but she cannot come because of illness. Family didn't want her to come. It was said that she could not come because she has a heart problem, 77 years old, and she lives out of this county.

There was an aunt present in the courtroom who said that she knew Derrick, that she was a Christian woman, that she didn't condone what he did, he needs to go down to the penitentiary and take care of his business or whatever. But if she had been asked about if Derrick ever told her what he did, she would have given a very bizarre story about demonic possession, which is something I already ran by Dr. Brown.

22 RR 8-12. Counsel also explained Dr. Jerome Brown, psychologist, was not

called to testify because it was Dr. Brown's opinion that "he could not be helpful

. . . through his testimony, that he felt like the defendant under the proper

circumstances would kill again. He felt that he wasn't a good candidate for probation - - I mean, for rehabilitation. . . . He found no evidence of retardation in the defendant or any other mental disorder." *Id.* at 7-8.

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Charles is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims Charles raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted, or claims which were exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted. Indeed, under the AEDPA, a federal habeas application shall not be granted unless:

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B) (i) there is an absence of available State corrective process; or
    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28

-17-

U.S.C. § 2254(b)(2).

Regarding exhausted claims, under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless that adjudication:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

As to questions of law, a decision is contrary to clearly established Federal law[11] if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. (*Terry*) *Williams v. Taylor*, 529 U.S. at 405-06; *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (*Penry II*). Alternatively, when confronting a mixed question of law and fact, a state court "unreasonably" applies clearly

---

[11]  "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

established Federal law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Penry II*, 532 U.S. at 792; *see* (*Terry*) *Williams*, 529 U.S. at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. (*Terry*) *Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal habeas relief is merited only where the state court decision is both incorrect *and* objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002). *See also Martin v. Cain*, 246 F.3d 471, 476 (5th Cir. 2001) (reiterating that relief is appropriate only where state court decision is both incorrect *and* objectively unreasonable). In other words, relief is *inappropriate* when a state court, at a minimum, reaches a "satisfactory conclusion." (*Terry*) *Williams*, 529 U.S. at 411 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

Further, it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001). *See also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.

2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"). And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the state result does not contradict Supreme Court precedent).

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court*

*proceeding*," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000).

# ARGUMENT

By the sole allegation before this Court, Charles argues that he was deprived of constitutionally effective assistance because his trial counsel failed to conduct a thorough enough investigation regarding mitigating evidence. In broad strokes, the mitigating evidence he contends should have been found and/or presented is evidence that: (1) he had a troubled childhood and a chaotic home life marked by poverty and domestic abuse; (2) he suffers from some mental illness, and mental illness runs in his family, and (3) he was born prematurely, suffers from brain damage, and had at least one seizure when he was a baby.

To establish a Sixth Amendment ineffective assistance of counsel violation, Charles must affirmatively prove both that: (1) counsel rendered deficient performance, and (2) counsel's actions resulted in actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984). Importantly, failure to prove either deficient performance or prejudice will defeat an ineffective assistance of counsel claim, making it unnecessary to examine the other prong. *Id.* at 687.

As an initial matter, this claim is at least partially unexhausted because much of the evidentiary support and some of the factual bases were not presented to the state courts for consideration. In any event, to a great extent, the information Charles contends counsel was not aware of, they were in fact

aware of and made reasonable strategic decisions not to present to the jury. Further, to the extent counsel was not aware of it but it was nevertheless considered by the state courts, their rejection of his claim was not objectively unreasonable. Finally, even considering the evidence and factual bases presented for the first time in the instant proceedings, Charles cannot establish ineffective assistance of counsel.

I. **This Claim—in Its Present Form—Is Partially Unexhausted and Procedurally Defaulted.**

Although this claim was raised during the state habeas proceedings, at least four of the factual bases and much of the evidence submitted to this Court were not presented to the state habeas court. First, Charles did not suggest—much less argue—to the state courts that his mother's own childhood, his family history of mental illness, and his alleged "long-standing and severe cognitive impairments" should have been investigated and/or presented to the jury. Second, Charles did not present the following evidence to the state courts:[12]

> *Houston Northwest Medical Center Psychiatric Records of Nancy Phillips (PX B)
>
> *Social Security Records of Nancy Phillips (PX C)

---

[12] *Compare* I SHCR 13-14 (list of evidence presented to state court in support of ineffective-assistance-of-counsel claim). Charles's TDCJ records were submitted by the State. *See* III SHCR 673-778, 779-801.

*Death Certificate of Herman Charles (PX H)

*Autopsy Report of Herman Charles (PX I)

*San Jacinto County District Clerk Files of Joyce Charles (PX K)

*Medicaid Records of Nancy Phillips (PX O)

*Red Oak Psychiatric Associates Records of Nancy Phillips (PX P)

*Confirmed Psychological Evaluation Clinical Interview and Mental Status of Nancy Phillips (PX Q)

*Texas Youth Commission Employee Data Sheet of Simona Cowan (PX S)

*Texas Youth Commission Summary Appraisal Forms of Simona Cowan (PX T)

*Crowley Voucher (PX Z)

*Transcript of December 15, 2005 *Castellano* Pretrial Hearing Finding Sid Crowley ineffective (PX BB)

*Petitioner's Original Disciplinary Petition *Commissioner for Lawyer Discipline v. James S. Crowley*, Cause No. 05-CV-140898, 240th Judicial District Court of Fort Bend County, Texas (PX CC)

*Agreed Judgment of Public Reprimand Cause No. 05-CV-140898, 240th Judicial District Court, Fort Bend County, Texas (PX DD)

*Affidavit of Alternate Juror Thomas Gregory Mayo (PX JJ)

*"The Team Concept in a Capital Case" (PX KK)

*2001 Stetler article (PX LL)

*Declaration of Christine Bickham (PX NN)

*Declaration of Lincoln Charles (PX OO)

\*Declaration of Lawrence Charles (PX PP)

\*Declaration of Christopher Charles (PX QQ)

\*Cypress Creek Hospital Records of Christine Bickham (PX RR)

\*Dr. Eileen Starbranch Records of Christine Bickham (PX SS)

\*Red Oak Psychiatry Associates Records of Lawrence Charles (PX TT)

\*Affidavit of Joe Patillo from *Ex parte Geno Capoletti Wilson* (PX UU)

\*Affidavit of Connie Williams from *Ex parte John Reyes Matamoros* (PX VV)

\*Affidavit of Connie Williams from *Ex parte Sean Derrick O'Brien* (PX WW)

\*Affidavit of Willie Tyrone Trottie (PX XX)

\*Affidavit of Connie Williams from *Ex parte Robert Mitchell Jennings* (PX YY)

\*Connie Williams Judgment and Findings of Facts and Conclusions of Law (PX ZZ)

\*Connie Williams Orders to File and Show Cause (PX AAA)

The exhaustion doctrine codified in 28 U.S.C. § 2254(b)(1) reflects a policy of comity consistently adhered to by the Supreme Court and the Fifth Circuit. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-10 (1992); *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson,* 230 F.3d 733, 745-46 (5th Cir. 2000). Thus, before a federal court will entertain the alleged errors, a petitioner

must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction. *Picard*, 404 U.S. at 275-76.

As relates to this instant proceedings, state court remedies are not exhausted when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief had been denied." *Dowthitt*, 230 F.3d at 745-46 (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996), and *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986)). This is so because in order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Id.* The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney*, 504 U.S. at 10.

"Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.*

Pursuant to 28 U.S.C. § 2254(b)(1)(A), habeas relief may not be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State." However, "[b]ecause [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted). In this case, it is clear that Charles would be barred from raising this claim—for the second time—in a successive state habeas application under Texas Code of Criminal Procedure, Article 11.071, Section 5(a).

Nonetheless, such a claim is subject to denial in federal court as procedurally defaulted. Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1989). In the instant case, just as in *Gray*, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." 518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

The Fifth Circuit holds that where a petitioner raises a claim in federal court that has not previously been presented to the state courts, and Article 11.071, Section 5(a) would foreclose review of that claim if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claim. *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998); *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997). Charles does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claim—in its current form—in state court. Thus, circuit precedent compels the denial of this claim as procedurally defaulted.[13]

---

[13]     In the alternative, if this Court concludes that Charles's claim is not procedurally defaulted, then the Director contends that the evidence significantly changes, rather than merely supplements, it. As such, Charles should be made to return to state court so that the state courts can have the first opportunity to consider the claim in its current form. *See Kunkle v. Dretke*, 352 F.3d 980, 987-88 (5th Cir. 2003).

## II. Charles Cannot Establish Deficient Performance.[14]

As explained by Charles, had counsel performed the right investigation, the following information would have been uncovered and could have been presented to the jury: (1) Charles was born premature and suffered from seizures during infancy; (2) Charles's biological father abandoned him; (3) there was a multi-generational pattern of severe mental illness, cognitive deficits, seizure disorder, and substance abuse in Charles's family; (4) Charles's mother

---

[14] Charles attempts to bolster his claim of ineffectiveness by providing evidence of counsel's conduct in other cases. Petition at 61-70; PX BB-DD, UU-AAA. As an initial matter, this argument is entirely unexhausted and procedurally defaulted. That aside, as the Fifth Circuit has explained, "Both prongs of the *Strickland* test, however, require examination of the specific conduct and decisions made by counsel in the particular case; [petitioner] cannot establish that the representation he received was constitutionally inadequate merely from evidence about [counsel's] reputation or conduct in other cases. *Anderson v. Collins*, 18 F.3d 1208, 1216 (5th Cir. 1994). Thus, such is irrelevant to the case at hand.

Charles attempts to further bolster his claim by quoting extensively from the American Bar Association (ABA) Guidelines and citing to the Supreme Court cases that have referenced the same. Petition at 108-13. But the Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (per curiam) (internal quotation marks omitted). *Strickland*, it noted, "stressed . . . that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id.* at 17. The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation marks omitted). The Court additionally chided the lower court of appeals for having used guidelines promulgated years after the trial in question to evaluate counsel's performance. *Id.* ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of trial—was error.").

suffered from severe mental illness which included psychosis, psychotic behavior, and depression during Charles's childhood; (5) Charles suffered from serious mental illness requiring two psychiatric hospitalizations as a child; (6) Charles had long-standing and severe cognitive impairments; (7) Charles exhibited long term and significant limitations in academic functioning; (8) Charles's childhood was marked by poverty and instability; (9) Charles witnessed serious incidents of domestic violence between his mother and stepfather, who both drank heavily; (10) Charles was the victim of physical and emotional abuse at the hands of his stepfather; (11) Charles's family, including his mentally-ill mother, failed to protect him from childhood abuse and neglect; and (12) on the night of the underlying offense, Charles was under the influence of a highly potent dissociative drug which can cause violent and unpredictable behavior. Petition at 5. Importantly, as discussed below, much of this information was in fact known to counsel, who made a reasonable decision not to present it. And to the extent it was not known, its mitigating relevance is slight at best. It was primarily for these reasons that the state habeas court rejected Charles's claim.

In order to demonstrate deficient performance, Charles must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," *i.e.*,

"prevailing professional norms." *Id.* at 689-90; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[15] *Strickland*, 466 U.S. at 689-90; *see also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Here, Charles alleges that counsel was ineffective for failing to investigate and/or present mitigating evidence.[16] "Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of individualized sentencing, and in the ultimate

---

[15] "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

[16] In part, Charles castigates counsel for questioning potential jurors about mitigating evidence during voir dire because, ultimately—he contends—the jury heard nothing mitigating. Petition at 70-71. In the first instance, what potential jurors were questioned about is largely irrelevant because the investigation was not yet complete at that point; counsel had no idea what they would ultimately present to the jury. But more importantly, as the record indicates, the jurors did hear a case for mitigation. Albeit, not the one Charles argues should have been presented, but they did hear one.

determination of whether the death penalty is an appropriate punishment." *Riley v. Cockrell*, 339 F.3d 308, 316 (5th Cir. 2003) (citing *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999)). Accordingly, counsel may be constitutionally ineffective for failing to exercise reasonable professional judgment in investigating a defendant's personal history that would be relevant to evaluating his moral culpability. *Id.* (citing *Wiggins*, 539 U.S. at 522). However, counsel is not *per se* deficient for failing to present such evidence. *Wiggins*, 539 U.S. at 522; *Moore*, 194 F.3d at 615. As the Supreme Court has reiterated, counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 522.

It is true that "counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 123 F.3d 716, 723 (5th Cir. 1997) (citation omitted). *See also Rompilla v. Beard*, 545 U.S. 374 (2005) (emphasizing counsel's duty under *Strickland* to make reasonable investigation); *Wiggins*, 539 U.S. 510 (2003) (same). But the "failure to investigate, develop, or present mitigating evidence is not ineffective assistance *per se*." *Smith v. Cockrell*, 311 F.2d 661, 669 (5th Cir. 2002). *See also Rompilla*, 545 U.S. at 389-90 (recognizing that *Strickland* necessarily requires a case-by-case analysis). Nevertheless, the

burden of demonstrating that counsel's investigation or trial decisions were professionally unreasonable remains with the criminal defendant challenging counsel's performance. *See Strickland*, 466 U.S. 689 (emphasizing "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

To meet this burden, a defendant must do more than merely allege a failure to investigate; he must affirmatively prove that the investigation counsel actually conducted fell below minimum professional standards. *Id.* at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."); *see also id.* at 687 (explaining that as to deficient performance, "the defendant must show . . . that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."). He must also state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson*, 18 F.3d at 1221; *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). Finally, counsel's failure to investigate will not rise to the level of ineffective assistance where the evidence in question is either cumulative, unknown, or possibly harmful to the defense.

*See Anderson*, 18 F.3d at 1220-21.

In the first instance, Charles does not argue that something should have been done *better*; rather, he argues that something should have been done *differently*. Such an argument flies in the face of the mandate of *Strickland*, that counsel's actions are not to be judged in this manner. Indeed, the Fifth Circuit has recognized that it "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt,* 230 F.3d at 743 (internal quotation marks and citation omitted); *see also United States v. Webster*, 393 F.3d 787, 794 (5th Cir. 2004) ("Webster's generalized allegation that more evidence of mental retardation and child abuse should have been presented is arguably frivolous. In any event, it is insufficient to demonstrate objectively deficient performance by counsel.").

That aside, to the extent the legal and factual bases for this claim were considered by the state courts, their rejection was not objectively unreasonable.[17]

_____

[17]      In a footnote, Charles details media allegations regarding the trial judge's behavior in another case. Petition at 78-80, n.25. He gives no reason for doing such; he certainly never directly asserts a claim of judicial bias. Rather, he only notes that the trial judge has "achieved notoriety for her potentially improper, pro-prosecution actions in a capital case." *Id.* Whatever his reason for including this information, it has no bearing on the instant case. To the extent this Court construes a claim of judicial bias, however, such is entirely unexhausted and procedurally defaulted. Further, media allegations about the judge's behavior in a completely unrelated case

In addition to the general investigation conducted by trial counsel, the state habeas court considered three broad areas of mitigating evidence that are also raised in the instant proceedings: (1) the Gulf Pines Hospital records, IV SHCR 1026-028 (¶¶ 47-52); (2) alleged brain damage, *id.* at 1028-030 (¶¶ 53-61); and (3) the alleged ingestion of phencyclidine prior to the murders, *id.* at 1030-031 (¶¶ 62-65). Counsel provided two affidavits during the state habeas proceedings, *id.* at 1057-061, 1063-067, and also testified at an evidentiary hearing regarding the instant claim of ineffective assistance, 1 SHRR 14-93.

## A.    The general investigation

Charles castigates trial counsel for failing to investigate and/or present evidence that his home life was "chaotic," Petition at 9-17,  and that his childhood was marked by poverty and frequent moves, *id.* at 17-19.  Regarding his chaotic home life, Charles contends that it was that way because it was marked by alcoholic parents, domestic abuse (physical and emotional abuse), parents who failed to protect their children, poverty, a schizophrenic mother and problems with his grandmother.  But as discussed above, much of the evidence he has provided to the Court is wholly unexhausted, including the affidavits of Christine Bickham, Charles's aunt (PX NN),  Lincoln Charles, Charles's paternal

---

cannot support a claim of judicial bias in this case.  Not without more.  Thus, that the judge exhibited any bias in the instant case is nothing more than rank speculation.

uncle (PX OO), Lawrence Charles, a cousin (PX PP), and Christopher Charles, Charles's brother (PX QQ), and Nancy Phillips's psychiatric records (PX B) and social security records (PX F). Only the affidavit of Leroy Phillps, Charles's stepfather (PX C), was considered by the state habeas courts, *see* I SHCR 56-58, and is, therefore, properly before this Court.

During the state habeas proceedings, as to the general investigation, counsel repeated the reasons—as stated at the close of the trial—for not calling various family members, including Charles's mother and stepfather, his grandmother[18] and his aunt.[19] *See* IV SHCR 1058-059, 1065-066; 1 SHRR 73-78. Counsel also testified that none of the family members he interviewed mentioned anything about any emotional and/or mental abuse. 1 SHRR 56-57. Indeed, it was counsel's understanding that both Charles's mother and stepfather had been very supportive of, and involved in, Charles's life. *Id.* at 55-56, 75 ("The impression I got from both the mother and the father is they were very caring, cared for him.").

In sharp contrast to what he had told defense counsel before trial, in the affidavit submitted during the state habeas proceedings, Phillips discussed his

---

[18]     Charles's grandmother knew he had been driving Brenda's car immediately after the murders. I SHRR 59. But Charles had lied, telling her "it was his girlfriend's car and all he had to do was return it by 12:00." *Id.* at 61.

[19]     During one pre-trial interview with defense investigators, Charles's aunt said he had temper. *Id.* at 62.

wife's schizophrenia and how that impacted both their relationship and her ability to be a mother:

5.    Her illness also made her violent. Derrick and his brother witnesse[d] numerous violent episodes between me and Nancy. Once, when Derrick was about 12, Nancy stabbed me in the groin with a pair of scissors, as both boys stood watching.[20] On another occasion, I asked her to cook dinner after I had come home from work and she came at me with a knife. She would also hear voices and think I was conspiring against her, and throw cups and plates at me, or hit me with a broom handle. Both boys witnessed these incidents. . . .

8.    In 1997, Nancy was finally diagnosed as a paranoid schizophrenic. She currently takes numerous types of medication. I would like to say that during the years her illness was not yet diagnosed, Nancy had problems being a good mother. The boys were often without supervision from her. It was not uncommon for them to be without clean clothes to wear to school or enough to eat.

9.    As Derrick grew up, our family frequently had to rely on welfare. We moved around a lot because we got evicted. Money was always a problem.

I SHCR 57 (footnote added).

Further, Charles's expert during the state habeas proceedings, Dr. Susana Rosin said in her affidavit that Charles had a "history of family dysfunction that included living in abject poverty, frequent moves and evictions, witnessing parental arguments and violence, the stepfather's alcoholism and the mother's

---

[20]    Counsel specifically testified that he was never told of this incident. *Id.* at 90.

untreated mental illness," that should have been considered as mitigating evidence. IV SHCR 960. She opined that

> partly as a result of this family dysfunction, Mr. Charles often lived in unsafe environments, witnessed repeated incidents of violence between his parents, and failed to receive proper parenting and medical treatment for his problems. Mr. Charles, for instance, was pulled out of the hospital by his mother against medical advice in 1993 only three days following admission. Records indicate that the parents failed to attend many group and family therapies during Mr. Charles's 1995 hospitalization, and subsequently failed to continue much needed psychiatric treatment and medication for Mr. Charles after his discharge from this second psychiatric hospitalization. Records indicate that the parents terminated Mr. Charles's treatment with Dr. Ginsberg in early 1996, in spite of the fact that Mr. Charles continued to exhibit very serious behavior and emotional difficulties throughout his adolescence. It is likely not coincidental that Mr. Charles's involvement with the law and Texas Youth Commission began approximately a year from the date he ceased to receive psychiatric help. Also not coincidentally, this was also the period of time during which Mr. Charles's mother's psychosis worsened and first came to light. Mr. Charles's mother and stepfather were reportedly separated during this period of time, Mr. Charles's brother was sent to live with the maternal grandparents, and Mr. Charles [was] left alone with a mentally ill mother who was reportedly exhibiting paranoid delusions, experiencing depression, chronic difficulties sleeping and hearing voices at the time.

*Id.* at 960-61. But some important considerations are not mentioned—considerations that were known to defense counsel at the time of trial and impacted the decision regarding the presentation of mitigating evidence. First,

Phillips told police that one eviction directly resulted from Charles's behavior.[21]

II SHCR 699. He also mentioned this during a pre-trial interview with defense investigators:

> He has a bad habit of breaking into people houses. He had broken into the peoples' house next door and we had gotten evicted from the place we used to stay because the guy accused him of breaking into his house. [] I had gotten mad at him and I told him that he could not live with us any longer and he had to find some other place to stay. I said that on several occasions but I was upset and I told him that was the last straw, he couldn't come back here. But he had been staying here anyway.

PX D.

Second, during the state habeas proceedings, both defense counsel and the prosecutor discussed being told of Charles's abusive behavior toward his parents. IV SHCR 1058; *see also id.* at 1069 (affidavit of Troy Cotton, lead prosecutor). Third, as discussed more fully in the next section, the Gulf Pines Hospital Records that would support a majority of these allegations, contain an equal amount of damaging evidence. Finally, as Dr. Denkowski stated, "Most children with aversive family backgrounds do not become criminals, and criminals come from all social classes." 3 SHCR at SX 7, page 5.

As the record demonstrates, then, this evidence, is double-edged, and the Fifth Circuit has repeatedly rejected claims of ineffective assistance on this

---

[21] Importantly, Phillips did not mention this in the affidavit he submitted during the state habeas proceedings. I SHCR 56-58.

basis.[22] *See Miniel v. Cockrell*, 339 F.3d 331, 346-48 (5th Cir. 2002) (upholding the state court's conclusion that the petitioner was not prejudiced by counsel's failure to investigate and present evidence of abuse and neglect during his childhood); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (failure to present evidence of troubled childhood, mental retardation diagnosis as a child, low IQ test score, being put on a psychomotor inhibitor, and good behavior in institutional settings not prejudicial because some of the evidence was double edged, and the rest had only "minimal[]" mitigating value; also, evidence of petitioner's future dangerousness was overwhelming); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (counsel not ineffective for failing to present evidence of alleged brain injury, abusive childhood, and drug and alcohol

---

[22] *See Ransom*, 126 F.3d at 721 (holding that Ransom was not prejudiced by counsel's failure to present any evidence at the punishment phase even though counsel could have presented evidence that "during his childhood Ransom was regularly subjected to physical, emotional, and possibly sexual abuse at the hands of his mother and older siblings; he was shuttled between his mother and a foster parent [and he] had positive traits to which his former foster mother could have testified); *see also Cockrum v. Johnson*, 119 F.3d 297, 301, 303-04 (5th Cir. 1997) (holding that undiscovered and un-presented evidence of an alcoholic abusive father, a long history of hospitalization, persons who thought highly of the defendant, a history of severe drug abuse and addiction beginning at age nine or ten, several suicide attempts, several psychotic episodes, and expert diagnoses of post-traumatic stress disorder, antisocial personality disorder, poly-substance abuse, and dysthemia were "at least as consistent with the theory that Cockrum is entirely responsible for his own deep-seated destructive tendency as with the theory that he is at least partially a victim of abuse and tragedy" and because there was substantial other aggravating evidence that would have been elicited if this strategy had been chosen, no reasonable probability existed that there would have been a different outcome, had the proposed strategy been chosen).

problems because evidence is "double-edged"); *Kitchens v. Johnson*, 190 F.3d 698, 702-03 (5th Cir.1999) (finding counsel's decision not to investigate mitigating evidence of child abuse, alcoholism, and mental illness was sound strategy where evidence was "double-edged" in nature); *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (evidence of a defendant's abuse-filled, violent upbringing and abuse of drugs and alcohol frequently can be "double-edged").

Ultimately, the state habeas court found trial counsel's decision not to present the testimony of Charles's various family members was not unreasonable. IV SHCR 1024-026 (¶¶ 40-43).[23] The court further found that "any testimony that [Charles] was allegedly hospitalized for sleep deprivation and depression; that his family was poor; that his biological father was not involved in his life; and, that [Charles] allegedly witnessed violent behavior between his stepfather and mother" would not result in a different outcome; nor did it "obviate trial counsels' reasonable strategic decision not to present the testimony of [Charles's] family." *Id.* (¶ 45). Given the record before it, this rejection was not objectively unreasonable.

---

[23]     The court also found that counsel had interviewed teachers and peers and could find no one who had anything positive to say about Charles. IV SHCR 1026 (¶ 46); *see* IV SHCR 1065 (not only did they not have anything positive to say, but told investigators they also believed testimony would be harmful).

**B.    The Gulf Pines Hospital records**

In the instant petition, Charles sites the records from his two stays at Gulf Pines Hospital to corroborate the unexhausted evidence of the "family's dysfunction." Petition at 12-13; *see also id.* at 21-29.

As an initial matter, as to whether counsel should have—at the least—discovered Charles's records from his two stays at Gulf Pines Hospital, the Court of Criminal Appeals expressly rejected the state habeas court's finding that counsel exercised due diligence in attempting to find the records. *Compare Ex parte Charles*, No. 67,717-01, Order at 2 *with* IV SHCR 1027-028 (¶ 52). However, the court's findings having to do with the nature of the records and the like were left in tact and, thus, subject to AEDPA deference:

49.    The Court finds, based on the credible affidavit of trial counsel and the 2006 writ evidentiary hearing, that [Charles's] family informed counsel that [Charles's] hospital stay at the Gulf Pines Hospital was a result of the problems he caused at home, and that [Charles's] hospitalization had nothing to do with mental illness.

50.    The Court finds, based on the credible affidavit of trial counsel and the 2006 writ evidentiary hearing, that [Charles's] diagnosis after admission to Gulf Pines Hospital included oppositional defiant disorder and depression.

51.    The Court finds, based on the credible affidavit of trial counsel and the 2006 writ evidentiary hearing, that [Charles's] Gulf Pines Hospital records contained the following harmful information: [Charles] was violent toward his peers at home and school; [Charles] was charged with the offense of assault by threat; [Charles] lost his temper, refused

> to do his chores, blamed others for his actions, and argued with adults; and, [Charles] was suspended from school because of his hostile behavior.

IV SHCR 1027 (¶¶ 49-51); *see* 3 SHRR at SX 6A, 6H, 6L. Other information found in these records included that Charles's parents

> stated he had problems at school, he had been fighting and assaultive at school, he had been expelled. And that was the second time he had been expelled. And that the problems - - then that he was having problems at home with tearing up furniture and tearing up everything that the parents would buy him. Also that he was talking back to teachers and fighting at school.

I SHRR 81; 3 SHRR at SX 6E. They revealed that Charles admitted to hospital staff that he had been having assaultive and/or homicidal thoughts. *Id.* The records also noted that Charles had been expelled for a fourth time after he had threatened to flatten the tires of a teacher's car. I SHRR 82; 3 SHRR at SX 6H. Finally, the staff noted that Charles was threatening, hitting others and menacing. *Id.* So like the evidence discussed in the previous section, this evidence was double-edged; whatever mitigating quality it might be found to have, was countered by an equally (if not more so) aggravating quality. Thus, the state court's rejection of this portion of Charles's claim cannot be objectively unreasonable.

## C. Brain damage, seizures, and premature birth[24]

In the instant proceedings, Charles attacks counsel for not providing a social history or the relevant mental health records to Dr. Brown before he made his assessment. Petition at 57-60; *see also* PX E (secondary letter from Dr. Brown indicating that he had seen "selected documents" from the Gulf Pines Hospital records and that further testing might have been suggested).[25]

Regarding allegations of brain damage and the like, Dr. Rosin stated in her affidavit that Charles's "history of premature birth, low birth weight, seizures, developmental delays, and reported head injury prior to age one" should have been considered as mitigating circumstances. IV SHCR 960. But she offered no further explanation or description.

In response, Dr. Denkowski explained that even though Charles was born premature (35 to 36 weeks), because his mother did not "'report any other problems around the pregnancy, labor, or delivery,'" Charles was not at risk for "severe impairment." 3 SHRR at SX 7, page 2. Charles's low birth weight was likewise not reason to believe he was "impaired [] in any significant manner." *Id.* at page 3. Regarding evidence that Charles had one seizure around eight

---

[24] Charles makes the general allegation that he suffers from brain damage, Petition at 8, and then discusses the impact that some of the Gulf Pines Hospital records and the like would have had on Dr. Brown and his ultimate conclusion that no mitigating evidence existed.

[25] No indication is ever made as to what the "selected documents" are.

months old, Dr. Denkowski explained that "'there is little, if any, lasting neurological or mental deficit.'" *Id.* Dr. Denkowski said of Charles's reported developmental delays, "It has long been known that considerable variability exists regarding when a child begins to walk, talk and use a toilet independently." According to his parents, Charles was reported to have accomplished toilet training right at two years old, when it is "well established that [it] is most successful." Thus, Dr. Denkowski concluded that it was "very unlikely that [Charles] evidenced significant developmental delays as a child." *Id.* Finally, about the reported head injury (for which there is no further description), Dr. Denkowski opined that there was no reason to believe that it had any permanent impact on Charles's development, and such opinion was validated by the testing completed by Dr. Rosin. *Id.* at pages 3-4.

Based on this evidence, the state habeas court found as follows:

> 60. The Court finds, based on the credible affidavit of Dr. Denkowski, that there is no reason to believe that [Charles's] premature birth weight impaired him permanently in any significant manner; that there is no basis for concluding that [Charles's] single febrile seizure impaired his functional capacity in any manner; that it is unlikely that [Charles] evidenced any significant developmental delays as a child; that there exists no reasonable expectation that any brain-related conditions impacted [Charles] in an enduring detrimental manner, based on [Charles's] functioning neuropsychologically as well as the average person of his intellect; that attention deficit disorder is not causally related to [Charles's] commission of the instant offense; and that there is no reason to believe that [Charles] was depressed at

the time of the instant offense.

61. The Court finds that any testimony concerning [Charles] being born a month early and allegedly having a seizure when he was eight weeks old does not establish brain damage[.]

IV SHCR 1029-030. Again, given the evidence before it, the state habeas court's rejection of this part of the claim was not objectively unreasonable.

## D. Alleged drug use at the time of the murders

Charles also specifically decries the fact that Dr. Brown was operating under the impression that he was involuntarily intoxicated at the time of the murders. *Id.* at 59. But the only evidence that he was intoxicated—involuntarily or otherwise—comes from Charles himself. PX II.[26] However, Dr. Denkowski was given a completely different story:

> On December 19, 2005, Mr. Charles reported to me that he regularly smoked marijuana cigarettes that were laced with PCP. It is therefore most likely that he deliberately purchased a "swisher" on the day of the Bennett murders since he liked the results of smoking them. As he told me, "[Y]ou feel like you're on top of the world," which is why he tried to "stay high" while living in the community. It is only since this 2005 interview that Mr. Charles has come to "consider" that the marijuana he smoked that day was laced without PCP without his knowledge—that he ingested PCP involuntarily. But based on my interview of Mr. Charles, he purposefully consumed PCP regularly, which means that he is responsible for any consequences associated with its use.

---

[26] Importantly, he did not mention his state of mind *at all* when giving his statements to police. SX 2, 2A.

Given how chronically Mr. Charles consumed PCP prior to the Bennett killings, if he did indeed "explode" whenever he consumed that drug, and if that drug was the trigger for his murder spree, he should have already killed scores of people prior to committing those capital offenses. Since he had not done so, it is obvious that Mr. Charles possessed the capacity to refrain from killing when he was under the influence of PCP.

3 SHRR at SX 7 at pages 5-6.

Regarding the drug use at the time of the instant murders, the state habeas court found as follows:

62. The Court finds that [Charles] presents a self-serving affidavit asserting that, around 4:30 p.m. on the day of the offense, he smoked a "swisher," a cigarette with marijuana replacing the tobacco; that the swisher allegedly affected him differently than the marijuana he previously smoked; and that he allegedly would not have committed the murders if he had not smoked the swisher.

63. The Court finds, based on the credible affidavit of trial counsel, that trial counsel were aware that [Charles] claimed to have smoked a marijuana cigarette the day of the instant murders; that [Charles] did not tell police he had smoked a swisher; that there were no witnesses to the alleged event, so [Charles] would have to testify at trial to present evidence about the alleged event; and, that [Charles's] habeas claim that he smoked a swisher at 4:30 p.m. did not explain why he waited four or five hours for [Brenda and Myeshia] to return home so he could kill them.

64. The Court finds that trial counsel pursued the reasonable strategy of not presenting [Charles's] testimony about the alleged smoking of a swisher hours before the offense in light of the horrific facts of the offense and in light of [Charles] being subject to cross-examination if he testified.

65. The Court finds unpersuasive and speculative the habeas assertion of Terry Rustin, M.D., that [Charles's] description of his actions on the day of the offense are "consistent" with the use of phencyclidine and the Court further finds that Rustin's speculative assertion is unsupported by the evidence that [Charles] ingested phencyclidine, by evidence of the length of time an individual is affected by phencyclidine, or by evidence of the effects of specific amounts of phencyclidine.

66. The Court finds, based on the facts of the offense, that [Charles's] actions were thoughtful and planned and belied any postconviction claim of drug-induced homicide or ineffective assistance of counsel for failing to pursue such [an] untenable defense.

IV SHCR 1030-031. Given the record before it, the state habeas court's rejection of this part of Charles's claim of ineffective assistance was not objectively unreasonable.

## III.  Charles Cannot Establish Prejudice.

Even if deficient performance can be established, Charles must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* The mere possibility of a different outcome is insufficient to prevail on the prejudice prong. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).

With respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley*, 339 F.3d at 315 ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)). "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Charles attempts to liken his case to that of *Williams*, *Wiggins* and *Rompilla*. Petition at 88-104. But as demonstrated below, these cases are easily distinguishable. First, the defense's case in *Williams* consisted of the testimony of Williams's mother and two neighbors that Williams was a "'nice boy' and not a violent person." *Id.* at 395. Outside of that, defense counsel emphasized Williams's voluntary confession and the fact that he turned himself in to police. *Id.* But closing argument "was devoted to explaining that it was difficult to find a reason why the jury should spare Williams'[s] life." *Id.* In sharp contrast to that, later investigation revealed "extensive records graphically describing

Williams'[s] nightmarish childhood," including that Williams's parents were imprisoned for criminal neglect and that Williams was "severely and repeatedly" abused by his father. *Id.* & n.19 (containing description of Williams's home). Other evidence established that Williams was "'borderline mentally retarded' and did not advance beyond sixth grade in school." *Id.* at 396. And Williams had received commendations while incarcerated, and was described by prison officials "as among the inmates 'least likely to act in a violent, dangerous or provocative way.'" Finally, there was evidence that Williams would thrive in a structured environment. *Id.* This evidence bore little resemblance to that considered by the jury. And while not related to dangerousness, the Court recognized that such evidence "may alter the jury's selection of penalty even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.* at 398.

In *Wiggins*, counsel focused on Wiggins's direct responsibility for the murder, but asked the jury to also consider his "difficult life" during opening statement. But *no* evidence was presented as to Wiggins's life history. 539 U.S. at 526. And as the Court described, "[t]he mitigating evidence counsel failed to discover and present in this case is powerful[:]"

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time

Wiggins spent homeless, along with his diminished mental capacities further augment this mitigation case.

*Id*. at 534-35. *See also id*. at 516-17, 525.

Finally, in *Rompilla*, the case for mitigation was composed of the testimony of five family members who "argued in effect for residual doubt, and beseeched the jury for mercy, saying that they believed Rompilla was a good man." 545 U.S. at 378. But the evidence that was readily available to trial counsel included "a range of mitigation leads that no other source had opened up." *Id*. at 390. As the Court wrote:

> The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was "reared in the slum environment of Allentown, Pa. vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out of Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages." . . . The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. . . . The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts.

*Id*. at 390-91 (citations omitted). Still other evidence established that Rompilla's mother drank during her pregnancy, that his father had a "vicious temper," that Rompilla and his siblings "lived in terror," that he and a brother were locked "in a small wire mesh dog pen that was filthy and excrement filled," that they were

isolated from other children, that their home had no indoor plumbing, and that they slept in an attic with no heat. *Id.* at 392. Ultimately, the Court said of the later-discovered evidence, it "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury[.]" 545 U.S. at 393.

As the record demonstrates, Charles's childhood and home life were certainly not perfect. But it certainly does not rise to the level of that described in *Williams*, *Wiggins* and *Rompilla.* Further, and perhaps more importantly, much of the evidence that Charles now contends should have been presented would have done little more than bolster the State's case for future dangerousness. Thus, the state court reasonably rejected Charles's attempts to liken his case to those cases. IV SHCR 1050-051 (¶ 4).

## A. The state court's conclusion that Charles had not established prejudice is not objectively unreasonable.

In the end, defense counsel were up against the wall. Charles had committed three horrific murders. Without motive or justification.[27] He attacked seventy-seven-year-old Obie with brute force. After killing him, he moved his body and attempted to hide the evidence of the struggle. Then he laid

---

[27]     During closing argument, the prosecutor implied that the murders were committed as revenge or retaliation for having been told to leave Myeshia alone. 23 RR 28-29; *see also id.* at 56, 59-65. In the alternative, the prosecution suggested that Myeshia and her mother were killed because "Myeshia knew he had been there with her grandfather. Ms. Bennett had called the police on him once. Are they going to let him run away and not say that he was the only one that could have done this?" *Id.* at 30.

in wait for several hours until fifteen-year-old Myeshia and her mother returned home, at which point he took his time and knowingly and intentionally killed each of them, sexually assaulting Brenda first. Afterwards—driving Brenda's car—he fled to his parents' home where he changed clothes and then holed up in a motel where he was ultimately arrested. While this may have been Charles's first display of such rage, it was certainly not the first time he had been violent. Indeed, the evidence before the jury demonstrated that his violent tendencies knew no bounds.

Defense counsel's reasonable strategy was to rebut the State's case for future dangerousness. To that end, the evidence before the jury showed that (1) before the murders, Charles had been relatively non-violent, (2) he was one of the better students at TYC and helped other students, and (3) his behavior improved while at TYC. Charles now asserts that defense counsel should have painted a more complete picture of his life—the poverty, his mother's and stepfather's alcoholism, his mother's schizophrenia, his alleged brain damage, the Gulf Pines Hospital Records, and the like. But doing this only would have opened the door to *more* evidence of Charles's violent proclivities and utter disregard for the rules.

As the state habeas court reasonably concluded:

1. Trial counsel were not ineffective for their reasonable, plausible trial decision, made after [a] thorough investigation,

to concentrate on the future dangerousness special issue and not to present the testimony of Charles's family that would be more harmful than beneficial to [Charles]. *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993) (holding that appellate courts will review trial strategy only if record demonstrates action, taken after thorough investigation, without any plausible basis); *Buckley v. Collins*, 904 F.2d 263, 265 (5th Cir. 1990) (holding choice of witnesses matter of trial strategy and counsel not ineffective for choosing not to call witness whose testimony would have harmed defendant regardless of beneficial effect of testimony).

2.      Trial counsel cannot be considered ineffective for not presenting [Charles's] Gulf Pine Hospital Records whose slight mitigating value, if any, would have been lost amidst the harmful information contained in the records about [Charles's] anger, hostile behavior and oppositional defiance; [Charles] fails to show that the results of the proceeding would have been different if such records [had] been presented. *See Joiner v. State*, 825 S.W.2d 701, 707 (Tex. Crim. App. 1992) (noting that there was no evidence that defendant's emotional problems and conditions affected his ability to conform to requirements of society); *see also Mooney v. State*, 817 S.W.2d 693, 697 (Tex. Crim. App. 1991) (holding that defendant must show how more in-depth investigation would have benefitted him in order to show harm).

3.      Trial counsel are not ineffective for not presenting evidence of alleged brain damage or alleged ingestion of phencyclidine hours prior to the instant offense, assuming *arguendo* that such evidence exists, based on the speculative, unsupported nature of such allegations and in light of the horrific nature of [Charles's] triple murders, his ability to plan and orchestrate the disabling and killing of three people, his stated awareness of the wrongfulness of his actions, and his attempts to elude capture. *See and cf. Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) (holding reasonable court could conclude there was no substantial likelihood that result of punishment proceeding would have been different if counsel presented evidence of defendant's organic brain

damage, in light of "horrific" nature of offense and defendant's history); *see also Nelson v. Dretke*, 442 F.3d 282, 285 n.4 (5th Cir. 2006) (rejecting defendant's claim that evidence of organic brain damage could not be considered within scope of special issues and noting that only evidence of organic brain damage was single sentence of expert testimony that "there is minimal room to consider that there may be minimal brain damage"); *Zimmerman v. State*, 881 S.W.2d 360, 362 (Tex. Crim. App. 1994) (holding that *Penry*[28] instruction not warranted for consideration of defendant's evidence, including evidence that defendant had metal plate in skull as a result of skull fracture at age ten, and noting no evidence of brain defect).

IV SHCR 1049-050 (footnote added). Thus, even taking the whole of Charles's mitigating evidence does not create a reasonable probability that the jury would have answered the mitigation special issue "yes" had the jury heard the additional evidence.

For these reasons, the state court's ultimate conclusion, that "[Charles] fails to show that counsel are ineffective for failing to investigate and present mitigating evidence," cannot be objectively unreasonable under *Strickland* and its progeny. IV SHCR 1050 (¶4).

**B.**      **Even adding the sum total of the unexhausted evidence to the equation, Charles cannot establish prejudice.**

As set out above, Charles has asserted several new lines of mitigating evidence that should have been investigated, and he has presented new

_____

[28]      *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*); *Penry II*, 532 U.S. 782.

supporting evidence to this Court. But none of this creates a reasonable probability that the outcome would have been different had the jury heard it.

First, the Supreme Court's Eighth Amendment jurisprudence demands that a capital sentencing jury not be precluded from considering, as a mitigating factor, the character and record of the individual offender, as well as the circumstances of the particular offense. *E.g.*, *Penry II*, 532 U.S. 782; *Penry I*, 492 U.S. 302; *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality op.). The focus, then, is on the defendant. Charles argues to this Court, that the best explanation for the vicious attacks perpetrated on Obie, Myeshia and Brenda is that Charles's "reaction to the drugs, coupled with his mental illness set him off." Petition at 115. But as the record clearly establishes, it is more likely than not that Charles was *voluntarily* intoxicated on that day and that he actually liked being—and indeed wanted to be—high. Further, even with evidence of his mother's mental illness and the mental illness of others in his family, Charles has not come close to establishing that he himself suffers from any mental illness such that would mitigate the instant crime. All he does is string together various statements made over the years and then leaps to the conclusion that he suffers from some form of mental illness. But the reality of what he offers is nothing more than rank speculation.

Second, while the affidavits of Charles's family and other records establish more clearly that his childhood was not ideal, they bring with them the opportunity for the State to introduce such evidence as Charles had been abusive to his own parents and that he was generally an angry, violent young man. A ticking time bomb. This evidence would have only bolstered the State's case for future dangerousness.

In the end, even considering the sum total of what Charles presents to this Court, he cannot establish that he was denied constitutionally effective assistance of counsel.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court deny Charles's petition for federal habeas relief and grant the Director's motion for summary judgment.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

___s/ Fredericka Sargent___
                        *FREDERICKA SARGENT
                        Assistant Attorney General
                        Texas Bar No. 24027829
                        Southern District Bar No. 27909

*Counsel of Record

                        P.O. Box 12548, Capitol Station
                        Austin, Texas 78711
                        Tel: (512) 936-1600
                        Fax: (512) 320-8132
                        e-mail: fredericka.sargent@oag.state.tx.us

                        ATTORNEYS FOR
                        RESPONDENT

**CERTIFICATE OF SERVICE**

I hereby certify that on Friday, April 30, 2010, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

Randall O. Sorrels
Abraham, Watkins, Nichols, Sorrels, Agosto & Friend
800 Commerce Street
Houston, TX 77002


      s/ Fredericka Sargent
FREDERICKA SARGENT
Assistant Attorney General
Postconviction Litigation Division