# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **DERRICK DEWAYNE CHARLES,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 09-592** |
| | § | **\*\*CAPITAL LITIGANT\*\*** |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## REPLY TO RESPONDENT'S ANSWER
## <u>AND MOTION FOR SUMMARY JUDGMENT</u>

### THIS IS A DEATH PENALTY CASE.

/s/ Randall O. Sorrels
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

.

/s/ Julius Eric Junker
JULIUS ERIC JUNKER
Federal Bar No. 1096250
Texas Bar No. 2406416
LAW OFFICE OF JULIUS ERIC JUNKER
212 Jackson Street
Richmond, Texas 77469
281-342-9476 Telephone
281-239-7503 Facsimile
**Attorney for Petitioner**

−2−

## <u>TABLE OF CONTENTS</u>

I.      **Introduction**………………………………………………………………..………      **4**

II.     **Respondent's Exhaustion/Procedural Default Objections are Meritless**………..…….      **5**

III.    **Mr. Charles was Deprived of his Sixth Amendment Right to the Effective Assistance      43
        of Counsel During the Punishment Phase of his Trial**………………………………..

IV.     **AEDPA poses no bar to granting relief on Mr. Charles' ineffective assistance of      88
        counsel claim because the state court rejection of Mr. Charles' claim was both an
        unreasonable application of clearly established Supreme Court precedent and
        resulted from an unreasonable determination of the facts in light of the evidence
        before the state courts. 28 U.S.C. § 2254(d)**…………………………………………..

        Prayer………………………………………………………………………      **101**

# I.
## INTRODUCTION

After Mr. Charles pled guilty to capital murder, his counsel failed to present any mitigating evidence and thus conceded to the State one of only two questions that would determine whether their client was sentenced to life or death. This is not a case in which counsel, after a thorough investigation, made a strategic decision to forgo presenting any mitigating evidence, nor is it a case in which counsel diligently pursued a mitigation investigation and came up empty-handed. Though the contemporaneous professional standard of care mandated a thorough mitigation investigation, counsel simply failed to conduct one or use the readily available funding to hire a mitigation specialist. In a series of post-conviction statements, counsel blame Mr. Charles' dysfunctional family for their omissions and offer incredible *post hoc* rationales based on the existence of allegedly damaging information that would have emerged from the investigation they never performed. Although such excuses for deficient performance are clearly unreasonable in light of the Supreme Court's Sixth Amendment jurisprudence, the state courts accepted it – with one critical exception. The Texas Court of Criminal Appeals ("CCA") refused to endorse the suggestion that counsel were diligent when they failed to obtain voluminous, readily available mental health records documenting Mr. Charles' mental illness and much of his tragic social history.

Mr. Charles presented – to the state courts and this one – extensive, compelling mitigating evidence that was available at the time of his trial. The multifaceted case in mitigation spans from Derrick's premature birth to his mental instability on the night of the offense. The 19 years in between are marked by dire poverty, mental illness, a turbulent and violent home life, neglect, and abuse, all mitigating evidence upon which the Supreme Court has repeatedly premised a finding of

prejudice from counsel's deficient investigation.  The state court's refusal to recognize prejudice in this case flowed from both an unreasonable determination of the facts based on the evidence before it and an unreasonable application of Supreme Court precedent (Mr. Charles is aware that he need demonstrate only one of these circumstances but both are indisputably true of the state court's work in this case).

Undersigned counsel, cognizant of their burden to satisfy 28 U.S.C. § 2254(d) and rebut challenged fact findings by clear and convincing evidence, supplemented the detailed and well-documented state court presentation with evidence that permissibly expands the record.  The Respondent reflexively answers that any and all new evidence is unexhausted and thus defaulted. This is not the law.  Instead of the absolute prohibition against new evidence posited by Respondent, federal habeas corpus jurisprudence allows petitioners to submit new evidence in federal courts so long as they did not deliberately withhold it from the state courts and the evidence does not fundamentally alter the claim.  As Respondent does not even attempt the relevant analysis, Mr. Charles will first dispel Respondent's exhaustion objection – of which Respondent never attempted a relevant analysis – and then reply to his defense of trial counsel's manifestly ineffective representation.

## II.
## RESPONDENT'S EXHAUSTION/PROCEDURAL DEFAULT OBJECTIONS ARE MERITLESS.

The Respondent attempts to vitiate the compelling evidence that Mr. Charles' trial counsel were ineffective for failing to develop and present mitigating evidence by arguing that facts presented to this Court are partially unexhausted and procedurally defaulted.  The Respondent first argues that specific mitigating circumstances were never presented or argued to state courts.  Mr. Charles

−5−

respectfully disagrees. The Respondent also attempts to invoke procedural bars by simply providing the Court with a list of documents undersigned counsel presented to this Court in support of Mr. Charles' petition for a writ of habeas corpus. Contrary to the Respondent's assertion, the mere presence of new evidence does not render a claim unexhausted when it supplements and clarifies the abundant mitigating evidence that was not discovered by trial counsel but *was* presented in state habeas proceedings. As will be discussed below, the supplemental documents in no way materially alter Mr. Charles' claim that his trial attorneys rendered ineffective assistance of counsel during the punishment phase of Mr. Charles' trial. Simply put, Mr. Charles timely presented both the legal principles and operative facts governing his claim to Texas state courts and thus, properly exhausted his claim within the meaning of 28 U.S.C. § 2254(b)(1).

**A.     New supplemental evidence must fundamentally alter the claim to trigger exhaustion problems. The mere presence of supplemental evidence presented for the first time in federal court does not render unexhausted an otherwise exhausted claim for habeas corpus relief.**

A state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus. 28 U.S.C. § 2254(b); *Picard v. Connor*, 404 U.S. 270, 275 (1971). The exhaustion doctrine is designed to give the state courts an initial opportunity to pass upon and correct alleged violations of its citizens' federal rights and reflects a policy of federal-state comity. *Picard*, 404 U.S. at 275. Once the substance of a federal habeas corpus claim has been fairly presented to the state courts, the exhaustion requirement is satisfied. *Id*. (citing *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971); *Roberts v. LaVallee*, 389 U.S. 40, 42-43 (1967); *Brown v. Allen*, 344 U.S. 443, 447-450 (1953)); *id*. at 278. In short, the state court must have been given a "'fair opportunity' to apply controlling legal principles to the facts bearing upon [a petitioner's]

constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). A fair opportunity has been afforded for purposes of exhausting state remedies when a claim has been presented that includes "reference to a specific federal constitutional guarantee" and "a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

New evidence presented for the first time in federal court in support of a habeas claim will render a state remedies unexhausted where the petitioner "attempted to expedite federal review by deliberately withholding essential facts from the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1984); *Conner v. Quarterman*, 477 F.3d 287, 292 (5th Cir. 2007). As a general rule, however, the exhaustion requirement remains satisfied when evidence presented for the first time in a federal habeas proceeding supplements, but does not fundamentally alter, the claim presented to the state courts. *Vasquez*, 474 U.S. 254, 260 (1984); *Conner*, 477 F.3d at 292; *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005); *Anderson v. Johnson*, 338 F.3d 382, 386-87 (5th Cir. 2003). Only evidence that "places the claims in a significantly different legal posture" need first be presented to the state courts. *Morris*, 413 F.3d at 491; *Anderson*, 338 F.3d at 387. Evidence of a kind that is "intrinsic to the consideration" of the claim does not fundamentally alter the claim. *Vasquez*, 474 U.S. at 259. *See also Conner v. Quarterman*, 477 F.3d at 292-93 (medical records proving petitioner had injured leg at time of offense newly offered in federal court in support of ineffective-assistance-of-counsel claim did not render claim unexhausted); *Anderson*, 338 F.3d at 388-89 (affidavit from "key eyewitness" to claim not presented to state court did not fundamentally alter the claim where state trial court did not hold evidentiary hearing to allow development of claim); *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000) (finding exhaustion of ineffective-assistance-of-counsel claim despite introduction in federal court for first time of affidavits from mental health experts discussing mental illness that was

basis of claim where only assertions of paranoid schizophrenia had been made in pleadings to the state courts); *Rivera v. Quarterman*, 505 F.3d 349, 357 (5th Cir. 2007).

The *Morris* Court distinguished the case before it from two prior Fifth Circuit decisions, *Graham v. Johnson*, 94 F.3d 958 (5th Cir. 1996), and *Kunkle v. Dretke*, 352 F.3d 980 (5th Cir.2003). Whereas Graham had "presented an abundance of new evidence to the federal court that had not been presented, ***even abstractly***, to the state courts," in *Morris* it "was ascertainable what further evidence Morris would be providing to the federal court if he could develop it."  *Morris*, 413 F.3d at 496-97 (emphasis supplied).  *Kunkle* differed because the petitioner therein had an opportunity to present to the state court evidence he ***had already developed in federal court*** before being sent back to state court to exhaust his remedies.  Mr. Kunkle had "no explanation of 'why he did not present to the state court the same materials he had [already] prepared and submitted to the federal court.'" *Id.* at 497.  In other words, Mr. Kunkle deliberately withheld his evidence from the state courts.  By contrast, the Court said, Morris presented his single *Atkins* claim to both the federal and state courts and "also explicitly acknowledged what particular evidence he lacked and requested a chance to acquire it." *Id.*

Mr. Charles' state court presentation was detailed in fact and law, and supported by voluminous documentary evidence submitted by both parties throughout the state court proceedings. Respondent does not allege – nor is there any evidence – that Mr. Charles "attempted to expedite federal review by deliberately withholding essential facts from the state courts." *Morris*, at 496 (internal quotations omitted).  As the following analysis demonstrates, there can be no doubt that Mr. Charles' ineffective assistance of counsel claim is exhausted and not procedurally defaulted.

**B.     The legal theory underlying Mr. Charles' ineffective assistance of counsel claim was properly presented to state courts.**

It is undisputed that the legal theory on which Mr. Charles' ineffective assistance of counsel claim was timely presented in state court.  The grounds for relief in Mr. Charles' Application for Writ of Habeas Corpus filed in the 184th Judicial District Court of Harris County  read as follows:

> GROUND FOR RELIEF NUMBER ONE
> Applicant's sentence of death results from the following violation of the Sixth Amendment guarantee of effective assistance of counsel: there is a reasonable probability that, but for trial counsel's deficient performance at the punishment stage of Applicant's trial, in failing to reasonably investigate or present available mitigating evidence, the result of such punishment proceeding would have been different and Applicant would have received a life sentence.
>
> GROUND FOR RELIEF NUMBER TWO
> Applicant's sentence of death results from the following violation of the Sixth Amendment: where trial counsel failed to adduce available mitigating evidence in the punishment stage of Applicant's trial, the State's pursuit of the death penalty was not subjected to meaningful adversarial testing.

Application for Writ of Habeas Corpus, *Ex. Parte Derrick Dewayne Charles*, No. 941969-A (Tex. 184th Dist. Ct.) (hereinafter "State Application") at 2.

**C.     The operative facts giving rise to Mr. Charles' ineffective assistance of counsel claim were properly presented to state courts. Respondent's arguments to the contrary are based on an inadequate review of the state court record and the misconception that the mere presence of supplemental evidence in federal court patently renders a claim unexhausted.**

Likewise, the record reflects that Mr. Charles unequivocally presented the operative facts on which his claim was based.  First, Mr. Charles' state Application for Writ of Habeas Corpus contained a thorough description of the numerous compelling mitigating circumstances that existed at the time of Mr. Charles' trial that trial counsel neither investigated nor presented.  Second, Mr. Charles' state habeas counsel submitted a declaration from psychologist Dr. Susana A. Rosin, Ph.D. in support of his application.  Dr. Rosin identified numerous compelling mitigating circumstances in Mr. Charles'

social history, evidence that trial counsel failed to develop and present to the jury. Finally, the state courts were presented with voluminous documentary evidence providing conclusive evidentiary support for Mr. Charles' factual allegations.

**1.    State habeas counsel explicitly identified the underlying facts supporting Mr. Charles' ineffective assistance of counsel claim.**

In his state application for a writ of habeas corpus, Mr. Charles' state habeas counsel argued that despite the complete absence of mitigating evidence in the penalty phase of Mr. Charles' trial, which left the jury knowing hardly anything about him, ample and compelling evidence of Mr. Charles' background, social history, and mental impairments existed at the time of Mr. Charles' trial. Specifically, Mr. Charles argued that trial counsels' failure to investigate and present the following mitigating themes constituted a violation of Mr. Charles' Sixth Amendment right to the effective assistance of counsel:

- Mr. Charles was born premature, weighing slightly more than three (3) pounds;

- Mr. Charles suffered from seizures in infancy;

- Mr. Charles suffered from head injuries when he was young;

- Mr. Charles exhibited impairments in judgment, behavior, and ability to cope with various demands of life since a very young age. He was prescribed Ritalin when he was only six years of age;

- At the age of ten, Mr. Charles was referred to Dr. Lawrence Ginsberg, psychiatrist with Red Oak Psychiatry Associates;

- Mr. Charles was psychiatrically hospitalized at Gulf Pines Hospital only one day after his initial visit with Dr. Ginsberg. He was once again hospitalized at Gulf Pines Psychiatric Hospital when he was thirteen years of age;

−10−

- Mental health professionals who treated Mr. Charles as a child noted concerns that Mr. Charles suffered from depression, sadness, feelings of guilt, lack of interest in usual activities, feelings of worthlessness and irritability and nervousness;

- Psychiatric professionals who treated Mr. Charles as a child identified "Complex Seizure Disorder", "neurological problems", and "organic brain injury" as possible sources of Mr. Charles' inability to conform his behavior to social norms;

- Mr. Charles suffered from low cognitive abilities (low IQ);

- Mr. Charles' mother suffered from long-standing schizophrenia during Mr. Charles' childhood which was not diagnosed until Mr. Charles was approximately fourteen (14) years of age.  As a result, Mr. Charles grew up with a mother who heard voices and believed her husband was conspiring against her;

- Mr. Charles' mother exhibited a long-standing pattern of inability to follow through with treatment recommendations for her son.  For example, psychiatric professionals anticipated that Mr. Charles would need to be hospitalized for 2-3 weeks in 1993.  Mr. Charles' mother, however, withdrew her son from the hospital only 3 days after he was admitted "because she missed her child".

- Mr. Charles' medical history included a familial history of depression, alcoholism, and seizures;

- Mr. Charles' childhood was marked by poverty and frequent moves;

- Mr. Charles' mother failed to meet Mr. Charles' basic needs.  At times there was no food in the house.  Likewise, Mr. Charles' mother failed to provide adequate clothing for her children;

- Mr. Charles, who witnessed frequent domestic violence between his mother and his stepfather, suffered "severe dysfunction at home and at school"; and

- Unlike his younger brother, Mr. Charles was rejected by his

–11–

maternal family.

*See* State Application at 27-34.

> **2.     Mr. Charles presented the expert opinion of Dr. Susana A. Rosin to the state courts, she explicitly identified the numerous and multifaceted mitigating themes trial counsel failed to investigate and present to the jury.**

Mr. Charles sought expert assistance from psychologist Dr. Susana A. Rosin during state postconviction proceedings.  Dr. Rosin was retained by Mr. Charles' state habeas counsel "to conduct a psychological evaluation of . . . Mr. Derrick Dewayne Charles, *for the purpose of evaluating Mr. Charles' cognitive functioning and bringing to light potential mitigating circumstances in Mr. Charles' case*."  Affidavit of Susana A. Rosin, Ph.D. (hereinafter "Rosin Affidavit") at 1 (emphasis added).  Mr. Charles properly submitted Dr. Rosin's Affidavit to state district court on October 10, 2006, in support of his ineffective assistance of counsel claim.  In accordance with the stated purpose for her evaluation, Dr. Rosin enumerated numerous mitigating circumstances that were neither investigated nor presented by Mr. Charles' trial counsel:

> In this expert's opinion, the following should have been considered *as mitigating circumstances* at the time, and are still relevant:
>
> 1.  Mr. Charles' history of premature birth, low birth weight, seizures, developmental delays, and reported head injury prior to age one.
>
> 2.  Mr. Charles' history of Attention Deficit Hyperactivity Disorder, which was initially diagnosed around the age of six, but only briefly treated.
>
> 3.  Mr. Charles' chronic history of poor academic achievement and school adjustment problems.
>
> 4.  Mr. Charles' history of severe depression for which he was treated during his early teens, and hospitalized twice, at ages

ten and thirteen.

5. History of **family dysfunction** that included living in **abject poverty, frequent moves** and evictions, **witnessing parental arguments** and family, the **stepfather's alcoholism**, and the **mother's untreated mental illness**. It appears that partly as the result of **family dysfunction**, Mr. Charles often lived in unsafe environments, **witnessed repeated incidents of violence between his parents**, and **failed to receive proper parenting and medical treatment for his problems**. Mr. Charles, for instance, **was pulled out of the hospital by his mother against medical advice in 1993** only three days following admission. Records indicated that the parents failed to attend many group and family therapies during Mr. Charles' 1995 hospitalization and subsequently failed to continue much needed psychiatric treatment and medication for Mr. Charles after his discharge from the second psychiatric hospitalization. **Records indicate that the parents terminated Mr. Charles' treatment with Dr. Ginsberg in early 1996, in spite of the fact that Mr. Charles continued to exhibit very serious behavior and emotional difficulties** throughout his adolescence. It is likely not coincidental that Mr. Charles' involvement with the law and Texas Youth Commission began approximately one year from the date he ceased to receive psychiatric help. Also not coincidentally, this was also the period of time during which **Mr. Charles' mother's psychosis** worsened and first came to light. Mr. Charles's mother and stepfather were reportedly separated ruing this period of time, Mr. Charles' brother was sent to live with the maternal grandparents, and **Mr. Charles left alone with his mentally ill mother who was reportedly exhibiting paranoid delusions, experiencing depression, chronic difficulties sleeping and hearing voices at the time** . . . .

*Id.* at 14, 15 (emphasis added).

Included in the list of mitigating circumstances Dr. Rosin identified was also the fact that mental health experts long suspected organic brain dysfunction as a contributing factor to Mr. Charles' disruptive behavior. *Id.* at 16.

In addition, Dr. Rosin noted that records pertaining to Mr. Charles are replete with references

to his academic difficulties.  *Id.* at 3.  In her discussion of mitigating circumstances, she stated that the results of her evaluation of Mr. Charles are, in fact, consistent with impairments in cognitive functioning.  *Id.* at 16.  She referred to Mr. Charles as a "***cognitively comprised individual***."  *Id.*  She explained that during her evaluation, Mr. Charles obtained an IQ score of 82, which is at the low end of the Low Average range of ability (12th percentile).  In other words, Mr. Charles' IQ score is lower than 88 percent of the general population.  *Id.* at 11, 12.  She further stated that Mr. Charles exhibited relative deficits in cognitive areas related to fluid intelligence, reasoning, listening, executive functioning, and impulse control.  *Id.* at 16.

Dr. Rosin's expert opinion was based on her evaluation of Mr. Charles as well as her review of ***voluminous documentary evidence totaling over three hundred fifty (350) pages*** and containing a wealth of information about Mr. Charles' life history which the jury that sentenced Mr. Charles to death never heard.  The documents, ***all of which are part of the state record*** and gave rise to Mr. Charles' ineffective assistance of counsel claim, included:

- 1993 Gulf Pines Hospital psychiatric records pertaining to Mr. Charles;

- 1995 Gulf Pines Hospital psychiatric records pertaining to Mr. Charles;

- Red Oak Psychiatry Associate records pertaining to Mr. Charles;

- Letter from Terry A. Rustin, M.D. to Bob Wicoff dated August 31, 2004;

- Letter from Lawrence D. Ginsberg, M.D. to Bob Wicoff dated September 17, 2004;

- UTMB/TDCJ Medical Records pertaining to Mr. Charles; and

- Declaration of Leroy Phillips (Mr. Charles' stepfather).

*Id.* at 1, 2.

−14−

3.      **There is no support in the record for the Respondent's argument that three factual bases of Mr. Charles' ineffectiveness claim were not presented to state courts and that, therefore, the claim is partially unexhausted and defaulted.**

In arguing that Mr. Charles' *Wiggins*[1] claim is partially unexhausted and procedurally defaulted, the Respondent identifies three factual bases which he claims were not presented in state court: (1) Mr. Charles' family history of mental illness; (2) his mother's own childhood; and, (3) Mr. Charles' long-standing and severe cognitive impairments.[2]  Respondent's Answer and Motion for Summary Judgment with Brief In Support (hereinafter "Answer") at 23.  The Respondent's claims are so flatly contradicted by the state court record as to raise doubt whether Respondent actually read through the evidence presented to the state court before interposing his objection.

a.      **Mr. Charles presented to the state courts evidence of the family history of mental illness.**

The Respondent asserts that Mr. Charles "did not ***suggest – much less argue*** – to the state courts that . . . his family history of mental illness . . . should have been investigated and/or presented to the jury."  Answer at 23 (emphasis added).  This claim is dreadfully inaccurate and misleading.  Mr. Charles very clearly argued to the state courts that his trial counsel were ineffective, in part, for failing to investigate and present a familial history of mental illness, including the fact that Mr. Charles' mother suffered from untreated schizophrenia throughout Mr. Charles' childhood.  As evidence that trial counsel should have been aware of, and investigated, this obvious red flag, Mr.

---

[1] *Wiggins v. Smith*, 539 U.S. 510 (2003).

[2]  With respect to all other factual bases of Mr. Charles' claim, the Respondent necessarily concedes they are properly exhausted and not procedurally defaulted.  *Carty v. Thaler*, 583 F.3d 244, 257 (5th Cir. 2009) (where the Respondent expressly enumerates which claims are unexhausted and treats the rest as exhausted, it waives in writing the exhaustion defense to all claims not identified as unexhausted, and the district court's contrary conclusion was erroneous as a matter of law).

−15−

Charles submitted the report from the trial investigator's interview with Leroy Phillips, in which he told the trial team that "mental illness runs in [Derrick's] mother's side of the family."  *See* State Application, Exh. K.

The state record is replete with extensive documentary evidence of mental health problems that afflicted Mr. Charles' mother and other maternal relatives.  To the extent that Mr. Charles presented facts related to his mother's childhood for the first time to this Court, those facts merely supplement and explain the ample evidence of mental illness and alcoholism that plagued Mr. Charles' extended family.  The newly presented facts in now way place Mr. Charles' ineffectiveness claim in a significantly different legal posture.

In his state application for writ of habeas corpus, Mr. Charles argued that among the multifaceted mitigating evidence trial counsel failed to investigate and present was "a family history of depression, alcoholism and seizures."  State Application at 29.  State habeas counsel noted that the jury heard nothing about the numerous disturbing childhood experiences Mr. Charles was forced to endure as a child, including the fact that:

> [Derrick's mother], unbeknownst to her or her family, ***suffered from schizophrenia***, which was not diagnosed until 1997.  As a result, ***Derrick and his brother Chris grew up with a mother who heard voices and believed her husband was conspiring against her***. Perhaps also ***due her disease, Nancy failed to fulfill some of her basic obligations as a mother***, like providing enough food in the house and making sure the boys had clothes to wear.  ***The schizophrenia was allowed to run full throttle, since Nancy had not been diagnosed and was not being treated by any medication***.

*Id.* at 33 (emphasis added).

In addition, state habeas counsel filed the affidavit of Leroy Phillips, Mr. Charles' stepfather, in support of Mr. Charles Application for Writ of Habeas Corpus.  In the affidavit, Mr. Phillips stated:

> [When Derrick was about 10 years old] Nancy began to really start exhibiting the signs of her schizophrenia, which was not actually diagnosed until 1997, a few years later. Of course, we did not know she had schizophrenia while Derrick and his brother were growing up, which made it worse because she wasn't being medicated. Nancy heard voices and other sounds. Like Derrick, she frequently stayed up all night.

Affidavit of Leroy Phillips, State Application, Exh. C (hereinafter "Leroy Phillips Affidavit") at 2.

Mr. Charles also properly filed an affidavit of psychologist Dr. Susana A. Rosin in the state courts. Among the numerous mitigating themes which Dr. Rosin identified was the fact that as a child, Mr. Charles was *left alone with* "*a mentally ill mother* who was reportedly exhibiting paranoid delusions, experiencing depression, chronic difficulties sleeping and hearing voices at the time." Rosin Affidavit at 15 (emphasis added).

Additional documentary evidence properly before state courts, *i.e.*, Red Oak Psychiatry Associates records, 1993 Gulf Pines Hospital psychiatric records, and 1995 Gulf Pines Hospital psychiatric records pertaining to Mr. Charles, included documentation of the extended family's history of substance abuse, mental illness, attention deficit disorder, cognitive deficits and seizure disorder. Mr. Charles' records from Red Oaks Psychiatric Associates include the following notations: "*Bipolar-Cousin*", "*Mental Retardation-Aunt, Uncle*", "*Seizures-Aunt, Cousin.*" Red Oak Psychiatry Associates Records of Derrick Charles, State Application, Exhibit D, (hereinafter "Red Oak Psychiatry Records of Derrick Charles") (emphasis added). An Admission Psychiatric Assessment completed on September 9, 1993, during Mr. Charles' first Gulf Pines psychiatric hospitalization, it was noted that Mr. Charles had a *cousin with Attention Deficit Disorder*. 1993 Gulf Pines Hospital Records of Derrick Charles, Respondent's Original Answer, Exh. A, *Ex. Parte Derrick Dewayne Charles*, No. 941969-A (Tex. 184th Dist. Ct.) (hereinafter "1993 Gulf Pines

Hospital Records") (emphasis added).

On September 20, 1995, during Mr. Charles' second psychiatric hospitalization, a Patient Family Questionnaire was completed.  With respect to problems experienced by family members, it was noted that Mr. Charles' *maternal grandmother suffered from "periods of intense depression," "suicide attempt," and "intense mood swings."*  1995 Gulf Pines Hospital Records of Derrick Charles, Respondent's Original Answer, Exh. A, *Ex. Parte Derrick Dewayne Charles*, No. 941969-A (Tex. 184th Dist. Ct.) (hereinafter "1995 Gulf Pines Hospital Records) (emphasis added).  It was also documented that Mr. Charles' maternal grandfather suffered from "alcoholism or drinking problems." *Id.*  An Admission Psychiatric Assessment also dated September 20, 1995, included the following notation, "The mother has a history of depression." *Id.*  On September 22, 1995, Mr. Charles underwent a psychological evaluation by Michele F. Larrow, Ph.D. *Id.*  In Dr. Larrow's report, it is noted that, "*There is a family history of depression, alcoholism, and seizures.*" *Id.* (emphasis added).

State habeas counsel explicitly argued that trial counsel should have investigated and presented, among many other circumstances, the evidence of the family history of mental illness, and the state courts were presented with the ample evidence of it described above.  Respondent's assertion that Mr. Charles failed to exhaust this argument is demonstrably frivolous.

> ### b.  Arguments and evidence of Mr. Charles' long-standing and severe cognitive impairments were properly before the state courts.

The Respondent also inexplicably contends that state habeas counsel failed to "*suggest – much less argue* – to the state courts that [Mr. Charles'] 'long-standing and severe cognitive impairments' should have been investigated and/or presented to the jury."  Answer at 23 (emphasis

added).   This objection can not have been made in good faith by anyone with a passing familiarity with the state court record.  Initially, it should be noted that Mr. Charles raised a claim that he has mental retardation and the States' own expert concluded that "Mr. Charles' measured mental ability was of borderline quality when evaluated at ages eleven and thirteen, which is affirmed by the adult IQ of 77."  *See* Affidavit of George Carl Denkowski (hereinafter as "Deknowski Affidavit"), State Habeas Hearing, State Exh. 7 at 33.  Thus, the State's own expert documented Mr. Charles' long-standing cognitive impairments.

In addition to the evidence of Mr. Charles' severe and long-standing cognitive impairments adduced by the State,  state habeas counsel explicitly argued at length that among the many mitigating themes trial counsel failed to uncover and present to the jury was evidence of Mr. Charles' long-standing impairments in cognition.  There was extensive evidentiary support in the state record for counsel's assertions.

Mr. Charles argued in the state court that trial counsel were ineffective for failing to obtain Mr. Charles' psychiatric records and that as a result, the jury did not learn that Mr. Charles' Full Scale IQ score was 77 when he was merely ten years of age.  State Application at 28.  As argued by state habeas counsel, the jury never knew that Mr. Charles' IQ score placed him in the borderline range of intellectual functioning.  *Id.*

State habeas counsel likewise argued that trial counsel were also deficient for failing to investigate and present evidence that, at the age of thirteen, Mr. Charles was evaluated by a psychologist, Dr. Michele Larrow.  *Id.* at 29.  Dr. Larrow measured Mr. Charles' IQ as 69.  *Id.*  In arguing that Mr. Charles' trial counsel rendered ineffective assistance of counsel, state habeas counsel noted that although Dr. Larrow opined that Mr. Charles did not meet the diagnostic criteria for mental

retardation because his adaptive behaviors were adequate, she concluded that Mr. Charles tested at "***an age equivalent of about 6 years***" (Mr. Charles was 13 years old during the evaluation).  *Id.* (emphasis added).  As discussed in Mr. Charles' state application, Dr. Larrow further noted that Mr. Charles, who wrote his name upside-down, "exhibited extreme problems with integrating visual motor knowledge." *Id.*  Dr. Larrow ultimately diagnosed Mr. Charles with Borderline Intellectual Functioning and questions of some organic brain injury.  *Id.*

In the Affidavit of Leroy Phillips, filed in support of Mr. Charles' state application, Mr. Charles' stepfather stated, "Derrick was very slow in school.  He couldn't do all kinds of basic things like other kids.  School came very hard for him, and his frustration frequently erupted in violence." Leroy Phillips Affidavit at 3.

Dr. Susana Rosin's affidavit discussed at great length ***Mr. Charles' severe cognitive deficits***. Dr. Rosin noted that Mr. Charles' prior IQ scores "generally fell in the upper end of the Mild Mentally Retarded range of intellectual functioning."   Rosin Affidavit at 11 (emphasis added).

Dr. Rosin completed a psychological evaluation of Mr. Charles on July 10, 2006.  She administered the WAIS III and obtained a Full Scale IQ score of 82, placing Mr. Charles in the 12th percentile (low average range of intellectual functioning).  *Id.* at 11, 12.  As noted previously, results of Dr. Rosin's testing reveal that at least  88 percent of the general population have IQ scores higher than Mr. Charles.

Dr. Rosin also administered the Wide Range Achievement Test-3 and selected reading subtests of the Woodcock Johnson III Tests of Achievement.  *Id.* at 12, 13.  Mr. Charles' performance  on the WRAT-3 and the Woodcock Johnson III Letter-Word Identification and Passage Comprehension subtests was also grossly substandard.  On the WRAT-3 test, Mr. Charles scored at

the 7th percentile/6th grade equivalency level in Reading; at the 8th percentile/5th grade equivalency level in Spelling; and at the 3rd percentile/4th grade equivalency level in Arithmetic. *Id.* at 13.

With respect to the Woodcock Johnson III, Mr. Charles tested at an age equivalent score of 9 years and 4 months and a grade equivalent score of 4th grade on the Word Identification subtest. *Id.* He obtained an age equivalent score of 10 years and 11 months and a grade equivalent score of 5th grade and 8 months on the Passage Comprehension subtest. *Id.*

Dr. Rosin went on to note:

> Result of the Trail Making tests, which require flexibility of cognitive operations as well as the planning, evaluating and executing of programs of action, ***were in the impaired range*** . . . Although Mr. Charles appeared to initially understand the test instructions, his performance was characterized by significant difficulties shifting from one cognitive set to another.
>
> Mr. Charles' ability to form hypotheses, apply rules across stimulus changes, and change response sets as measured as measured by the Booklet Category Test was in the mildly impaired range with seventy errors noted. Mr. Charles appeared to benefit from the untimed nature of this particular task, as he took longer than average to look at the various test items, formulate strategies and provide responses.

*Id.* (emphasis added).

The state record also contained extensive evidentiary support for the claim that Mr. Charles' cognitive abilities were impaired. Mr. Charles' psychiatric records, which were properly before state courts, reveal that on March 10, 1993, during Mr. Charles' psychiatric hospitalization, Roxanne Brown, BA, SWA, LCDC, completed a Psychosocial Assessment on Mr. Charles. 1993 Gulf Pines Hospital Records. The following information was provided in the "Educational and Vocational History" section of the report:

> The patient is in the 3rd grade at Calvert Elementary School. He is in a

> special education program [*sic*] called SNAAP.  His grades are below
> average and the family is very concerned about that because they have
> been dropping.

*Id.*  Dr. Karen Redus, a psychologist, determined that Mr. Charles had "**significant impairments in his cognitive processing**."  *Id.* (emphasis added).

In addition, psychiatric records pertaining to Mr. Charles' 1995 hospitalization contain abundant evidence of Mr. Charles' cognitive impairments.   Dr. Larrow, who completed the psychological evaluation of Mr. Charles during which Mr. Charles obtained an ***IQ score of 69***, made the following observations of Mr. Charles' intellectual functioning:

> Derrick was below average on most tasks.  On the verbal tests, he had
> a strength in abstract reasoning, although he was still below average
> here.  His word knowledge and general knowledge are especially poor.
>  These scores are probably lowered by a combination of cultural
> deprivation and learning problems. He was also below average on
> tasks that tap freedom of distractability.  His social knowledge is also
> poor, although contrary to expectations, there were no signs of
> antisocial behavior in his responses.  Most of the time, Derrick still
> tends to think concretely and his knowledge of the world is limited . . .
> .
>
> He exhibited extreme problems with integrating visual-motor
> knowledge.  He also had problems analyzing a design into component
> parts and reproducing it; he showed rotations and poor gestalt . . . . On
> the Bender, his [*sic*] made 6 errors, all of which are significant of brain
> injury.  He rotated figures, distorted what he saw, and lost the gestalt
> figures.   These errors correspond to an ***age equivalent of about 6
> years***.  Derrick also wrote his name upside down and said he could not
> write it the right way.  His human figures were similarly quite
> primitive for his age.  Taken together, this profile of his results suggest
> the ***strong possibility that he has some organic brain damage*** that is
> contributing to his behavioral problems.  At the very least, he has a
> ***severe learning disability***.

1995 Gulf Pines Hospital Records (emphasis added).

Mr. Charles' psychiatric records also contained ample evidence that Mr. Charles exhibited

persistent symptoms of cognitive impairments.   According to Mr. Charles' Gulf Pines Hospital records:

      a.      Mr. Charles failed first grade;

      b.      As a third grade student, Mr. Charles was placed in special education.  Despite the fact that he was receiving special education services, his grades were below average;

      c.      Approximately six months into third grade, Mr. Charles was administered an educational assessment.  He scored below average on all subjects.  In Letter-Word Identification, Mr. Charles was functioning at the first garde level; in Passage Comprehension, Mr. Charles was functioning at the first grade level; in Calculation, Mr. Charles was functioning at a second grade level; in Math Reasoning, Mr. Charles was functioning at a second grade level; in Written Language, Mr. Charles was functioning at the second grade level; in Broad Reading, Mr. Charles was functioning at the second grade level; and in Broad Math, Mr. Charles was functioning at the second grade level.  The evaluator noted that Mr. Charles required special assistance in academic settings.

      d.      As a sixth grade student, Mr. Charles failed to meet the minimum requirements for the "Math Mastery" as well as "Reading Mastery" of the TAAS test.

      e.      Mr. Charles was in special education in seventh grade.  During the first semester of the 1995/1996 school year, his grades were consistently substandard.  He obtained the following grades: Science: 50; Reading: 80; Math: 50; Texas History: 70; English: 70; and Pre Voc: 50.

      f.      On October 2, 1995, a Gulf Pines Hospital teacher noted that Mr. Charles was functioning "well below grade level."

1995 Gulf Pines Hospital Records.

      Because *all* of this evidence was properly before state courts, there can be no doubt that they had a meaningful opportunity to consider Mr. Charles' assertions that he suffered from long-standing

−23−

and severe cognitive impairments. Respondent's suggestion that Mr. Charles failed to even "suggest" this issue to the state courts is baseless. To the contrary, the evidence of cognitive impairments in the Gulf Pines Hospital records and Dr. Rosin's affidavit were – and remain – essential facets of Mr. Charles' case.

### c. Evidence of Nancy Phillips' traumatic childhood corroborates and explains evidence of the family history of mental illness properly presented in state court.

Respondent objects that Mr. Charles never suggested to the state courts that evidence of Nancy Phillips' own childhood should have been investigated and/or presented to the jury (Answer at 23), though he conspicuously fails to explain – or even suggest – how this evidence fundamentally alters the picture painted by the voluminous and overwhelming evidence of family dysfunction and mental illness that was before the state court. Respondent's emotionally charged rhetoric to the existence of supplemental evidence is not an adequate substitute for a valid exhaustion objection. The supplemental evidence merely provides some context for Nancy Phillips' severe psychiatric illness – which left her incapable of caring for Derrick through much of his childhood – as well as the family history of mental illness. Mr. Charles briefed the issue of mental illness in Derrick's family for the state courts and presented numerous supporting documents. The supplemental evidence presented to this Court cannot credibly be described as placing Mr. Charles' claim in a significantly different legal posture.

Undersigned counsel obtained an affidavit from Lincoln Charles, Mr. Charles' maternal uncle, and presented it for the first time to this Court. In his affidavit, Lincoln Charles confirmed that his father, Mr. Charles' maternal grandfather, was an alcoholic as noted in Mr. Charles' psychiatric records presented to the state courts. Lincoln Charles described Mr. Charles' maternal grandfather as

someone who "drank all day and would come home after drinking all night" and who was habitually violent towards his family including his wife (Mr. Charles' maternal grandmother) and unable to meet his family's basic needs because of his drinking problems. Declaration of Lincoln Charles, Amended Petition for Writ of Habeas Corpus (hereinafter "Amended Petition"), Exh. OO (hereinafter "Lincoln Charles Affidavit"). According to Lincoln Charles, the violence in the home culminated in the killing of Mr. Charles' maternal grandfather by Mr. Charles' maternal grandmother. *Id.*

Undersigned counsel also obtained psychiatric records pertaining to Nancy Phillips, Mr. Charles' mother. The records contain relatively brief information about Ms. Phillips' childhood – *i.e.*, history of neglect, physical abuse, emotional abuse, and sexual abuse – and corroborate the familial history of substance abuse. They also provide some insight into the root causes of Ms. Phillips' severe mental illness. *See* Houston Northwest Medical Center Psychiatric records of Nancy Phillips, Amended Petition, Exh. B (hereinafter Houston Northwest Medical Records of Nancy Phillips"). According to the records, Ms. Phillips' "father was killed by her mother because of his drinking." *Id.* Ms. Philips also informed mental health professionals that she attributed the problems she was experiencing to the fact that she witnessed her father's homicide, a trauma for which she never received treatment. *Id.* The death certificate and autopsy report of Herman Charles, Mr. Charles' maternal grandfather, corroborate the fact that Herman Charles was killed by Mr. Charles' maternal grandmother and the fact that Mr. Charles' maternal grandfather suffered from drinking problems. *See* Death Certificate of Herman Charles, Amended Petition, Exh. H; Autopsy Report of Herman Charles, Amended Petition, Exh. I (hereinafter "Autopsy of Herman Charles"). Herman Charles' blood alcohol level was .183 at the time of his death, more than twice the current legal limit. *Id*.

The information regarding Ms. Phillips' background, which both corroborates the maternal

family history of substance abuse and provides context for Ms. Phillips' severe and protracted mental illness, adds little to state habeas counsel's explicit assertions – which were undoubtedly supported by evidence in the state record – that trial counsel were ineffective for failing to develop extensive familial history of mental illness and substance abuse.

In sum, the Respondent's suggestion that Mr. Charles failed to "suggest" to the state courts three lines of mitigating evidence included in the federal petition is simply wrong as matter of fact. Respondent's objection that Mr. Charles' claim is either unexhausted or defaulted is meritless.

4.   **Documents filed for the first time in this Court in support of Mr. Charles' petition for writ of habeas corpus merely supplement the abundant evidence of the myriad and compelling mitigating factors argued and presented in state courts**.

Respondent also argues that Mr. Charles' claim that trial counsel were ineffective for failure to investigate and present mitigating evidence is partially unexhausted and procedurally defaulted based on the existence of evidence presented to this Court for the first time.  *See generally* Respondent's Answer at 23-28.  Rather than engaging in the relevant analysis, Respondent merely lists exhibits that were not presented to the state courts, cites cases discussing the exhaustion doctrine, and then stops without addressing whether the evidence in question fundamentally alters Mr. Charles' case or presents new crucial factual allegations never made in state court. *See e.g. Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000).  Respondent's hasty reaction to the existence of additional evidentiary support for Mr. Charles' claims sheds no light on whether there is a valid exhaustion concern in the this case.  Applying the exhaustion rules to this case, however, reveals that Mr. Charles' claim is fully exhausted.  The documentary evidence presented to this Court for the first time merely supplements the arguments and evidence properly before state courts and in now way places Mr. Charles' claim

–26–

that trial counsel rendered ineffective assistance of counsel in a significantly different legal posture.

### a.     Supplemental evidence of Mr. Charles' protracted mental illness.

Arguments and Evidence Presented to the State Courts

State habeas counsel explicitly argued that Mr. Charles' trial counsel were ineffective for failing to investigate and present to the jury evidence of Mr. Charles' protracted and severe history of mental illness.  State Application at 14-17, 22-24, 27-34.

Properly before state courts was a wealth of evidence documenting of Mr. Charles' mental health history, *i.e.*, the 1993 Gulf Pines Hospital psychiatric records, the 1995 Gulf Pines Hospital psychiatric records, the Red Oak Psychiatry Associates records, the University of Texas Medical Branch records, a letter from Dr. Lawrence Ginsberg, psychiatrist, to state habeas counsel dated September 17, 2004, and the affidavit of Leroy Phillips, Mr. Charles' stepfather.  The affidavit of Lawrence Charles in no way alters Mr. Charles' *Wiggins* claim.

Psychiatric records pertaining to Mr. Charles, which were part of the state habeas corpus record, contain the following information about his mental health history:

      a.    Mr. Charles received mental health services at school starting in first or second grade.

      b.    Mr. Charles was first seen by Dr. Lawrence Ginsberg, psychiatrist, on March 8, 1993, when Mr. Charles was merely ten years old.  According to medical records:

> [Mr. Charles] has been violent towards his peers at home and at school. He has been depressed in school. [Mr. Charles] loses his temper, argues with adults, he refuses his chores, he is easily annoyed, he is angry and resentful and blames others for his actions. [Mr. Charles] has been suspended from school.

c.   Mr. Charles was psychiatrically hospitalized at Gulf Pines Hospital on March 9, 1993, only one day after his initial visit with Dr. Ginsberg.

d.   At intake, Mr. Charles affect and mood were noted to be "flat" and "depressed."   He received the following provisional diagnosis on admission:

|  |  |
|---|---|
| Axis I: | Oppositional Defiant Disorder Depressive Disorder, Not Otherwise Specified |
| Axis II: | No diagnosis |
| Axis III: | Rule Out Partial Complex Disorder |

e.   Rationale for inpatient treatment was noted to be: Potential for danger to self/others/property; behavior control needed for effective treatment ; **_severe, incapacitating anxiety/depression_**; failure of outpatient/extended case management (school counseling); and **_severely impaired social/family/occupational functioning_**.

f.   On March 10, 1993, a day after Mr. Charles was hospitalized, Mr. Charles underwent a psychological evaluation by Dr. Karen Redus, Ph.D.   Dr. Redus made the following observations:

> Derrick . . . appeared to have very low self esteem and . . . appeared to be experiencing irritating and painful affect that was interfering with his perception and/or mediational activities.  He displayed a marked tendency to narrow or simplify stimulus fields and to hastily or haphazardly scan his environment. Because he may miss, neglect, or distort critical cues or bits
> of information, this style can create the potential for a higher frequency of behaviors that do not coincide with social demands or expectations.  It also appeared that Derrick was likely to have difficulty in modulating effect

—28—

and is more inclined to display feelings and be less concerned about modulating those displays. He may have a sense of helplessness or discouragement about his relationships to the word and may expect gloomy outcomes regardless of his efforts. Some of his responses suggested that problems with impaired perceptual accuracy could be either to attention and concentration problems, neurological problems or decompensation and internal preoccupation related to depressive affect. He did give an unusually large number of responses to portions of the testing, which can be associated with Biploar process. This along **with significant impairments in his cognitive processing** suggest that he will need to be monitored for this possible development of more significant affective and cognitive disturbances.

g.    Dr. Redus' diagnostic impressions included the following:

Axis I:    Oppositional Defiant Disorder
           Depressive Disorder, NOS
           Features of Attention Deficit
           Disorder

Axis III:  Rule Out Seizure Disorder

h.    Mr. Charles was prematurely discharged from Gulf Pines Hospital on March 11, 1993 at the request of his mother who stated she "missed" her son.

i.    Mr. Charles was once again seen by Dr. Ginsberg on February 21, 1995, for severe behavioral problems. Dr. Ginsberg diagnosed Mr. Charles with Oppositional Defiant Disorder and Depressive Disorder Not Otherwise Specified.

j.    Dr. Ginsberg ordered an EEG in order to rule out seizure disorder. Although the results of the EEG and the EKG were within normal limits, Dr. Ginsberg opined that Mr. Charles was suffering from Attention Deficit Disorder and Major Depressive Disorder.

k.   On March 14, 1995, Dr. Ginsberg Prescribed Imipramine, an antidepressant, to Mr. Charles.

l.   On September 20, 1995, when Mr. Charles was thirteen years of age, Mr. Charles was seen emergently for psychiatric care at Gulf Pines Hospital.  He was admitted for inpatient treatment.

m.   At intake, Mr. Charles' affect and mood were noted to be "blunted" and "depressed."  On admission, Dr. Ginsberg diagnosed Mr. Charles with Major Depression, Recurrent and Rule/Out Partial Complex Seizure Disorder.

n.   Mr. Charles was continued on Imipramine and in addition, Dr. Ginsberg prescribed Mellaril for agitation to Mr. Charles.

o.   On September 22, 1995, two days after Mr. Charles' second psychiatric hospitalization, Mr. Charles underwent a psychological evaluation by Michelle F. Larrow Ph.D.  Dr. Larrow made the following observations: "[Derrick's] affect was flat and depressed and he avoided eye contact.  He had trouble with psychomotor tasks and rotated figures."  In her report, she stated:

> Derrick's testing . . . shows him to be depressed and have poor self esteem.  He also has some anxiety that may be due to depression and feelings of guilt.  He withdraws socially in response to feeling poorly about himself . . . He may act angrily as a defense against feelings of sadness and rejection.

p.   Mr. Charles received the following diagnosis:

Axis I:     Major Depressive Disorder, Recurrent, Severe Without Psychotic Features

Axis II:    Borderline Intellectual Functioning

Axis III:   Question of Some Organic Brain Injury

−30−

Axis IV:      Family Conflict; Separation of
Parents

q.     Mr. Charles, who remained in the hospital for over two weeks, was discharged on October 6, 1995.

r.     During the course of his hospitalization, Mr. Charles received individual therapy, family therapy, group therapy, and activities therapy in addition to pharmacotherapy.

s.     Mr. Charles received a final decision of Major Depression, Recurrent. He was prescribed Imipramine for Depression at discharge. In addition, Dr. Ginsberg recommended that he continue with outpatient individual and family therapy with Jan Richards, LPC.

*See generally* Letter from Lawrence D. Ginsberg, M.D. to Bob Wicoff, Red Oak Psychiatry Records of Derrick Charles, State Application, Exh. D; 1993 Gulf Pines Hospital Records; 1995 Gulf Pines Hospital Records.

UTMB records pertaining to Mr. Charles' 2001 TDCJ incarceration were also part of the state record and included several notations regarding Mr. Charles' mental health history. During a screening interview, Mr. Charles informed TDCJ Officials that he suffered from seizures as a young child and that the had been prescribed Ritalin at the age of 12 or 13. UTMB Records of Derrick Charles, Respondent's Original Answer, Exh. I, *Ex. Parte Derrick Dewayne Charles*, No. 941969-A (Tex. 184th Dist. Ct.). In addition, he reported that he had been a patient in a mental institution for behavioral problems in 1995 or 1996 and provided the name of Gulf Pines Hospital to the interviewer. *Id.* Noted on TDCJ's "Master Problem List" was Mr. Charles' history of depression. *Id.*

Furthermore, Leroy Phillips, Mr. Charles' stepfather, provided information about Mr. Charles' psychiatric problems in his declaration. He reported that Mr. Charles was prescribed Ritalin

when Mr. Charles was 6 or 7 years old and that when Mr. Charles was approximately ten years of age, Mr. Charles was psychiatrically hospitalized. Mr. Phillips explained that Mr. Charles had been exhibiting severe sleep disturbances prior to his hospitalization. Leroy Phillips Affidavit at 1, 2.

Supplemental Evidence Presented to this Court

Undersigned counsel obtained a declaration from Lawrence Charles, Mr. Charles' cousin. The corroborating value of Lawrence Charles' declaration is negligible as compared to the overwhelming evidence of Mr. Charles' history of mental illness presented in state habeas corpus proceedings. Indeed, the declaration contains a single sentence regarding Mr. Charles' mental health problems. The sentence says, "I know that when Derrick was young, he was in the hospital for mental health problems." Declaration of Lawrence Charles, Amended Petition, Exh. PP (hereinafter "Lawrence Charles Declaration") at 2.

**b.    Supplemental evidence of a familial history of seizures, mental illness, and substance abuse.**

Arguments and Evidence Presented to the State Courts

State habeas counsel argued that trial counsel failed to investigate and present extensive familial history of mental illness and substance abuse. *See* State Application at 29, 33. Mr. Charles fairly presented evidence in state habeas corpus proceedings that when Mr. Charles was a child, his mother suffered from schizophrenia, exhibited paranoid delusions and experienced depression, chronic sleeping disturbances, as well as hallucinations. Leroy Phillips Affidavit at 2; Rosin Affidavit at 15. In addition, state courts had before them evidence that Mr. Charles had an extended family history of substance abuse, mental illness, attention deficit disorder, cognitive deficits, and seizure disorder. *See generally* Associates Psychiatry Records of Derrick Charles, 1993 Gulf Pines Hospital

Records, 1995 Gulf Pines Hospital Records.

<u>Supplemental Evidence Presented to this Court</u>

The medical records pertaining to Mr. Charles' mother obtained by undersigned counsel – *i.e.* Houston Northwest Medical Center Psychiatric records, Medicaid records, Red Oak Psychiatric Associates records, and the Confirmed Psychological Evaluation Clinical Interview and Mental Status of Nancy Phillips – merely corroborate Ms. Phillips' serious history of depression and psychotic disorder and in no way fundamentally alter Mr. Charles' claim.  The records reveal that:

a.   In 1994, when Mr. Charles was twelve years old, Mr. Charles' mother was hospitalized following a suicide attempt.  According to medical records, Ms. Phillips took an overdose because she was experiencing other psychiatric symptoms.  She was fearful that her husband was poisoning her.

b.   Mr. Charles' mother was once again hospitalized at Houston Northwest Medical Center in 1996,  when Mr. Charles was fifteen years old.  This time, she was experiencing auditory, visual, and olfactory hallucinations; paranoia, and mood swings.  Medical personnel noted that Ms. Phillips also presented all signs of depression.

c.   Following a preliminary evaluation in the emergency room, Mr. Charles' mother was admitted into the hospital for psychiatric treatment.  She remained hospitalized for one week.   She received the following diagnosis on admission:

Axis I:      Psychosis NOS: Rule out major depression with psychotic features

Axis II:     Deferred

Axis III:    No Major Illness

Axis IV:    Relationship, financial, and occupational problems;

d.   Ms. Phillips' final diagnosis was Major Depressive Affective Disorder, Single Episode, Severe, with Psychotic Behavior and Unspecified Psychosis.  At discharge, she was prescribed Risperdal, an antipsychotic medication, and Zoloft, an antidepressant;

−33−

e.     Mr. Charles' mother received a diagnosis of Schizoaffective Disorder following her 1996 psychiatric hospitalization;

f.     From the time that Mr. Charles was fifteen years of age until his trial, Mr. Charles' mother was under the psychiatric care of Red Oak Psychiatric Associates. She received medications for psychosis as well as depression during the five years preceding Mr. Charles' trial; and

g.     A 2004 psychological evaluation of Ms. Phillips corroborates her long-standing and severe mental illness. The evaluator's diagnostic impressions were "Schizophrenia, Paranoid Type, under medical control, pending receipt of records documenting impairment."

Similarly, the declarations, Christine Bickham (Ms. Phillip's first cousin); Lincoln Charles (Ms. Phillips' brother), and Lawrence Charles (Ms. Phillips' nephew) simply corroborate the evidence of Ms. Phillips' long-standing and severe mental illness. In their respective declarations, Ms. Phillips' relatives reported that she had a "nervous breakdown" and that Ms. Phillips exhibited bizarre behavior and changes in demeanor prior to her 1996 psychiatric hospitalization. *See* Declaration of Christine Bickham, Amended Federal Petition, Exh. NN (hereinafter "Christine Bickham Declaration") at 2, 3; Lincoln Charles Declaration at 2; Lawrence Charles Declaration at 2.

Likewise, records pertaining to extended family members obtained by undersigned counsel only substantiate the references to intergenerational patterns of substance abuse and mental health problems presented in state court.

The declarations of Christine Bickham and her son Charles Lawrence as well as their respective psychiatric records confirm the family history of mental retardation, substance abuse, and mental illness. In her declaration, Christine Bickham reported that she has suffered from severe depression as well as auditory and visual hallucinations. Christine Bickham Declaration at 1, 2. Psychiatric records pertaining to her confirm that she has suffered from mental illness and that in

−34−

1996, seven years prior to Mr. Charles' trial, she was diagnosed with Major Depressive Disorder with Psychotic Features.  Cypress Creek Hospital Records of Christine Bickham,  Amended Petition, Exh. RR;  Dr. Eileen Starbranch Records of Christine Bickham,  Amended Petition, Exh. SS.  Ms. Bickham's psychiatric records also provide corroborating evidence of the family's substance abuse history.  Cypress Creek Hospital Records of Christine Bickham.

In his declaration, Lawrence Charles, Ms. Bickham's son, reported that when he was approximately ten years of age, he (Lawrence Charles) attempted to commit suicide, that like Mr. Charles, he too has been psychiatrically hospitalized, that he has been diagnosed with schizophrenia and bipolar disorder, and that his mother and sister have received psychiatric treatment in the past. Lawrence Charles Declaration at 2.  Psychiatric records pertaining to Lawrence Charles reveal that in 2001, two years prior to Mr. Charles' trial, Lawrence was diagnosed with Diffuse Cognitive Impairment with Cyclical and Psychotic Features as well as Mild Mental Retardation.  Red Oak Psychiatry Associates Records of Lawrence Charles,  Amended Petition, Exh. TT.

In his declaration, Lincoln Charles, Mr. Charles' maternal uncle, acknowledged that he struggled with alcohol-related problems in the past, thereby corroborating the family's history of substance abuse. Lincoln Charles Declaration at 3.

Court records pertaining to Joyce Faye Charles, Mr. Charles' maternal aunt, are also consistent with the reported familial history of mental disorders.  In *State v. Joyce Faye Charles*, she was found to be incompetent to stand trial. Cause No. 6792, 258th District Court, San Jacinto County, Texas. San Jacinto County District Clerk Files of Joyce Charles, Amended Federal Petition, Exh. K.

These records merely supplement the arguments and evidence presented to the state courts, they do not fundamentally alter the claim.

###### c.       Childhood marked by abject poverty and frequent moves.

Arguments and Evidence Presented to the State Courts

Mr. Charles argued to state courts that his trial attorneys rendered ineffective assistance of counsel, in part, for failing to investigate and present evidence of the family's abject poverty and frequent moves. *See* State Application at 32.  Documents filed for the first time with this Court, *i.e.*, Social Security records and Houston Northwest Medical records pertaining to Mr. Charles' mother, as well as Declarations of Christopher Charles (brother), Lawrence Charles (cousin), and Lincoln Charles (uncle), supplement, but in no way materially alter claims presented in state habeas corpus proceedings.

Records pertaining to Mr. Charles' 1993 psychiatric hospitalizations as well as the Declaration of Leroy Phillips, both part of the state habeas corpus record, describe the  persistent poverty and instability that Mr. Charles endured as a child.  Leroy Phillips, Mr. Charles' stepfather, provided the following description in his declaration, "As Derrick grew up, our family had to rely on welfare.  We moved around a lot because we got evicted.  Money was always a problem."  Leroy Phillips Affidavit at 2.

Mental health professionals recognized and documented the serious economic hardships facing Mr. Charles and his family and noted concerns about the ill effects of poverty on Mr. Charles' well-being.  The 1993 Gulf Pines Hospital record includes references to Mr. Charles' impoverished environment.  Roxane Brown, who conducted a Psychosocial Assessment on March 10, 1993, made several observations regarding the family's impoverished background.  1993 Gulf Pines Hospital Records.  She stated, "[Mr. Charles and his family] live in an apartment complex.  From the way the mother described the apartments, they are not very safe.  The come from a lower socioeconomic

situation." *Id.* Ms. Brown, went on to state, "[T]he impression from talking with the patient's mother and the information provided in the report by the stepfather is that the family comes from a very poor Black environment." *Id.* She further noted, "It does appear that he comes from a very deprived background, therefore does not get a lot of opportunities to expand his leisure and recreational interests. Also just living in a bad area prevents him from the usual socialization and involvement with other children." *Id.* Finally, she observed, "The family may experience a certain amount of distress in the process of getting treatment considering that their finances are so limited they may have some difficulty following through with aftercare recommendations so it will need to be discussed with them closely." *Id.* Mr. Charles clearly presented ample evidence of the family's poverty and instability to the state courts.

Supplemental Evidence Presented to this Court

In their respective declarations, Christopher Charles, Mr. Charles' brother; Lawrence Charles, Mr. Charles' cousin; and Lincoln Charles, Mr. Charles' maternal uncle merely confirm the evidence of unrelenting poverty Mr. Charles was forced to endure during his childhood. In his declaration, Christopher Charles confirmed that he and his family moved frequently because of the family's inability to pay the bills. Declaration of Christopher Charles, Amended Petition, Exh. QQ (hereinafter "Christopher Charles Declaration") at 1. He attributed his family's economic hardships to his stepfather's drinking problems. *Id.* Similarly, Lawrence Charles noted that Mr. Charles' stepfather failed to provide financial assistance to Mr. Charles' mother and that at times, Mr. Charles did not have clothes to wear. Lawrence Charles Declaration at 2. Lawrence recalled that he sometimes had to give his cousin (Mr. Charles) clothes to wear. *Id.* Likewise, Lincoln Charles reported that Mr. Charles and his family experienced money problems. He stated:

−37−

> When Derrick was a kid, Derrick's family moved a lot.  Money was
> sometimes low.  The reason I know that Derrick's family was having
> problems is because sometimes I would tell my sister that I wanted to
> come over to get something to eat and she would tell me that food was
> getting low.  Whenever she would say this, I would not come to their
> house.  Sometimes I would loan money to [Mr. Charles' mother and
> stepfather].

Lawrence Charles Declaration at 2.

Records pertaining to Mr. Charles' mother also corroborate the evidence of Mr. Charles'

impoverished childhood first presented in state habeas corpus proceedings.  According to Nancy

Phillips' Social Security records, her lifelong job history consisted of a *single* job.  Social Security

Records of Nancy Phillips, Amended Petition, Exh. F.  At the time of Mr. Charles' trial for the

underlying offense, his mother's lifelong earnings totaled a mere $182.75.  *Id.*  In addition, Ms.

Phillips' Houston Northwest Hospital records reveal that, as Mr. Charles' stepfather claimed in his

declaration, the family depended on government assistance for its survival.  Houston Northwest

Medical Records of Nancy Phillips, Amended Petition, Exh. B.

This information, again, merely supplements the extensive evidence presented to the state

courts.

### d.    Corroborating evidence of severe family dysfunction which included parental substance abuse, violence, and rejection by maternal family.

Arguments and Evidence Presented to the State Courts (Violence & Substance Abuse)

State habeas counsel asserted that Mr. Charles' trial counsel rendered ineffective assistance of

counsel for failing to investigate and present evidence of the severe dysfunction that plagued Mr.

Charles' family throughout Mr. Charles' childhood.  State habeas counsel argued and presented

multiple and varied features of family dysfunction including parental substance abuse, violence within

the family, and rejection of Mr. Charles by the extended maternal family.  State Application at 31-34.  The state habeas corpus record contained ample evidentiary support for Mr. Charles' assertions.  The documents relevant to this theme presented for the first time to this Court – *i.e.* the declarations of Lincoln Charles, Lawrence Charles, and Christine Bickham, and psychiatric records pertaining to Mr. Charles' mother – simply supplement and corroborate the evidence before state courts.

Mr. Charles' psychiatric records as well as the Affidavit of Leroy Phillips, both part of the state court record, undoubtedly provided evidentiary support for Mr. Charles' claim that Mr. Charles' right to effective assistance of counsel was violated when trial counsel failed to discover ample evidence of dysfunctional family dynamics which was available at the time of Mr. Charles' trial.

In his state court affidavit, Leroy Phillips, Mr. Charles' stepfather described a home environment marked by violence and parental neglect.  He reported that Mr. Charles' mother engaged in violent acts as a direct result of her schizophrenia.  He stated:

> Derrick and his brother witnessed numerous violent episodes between me and Nancy.  Once when Derrick was about 12, Nancy stabbed me in the groin with a pair of scissors, as both boys stood watching.  On another occasion, I asked her to cook dinner after I had come home from work and she came at me with a knife.  She would also hear voices and think I was conspiring against her, and throw cups and plates at me, or hit me with a broom handle.  Both boys witnessed these incidents.

Leroy Phillips Affidavit at 2.

Mr. Phillips went on to note that Mr. Charles' basic needs often went unmet.  He stated, "Nancy had problems being a good mother.  The boys were often without supervision from her.  It was not uncommon for them to be without clean clothes to wear to school or enough to eat."  *Id.*

When Mr. Charles was only ten years of age, he confirmed to mental health staff that he  he

had witnessed violent behavior between his mother and stepfather.  A Psychosocial Assessment was completed on March 10, 1993, during Mr. Charles' first psychiatric hospitalization.  1993 Gulf Pines Hospital Records.  Extremely significant is the fact that the interviewer was left with the impression that the family was experiencing "significant problems at home" that the family was "not ready or unable to disclose at that time."  *Id.*

Mr. Charles' 1995 psychiatric records also included documentation of persistent dysfunction within the family.  The following information regarding the family environment was noted in the records:

a.   An adult in the home did not know the whereabouts of the child: Sometimes;

b.   Family members argued a lot: Sometimes;

c.   Family members felt close to one another: Never;

d.   Family members got angry a lot or list their temper: Often;

e.   Family members could communicate or talk freely with one another: Never;

f.   Family members yelled, swore, or said mean things to each other: Often;

g.   Family members gave each other emotional support or helped each other out when things went wrong: Never;

h.   Family members found a way to solve their problems: Never;

i.   Family members got so angry that they hit, punched, or threw things at each other: Often; and

j.   Family members felt physically safe with one another: Never.

1995 Gulf Pines Hospital Records.

With respect to Derrick's relationship with his mother and father/father figure, the following notations were made:

–40–

a.    The child and parent did things together: Never;

b.    The child talked to the parent or asked for help with problems: Never; and

c.    The parent talked to the child or asked for help with problems: Never.

*Id.*

With respect to Nancy Phillips' functioning during the preceding three months, the following factors were noted:

a.    Abused drugs or alcohol;

b.    Was nervous or depressed a lot or had intense mood swings; and

c.    Was very distressed or upset by things that happened in his/her own life.

*Id.*

Mr. Charles unquestionably argued to the state court that counsel should have used this evidence in mitigation.

Supplemental Evidence Presented to this Court (Violence & Substance Abuse)

In their respective declarations, Lincoln Charles, Christopher Charles, and Lawrence Charles confirmed that violence, which included physical fights between Mr. Charles' mother and stepfather as well as physical abuse of Mr. Charles and his brother by Mr. Charles' stepfather, was indeed commonplace in the home. Lincoln Charles Declaration at 2; Christopher Charles Declaration at 1; Lawrence Charles Declaration at 2. All three family members also confirmed that parental substance abuse was a contributing factor to the family's dysfunctional functioning. *Id.*

Houston Northwest Medical Center Psychiatric Records of Nancy Phillips also corroborate state habeas counsel's arguments that Mr. Charles was exposed to domestic violence as a child. During her own psychiatric hospitalization, Mr. Charles' mother informed mental health staff that her

–41–

husband, Mr. Charles' stepfather, was physically and emotionally aggressive towards her.  Houston

Northwest Medical Records of Nancy Phillips.  Hospital staff provided her with counseling resources

for domestic violence-related problems at the time of her discharge.  *Id.*

Arguments and Evidence Presented to the State Courts (Rejection by Maternal Family)

In state court, as he does here, Mr. Charles argued and presented evidence that trial counsel's

failure to investigate and present evidence of the rejection and disparate treatment that Mr. Charles

received at the hands of his maternal family contributed to their deficient performance.  Amended

Petition at 32.  In his state court affidavit, Leroy Phillips stated, "Nancy's family would always

welcome his brother, and include him in family get-togethers, but rejected Derrick.  Derrick was

always very troubled by his treatment."  Leroy Phillips Affidavit at 2, 3.

Supplemental Evidence Presented  to this Court (Rejection by Maternal Family)

The declarations of Lawrence Charles and Christopher Charles provide corroborating evidence

of the fact Mr. Charles was rebuffed by his own family as a young child.   Lawrence Charles

Declaration at 1, 2; Christopher Charles Declaration at 2.  Lawrence Charles, Mr. Charles' cousin,

stated:

> The reason why Chris got to stay with his grandmother, but Derrick
> was not allowed to stay in Shepherd is because Chris was the favorite.
> Derrick was the black wolf, the black sheep of the family.  I don't
> know why Derrick was the black sheep of the family, that's the way
> the family members wee.  They didn't treat Derrick like they treated
> Chris.

Lawrence Charles Declaration at 1, 2.

Once again, there is no merit to the contention that the complained of documents add new

crucial factual allegations.

As exhaustively demonstrated above, Mr. Charles presented a wealth of documentary evidence to the state courts in support of numerous mitigating circumstances that he argued should have been pursued by state habeas counsel. Thus, naturally, this is a case in which federal counsel may permissibly supplement the record with respect to each of the numerous issues argued to the state court. The number of new documents presented here is not, as Respondent seems to imply, an indication that significant portions of the case are unexhausted. It is a testament to the multifaceted mitigation case presented to the state courts, and the copious information contained in the voluminous documents in the state court record. Though Respondent objects on the basis of exhaustion, he fails to accurately identify a single essential fact that was allegedly withheld from the state court, nor has he even attempted to explain how any of the supplementary evidence fundamentally alters Mr. Charles' claim. Respondent's objections are groundless in the face of such a weighty state court record. In sum, there is no bar to federal review of Mr. Charles' claim.[3]

---

[3] Petitioner has exhaustively demonstrated that Respondent's exhaustion objection is meritless. In abundance of caution, Petitioner notes that Respondent's procedural default arguments are based on stale Fifth Circuit precedent from the 1990's. Answer at 28 (citing *Muniz v. Johnson*, 132 F.3d 214 (5th Cir. 1998); *Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997); *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995). Based on these cases, Respondent insists that the proper course of action would be to proceed directly from a finding of no exhaustion to the question of procedural default. Respondent, however, skips a couple of steps.

AEDPA "dramatically altered the landscape for federal habeas corpus petitions," and imposed a one-year statute of limitations for the filing of federal habeas petitions. *Rhines v. Weber*, 544 U.S. 269, 274 (2005); 28 U.S.C. § 2244(d). Because the pendency of a federal petition did not toll the statute of limitations, *see Duncan v. Walker*, 533 U.S. 167, 181 (2001), the total exhaustion requirement threatened to foreclose review altogether for petitioners who arrived in federal court with mixed petitions and whose limitations period expired after the filing of the federal petition. To avoid this dilemma, the Supreme Court unanimously adopted a stay-and-abeyance procedure in *Rhines v. Weber*. The Court held that district courts should stay federal proceedings (1) when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court; and (2) the claims presented are not "plainly meritless." 544 U.S. at 277. The Fifth Circuit has held that the Supreme Court did not intend the phrase "good cause" in *Rhines* in the "technical sense," but "rather intended the district court [to] find 'good cause' in the equitable sense." *Ruiz v. Quarterman*, 504 F.3d 523, 529 n.17 (5th Cir. 2007).

Procedural default generally occurs in one of two circumstances. First, when a claim has been exhausted in the state courts, the claim may nevertheless be procedurally defaulted in federal court if the state court denied relief on a state procedural rule that is both independent of the federal claim and adequate to support the decision. *Id.* at 729. Second, a

### III.
### MR. CHARLES WAS DEPRIVED OF HIS SIXTH AMENDMENT
### RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL
### DURING THE PUNISHMENT PHASE OF HIS TRIAL.

**A.      Trial counsel were deficient in their preparation for the sentencing phase and thus failed to discover and present compelling mitigating evidence.**

Although the Texas Court of Criminal Appeals rejected any finding that trial counsel were diligent in their efforts to secure critically important records of their client's psychiatric hospitalizations, Respondent nonetheless defends counsel's performance. Respondent's defense fails for at least two independent reasons. First, Respondent relies on the indisputably incredible testimony of trial counsel that he did not know any of the circumstances, such as the duration and reason, surrounding Mr. Charles' psychiatric commitments as a child. Second, and more fundamentally, Respondent's arguments – and cited legal authorities – all pertain to the existence of prejudice from

---

petitioner's claim may be procedurally defaulted in federal court when the claim is unexhausted *and* "the court to which he would be required to return [to exhaust the federal claim] . . . would now find the claim procedurally barred." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). However, unless it is "entirely clear" that the state court would apply an independent and adequate procedural bar to petitioner's claim, "the State should be allowed to make the procedural, *vel non*, determination." *Wilder v. Cockrell*, 274 F.3d 255, 262 (5th Cir. 2001).

Based on recent developments in Texas habeas corpus law and the Fifth Circuit's interpretation of these developments in *Ruiz v. Quarterman*, *supra*, and *Balentine v. Thaler*, 609 F.3d 729 (5th Cir. 2010), it is now clear that a state court remedy is potentially available for meritorious claims that were not raised in an initial state habeas application, thus it is an abuse of discretion for a federal court to deny a stay of proceedings on the ground that exhaustion would be futile. As another federal court in Texas recently concluded, "[i]n *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007), the Fifth Circuit observed that the previously impregnable Texas statute banning successive petitions in all but very limited circumstances has begun to show some cracks. *Ruiz* noted that the Texas Court of Criminal Appeals has been ambiguous in a number of cases on the issue of whether it dismissed successive petitions on procedural grounds . . . ." Order Granting Petitioner's Motion for Stay and Abeyance, *Williams v. Thaler*, No. 09-cv-04165 (S.D. Tex. Apr. 13, 2010). *See also* Order, *Sorto v. Thaler*, No. 10-cv-00613, slip op. at *2 (S.D. Tex. July 12, 2010) (staying petitioner's claims and ordering him to file a successive state petition within 120 days of the order because "recent Fifth Circuit case law has called into question the adequacy of boilerplate dismissal orders by the Texas Court of Criminal Appeals").

The Respondent's petition for *en banc* review of *Balentine* is currently pending. If the court grants rehearing, its decision could have an impact on the above exhaustion /default analysis. Should this Court determine that Mr. Charles' claim is unexhausted, he respectfully requests the opportunity to be heard on the appropriate course of action. Briefing the issue now, before the *Balentine* case is final, would be premature – as well as unnecessary because Mr.Charles' claim is exhausted.

counsel's omissions and errors.  In essence, Respondent argues that counsel's lackadaisical approach to the case was not deficient because the information secured by diligent counsel would not, in Respondent's opinion, have made a difference at trial.  That is not an argument about deficient performance, it is an assessment of prejudice – a very flawed one, as Mr. Charles will demonstrate, *infra*, when he addresses the prejudice from counsel's errors.

> ### 1. The standard of care at the time of Mr. Charles' trial mandated that defense counsel conduct a thorough social history.

Respondent criticizes Petitioner for citing to the ABA guidelines when discussing the standard of care applicable to capital defense counsel:

> [T]he Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (per curiam) (internal quotation marks omitted).  *Strickland*, it noted, "stressed . . . that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id*. at 17.

Answer at 29.  Respondent, however, stops short of acknowledging the Supreme Court's instructions to lower federal courts for ascertaining the relevant standard of care.

In *Van Hook*, the Court stated that "[r]estatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing **when the representation took place**." *Van Hook*, 130 S.Ct. at 17 (emphasis added).  Van Hook was tried 18 years before the promulgation of the ABA Guidelines relied upon by the lower court.  *Id*.  The Supreme Court concluded that Van Hook's counsel were not deficient when measured against contemporaneous standards of care.  *Id*. at 18 ("Van Hook insists that the Sixth Circuit's missteps made no difference because his counsel were ineffective even under professional standards prevailing at the time.  He is wrong.").

In *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482-83 (2010), in which the Court deemed deficient counsel's failure to advise a non-citizen defendant about the immigration consequences of a guilty plea, the Supreme Court relied on the ABA guidelines, as well as numerous other sources, to determine the prevailing standard of care:

> The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. *National Legal Aid and Defender Assn.*, Performance Guidelines for Criminal Representation § 6.2 (1995); G. Herman, Plea Bargaining § 3.03, pp. 20-21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 *Cornell L.Rev*. 697, 713-718 (2002); A. Campbell, Law of Sentencing § 13:23, pp. 555, 560 (3d ed.2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. D10, H8-H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); *ABA Standards for Criminal Justice*, Prosecution Function and Defense Function 4-5.1(a), p. 197 (3d ed.1993); *ABA Standards for Criminal Justice*, Pleas of Guilty 14-3.2(f), p. 116 (3d ed.1999). "*[A]uthorities of every stripe-including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications*-universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients ... ." Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as *Amici Curiae* 12-14 (footnotes omitted) (citing, *inter alia*, *National Legal Aid and Defender Assn.*, Guidelines, *supra,* §§ 6.2-6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Noncitizen in a Criminal Case, 31 *The Champion* 61 (Jan./Feb.2007); N. Tooby, Criminal Defense of Immigrants § 1.3 (3d ed.2003); 2 Criminal Practice Manual §§ 45:3, 45:15 (2009)).

*Id*. (emphasis added). Thus, the Court looked to the applicable ABA guidelines, as well as other publications and treatises, including the publications of criminal defense organizations, to establish the relevant standard of care.

Mr. Charles presented proof of the applicable standard of care in Texas capital cases at the time of his trial, *see* Amended Petition at 110-13, and those standards are indisputably reflected in the contemporaneous ABA Guidelines. For example, Mr. Charles relies on materials distributed during a Texas capital defense CLE in 2001, two years *prior* to Mr. Charles' trial. *See* "The Team Concept in

a Capital Case," Amended Petition, Exh. KK.  Those materials reflect the prevailing norm that capital defense teams ***must*** hire a mitigation specialist: "The mitigation specialist has become accepted as a ***basic tool*** for the defense of a capital case . . . ."  *Id.* at 2 (emphasis added).[4]  Indeed, this was so clearly the contemporaneous standard of care that the trial judge – after it became clear that defense counsel had yet to hire a mitigation specialist just 32 days before the trial – authorized $5000.00 funding for a mitigation specialist ***even though counsel never asked for one***.  Amended Petition at 56.  The trial court could not have done more to prod defense counsel except hire the mitigation expert herself.  This was not a *sua sponte* act of largesse on the part of the court, it was a recognition that the standard of care required counsel to use a mitigation specialist.

The applicable Texas standard of care reflected an understanding that "[t]he largest role of the mitigation specialist is that of a psycho-social investigator.  The complete social investigation compiled by the mitigation specialist is the ***base*** upon which a successful mitigation [case] is built."  Amended Petition, Exh. KK at 4.

---

[4] Mr. Charles submitted the affidavit of criminal defense attorney James R. Reed to the state court as proof that the local, contemporaneous standard of care mandated the use of a mitigation specialist when defending a capital case.  *See* Affidavit of James R. Reed, State Application, Exh. I.  Mr. Reed, a Board Certified criminal lawyer experienced in handling capital cases in Harris County, averred that

> the prevailing professional norms for the representation of capital murder defendants in Harris County, Texas, including the time period that this case was tried, ***mandate the use of a mitigation specialist***.  I believe that trial counsel who does not avail himself of the services of a mitigation specialist, which in my experience is always provided upon request in Harris County, runs an unacceptable risk that valuable mitigating evidence will be overlooked.

*Id.* (emphasis added).  That the trial court offered Mr. Charles' counsel funding for a mitigation specialist, without a motion requesting it, *see infra*, confirms Mr. Reed's assertion that Harris County courts always provided this resource.  Notably, the state court findings are silent on this issue, so this Court must address it *de novo*.

Respondent identifies Mr. Charles' exhibits relating to the standard of care as among those not presented to the state court.  Answer at 24.  Respondent fails acknowledge that Mr. Charles argued in the state courts that the contemporaneous local standard of care required the use of a mitigation specialist, and supported this allegation with the uncontroverted affidavit of Mr. Reed.  Clearly, the two articles presented here permissibly supplement Mr. Charles' detailed state court presentation on the same fact issue.

Petitioner has also submitted an article from *The Champion*, Amended Petition, Exh. LL, the same publication of the National Association of Criminal Defense Lawyers ("NACDL") relied upon by the Supreme Court as a barometer of the standard of care in the criminal defense community. *Padilla*, 130 S.Ct. at 1482-83.  The article, which was distributed to Texas lawyers during a 2001 capital defense training, describes the standard of care in capital cases well before Mr. Charles' trial. With respect to document collection during a mitigation investigation, it states:

> The search for records ***typically includes*** birth certificates and genealogical archives; prenatal, birth, and ***pediatric charts; physicians, hospitals, and mental health records***; school, social service agency, juvenile court, employment, Social Security, and workers compensation files; military records; marriage and divorce files; death and autopsy records; correctional, probation and parole records; court files and litigation records.

Amended Petition, Exh. LL at 11 (emphasis added).  The prevailing norm required that counsel investigate enough to "identify the multiple risk factors in the client's life" and "offer a more accurate and textured picture" of the client's social history.  *Id*. at 10.  "Developing mitigation evidence through life-history investigation involves ***hundreds of hours of work*** – with meticulous attention to detail, painstaking efforts to decode and decipher old records, patience and sensitivity in eliciting disclosures from both witnesses and the client."  *Id*. at 15 (emphasis added).  These were the professional norms in Texas before and during Mr. Charles' trial and not a single person on his defense team performed this function, yet trial counsel inexplicably failed to use the $5000.00 authorized by the trial court for this very purpose.

In his Amended Petition, Mr. Charles asserted that "trial counsel failed to attempt a small fraction of the work mandated by prevailing professional norms reflected in the decisions of the Supreme Court, the ABA Guidelines, and/or ***contemporaneous local practice***."  Amended Petition at

113 (emphasis added).  Respondent does not contest, rebut, or even criticize Petitioner's proof of the contemporaneous local practice.  Respondent does not, and could not, assert that the Texas standard of care is somehow different from – or more diminished than – the ABA Guidelines.  Instead, Respondent offers only an out-of-context truism: the ABA Guidelines, in isolation, are not "inexorable commands" to capital defense counsel.  Not once did Petitioner argue that they were.  Further, this case is not at all like *Van Hook* because Mr. Charles has offered uncontroverted proof of the local standard of practice, and the ABA Guidelines – promulgated during the ***same year*** as Mr. Charles' trial – "describe the professional norms prevailing when the representation took place."  *Van Hook*, 130 S.Ct. at 16.[5]  Thus, applying *Van Hook*, this Court should assess trial counsel's performance in light of the norms reflected in the materials attached to Mr. Charles' petition.  Moreover, the ABA Guidelines are a useful guide in this case because they clearly reflect the prevailing norms when the representation took place.

Petitioner's case is indistinguishable from the Supreme Court's decisions in *Padilla* and *Porter v. McCollum*, 130 S.Ct. 447 (2010).  In *Porter*, the Court noted that the applicable standard of care during Porter's trial required a competent investigation of Porter's background:

> It is unquestioned that under the prevailing professional norms at the time of [Petitioner's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'  *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The investigation conducted by Porter's counsel clearly did not satisfy those norms.

---

[5] Defense counsel testified during the 2006 evidentiary hearing that he had learned, ***after*** Mr. Charles' trial, that the standard of care requires using a mitigation specialist.  Amended Petition at 56-57, n. 11.  Thus, trial counsel did not dispute that hiring a mitigation specialist is an essential element of defending a capital case in Texas.  Instead, he was simply unaware of this when he tried Mr. Charles' case.  As shown by the article from *The Champion* and the 2001 CLE materials attached to Mr. Charles' amended petition, a thorough mitigation performed by a professional was the national and Texas prevailing professional norm years before Mr. Charles' trial.  The ABA Guidelines were issued in February of 2003, before Mr. Charles' trial started, and reflect the local standard of care.  Thus, it is this standard that guides this Court's assessment of trial counsel's performance.

*Porter*, 130 S.Ct. at 452-53.  Here, too, the contemporaneous prevailing professional norms obligated counsel to conduct a thorough investigation of Mr. Charles' background.  In light of this obligation, counsel's failure to heed the numerous red flags that came to counsel's attention – the client's psychiatric hospitalizations, the family history of mental illness, PCP intoxication and hallucinations on the day of the crime, and more – was egregiously deficient:  "In *Wiggins v. Smith*, . . ., we held counsel 'fell short of ... professional standards' for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly 'in light of what counsel actually discovered' in the records."  *Porter*, 130 S.Ct. at 453; *see also i.d.* ("like the counsel in *Wiggins*, [counsel] ignored pertinent avenues for investigation of which he should have been aware.").

### 2.    Counsel's representation of Mr. Charles did not approach the applicable standard of care.

Trial counsel's investigative efforts were focused almost entirely on the guilt/innocence phase of the trial.  *See generally* Amended Petition at 47-60.  Even when counsel or their investigator talked to family members who could have provided them with critical information, they failed to ask questions about Mr. Charles' social history or background.  As the transcripts of the investigators' interviews reveal, they focused their interviews primarily on the crime and the immediate aftermath.  *Id*. 48-53.  Trial counsel themselves performed almost no work related to mitigation, the second chair lawyer – who was allegedly in charge of securing assistance with the case in mitigation[6] – devoted only **15 hours** of out-of-court time preparing for trial, **10** of which were spent reading the prosecution's file.  *Id*. at 53-54.

---

[6] Amended Petition at 56.

Mr. Charles has been unable to secure records of Connie Williams' hours in this case but it is exceedingly unlikely that he spent much time preparing to defend Mr. Charles.  During the nine-month  pretrial stage of Mr. Charles' case, Mr. Williams was attorney of record in at least **one hundred nine (109)** additional  criminal cases in Harris and Fort Bend Counties alone.  *See* Workload of Connie Williams, Exh. BBB.  At a minimum, Mr. Williams' caseload during this period included :

| | |
|---|---|
| 65 | Felony-level cases in Harris County, |
| 3 | Felony-level cases in Fort Bend County, |
| 40 | Misdemeanor-level cases in Harris County, and |
| 1 | Misdemeanor-level case in Fort Bend County. |

*Id.*[7]

---

[7] It has long been recognized that overburdened attorneys, like Mr. Williams,  cannot possibly fulfill their constitutional mandate of providing their clients with effective representation.  *See* American Bar Association, *Ten Principles   of   a   Public   Defense   Delivery   System*   (Feb.   2002),   *available   at* http://www.abanet.org/legalservices/downloads/sclaid/ indigentdefense/tenprinciplesbooklet.pdf.  *See also* National Advisory Commission on Criminal Justice Standards and Goals, Task Force on Courts, *Standards for the Defense* (1973), *available at* http://www.nlada.org/Defender/Defender_Standards/Standards_For_The_Defense.  Principle Five of the ABA's Ten Principles of a Public of a Public Defense Delivery System commands that "[d]efense counsel's workload [must be] controlled to permit the rendering of quality representation.  Counsel's workload, including appointed and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations. . . ."

The unequivocal recognition that capital defense attorneys with excessive caseloads are simply unable to meet their professional responsibilities is most starkly reflected in at least two state statutes.  Indiana Criminal Rule 24(B)(3) provides in pertinent part that salaried or contractual public defenders may only be appointed as trial counsel in a capital case if "the public defender's caseload will not exceed *twenty (20)* open felony cases while the capital case is pending in the trial court."  Ind. Crim. Rule 24(B)(3)(c)(i). Washington State Superior Court Special Proceedings Rule 2 states in relevant part that trial counsel "must not be presently serving as appointed counsel in another active trial level death penalty case."

The ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases emphasize that "the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the highly specialized legal knowledge that counsel must possess and in the advocacy skills he or she must master."  Guideline 1.1, Commentary at 3.

The unique demands of investigating, preparing, and trying both the guilt/innocence and punishment phases of a capital case have been found to require *an average of nearly 1,900 hours of attorney time*.  Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense*

Jury selection began on April 1, 2003, Mr. Williams was appointed almost nine months earlier, on July 10, 2002.  Amended Petition at pp. 47, 70.  On February, 26, 2003, just 32 days before trial, trial counsel was still "looking to the possibility of getting . . . some mitigation specialist to assist" the defense.  Amended Petition at 56.  As Respondent candidly concedes, when Connie Williams and Sid Crowley walked into court to try Mr. Charles' death penalty case, defense "***counsel had no idea what they would ultimately present to the jury***."  Answer at 31, n.16.[8]  Counsel ultimately failed to present any mitigation witnesses.  The entire defense consisted of four witnesses summoned to testify that Mr. Charles would not be a future danger if incarcerated.  These witnesses were not contacted or interviewed until trial was well under way, two of them were not interviewed or prepared until the same day they testified.  Amended Petition at 77 (the day before witness Kenneth Allen testified, trial counsel admitted that he did not know whether Mr. Allen "would be a good witness or not" because he had yet to locate or interview him; Dr. Walter Quijano was first briefed on the case at 10:00 a.m. on the day he testified).[9]

---

*Representation* (1998), *available at* http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/Publications/ RecommendationsCostQuality/AnalysisAndFindings.aspx.

It is extremely difficult to imagine Mr. Williams devoted the time and attention necessary for adequate representation of Mr. Charles, given his astronomical caseload.

[8] Amazingly, Respondent offers counsel's total ignorance about their case even while the trial was underway as an excuse for questioning jurors about wide variety of mitigating evidence never presented in this case.  Answer at 31, n.16.  The parties thus agree that trial counsel selected a jury wholly unprepared to present a defense and thus could not question potential jurors about issues relevant to Mr. Charles' case.  Petitioner also agrees that counsel's failure to prepare a defense in the nine months preceding trial explains counsel's performance during trial.

The contemporaneous standard of care mandated that counsel know, ***before*** selecting the jury, what their case will be: "Counsel should devote substantial time to determining the makeup of the venire, ***preparing a case-specific set of voir dire questions***, planning a strategy for *voir dire*, and ***choosing a jury most favorable to the theories of mitigation that will be presented***."  Commentary to ABA Guideline 10.10.2, Voir Dire and Jury Selection (emphasis added).

[9] In their closing argument, the prosecution effectively belittled Dr. Quijano's testimony, pointing out that he started preparing for this case "[a]round 10:30, 10:00 a.m. this morning."  Vol. 23, p. 76.

While counsel's total failure to conduct a mitigation investigation, in isolation, would constitute deficient performance under contemporaneous prevailing professional norms, that is not Mr. Charles' whole case.

In this case, trial counsel's failure to investigate is especially egregious because they encountered numerous red flags about mitigating aspects of Mr. Charles' background. As in *Wiggins*, "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered." 539 U.S. at 525. Among other things:

- Trial counsel knew that Derrick Charles was hospitalized for 15 days for psychiatric reasons in 1995. Amended Petition at 72.[10]
- Trial counsel knew that Derrick's treating physician at the hospital was named Dr. Lawrence Ginsberg, and that Dr. Ginsberg was a psychologist or psychiatrist. Amended Petition at 53, n.10.

- Trial counsel knew that mental illness runs in Derrick's mother's family. State Habeas Application, Exh. K.

---

[10] During the trial, defense counsel stated on the record that Mr. Charles "was in a hospital being treated for depression. Your Honor, for 15 days at one time." RR.XVI 14-15. Thus, the record could not be any clearer that trial counsel knew at the time of trial that Mr. Charles had been hospitalized for over two weeks for mental health reasons.

Subsequent to trial, the same attorney signed several sworn statements and testified under oath at the post-conviction hearing. In his post-trial testimony defending his failure to call Derrick's treating physician or otherwise follow up on this neon sign of a lead, counsel averred that the hospitalization "had *nothing* to do with mental illness" and/or that the hospital stay was *a brief two day visit*. Amended Petition at 53, n.10. Despite the fact that these *post hoc* rationalizations are demonstrably false in light of counsel's on-the-record statements at trial, the state court signed the State's findings of fact crediting them.

Mr. Charles briefed this issue and demonstrated that trial counsel's post-conviction hearing testimony was incredible. Amended Petition at 53, n. 10. Undeterred, Respondent simply blinks at the trial record and urges this Court to do the same by deferring to these clearly erroneous findings. Answer at 42. Instead, this Court should reject as squarely contradicted by the record any finding that implies trial counsel were unaware of the nature or duration of Mr. Charles' inpatient psychiatric treatment. Further, the fact that trial counsel would swear to so many differing versions of events – whether due to lack of memory or an intentional effort to avoid being found ineffective – is a basis for rejecting *any* state court finding that trial counsel is credible. No level of deference requires this Court to maintain the fiction that trial counsel is credible in the face of overwhelming evidence to the contrary. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. *A federal court can disagree with a state court's credibility determination* and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.") (emphasis added).

- Trial counsel knew that Derrick's mother is schizophrenic.  Amended Petition at 83.

- Trial counsel knew that Derrick's uncle is so mentally impaired that "he can't do nothing for himself."  Amended Petition at 51.

- Trial counsel knew that Derrick's aunt is also mentally impaired.  *Id*.

- Trial counsel knew that Derrick's grandmother reported that Derrick suffered from mental illness.  *Id*.

- Trial counsel knew that Derrick was experiencing visual hallucinations during the crime.  Amended Petition at 83.

Confronted with this information, reasonably competent counsel would have pursued these mutually reinforcing leads about mental illness in their client's life and impaired functioning during the crime. Mr. Charles' counsel did not.

Respondent nevertheless represents to this Court that defense counsel's performance satisfied the prevailing professional norms.  His arguments, however, rest on incredible factual assertions and/or irrelevant or erroneous legal arguments.

Respondent defends trial counsel's failure to call Mr. Charles' family members as mitigation witnesses based counsel's misguided belief that Derrick's schizophrenic mother and alcoholic step-father "had been very supportive of, and involved in, Charles's life."  Answer at 36.  As demonstrated above, had trial counsel exercised due diligence with respect to the Gulf Pines Hospital records, they would have learned that nothing could be further from the truth.

The Gulf Pines records contain numerous entries noting concern about Derrick's dysfunctional home life and documented the family's history of failing to secure the necessary outpatient treatment for Derrick.  The Gulf Pines staff noted that the family was violent and unsupportive, to the point that Derrick did not feel safe in his own home.  Amended Petition at 12-13.  Subsequent investigation

would have revealed that Derrick's step-father beat Derrick and his brother with extension cords, belts, and switches. Amended Petition at 11. He referred to the children as "faggot," "dickhead," "retarded," and other names. *Id*. Derrick and his brother were also abandoned by the their parents, for up to one month at a time, and expelled from the house. *Id*. Derrick's mother reported to the medical staff, during her own psychiatric hospitalization, that she was emotionally abusive to her children. Amended Petition at 13. Petitioner has demonstrated that, because they never conducted a social history investigation, counsel were woefully off base in their conjecture about their client's "supportive" family background.[11]

Termination of mitigation investigation is only appropriate in the context of an informed decision, after a ***thorough investigation***. *Rompilla v. Beard*, 545 U.S. 374, 395 (2005); *Wiggins*, 539 U.S. at 527-28. Counsel could not make a strategic decision to not pursue or present evidence of Derrick's violent and chaotic home life, of which they were unaware, based on uninformed and

---

[11] Respondent seems to suggest that, because Derrick's stepfather, Leroy Phillips, was not more competently interviewed by the trial team, Mr. Phillips is somehow at fault for not volunteering more information about Derrick's background. Answer at 36-37 (noting the "sharp contrast" between what Mr. Phillips told trial counsel and the information he reported during post-conviction proceedings). The bizarre suggestion that Derrick's step-father is responsible for trial counsel's ignorance belies a failure to appreciate the role and expertise of a mitigation specialist on the capital defense team.

A mitigation specialist "is not someone who will just go out and talk to people. This should be a professional who is trained in conducting mitigation investigations. This can be a licensed social worker with an MSW or Ph.D. This is an ***expert***." Amended Petition, Exh. LL, at 2 (emphasis added). Joe Patillo, who was in charge of the trial investigation, had been an airport policeman and a security guard in a dry cleaners. Amended Petition at 48, n. 8. Bette Burke, the mitigation specialist in the state post-conviction proceedings, was a licensed clinical social worker who trained as a mitigation specialist with the Texas Defender Service. Amended Petition, Exh. W. Trial counsel, in post-conviction proceedings, acknowledged being aware that a mitigation specialist possesses a "level of expertise" ***greater than*** "what an investigator may have to see if there are some mitigation issues," and that Patillo was not functioning as one. *Id*.

The "sharp contrast" between the information provided to trial counsel and to state post-conviction counsel effectively illustrates the difference between an interview by an untrained investigator and one conducted by a professional mitigation specialist. The transcripts and notes of the trial investigators prove that they frequently failed to even inquire about mitigating evidence. *See* Amended Petition at 48-52.

mistaken beliefs that resulted from inadequate preparation:

> This point is plain in *Williams:* We rejected any suggestion that a decision to focus on one potentially reasonable trial strategy – in that case, petitioner's voluntary confession – was "justified by a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S., at 396, 120 S.Ct. 1495. A _tactical decision_ is a precursor to concluding that counsel has developed a "reasonable" mitigation theory in a particular case.

*Sears v. Upton*, 130 S.Ct. 3259, 3265 (2010). Here, trial counsel's misguided beliefs about Mr. Charles' allegedly supportive and loving home life were a ***product*** of their failure to conduct a professionally reasonable mitigation investigation, not an excuse for it.

Next, Respondent argues that because mitigation witnesses and social history documents may have revealed allegedly aggravating evidence, counsel were somehow relieved of their duty to conduct an investigation. Answer at 39-41 (Leroy Phillips told the police that Derrick's bad behavior resulted in an eviction; Gulf Pines Hospital records contain damaging evidence). In support of this assertion about the reasonableness of counsel's ***performance***, Respondent cites numerous cases finding ***no prejudice*** from various failings by defense counsel in other cases. *Id*.

Even if Respondent's characterizations of the record and evidence were accurate, whether mitigation witnesses and/or documents may potentially contain aggravating evidence cannot be a justification for failing to investigate. Counsel could not have made, for example, a strategic decision to not find and review the Gulf Pines Hospital records based on the contents of documents he never saw. The Supreme Court rejects this sort of *post hoc* reasoning: "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-27.

Moreover, the record before the state courts overwhelmingly refutes Respondent's suggestion that counsel investigated the contents of the Gulf Pines Records and decided to forego pursuing them. Trial counsel acknowledged that they pursued the records but relied on their investigator, who failed to get them. Amended Petition at 52. Likewise, trial counsel testified in post-conviction proceedings that there was no strategic reason for failing to call Mr. Charles' treating psychiatrist, Dr. Ginsberg, whose name they had and who was listed in the Houston phonebook. Amended Petition at 53, n.10. The Court of Criminal Appeals expressly rejected a suggested finding of fact that trial counsel had exercised diligence in their search for these records. And, in 2004, trial counsel averred under oath that "I do believe that [the Gulf Pines Hospital records] may have been used in mitigation of punishment depending on Dr. Brown's view of those records in light of his own recent examinations of the defendant . . . . I accept responsibility for not having discovered the records." *See* Affidavit of Connie Williams on 9/22/2004, Amended Petition, Exh. Y; *See* Affidavit of Connie Williams on 9/22/2004, State Application, Exh. Q.

Respondent clings to the fact that Mr. Williams subsequently testified under oath to wholly different facts. For example, in his 2005 affidavit and 2006 hearing testimony, Mr. Williams testified that he did not pursue the Gulf Pines Hospital records or contact Dr. Ginsberg because Mr. Charles' family told him that he was hospitalized for "acting out" at school and at home. Habeas Hearing at 8; *See* Affidavit of Connie Williams on 3/30/2005, Amended Petition, Exh. Y at 2; *See* Affidavit of Connie Williams on 11/17/2006, Amended Petition, Exh. Y at 7; Habeas Hearing at 21, 41. He also testified that he was only told of one short hospital stay, when Mr. Charles was 10, and did not learn of the subsequent, lengthier hospitalization until after the trial. Habeas Hearing at 24.

Mr. Williams' post-conviction testimony is refuted by the record. As noted, *supra*, he knew

by the first day of trial that (1) Derrick had been hospitalized for 15 days at one time; and, (2) that it was for depression.  Mr. Williams' post-conviction testimony is plainly incredible in light of the trial record.  Nonetheless, Respondent urges this Court to defer to the prosecution-authored findings, rubber-stamped by the state courts, that Mr. Williams' 2005 and 2006 testimony is credible.  Answer at 42-43.[12]  The State led the state courts to make clearly erroneous fact findings, and that state court's determination of no deficient performance is not only incorrect but is based on an unreasonable determination of the facts in light of the record before state court.

Moreover, even if Mr. Williams had not declared on the record during trial that he knew the hospitalization was a 15-day in–patient treatment for depression, *i.e.* a mental health condition, "[n]o reasonable lawyer would forgo examination of the [Gulf Pines Hospital] file thinking he could do as well by asking the defendant or family relations" about these documents.  *Rompilla*, 545 U.S. at 389.

Respondent similarly contends that counsel were excused from conducting any social history investigation into Mr. Charles' home life – a basic step that is done in every capital case – because Mr. Charles' stepfather (Leroy Phillips) told the police that they once had to move because of Mr. Charles' behavior, and because the ***prosecution*** told defense counsel that Mr. Charles was abusive to his parents.  Answer at 38-39.  As demonstrated above, a competent mitigation interview of Leroy Phillips would have elicited powerful mitigating evidence of Nancy's schizophrenia and her inability to care for her children, the violence in the home, and the family's poverty.  Respondent's own complaints about Leroy Phillips not providing this information are an indictment of trial counsel's

---

[12] For example, Respondent asks this Court to defer to the clearly erroneous factfinding that, "based on the credible affidavit of trial counsel and 2006 writ evidentiary hearing, that [Charles's] family informed counsel that [Charles's] hospital stay at the Gulf Pines Hospital was a result of the problems he caused at home, and that [Charles's] hospitalization **had nothing to do with mental illness**."  Answer at 49 (emphasis added).  The prosecution-authored findings understandably make no reference to Mr. Williams' on-the-record statements during trial or his 2004 affidavit.

–58–

failure to conduct professionally reasonable interviews. Not only would counsel have developed compelling mitigating evidence, they would have been able to contextualize the client's allegedly negative behavior. As the Supreme Court recently observed when rejecting the same excuse for not conducting an adequate mitigation investigation in a capital case:

> [T]he fact that along with this new mitigation evidence there was also some adverse evidence is *unsurprising*, *post,* at 3271, *given that counsel's initial mitigation investigation was constitutionally inadequate*. Competent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, *ibid.,* were features, in another well-credentialed expert's view, [] of a "profound personality disorder." 1 Record 104. *This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears*, and his horrendous acts – especially in light of his purportedly stable upbringing.

*Sears*, 130 S.Ct. at 3264 (emphasis added). Here, too, counsel could have used the evidence of Mr. Charles' abusive and tragic home life, coupled with his mental illness, to help the jury understand Mr. Charles.

Respondent relies on the state court determination that counsel were not deficient for investigating evidence of Mr. Charles' psychiatric hospitalization and his chaotic background because the new evidence does not "obviate trial counsels' reasonable strategic decision not present that testimony of [Charles's] family." Answer at 41. This conclusion is, once again, deeply flawed. Trial counsel could not make a strategic decision to withhold evidence from the jury if they never knew of it in the first place. Contrary to the state court finding, the record is clear that trial counsel directed his investigator to obtain the Gulf Pines Hospital records. He failed to obtain them out of negligence, not for any strategic reasons. Likewise, counsel met with some family members but negligently failed to conduct professionally reasonable social history interviews. Respondent's suggestion that counsel

were not deficient in their pursuit of this evidence because of allegedly aggravating information

contained in the documents is logically, factually,[13] and legally frivolous.

The Supreme Court had before it identical arguments and fact findings, in *Wiggins*:

> In light of what the PSI and the DSS records actually revealed, however, counsel **chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible**. The Court of Appeals' **assumption that the investigation was adequate thus reflected an unreasonable application of Strickland**. 28 U.S.C. § 2254(d)(1) . . . . As we established in *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S., at 690-691, 104 S.Ct. 2052.

---

[13] When preparing findings for the trial court to adopt, the prosecutor cherry-picked every detail it could find that seemed aggravating, but it failed to acknowledge or address the vast majority of the mitigating evidence. As discussed, *infra*, in the prejudice section, highlighting the allegedly aggravating elements and failing to engage the mitigating evidence is not just incorrect, it is an unreasonable application of the *Strickland* prejudice prong. *Porter*, 130 S.Ct. at 455 (" It is also unreasonable to" reduce . . . Porter's military service "to 'inconsequential proportions,' . . . simply because the jury would also have learned that Porter went AWOL on more than one occasion."). The prosecutor's overly partisan approach similarly failed to engage Mr. Charles' mitigating evidence, and has thus convicted the state courts of the same unreasonable error identified by the *Porter* Court.

Moreover, the prosecution-authored findings are clearly erroneous in significant respect. As noted, *supra*, the findings suggest that counsel was under the impression that Mr. Charles' hospitalization was short and had nothing to mental illness. Counsel's on-the-record statements to the same judge who adopted the State's findings prove that he know it was lengthy a stay for mental health reasons. To the extent the finding is misleading, it is clearly erroneous.

Likewise, the state court found that Mr. Charles was diagnosed with oppositional defiant disorder ("ODD") after he was admitted to the Gulf Pines Hospital. Answer at 42 (citing state court finding that Petitioner's "diagnosis after admission to Gulf Pines Hospital included oppositional defiant disorder"). The finding is simply ***false*** and based on a misreading of the record.

Mr. Charles was first hospitalized in 1993, and Dr. Ginsberg estimated treatment would take 2 or 3 weeks, but his mother terminated treatment after 2 days. Amended Petition at 23. During that stay, the records reflect an initial diagnostic impression of ODD. During Mr. Charles' second hospitalization, which lasted 15 days and included a full evaluation, he received the following diagnosis:

Axis I:   Major Depressive Disorder, Recurrent, Severe Without Psychotic Features
Axis II: Borderline Intellectual Functioning
Axis III: Question of some organic brain injury
Axis IV: Family conflict; separation of parents

Amended Petition at 27. Thus, his diagnosis was not ODD. The state court findings omit any reference to Mr. Charles' actual diagnosis and thus, as in *Porter*, "reflect[] a failure to engage with" Mr. Charles' mitigating evidence. *Porter*, 130 S.Ct. at 455.

*Wiggins*, 539 U.S. at 527-28 (emphasis added).

There is no question that Petitioner's trial counsel abandoned their investigation at an unreasonable juncture, thus it is similarly impossible to cast their failure to present evidence they never found as "strategic decisions."   "[L]ike the counsel in *Wiggins*, [they] ignored pertinent avenues for investigation of which he should have been aware." *Porter*, 130 S.Ct. at 453.  Thus, as in *Wiggins*, the state court assumption that the investigation was adequate "reflected an unreasonable application of *Strickland*" pursuant to 28 U.S.C. § 2254(d)(1).  Moreover, with respect to Gulf Pines Hospital records, the CCA rejected the prosecution's proposed finding that counsel exercised diligence, thus § 2254(d) is inoperative.

With respect to the evidence of potential brain damage, the Respondent and the state courts pin their response and findings, respectively, on the credibility of psychologist Dr. George Denkowski.  Answer at 44-46.  Dr. Denkowski was retained by the State to render an opinion on Mr. Charles' *Atkins* claim.  However, in response to Mr. Charles' mitigation case, Dr. Denkowski signed a second affidavit:  "At the request of Harris County Assistant District Attorney, Ms. Neelu Sachdevo, I reviewed those ten circumstances [identified by the defense expert, Dr. Rosin] to determine if they are indeed potentially mitigating."  Denkowski Affidavit at 1.  Dr. Denkowski, undeterred by his lack of legal training or expertise, opined that "[n]one of the ten psychological/neuropsychological circumstances cited by Dr. Rosin should have **contributed to** Mr. Charles' commission of murder," thus there was "***no reason for the defense to have explored those circumstances further in preparation for the punishment phase of Mr. Charles' trial***."  *Id*. at 2; 8 (emphasis added).

Even if Dr. Denkowski were a well-respected member of the psychological community, he

dramatically overstepped his expertise, to the same degree a lawyer with no psychological training would do by rendering an "expert" psychological opinion.  What is "mitigating" is a legal concept, not a psychological one.  "One does not need to be a psychiatrist or a seer to know that, if nothing else, [a background of childhood abuse, neglect, sexual abuse, abandonment, and alcoholic parents] provides a fertile soil in which to develop mental problems and from which some degree of social maladjustment or antisocial behavior might be predicted."  *See Bouchillon v. Collins*, 907 F.2d 589, 590 (5th Cir. 1990) (footnote omitted).

Two years before Dr. Denkowski rendered his "expert" opinion that Mr. Charles' social history contained no potentially mitigating circumstances that warranted investigation by the defense team, the Supreme Court resoundingly rejected Dr. Denkowski's construct that mitigating evidence must "contribute to" – or have a nexus with – the crime.  The Court held that such a limitation "has **no basis** in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context."  *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) (emphasis added); *see also Smith v. Texas*, 543 U.S. 37, 45 (2004) ("The state court also held that petitioner had offered 'no evidence of any link or nexus between his **troubled childhood** or his **limited mental abilities** and this capital murder.'  132 S.W.3d, at 414.  We rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . .") (emphasis added).

Dr. Denkowski, contrary to the very clear precedent in *Smith*, 543 U.S. at 45, opined that Mr. Charles' adverse family background is not mitigating because there was "no realistic prospect" that it "compelled him to commit murder."  Denkowski Affidavit at 5.  Likewise, Dr. Denkowski repeatedly averred that Mr. Charles' limited mental abilities and impairments were not mitigating, and thus unworthy of exploration by the defense, because they did not cause Mr. Charles to commit murder.

*Id.* at 4 (attention deficit disorder "would not have been causally related to [Petitioner's] murder of the Bennetts"); *id.* (the fact that Mr. Charles functions at the 6th grade level or lower "does not distinguish him from many criminal defendants.  There are also no studies which have found that low literacy induces people to commit murder.").

Dr. Denkowski's affidavit is facially contrary to clearly established Supreme Court precedent defining mitigating circumstances in capital cases.  The Supreme Court has repeatedly held, limited intellectual capacity is inherently mitigating:

> There is **no question** that a jury might well have considered petitioner's IQ scores and history of ***participation in special-education classes*** as a reason to impose a sentence more lenient than death.  Indeed, ***we have held that a defendant's IQ score of 79, a score slightly higher than petitioner's, constitutes relevant mitigation evidence***.  *See Wiggins v. Smith*, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *cf. Tennard*, *supra*, at 288, 124 S.Ct., at 2572-2573).

*Smith*, 543 U.S. at 44 (emphasis added).  According to Dr. Denkowski, Mr. Charles  – who was placed in special education classes and whose IQ has been measured to be anywhere from 69 to 82 – "as evidenced by his *pre* capital offense capacity to keep himself from killing people, . . . was entirely capable of refraining from murder with that IQ when he chose to control himself."  Denkowski Affidavit at 7.[14]

Dr. Denkowski, unsurprisingly, was wholly incompetent to render such opinions.  The fact that the State located a psychologist willing to give an "expert" opinion on the duties of capital defense counsel does nothing to refute Petitioner's case on the *Strickland* performance prong.  It does,

---

[14] Dr. Denkowski's unconstitutionally narrow view of mitigating evidence is even more State-friendly than the trial prosecutor's.  In his closing argument, the prosecutor highlighted the absence of mitigating evidence: "Issue Number Two, are there any sufficient mitigating reasons why this defendant should get life instead of death?  They want to say one, ***not a mental deficiency, or because he was high on alcohol or dope at the time of the crime***, because he is 19." (RR.XXIII-77-78) (emphasis added).

however, undermine any deference to the state court findings because the prosecution liberally incorporated the "credible" affidavit of Dr. Denkowski into the state court findings of fact, *see* Findings at 14-15, and injected his unconstitutionally narrow definition of mitigating circumstances into the state court's rationale for rejecting Mr. Charles' ineffective assistance of counsel claim. Dr. Denkowski's – and hence the state courts' – failure to attach ***any*** mitigating significance to the evidence before the state courts was both an unreasonable application of *Strickland*, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts in light of the evidence before the state courts. 28 U.S.C. § 2254(d)(1)[15]

Finally, with regard to counsel's handling of evidence that Mr. Charles was intoxicated on PCP on the day of the crime, Respondent relies on state court findings that counsel made a reasonable strategic choice to withhold that evidence because it would have required putting Mr. Charles on the witness stand. Answer at 47. This finding is based on an erroneous understanding of the law. In Texas, as in practically all jurisdictions, trial counsel could have presented expert testimony, like that contained in Dr. Terry Rustin's affidavit, about Derrick's PCP intoxication on the night of the crime. *See* Report of Dr. Terry A. Rustin, Amended Petition, Exh. R. Dr. Rustin could have testified as an expert based on information "reasonably relied upon by experts in the particular field in forming opinions." Tex. Rule Ev. 703. Just as any medical or psychological expert relies on information

---

[15] That Dr. Denkowski would overstep in such a manner, and is indeed facially unqualified, renders his "expert" opinion completely incredible. Even were that not the case, Dr. Denkowki's credibility is suspect because he is currently under investigation by the profession in which he is allegedly qualified. The Texas State Board of Examiners of Psychologists has filed complaints against Dr. Denkowski with respect to his work in several capital cases for "intentionally misapplying psychiatric testing methods. *Maldonado v. Thaler*, ___ F.3d. ___, No. 10-7003, slip op. at 6 (5th Cir. Oct. 29, 2010) (available at http://www.ca5.uscourts.gov/opinions/pub/10/10-70003-CV0.wpd.pdf). In each of the cases, Dr. Denkowski is accused of intentionally misapplying methods to help the State of Texas defeat a death-sentenced prisoner's effort to seek habeas relief. Should Dr. Denkowski be found to have intentionally skewed his evaluations for the State's benefit, it will be all the more reason for this Court to decline Respondent's invitation to rely on Dr. Denkowski's definition of mitigation.

supplied by the subject of the evaluation, so too did Dr. Rustin, and the law at the time unquestionably permitted such testimony at trial. *See e.g. Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999) (finding a court-appointed defense psychiatrist qualified to testify to "the effect of substance abuse on the special issues of deliberateness, future dangerousness, and mitigation."); *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997) ("Appellant offered the testimony of . . . Master's-level psychotherapist, Michelle Dennison. Among other conclusions, Dennison opined that appellant had a serious problem with drug abuse and had been using 'crack' cocaine for 5-6 hours a day for the five months prior to the victim's murder, indicating a very severe addiction.").

Counsel could not have made a "strategic" decision to withhold evidence of Mr. Charles' PCP intoxication during the crime based on the fundamental misconception that only Derrick Charles could testify about his drug use. As in *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), "[t]he justifications [Petitioner's] attorney offered for his omission betray a startling ignorance of the law – or a weak attempt to shift blame for inadequate preparation." And, to the extent the state courts credited counsel's grievous legal error as the basis for a "reasonable strategy," Answer at 47, the state court decision was both an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), and an unreasonable application of clearly established law. 28 U.S.C. § 2254(d)(1).

Additionally, the state court relied on the State's characterization of the offense as "thoughtful and planned." Answer at 48. The testimony showed that Mr. Charles spent the day with his ex-girlfriend, in her house. The two spent the day together and were intimate. There is no suggestion that Mr. Charles went to the house with any plan to harm someone. He did not bring any weapons. Instead, the evidence shows that the crime was spontaneous, and the victims were killed with items found in the house. After the crime, Mr. Charles turned himself in, confessed, and eventually pled

guilty.  It is difficult, even with the benefit of hindsight, to discern a plan.  The only way to begin to understand this crime is to consider Mr. Charles' chaotic and tragic upbringing and his long-standing mental illness.  Counsel's deficient performance deprived the jury of any understanding of Mr. Charles or the circumstances of the crime and thus left them no choice but to answer "no" to the mitigation special issue.

The investigation into Mr. Charles' case was a cursory affair conducted by people lacking adequate skills.  In the end, counsel put on only four witnesses who were contacted at the very last minute, and the substance of counsel's two-hour case was limited to just the future dangerousness special issue.[16]  Even the state courts – which rubber-stamped numerous prosecution-authored factfindings flatly contradicted by the record – properly balked at the characterization of Mr. Charles' counsel as "diligent."  Respondent does not seriously dispute that counsel performed deficiently, his arguments are misplaced assertions that no prejudice ensued from counsel's omissions.  As in *Wiggins*,

---

[16] Respondent asserts that counsel's "reasonable strategy was to rebut the State's case for future dangerousness." Answer at 53.  Again, counsel could not make a reasonable strategic decision to forego presenting mitigating evidence without first conducting a thorough investigation of the potential mitigation. *Sears*, 130 S.Ct. at 3265.  Moreover, there is no logic to the assumption that addressing one of the special issues somehow precludes addressing the other.  Counsel was not faced with an either/or choice.  In order to win a life sentence, the best result for which they could hope after the client pled guilty, all they needed was **one vote on either special issue**.  Thus, it is no answer to counsel's dereliction of their **duty** to conduct a mitigation investigation to say that they decided to forego it based on the future dangerousness issue.

Moreover, under the circumstances of this case, it is highly questionable whether it could ever have been a reasonable strategy.  The future dangerousness investigation was clearly conducted at the last minute, during the state punishment phase itself.  Thus it could not serve as a justification for failing to conduct a mitigation investigation during the **preceding** nine months.  According to counsel, they did not call their own psychological expert to the stand because he thought the client would be a future danger.  Counsel repeatedly justified their inactions based on the facts of the crime, which speak to future dangerousness far more than they do Mr. Charles' background.  Respondent argues – in the very sentence preceding his assertion that counsel were reasonable to focus on their client's lack of dangerousness – that "the evidence before the jury demonstrated that [Petitioner's] violent tendencies knew no bounds." Answer at 53.  Under these circumstances, even had counsel first conducted a thorough mitigation investigation, it clearly would not have been reasonable to forgo a mitigation case in favor of exclusive reliance on rebutting future dangerousness.

> Counsel's investigation into [the client's] background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in [at trial], nor reasonable in light of the evidence counsel uncovered . . . – evidence that would have led a reasonably competent attorney to investigate further. Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment. In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied *Strickland*. Furthermore, the court partially relied on an erroneous factual assumption. The requirements for habeas relief established by 28 U.S.C. § 2254(d) are thus satisfied.

*Wiggins*, 539 U.S. at 534.

**B.     In light of the compelling mitigating evidence that could have helped the jury understand Derrick Charles and the circumstances of the offense, Mr. Charles was clearly prejudiced by counsel's deficient performance.**

"Mitigating evidence unrelated to future dangerousness may alter the jury's selection of the death penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). This is especially true in Texas because the capital sentencing scheme poses two separate questions to the jury, and a judge may not impose a death sentence unless the jury unanimously answers both in the State's favor. Thus, even if the jury unanimously believes that the defendant will be a future danger to society, it still must answer a second question:

> whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Tex. Code Crim. Proc. art. 37.071 (Vernon's 2003).

Mr. Charles' counsel presented no mitigating evidence, and thus effectively conceded this issue to the State, and with it the most fundamental Eighth Amendment guarantee to emerge from the

Supreme Court's post-*Furman*[17] capital punishment jurisprudence: "our cases ha[ve] firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, ***notwithstanding the severity of his crime or his potential to commit similar offenses in the future***." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added).  Trial counsel's deficient performance thwarted this critical function.

Mr. Charles' trial counsel would have discovered a trove of mitigating evidence, and numerous red flags signaling the need to investigate further, had they merely exercised reasonable diligence in their pursuit of the records from Mr. Charles' commitments to the Gulf Pines Hospital as a child.  This pivotal failure subverted any authentic examination of Derrick's social history.  The Gulf Pines records expose Derrick's troubled life preceding his inpatient commitments, portray a tragic child in need of substantial support and treatment, demonstrate that his impoverished and dysfunctional family was unable to meet his needs, and foreshadow Derrick's ensuing inability to adapt to society.

The Supreme Court's prejudice analysis in *Rompilla v. Beard*, 545 U.S. 374 (2005), in which counsel likewise failed to exercise reasonable diligence when they failed to review available records, is particularly instructive.  *See* Amended Petition at 99-104 (describing the *Rompilla* decision at length).  The Court first noted that, "[i]f the defense lawyers had looked in the file[s] . . . it is uncontested they would have found a range of mitigation leads that no other source had opened up." *Id*. at 390.  Likewise, here the Gulf Pine Hospital records numerous leads that had not been identified during counsel's cursory investigation.  "The . . . files pictured Rompilla's childhood and mental

---

[17] *Furman v. Georgia*, 408 U.S. 238 (1972).

health very differently from anything defense counsel had seen or heard." *Id*. 391. The Gulf Pines Hospital records told a very different story than the one counsel claim to have heard from Mr. Charles' mother and step-father.

Moreover, Rompilla's ***three*** mental health experts at trial were deprived of the social history information, including an occasion on which his mother stabbed his father; withholding of parental affection or approval; isolation; abuse; and the failure to adequately clothe and care for the children. *Id*. at 391-92. "While [Rompilla's mental experts at trial] found 'nothing helpful to [Rompilla's] case,' . . . their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of 'red flags' pointing up a need to test further." *Id*. at 392 (citations omitted). The post-conviction experts found that Rompilla suffered from "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions," and that "Rompilla's problems relate back to his childhood." Here, too, the records led to a post-conviction expert report highlighting numerous significant mitigating circumstances about Mr. Charles and the crime.

As in *Rompilla*, the Gulf Pine Hospital records "would probably have prompted a look at [other] records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother 'was missing from home frequently for a period of one or several weeks at a time;'" and "that his mother 'has been reported ... frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side which was also the condition of the home at all times;" and "[s]chool records showed Rompilla's IQ was in the mentally retarded range." *Id*. at 393. This also describes the evidence Mr. Charles' counsel would have discovered, including Derrick's childhood full scale IQ score of 69; his mother's inability to adequately care for him in light

–69–

of her untreated schizophrenia, that Derrick was abandoned to fend for himself for extended periods

of time, and the physical abuse Derrick suffered at the hands of his stepfather.

The Supreme Court concluded that

This evidence adds up to a mitigation case that bears no relation to the few naked
pleas for mercy actually put before the jury, and although we suppose it is possible
that a jury could have heard it all and still have decided on the death penalty, that is
not the test.  It goes without saying that the undiscovered "mitigating evidence, taken
as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's]
culpability," *Wiggins v. Smith*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v.
Taylor*, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the
evidence had gone in is "sufficient to undermine confidence in the outcome actually
reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S.Ct. 2052.

*Id*.  The same is true in Mr. Charles' case.  Mr. Charles does not, and need not, assert that the jury

would have unanimously answered the mitigation question in his favor if presented with this new

evidence.  There is, however, a reasonable probability that the evidence might well have influenced

one juror's appraisal, thus Mr. Charles suffered *Strickland* prejudice from his counsel's omissions.

What follows is a brief summary of the available mitigating evidence never located by

counsel.  This evidence is more exhaustively described, with citations to the record, in Mr. Charles'

Amended Petition at 8-42; 118-21.  It is precisely the kind of mitigating evidence upon which the

Supreme Court – in *Williams*, *Wiggins*, *Rompilla*, *Porter*, and *Sears* – has predicated a finding of

prejudice.

Derrick Charles was abandoned by his father before he was born, and did not meet him until

he was a teenager.  He grew up in a chaotic environment, in which his alcoholic step-father and

schizophrenic mother drank every day and fought constantly.  These were violent confrontations, in

which Derrick's parents assaulted each other with objects such as bottles as dishes, as well as their

fists.  Derrick and his brother, Christopher, witnessed numerous violent episodes, including their

mother stabbing their step-father.  When Derrick was nine, his uncle cut his step-father with a knife during an argument over money and, when the police were called, his mother joined in the fight and was arrested along with Derrick's uncle.

Derrick and Christopher were physically and emotionally abused at the hands of their step-father.  Mr. Phillips made it clear to the boys that he did not like them and did not want them around. He referred to the boys as "faggot," "dickhead," and "retarded."  He beat them with switches, cable cords, and extension cords.  Other family members observed the "big whelps" these beatings left on the boys.[18]

The boys were also neglected and isolated, particularly Derrick.  Mr. Phillips once took their mother and moved across town, leaving them to fend for themselves for a month.  On another occasion, the Mr. Phillips kicked the boys out of the house.  Family members reported that when Mr. Phillips beat the children or kicked them out of the house, their mother either would not or could not intervene to protect them.  The Gulf Pines staff documented their concerns about Derrick's mother's lack of parenting skills.

When the boys were abandoned, Christopher was taken in by their grandmother but Derrick was left to make his way on the streets.  Christopher was loved by their mother's family, but Derrick was rejected by them as a child, and pain from this rejection was evident to people who saw him

---

[18] Respondent concedes that Mr. Charles has established that his childhood "was not ideal," Answer at 57, but argues that evidence from his family members about the physical and emotional abuse "bring with them the opportunity for the State to introduce" evidence that Derrick has been abusive to his parents and that he was generally an angry, violent young man."  Of course, the door is always open for the State to present this evidence, regardless of what the defense puts on, and the State did in fact introduce evidence of Derrick's turbulent youth.  What the jury did not hear about were *any* of the circumstances Derrick's childhood, which may well have led the jury to believe that Derrick's alleged abuse of his parents may have been self-defense.  Only Leroy Phillips – the alcoholic step-father who whipped and tormented the children – is reputed to have said that Derrick was abusive to his parents, numerous family members reported that Leroy abused the children.

growing up.  Several witnesses reported that Derrick was deeply troubled and affected by his rejection and isolation.  Even his brother recognized that Derrick "got the worst treatment" and seemed sad and lost because he had no one to whom he could turn.

During one of Derrick's inpatient psychiatric commitments to Gulf Pines Hospital as a child, the staff documented his precarious home life.  In response to questions from the staff, Derrick reported that family members argued a lot; never felt close to one another; often got angry and lost their temper; often yelled, swore, or said mean things to each other; never gave each other emotional support or helped out when things went wrong; and often got so angry that they hit, punched or threw things at each other.  Unsurprisingly, Derrick reported that family members never felt physically safe with one another.

Derrick's mother, when she was finally hospitalized for her schizophrenia, reported that she was abusive to her children, and Mr. Phillips was "sexually aggressive" and abusive towards her.

Derrick also endured unrelenting poverty and instability throughout his life.  Leroy and Nancy moved a lot because they could not pay their bills.  Leroy spent the little money he acquired on his addictions to alcohol and cigarettes.  The children had no toys, no new clothes, and sometimes no food.  When their grandmother gave Derrick and Christopher money to buy lunch, Leroy stole it to buy alcohol.  The Gulf Pines records describe Derrick's circumstances as "very deprived," his mother reported that the neighborhood was too rough and dangerous to let the children out.

The Gulf Pines records document that Derrick suffered from mental illness and impairments from a very young age, and that his impoverished and dysfunctional family was unable to secure adequate care for him.  Derrick was first referred for mental health treatment in the first or second grade, and was first committed to Gulf Pines at age 10, in 1993.

At the time of his first commitment, Derrick was depressed and lethargic.  The records depict a very sick child:

> Derrick . . . appeared to have very low self esteem and . . . appeared to be experiencing irritating or painful affect that was interfering with his perceptual and/or meditational activities . . . .  Because he may miss, neglect or distort critical cues or bits of information, this style can create the potential for a higher frequency of behaviors that do not coincide with social demands or expectations.  It also appeared that Derrick was likely to have difficulty in modulating affect and is more inclined to display feelings and be less concerned about modulating those displays.  He may have a sense of helplessness or discouragement about his relationships to the world and may expect gloomy outcomes regardless of his efforts.  Some of his responses suggested that problems with impaired perceptual accuracy could be due either to attention and concentration problems, neurological problems or decompensation and internal preoccupation related to depressive affect.  ***He did give an unusually large number of responses to portions of the testing, which can be associated with a Bipolar process. This along with significant impairments in his cognitive processing suggest that he will need to be monitored for this possible development of more significant affective and cognitive disturbances.***  Also further testing could rule out the presence of neurological problems.

Amended Petition at 23.  The seriousness of Derrick's condition led Dr. Ginsberg to estimate that Derrick would require ***2-3 weeks*** of inpatient care.  However, his then-untreated schizophrenic mother checked Derrick out against medical advice after just two days because she missed him.[19]  Hospital staff warned Derrick's family "that [the] patient has potential to hurt/harm himself or others may hurt/harm him," and urged them to at least continue with outpatient care.  The family did not seek outpatient care for Derrick until another two years had passed and his condition had significantly deteriorated.

Derrick's second hospitalization, in September of 1995, followed six months of unsuccessful

---

[19] Trial counsel would later cite to the brevity of this stay as a basis for concluding that the commitment of little moment.  Had he acquired the records, he would have known that Derrick's condition was serious and the brevity of the stay was an indication that a very sick 10-year-old child was being deprived of adequate care by his severely mentally ill mother.

outpatient treatment.  Upon intake, then 13-year-old Derrick was experiencing decreased sleep, labile

mood, crying spells, impaired memory, and impaired concentration.  His mother reported that Derrick

was beating his head against a wall and would not respond to her.  Not surprisingly, he was unable to

control his behavior at school.

      Two days after his admission, Derrick was evaluated by a psychologist and her report once

again describes a debilitated and frail child:

> On this testing, his intelligence testing was measured to be in the intellectually deficient range.  It would probably be in the borderline range *if he were not having so many psychological problems*.  He has a strength in abstract reasoning, although it is still below average.  His freedom from distractibility is poor.  His word knowledge and general knowledge are very low and suggest learning problems and cultural impoverishment.  His social understanding is also well below average, although he did not show any antisocial tendencies in his responses.  His perceptual organization skills are extremely poor, especially his visuo-motor coordination and visual integration.  He rotates figures, writes upside down, and distorts figures.  These results suggest he may have some organic damage that is contributing to his problem with behavior control.  However, it is unlikely that all of his current problems are explained by neurological problems.
>
> Derrick's testing also shows him to be depressed and have poor self esteem. . . .  He also has some anxiety that may be due to depression and feelings of guilt.  He withdraws socially in response to feeling poorly about himself.  He does not seem to be getting his needs met by his family.  He may act angrily as a defense against feelings of sadness and rejection.  *It also likely that his trouble controlling his anger may have a neurological component* [sic].

Amended Petition at 26-27 (emphasis added).  Derrick was diagnosed with a severe, recurrent

depressive disorder as well as Borderline Intellectual Functioning:

      Axis I: Major Depressive Disorder, Recurrent, Severe Without Psychotic Features

      Axis II: Borderline Intellectual Functioning

      Axis III: Question of some organic brain injury

      Axis IV: Family conflict; separation of parents

Amended Petition at 27.

The Gulf Pines records also document Derrick's longstanding, severe cognitive impairments. During his first hospitalization, his IQ was measured at 77. Two years letter, when Derrick was 13 years old, the hospital measured his full scale IQ at 69. As described *supra*, Derrick failed first grade and was in special education starting in 3rd grade. Throughout his life Derrick consistently tested far below his chronological age.

During his 16-day inpatient treatment, the hospital was able to stabilize Derrick with medication, therapy, and other treatment. His prognosis upon discharge was "fair to good with continued outpatient treatment." Amended Petition at 28.[20]

Derrick's mother was unable, however, to cope with getting her child the continued treatment he needed to maintain his stability. After just 2 outpatient appointments, she stopped bringing Derrick for treatment. Inevitably, Derrick regressed and was unable to cope or adapt. He began to get into trouble at school for excessive lateness and disruption, and was repeatedly referred to the juvenile authorities.

Derrick's mother was unable secure his outpatient treatment or otherwise help him during this time because she was descending into her own severe illness. Nancy Phillips had a long history of

---

[20] Respondent asserts that "Charles has not come close to establishing that he himself suffers from any mental illness such that would mitigate the instant crime. All he does is string together various statements made over the years and then leaps to the conclusion that he suffers from some form of mental illness. But the reality of what he offers is nothing more than rank speculation." Answer at 56.

The "various statements over the years" include numerous evaluations and diagnoses by mental health professionals, whose intervention in Derrick's life began when he was in first grade. He has been diagnosed with Major Depressive Disorder as well as Borderline Intellectual Functioning. The diagnostic testing over years consistently reveals significant cognitive impairments. Doctors at a psychiatric hospital determined at two different times in Derrick's childhood that, based on thorough intake evaluations, Derrick required 2 to 3 weeks of in-patient psychiatric treatment. Like trial counsel, Respondent is apparently under the illusion that psychiatric hospitals commit indigent children for lengthy in-patient treatment for reasons wholly unrelated to mental illness. The record refutes this ridiculous fiction.

illness and trauma.  Born in 1962, she grew up in house with no running water or electricity, and sometimes no food.  Her father was an extreme alcoholic who raged violently at Nancy's mother and her eight siblings.  When Nancy was 15, her mother – unable to endure the unrelenting terror any longer – shot and killed Nancy's father in front of Nancy and her brothers and sisters.

In 1992, when Derrick was 10 years old, Nancy tried to kill herself and was hospitalized.  In 1996, when Derrick desperately needed help securing treatment for his own mental health issues, Nancy was admitted to the hospital because she was hallucinating, paranoid, and unable to eat.  Nancy's mental health records document that she was profoundly ill and low functioning throughout Derrick's teenage years.  Nancy was so impaired during this period that the Social Security Administration deemed her disabled.  She was manifestly unable to care for her son.

As Petitioner has described *supra*, the Gulf Pines records reveal that Derrick's family has a significant history of severe mental impairments, including psychosis, severe depression, mental retardation, cognitive impairments, and alcoholism.

By the time Derrick was institutionalized in the Texas Youth Commission in 1998, he was beginning to exhibit more severe psychological symptoms.  According to a psychological evaluation on November 13, 1998:

> Derrick was also noted to exhibit some speech deficits, as articulation was, at times, inaudible.  He was asked to repeat his statements often throughout the assessment for examiner verification of his remarks . . . . Derrick was minimally verbally responsive, which seemed to suggest a degree of suspiciousness, and noted and what appeared to be fearfulness . . . ***Derrick reported that he often experiences auditory and tactile hallucinations.  Derrick seemed cautions in relating this information and reported that he has not informed anyone else of his "voices."  He stated that he is unable to distinguish what the voices are saying to him, but that other people talking to him appear to be in the distance and mumbled***.  He further stated that the last time he heard voices was two days ago.  ***He claimed that he has experienced these hallucinations for the past year. Derrick stated that the tactile hallucinations***

> *involve him feeling as if someone is touching him all over his body at different times.  He stated that experiencing the hallucinations had angered him, as well as causing fear*.  He further indicated that he has been experiencing sleep problems, as *he reported the voices have been waking him up at different times during the night*.  It was interesting to note that Derrick was observed several times throughout the assessment to pull and slightly tug at his right ear and he did not appear conscious of this behavior.  It was noted in previous evaluation that Derrick's mother has been diagnosed with Schizophrenia and manages her symptoms by taking medication . . . .  He does not meet the diagnostic criteria at this time for thought disorders or personality disorders, but this may change, as there is a possibility further symptoms could emerge and become more defined.

Amended Petition at 39.  Despite the above evaluation, TYC inexplicably failed to provide Derrick with any psychiatric services.

Derrick's lengthy history of mental illness and inability to secure sustained, adequate treatment is all the more significant because Derrick's aunt reported to trial counsel that Derrick experienced hallucinations during the crime.  Counsel, instead of seeing a red flag that required further investigation, saw only an opportunity to joke about their client's illness with trial court.[21] This appallingly dismissive attitude to Mr. Charles' serious mental illness embodies counsel's indifference to their role in the sentencing proceeding.  Available records corroborate Derrick's history of hallucinations and hearing voices starting years before the crime.

The consequences that flowed from counsel's inadequate mitigation undermined the integrity of the defense function, and with it confidence in outcome of the sentencing proceeding.  First, and most essentially, counsel's deficient performance deprived the jury of an accurate and textured picture of Mr. Charles, thus they could not preform their critical role of determining whether "there is a

---

[21] During counsel's real-time, *ex parte* apologia for their deficient performance, *see* Amended Petition at 80-83, counsel said that when he heard about Derrick's hallucinations, he talked to *lay people* about it, and they suggested that he "get a Catholic priest to come down and talk about exorcism," but he did not think the testimony would "fit with the tests at the courthouse to be admissible evidence."  *Id*. at 83.

sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." This alone renders the proceeding constitutionally suspect.

Second, counsel harbored conspicuously false impressions about their client because they were ignorant of Mr. Charles' social history. Counsel thought Mr. Charles came from a loving and supportive family, and thus made a "strategic" decision to not pursue or present mitigating evidence about their client's family background. Counsel erroneously believed that Mr. Charles' brief initial commitment to Gulf Pines was insignificant because it lasted only 2 days, which apparently allowed them to indulge in the fiction that a 10-year-old boy was a committed to a mental institution for "acting out." This trivialized a significant and compelling event: Derrick was very sick and the hospital wanted to keep him for 2-3 weeks, but his mother terminated the treatment against medical advice and even failed to heed the doctors' entreaties to at least get outpatient treatment for Derrick. Their complete ignorance of Derrick's tragic history rendered counsel incapable of explaining to the jury that Derrick's unmoderated behavior as a child was a product of his untreated mental illness, but that he responded to – and would pose no danger with – with treatment. Instead, counsel's closing argument to the jury was: "You heard evidence about what a pain in the butt he was as a teenager, going around threatening folks, cussing them . . . . That doesn't necessarily demonstrate that he would be a threat to society in the future, violence to society in the future. Because he never attacked any of them."

As in *Rompilla*, the undiscovered mitigating evidence,

would have destroyed the benign conception of Rompilla's upbringing . . . counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would

presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview.

*Rompilla*, 545 U.S. at 391.  To the extent counsel engaged in any strategic decision-making in the planning and presentation of Derrick's case, their efforts were throughly undermined by their professionally unreasonable poverty of knowledge about their client.

A third consequence of counsel's deficient performance is that they torpedoed the work of their own mental health expert, Dr. Jerome Brown, by failing to provide him with the necessary materials and information.  Amended Petition at 57-60.  Although counsel acknowledged that he was responsible for investigating and collecting mitigating evidence, and not Dr. Brown, counsel failed in this vital duty.  *Id.* at 57.  Thus, Dr. Brown was provided with very little information about Derrick's background and ultimately reported to trial counsel that "nothing . . . offered in [Derrick's] history by the defendant or by his parents that would be of use in his defense," and there was no information pointing to "the possibility of brain tissue trauma, childhood abuse, deprivation, or traumatic life events."  *Id.* at 59-60.

Had counsel conducted a professionally reasonable investigation, they could have supplied their expert with evidence of almost every mitigating circumstance – deprivation, childhood abuse, and traumatic life events – that Dr. Brown identified as potentially useful but absent in this case.

Dr. Brown affirmed in the state court proceedings that, if given the Gulf Pines records,[22] he would have conducted further evaluation to rule out the possibility of brain damage and mental

---

[22] As noted *supra*, in his 2004 affidavit, Connie Williams testified that "I do believe that [the Gulf Pines Hospital records] may have been used in mitigation of punishment depending on Dr. Brown's view of those records in light of his own recent examinations of the defendant . . . .  I accept responsibility for not having discovered the records."  Williams testified that he gave Dr. Brown everything he had, so he clearly would have given Dr. Brown the Gulf Pines records had his investigator managed to find them.

retardation: "At the time of my original evaluation, there was no evidence to suggest that either one of these might have been present, or that they might have affected his behavior and thinking at the time he committed the offenses.   However, the recent records provided clearly suggest that these possibilities existed and should have been pursued through additional neurological, neuropsychological and intelligence testing." *Id*. at 58.

It is precisely this information that led Dr. Rosin to the same conclusions in the post-conviction proceedings.  Had trial counsel exercised reasonable diligence with the respect to the Gulf Pines records, instead of obtaining an expert report finding "nothing . . . of use in [Derrick's] defense,"  their expert report would have come back like Dr. Rosin's – loaded with compelling mitigating evidence that could have been presented to the jury, including: cognitive impairments; a history of severe depression; family dysfunction; abject poverty; stepfather's alcoholism; Derrick's mother's untreated mental illness and related inability to care for her children; that Mr. Charles lived in unsafe environments; that he witnessed repeated incidents of violence between his parents; that he failed to receive proper parenting and medical treatment for his problems; and link the between the failure to get psychiatric help and his run-ins with the law.

When concluding that counsel's unreasonable failure to review readily available documents prejudiced the defendant, the *Rompilla* Court noted the contrast between the reports of the trial and post-conviction mental health experts:

> The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial.  While they found "nothing helpful to [Rompilla's] case," . . . their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of "'red flags'" pointing up a need to test further . . . .  When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions. *Ibid.*  They also said that "Rompilla's

−80−

> problems relate back to his childhood, and were likely caused by fetal alcohol
> syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct
> or to conform his conduct to the law was substantially impaired at the time of the
> offense."

*Rompilla*, 545 U.S. at 392 (citations omitted).   Trial counsel's deficient investigation likewise

sabotaged Dr. Brown's effectiveness as a defense expert.

Fourth, in the absence of any evidence of Mr. Charles' background, the prosecution freely

painted a devastatingly false picture for the jury.   In his closing argument, the prosecutor told the jury

to answer the mitigation special issue "no" because the defense failed to present any mitigating

evidence:

> Issue Number Two, are there any sufficient mitigating reasons why this defendant
> should get life instead of death?   They want to say one, ***not a mental deficiency or
> because he was high on alcohol or dope at the time of his crime***, because he is 19.
> This ain't a typical 19 year-old.   We have spend time and time again to try to
> rehabilitate him . . . .   And he chose, he decided that he wasn't going to listen . . . .   He
> has decided, "I'm not going to be rehabilitated."

Vol. 23, pp.77-78 (emphasis added).   Counsel's omissions allowed the prosecution to persuade the

jury that two compelling mitigating circumstances – mental impairments and drug intoxication – were

not present here.   That the prosecution highlighted for the jury the absence of these specific mitigating

circumstances illustrates their significance.

Defense counsel failed to present evidence of Derrick's mental illness, or evidence that

sustained treatment alleviated the associated, involuntary behavior problems, or evidence of the

repeated failures to provide Derrick with the necessary treatment, or evidence that Derrick had

experienced demonic hallucinations on the night of the crime.   The jury was deprived of the true

narrative that led to Derrick's crime.   The prosecution capitalized by telling a story about a sober,

mentally healthy, calculatedly evil individual who is irretrievably immune from the intervention of

well-intentioned people.  As the Gulf Pines records and other evidence demonstrate, the prosecution's

creation is a highly prejudicial fiction.  *See Sears*, 130 S.Ct. at 3262 (counsel's deficient performance

allowed the prosecution to paint a false and damaging picture of a defendant's background bereft of

mitigating circumstances).  That the jury was permitted to sentence Mr. Charles to death based on a

such a distorted understanding of his background and the circumstances of the crime undermines

confidence in the outcome of his trial.[23]

"This is not a case in which the new evidence 'would barely have altered the sentencing

profile presented to the sentencing judge.'" *Porter*, 130 S.Ct. at 454 (quoting *Strickland*, at 700).  As

in *Porter*,

> The judge and jury at Porter's original sentencing heard almost nothing that would
> humanize Porter or allow them to ***accurately gauge his moral culpability***.  They
> learned about Porter's turbulent relationship with [the victim], his crimes, and almost
> nothing else.  Had Porter's counsel been effective, the judge and jury would have
> learned of the "kind of troubled history we have declared relevant to assessing a
> defendant's moral culpability." *Wiggins, supra,* at 535, 123 S.Ct. 2527.

*Id*.  This Court should not hesitate in finding that Mr. Charles was prejudiced by counsel's deficient

performance.

---

[23] The defense closing arguments were equally unhelpful.  Mr. Crowley delivered the first segment and **made no reference whatsoever to the mitigation special issue**.

As noted, *supra*, Mr. Williams, in his ignorance of Derrick's mental illness and true social history, described his own client as a "pain in the butt" teenager and focused on the absence of assaultive behavior while Derrick was incarcerated.  Amended Petition at 85.  The sole mitigating circumstance mentioned by the defense was that Mr. Charles was 19 years old at the time of the crime. 23:52-53.  In summing up, Mr. Charles' counsel failed to even suggest that the jury spare his client:

> Some of you probably already have your minds made up about what you want to do or what you are
> going to do.  I don't know.  We're just [sic] summating the evidence.  None of us will be allowed to
> give our opinion on what we think should happen.  We can only tell you what we believe the evidence
> points out to you.

Vol. 23 p. 54.

## IV.

**AEDPA POSES NO BAR TO GRANTING RELIEF ON MR. CHARLES' INEFECTIVE ASSISTANCE OF COUNSEL CLAIM BECAUSE THE STATE COURT REJECTION OF MR. CHARLES' CLAIM WAS BOTH UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT AND RESULTED FROM AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE <u>EVIDENCE BEFORE THE STATE COURTS. 28 U.S.C. § 2254(d).</u>**

Throughout his argument *supra* and in his amended petition, Mr. Charles has noted the numerous ways in which the state court rejection of his claim was unreasonable, he will briefly recap them below to demonstrate that if the § 2254(d) bars to relief apply in this case, Mr. Charles easily clears them.

**A.      The state court finding of no deficient performance should be reviewed de novo in light of the Texas Court of Criminal Appeals' rejection of the diligence finding; alternatively the finding was unreasonable.**

The Court of Criminal Appeals rejected the trial court's finding of fact that counsel "exercised due diligence in attempting to locate Petitioner's Gulf Pines Hospital records." Amended Petition at 6. Thus, this Court addresses the issue of counsel's diligence with respect to the Gulf Pines Hospital records *de novo.  Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008) (no presumption of correctness attaches when trial court findings are rejected by the CCA). Of course, as exhaustively demonstrated above, the Gulf Pines Hospital records are no small part of Mr. Charles' case. They are the very core of Mr. Charles' ineffectiveness claim and contain information and leads to evidence relevant to practically every aspect of the mitigation case counsel should have presented. These leads include Derrick's mental health impairments, his turbulent home life, his impoverished background, his family's failure to secure treatment for him, and so on. Thus, the scope of this Court's *de novo* review of counsel's performance is necessarily broad.

−83−

Regardless, Petitioner does not shrink from any obligation to demonstrate the unreasonableness of the state courts' failure to find deficient performance in this case. Mr. Charles has established, *supra*, that the state court repeatedly, and unreasonably, excused trial counsel from their lapses based on the assumption that they conducted a thorough investigation. Counsel failed to hire a competent mitigation specialist though the funding for one was thrown at them, failed to conduct an adequate social history, failed to follow the numerous leads with which they were confronted, unreasonably relied on the family's characterization of the Gulf Pines records, failed to call Derrick's treating physician, and failed to pursue and present evidence about Derrick's hallucinations on the night of the crime based on a startling ignorance of the law. Confronted with this evidence, it was unreasonable pursuant to both § 2254(d)(1) and (d)(2), for the state courts to adopt the prosecution's findings that trial counsel were diligent.

## B.    The state court determination that Mr. Charles was not prejudiced by counsel's deficient performance was unreasonable.

The state courts made only four conclusions of law with respect to Mr. Charles' ineffective assistance of counsel claim. The fourth is merely a throw-away statement, without explanation or analysis or support, that Mr. Charles failed to show that his case is factually similar to *Williams*, *Wiggins*, or *Rompilla*. Findings and Conclusions at 35. The other three, which Respondent cites in his prejudice argument, Answer at 53-54, appear largely focused on counsel's performance. Even if generously read as addressing *Strickland*'s prejudice prong, they convict the state courts of fundamentally flawed, unreasonable applications of *Strickland*.

The state court's first conclusion of law, Answer at 53-54, concludes that "[Mr. Charles'] counsel were not ineffective for their reasonable, plausible trial decision, ***made after [a] thorough***

–84–

*investigation*, to concentrate on the future dangerousness special issue and not present the testimony of Charles's family that would have been more harmful than beneficial . . . ." *Id*.  However, the CCA rejected any finding that counsel were diligent with respect to the Gulf Pines records, and thus all of the information they contained, so the premise of this conclusion of law is no longer true: there was no thorough investigation.  As explained, *supra*, counsel could not have made a reasonable strategy without first conducting a thorough investigation, and the contrary conclusion was an unreasonable application of *Strickland*.

Just as fundamental, the state courts failed to analyze whether trial counsel's allegedly strategic decision to concede the mitigation special issue prejudiced Mr. Charles **regardless** of whether their strategy with respect to the future dangerousness issues was reasonable.

The *Sears* Court reversed the Georgia courts, in part, for the same error:

> There are two errors in the state court's analysis of Sears' Sixth Amendment claim. First, the court curtailed a more probing prejudice inquiry because it placed undue reliance on the assumed reasonableness of counsel's mitigation theory.  The court's determination that counsel had conducted a constitutionally deficient mitigation investigation, should have, at the very least, called into question the reasonableness of this theory.  *Cf. Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (explaining that "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision ... because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background'" (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); alteration in original)).  And, more to the point, ***that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced Sears***.  The "reasonableness" of counsel's theory was, at this stage in the inquiry, ***beside the point***: Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not.

*Sears*, 130 S.Ct. at 3265.  Likewise, that counsel might have reasonably decided to rebut the state's case for future dangerousness does not obviate the need to analyze whether their failure to conduct an

adequate mitigation investigation prejudiced Mr. Charles. Nothing precluded counsel from trying to

persuade the jury on both of the special issues before them, nor is lack of future dangerousness

somehow inconsistent with the presentation of mitigating evidence. To the contrary, the mitigating

evidence developed in post-conviction proceedings helps explain and vitiate the extraneous conduct

relied upon by the prosecution when arguing that Mr. Charles was dangerous. It also demonstrated

that Mr. Charles responds to proper medication and treatment, and thus would not be a future danger

if incarcerated in a facility with adequate medical care. This evidence significantly bolsters the only

point trial counsel tried to make to the jury.

That trial counsel put together, albeit belatedly, a superficial defense with respect to the future

dangerousness issue does not insulate their performance from scrutiny, nor does it insulate from this

Court's review the state court's determination that counsel were effective:

> [w]e . . . have found deficiency *and* prejudice in other cases in which counsel
> presented what could be described as a superficially reasonable mitigation theory
> during the penalty phase. *E.g., Williams, supra*, at 398, 120 S.Ct. 1495 (remorse and
> cooperation with police); *Rompilla v. Beard*, 545 U.S. 374, 378, 125 S.Ct. 2456, 162
> L.Ed.2d 360 (2005) (residual doubt). We did so most recently in *Porter v. McCollum*,
> 558 U.S. ----, ----, 130 S.Ct. 447, 449, --- L.Ed.2d ---- (2009) (*per curiam*), where
> counsel at trial had attempted to blame his client's bad acts on his drunkenness, and
> had failed to discover significant mitigation evidence relating to his client's heroic
> military service and substantial mental health difficulties that came to light only
> during postconviction relief, *id.,* at 453-54. *Not only did we find prejudice in Porter,*
> *but – bound by deference owed under 28 U.S.C. § 2254(d)(1) – we also concluded*
> *the state court had unreasonably applied Strickland's prejudice prong when it*
> *analyzed Porter's claim*. *Porter, supra,* at ----, 130 S.Ct., at 454-55.

*Sears*, 130 S.Ct. at 3266 (emphasis added).

Additionally, as described *supra*, the state courts wholly failed to engage the mitigating

evidence in the Gulf Pines records but instead relied on the prosecution's blinkered focus on allegedly

damaging information they contained. Conclusion of Law No. 2, Answer at 54, the only conclusion

of law to address the Gulf Pines records discounts the "slight" mitigating value, "if any," of the Gulf Pines records because (1) there was allegedly harmful evidence in the records; and, (2) Mr. Charles failed to show the results would have been different had the evidence been presented. The conclusion of law is premised upon two early 1990's CCA cases, both of which expressly rely on the nexus test for mitigating evidence. This conclusion is unreasonable for at least five independent reasons, any one of which defeats the application of § 2254(d) to Mr. Charles' claim.

First, the state court unreasonably failed to engage Mr. Charles' evidence. The state court wholly adopted the prosecution's proposed order, even when flatly contradicted by the record. Thus, it found that trial counsel was not aware of the nature and duration of Mr. Charles' commitment to Gulf Pines even though counsel stated to the contrary on the record – to the same judge who signed the findings. *See e.g.* Findings of Fact at 12 ("based on the credible affidavit of trial counsel," "the applicant's family informed counsel that the applicant's hospital stay at Gulf Pines . . . had nothing to do with mental illness").[24] The state court also adopted the prosecutions view that the Gulf Pines records had "slight" mitigating value. These records contained numerous mitigating circumstances – impoverished background, neglect, violent and chaotic home life, cognitive impairments – that the Supreme Court has repeatedly validated as significant. To conclude that the mitigating value of these document is "slight" is an unreasonable application of clear Supreme Court precedent. *Cf. Porter*, 130 S.Ct. at 454 ("The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing.").

---

[24] Trial counsel never found the hospital records, nor did he bother to call Derrick's treating physician, Dr. Ginsberg. Yet he stated on the first day of trial that Derrick was hospitalized for 15 days for depression. Under these circumstances, it is highly unlikely that counsel's accurate understanding – at trial – of Derrick's hospitalization could have come from any source other than Derrick's family.

Second, and relatedly, the state courts unreasonably discounted the mitigating value of the Gulf Pines records based on allegedly damaging evidence they contained. The Supreme Court rejected this same mode of side-stepping mitigating evidence in *Porter*: "It is also unreasonable to conclude that Porter's military service would be reduced to 'inconsequential proportions,' 788 So.2d, at 925, simply because the jury would also have learned that Porter went AWOL on more than one occasion." *Porter*, at 130 S.Ct. 455. As the Court explained,

> [t]he relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter. [] The evidence that he was AWOL is consistent with this theory of mitigation and does not impeach or diminish the evidence of his service. To conclude otherwise reflects a failure to engage with what Porter actually went through in Korea.

*Id*. at 455 (footnote omitted). Likewise, to conclude that references to Derrick's anger and hostile behavior would diminish the impact of his chaotic, abusive, and impoverished upbringing, his cognitive impairments, and his guardians' inability to secure adequate treatment for him, reflects a failure to engage the evidence of Mr. Charles tragic childhood. As in *Porter*, Mr. Charles' anger and behavioral problems are consistent with, and do not diminish, his tragic circumstances. It would be extraordinary if a child immersed in these circumstances failed to act out, or if untreated mental illness resulted in no symptoms classifiable as aggravating. As the Supreme Court recently observed, competent counsel can account for these facts:

> Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, *post,* at 3271, given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, *ibid.,* were features, in another well-credentialed expert's view, [] of a "profound personality disorder." 1 Record 104. This evidence might not have made Sears any more likable to the jury, but it

might well have helped the jury understand Sears, and his horrendous acts – especially
in light of his purportedly stable upbringing.

*Sears*, 130 S.Ct. at 3264.

Third, because the state courts failed to engage Mr. Charles' evidence, they obviously failed to

evaluate the totality of the circumstances when assessing prejudice. *See Williams*, 529 U.S. at 397-98

("the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate

the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced

in the habeas proceeding in reweighing it against the evidence in aggravation.").  The state court

failed to even acknowledge, let alone weigh, the new evidence presented in post-conviction

proceedings.

Fourth, contrary to the state court prejudice formulation, Mr. Charles need not show that "the

results would have been different had the evidence been presented."  He need only show a reasonable

probability of a different outcome.  *Wiggins*, 539 U.S. at 534.

Fifth, state court's determination of no prejudice relies upon *Joiner v. State*, 825 S.W.2d 701

(Tex. Crim. App. 1992), and *Mooney v. State*, 817 S.W.2d 693 (Tex. Crim. App. 1991).  *Joiner*,

which predated the Supreme Court's *Tennard* and *Smith* decisions by twelve years, expressly relies on

the discredited notion that mitigating evidence must have a nexus to the crime.  In *Mooney*, the post-

conviction counsel failed to conduct any investigation to demonstrate prejudice.  Predicating a finding

of no prejudice on these CCA decisions injected an unreasonable application of the Supreme Court's

jurisprudence into the state court decision.

The state court's remaining legal analysis, Conclusion of Law No. 3, Answer at 54-55,

purports to excuse counsel from investigating and presenting mitigating evidence of brain damage and

ingestion of PCP before the crime in "light of the horrific nature" of the crime, Mr. Charles' "ability

to plan and orchestrate the disabling and killing of three people, his stated awareness of the

wrongfulness of his actions, and his attempts to elude capture." *Id.*

To the extent the state court held that the horrific nature of the crime excused counsel from

their duty to investigate, that is a clearly unreasonable application of Supreme Court precedent.  More

likely, the state court intended to hold that the brutal nature of the crime precludes a finding of

prejudice.  The Fifth Circuit, however, has declared this argument to be a "non-starter," even in the §

2254(d) context.  *Walbey v. Quarterman*, 309 Fed.Appx. 795, 2009 WL 113778, at *8 (5th Cir. Jan.

19, 2009), relying on *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001), held that

> [T]he State's stereotypical fall-back argument – that the heinous and egregious nature
> of the crime would have ensured assessment of the death penalty even absent [the
> error] – cannot carry the day here.  First, that argument cannot prevail without
> eviscerating the Supreme Court-approved Texas "special issues" scheme.  To permit a
> jury to impose the death sentence solely because the facts are heinous and egregious
> would be to return to the days of inflicting capital punishment based on emotion and
> revenge, supplanting altogether the questions of deliberateness and future
> dangerousness which make the Texas scheme constitutional.   Second, in this
> particular case, the details of the crime, as horrific as they are on an absolute scale, are
> not significantly more egregious than those in [a case compared to which Walbey's
> crime is not significantly more egregious].... Finally, our decades of experience with
> scores of § 2254 habeas cases from the death row of Texas teach an obvious lesson
> that is frequently overlooked: ***Almost without exception, the cases we see in which
> conviction of a capital crime has produced a death sentence arise from extremely
> egregious, heinous, and shocking facts*.  *But, if that were all that is required to
> offset prejudicial legal error and convert it to harmless error, habeas relief ... would
> virtually never be available, so testing for it would amount to a hollow judicial act*.**

*Gardner*, 247 F.3d at 563 (emphasis added).  The *Walbey* Court held that "[u]nder *Gardner,* Texas

must do more than baldly point out the obvious, that Walbey's crime was extremely brutal.  Texas has

not done more."  *Walbey*, 2009 WL 113778, at *9.  Nor did the state courts do so here.

In *Yowell v. Thaler*, No. 07-CV-132-C, slip op. (N.D. Tex. Aug. 26, 2010), the court, applying

–90–

the AEDPA, granted habeas relief based on counsel's ineffective assistance during the punishment phase.  Mr. Yowell shot his father in the head, beat his mother and eventually strangled her to death with a lamp cord, and then opened a gas jet and left with his father's wallet and car.  When his elderly grandmother later opened the door to her bedroom, the accumulated gas ignited and exploded, and she died a few days later.  *Id*. at 5.  Despite the horrific facts of this triple homicide, the federal court concluded that Mr. Yowell was prejudiced by his counsel's failure to introduce evidence of his mental illness, substance abuse, hallucinations, and chaotic and abusive home life, and the state court's conclusion to the contrary was an unreasonable application of *Wiggins*.  *Id*. at 21-24.

The Supreme Court has "firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, ***notwithstanding the severity of his crime or his potential to commit similar offenses in the future***."  *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) (emphasis added).  Contrary to the suggestion of the Respondent, there is no exception to this mandate for crimes it deems too aggravated.

Because the state court decision was riddled with unreasonable applications of *Strickland* and based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d) poses no bar to habeas relief.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Charles prays that this Court:

1.    Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.    Grant such other relief as law and justice require.

Respectfully submitted,


/s/ Randall O. Sorrels_____ _____
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**




/s/ Julius Eric Junker_____ _____
JULIUS ERIC JUNKER
Federal Bar No. 1096250
Texas Bar No. 2406416
LAW OFFICE OF JULIUS ERIC JUNKER
212 Jackson Street
Richmond, Texas 77469
281-342-9476 Telephone
281-239-7503 Facsimile
**Attorney for Petitioner**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this November 11, 2010, a copy of this Reply to Respondent's Answer was served on the Respondent via Electronic Delivery at the following address:

Assistant Attorney General Fredericka Sargent
Office of the Attorney General
Capital Litigation Division
P.O. Box 12548
Austin TX, 78711-2548
fredericka.sargent@oag.state.tx.us

/s/ Randall O. Sorrels
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

/s/ Julius Eric Junker
JULIUS ERIC JUNKER
Federal Bar No. 1096250
Texas Bar No. 2406416
LAW OFFICE OF JULIUS ERIC JUNKER
212 Jackson Street
Richmond, Texas 77469
281-342-9476 Telephone
281-239-7503 Facsimile
**Attorney for Petitioner**

–93–