# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK DEWAYNE CHARLES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-0592 |
| | § | |
| RICK THALER, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING
## PETITION FOR A WRIT OF HABEAS CORPUS

In May 2003, a Texas jury convicted Derrick Dewayne Charles of capital murder. A separate punishment hearing resulted in a death sentence. After unsuccessfully seeking state appellate and habeas remedies, Charles has filed a federal petition for a writ of habeas corpus. Charles' petition raises a single ground for relief arguing that trial counsel's representation fell below constitutional requirements in the investigation and presentation of mitigating evidence. The issue now before the Court is whether Charles has shown an entitlement to relief under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Having considered the record, the pleadings, and the law, the Court **denies** Charles' federal habeas petition. The Court, however, will issue a Certificate of Appealability.

## BACKGROUND

Charles complains that trial counsel failed to present mitigating evidence largely consisting of his childhood mental-health problems, his troubled background, and his possible drug use before the murders.   A reviewing court must assess counsel's representation under the familiar standards established in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   Under *Strickland*'s two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense."   *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   Before turning to the substance of Charles' constitutional challenge, the Court must place trial counsel's representation into the context of the charges he faced.   Against that backdrop, the Court will also recount trial counsel's efforts to prepare for trial.   In addition, the course of Charles' state-court litigation will frame the matters now before this Court.

## I.     The Murders

The facts of Charles' crime were not in dispute at trial.   Charles, who was 19 years old, spent the afternoon on July 2, 2002, hanging out and having sex with his

15-year-old former girlfriend Myeshia Bennett.[1]  Myeshia's mother (Brenda Bennett) did not know that Charles was inside her house; she had previously secured a restraining order against him.  When Myeshia and her mother left at around 4:30 p.m., Charles remained behind watching television in her bedroom.  Myeshia's 77-year-old grandfather (Obie Bennett) was surprised when, after woodworking in the garage, he found Charles inside the house at around 5:30 p.m.  Charles then killed the grandfather, waited hours in the apartment for the two females to return, and slaughtered them in a most brutal manner.

A pungent odor and accumulated newspapers led to the eventual discovery of the three corpses.  Charles quickly became a suspect.  The police arrested him within a few days.  Charles' subsequent confession described how he first inexplicably murdered the grandfather:

> At about 5:30 this same evening, I heard the outside garage door closing. So I got up and walked to Myeshia's bedroom doorway. I could hear Myeshia's grandfather open the door from the garage to the house.  After he came inside, he went into the kitchen for just a little bit.  I stayed in Myeshia's doorway.
>
> Myeshia's grandfather started to walk towards the bathroom located across from Myeshia's bedroom.  When he turned, he saw me and said, "Hey," like he was surprised to see me, but he wasn't upset.  He asked what I was doing, but I never answered him.  He turned as though he was leading to the front door.  He opened the door, and I pushed the door

---

[1]    The record contains various spellings for the given name of Charles' former girlfriend.  The Court has changed any variation to "Myeshia," the spelling contained in the indictment.

closed and locked it.

This . . . is when Myeshia's grandfather and me started to wrestle. We struggled in the hallway and ended up on the little black sofa inside the living room. I reached for a lamp that was next to the little black sofa and hit Myeshia's grandfather on the head. After that, we were still struggling and ended up on the floor. Here, I was able to hit him with my fist several times in the face. I got a couple of trophies that were located on the table next to the brown sofa. I started to hit her grandfather over the head. He was still trying to fight back, but I continued hitting him with the trophies. There was blood all around his head, and he just went out.

Then I reached for the cord on the lamp that I had used to hit Myeshia's grandfather. I don't know if I pulled the cord off the lamp or I cut it, but I wrapped the cord around her grandfather's neck. I wrapped it around several times until he stopped breathing.

I pulled her grandfather's body into the kitchen where he was found. Then I got some newspaper and laid it on top of the blood in the living room.

Tr. Vol. 24, State's Exhibit 2 at 3-4.[2]  Charles described how he stayed in the apartment for hours, "start[ing] to feel bad" because he "had never done something this serious in all [his] life." He repeatedly went to the kitchen, stood over the grandfather's body, and expressed sorrow for the murder. But when Myeshia and her mother returned at around 11:00 p.m., Charles began an even more vicious assault on

---

[2]     The state court proceedings in this case resulted in a voluminous record. The Court will cite the Clerk's Record containing trial court motions and docket entries as Trans. at ___. The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___. The Court will refer to the record from Charles' state habeas proceedings as State Habeas Record at ___. The transcript of his state evidentiary hearings will be cited as State Habeas Hearing at ___.

them.  He explained how he subdued the two women and killed his former girlfriend

first:

> Myeshia got out of the car first.  She walked up and unlocked the front
> door to the house.  I was waiting behind the front door when she walked
> in.  I grabbed her arm and pulled her into her room.  I told her not to
> leave.  At first, she didn't say anything.  When her momma came in,
> Myeshia came to the hallway.  Brenda said, "What's going on?"
> Myeshia said, "He's going to kill us; do everything he says."  I turned
> and locked the front door . . . after Brenda walked inside.
>
> I told both of them to go on the hallway floor.  Then I told them to crawl
> to the living room.  I told them to get up and go by the bathroom and lie
> down.  I told them not to say anything.  I told them not to move, and that
> I would be right back.
>
> This is when I went and got the gray duct tape.  I came back and tied up
> Myeshia's hands first.  I wrapped Myeshia's hands behind her several
> times.  I also did the same to her momma.  I went to the bathroom and
> got a sock.  I cut this sock in two and placed one in each of their mouths.
> Then I placed tape on top and around their mouth and head.  I asked
> Myeshia to get up off the floor, and we went inside her bedroom.
> Myeshia was trying to tell me to take her and not kill her mother.  Even
> though she had this sock and tape on her mouth, I could tell what she
> was trying to say.  Myeshia would tell me that she loved me, and I told
> her it was too late.  I told her to lie down beside her bed. I cut a piece of
> the extension cord from her stereo, which was in front of her bedroom
> window.  I cut the extension cord with what I thought was scissors.
> After that, I placed the extension cord around her neck. I placed it around
> her neck really tight, hoping that she would stop breathing.  It didn't
> seem like Myeshia wanted to die because she was still moaning – I told
> Myeshia, "I guess you don't want to die."  So I reached for one of her car
> speakers located inside a Nike shoe box.  I took the speaker out and hit
> her in the face several times.  It was something I didn't want to do. I told
> her that I still loved her and that I didn't mean for this to happen like
> this.
>
> Then I reached for the television set in her room.  I raised the television

> set above Myeshia and dropped it on her head a couple of times.  At this
> point, Myeshia stopped breathing.

Tr. Vol. 24, State's Exhibit 2 at 4-5.  Charles then turned to Myeshia's mother, whom

he had left in the hallway:

> It seemed as though she was praying to herself.  I walked into the
> bathroom located next to Myeshia's grandfather's room. I flipped on the
> light and started to fill the bathtub. I filled it half way and returned to the
> hallway where Myeshia's mother was lying. I told Myeshia's mother to
> go in the bathroom.  She kept asking me why I was doing this.

> I told her that I couldn't really tell her because I really didn't know why
> I was doing this.  I pushed Myeshia's mother into the . . . bathroom and
> into the tub.  I went and got the same television I dropped on Myeshia's
> head and returned to the bathroom. I wanted to see if the cord would
> stretch across the bathroom and into the bathtub.  The cord was too short.

> I located a power strip that connected to the computer and returned to the
> bathroom.  I plugged the power strip into the wall and connected the
> television to it.  Then I placed the television inside the bathtub, but it
> didn't do anything.  I wanted to electrocute Myeshia's mother to death.
> I found an extension cord inside Myeshia's room and returned back to
> the bathroom her mother was in. I placed the extension cord around her
> neck one time but tied a slipknot so that when I pulled on it, it would
> tighten.

> . . . I was able to pull Myeshia's mother into the hallway, and she started
> to make a noise.  I told her mother that I loved her daughter a lot.  Then
> I searched her pockets to see if she had any money.  Then I asked for her
> car keys, and she said that they were in the door.  I didn't start to search
> for the keys until I left.  I walked back to the bathroom in the hallway
> and got a stick from the plunger. I took the stick off the rubber piece and
> went in the hallway.  I placed this stick inside Myeshia's mother's ass
> and pussy.  I did this one time in each area.

> After I placed the plunger in these areas, I found the keys to the car.  I

locked the front door and left before checking to see if Myeshia's mother stopped breathing.  I got inside Myeshia's mother's maroon Dodge Stratus and drove off.

Tr. Vol. 24, State's Exhibit 2 at 5-6.  Charles then returned to his home in the stolen car, showered, and fled to his grandmother's house in Livingston, Texas.  Charles later returned to Houston and holed up in a motel room.  The police found Charles and arrested him on a parole-violation warrant.  Tr. Vol. 24, State's Exhibit 2A; State Habeas Record at 1184-89.

## II.   Charles' Guilty Plea

On July 8, 2002, the State of Texas charged Charles with capital murder for killing the three victims during the same criminal transaction.  Clerk's Record at 2.  The trial court appointed Connie Williams on July 10, 2002 to represent Charles.  Clerk's Record at 6.  The next day the trial court appointed Sid Crowley as co-counsel.  Clerk's Record at 7.[3]  Early on, trial counsel investigated the evidence against Charles and tried to champion his innocence.  Trial counsel retained a DNA expert who, while finding minor errors, could not dispute the forensic evidence placing Charles at the scene of the triple murder.  Tr. Vol. 22 at 5.  Trial counsel challenged Charles' confession, but the trial court denied a motion to suppress.  Trial counsel ultimately concluded it would be best for Charles to plead guilty.

---

[3]    Unless necessary to identify one attorney, the Court will refer to the attorneys who defended Charles at trial collectively as "trial counsel."

7

Charles, nonetheless, told counsel "he wanted to fight it."   Trial counsel consulted with Charles' family about the wisdom of that decision, but they could not persuade him otherwise.   Even immediately before trial, Charles reaffirmed that he would plead not guilty. Charles surprised everyone when he pleaded guilty on the first day of trial.  Tr. Vol. 16 at 10-27.  The trial court dispensed with the guilt/innocence phase of the trial and focused on Charles' punishment.  Only two outcomes remained: a death sentence or life imprisonment.  Trial counsel's knowledge of the State's case for a death sentence would set the course for the defense's punishment-phase strategy.

## III.   **The Case for a Death Sentence**

Texas' capital sentencing scheme provides for a probing review of a defendant's life, allowing the parties to introduce wide-ranging information about his background, previous acts, and personal qualities.  *See* TEX. CODE CRIM. PRO. art. 37.071 § 2(a).  The jury decides a capital defendant's sentence by answering two special issue questions: (1) will the defendant be a future danger to society and (2) do sufficient circumstances mitigate against a death sentence? *See* TEX. PENAL CODE art. 37.071 § 2(b).  The structure of Texas' capital-sentencing scheme influenced the decisions both parties would make in forming strategy.

Because Texas law allows prosecutors to present evidence of prior bad acts, unadjudicated offenses, and extraneous crimes, *see Powell v. State*, 898 S.W.2d 821,

830 (Tex. Crim. App. 1994), prosecutors scour a defendant's life for prior criminality, hoping to convince a jury that the murder which the defendant committed was not an aberration, but one facet in his future danger to society. The defense knew that the prosecution would make Charles' prior lawlessness the focal point of the punishment phase. While a juvenile, the police arrested Charles several times. His prior crimes included trespass of an apartment, assault, fighting with police officers, several incidents of burglary, theft, and threatening teachers. While in Texas Youth Commission ("TYC") custody his numerous rule violations resulted more than one hundred write-ups and confinement in lock-down twenty-two times. At TYC he bragged about selling dope, threatened staff, fought with other students, and received a "chronic serious offender" classification. Upon his release, he failed to attend weekly parole appointments. After serving time in the Texas Department of Criminal Justice ("TDCJ") for burglary of a habitation, Charles only met with his parole officer once. Trial counsel knew that the prosecution would argue that lawlessness pervaded his entire life. The State indeed emphasized Charles' prior lawlessness in seeking a death sentence.

In addition, trial counsel knew that the brutality of the murders would hang over the punishment phase. Counsel knew that the prosecution would emphasize Charles' terrible cruelty, characterizing the killings as the capstone of Charles' escalating criminality. The facts of the crime provided little fodder for rebuttal. The killings

were inexplicable; Charles could not describe why he murdered and why he did so with such extreme violence.

Charles claimed to have smoked marijuana (possibly laced with another drug) hours before the murder.  Trial counsel, however, could only confirm that fact by putting him on the stand.  Having Charles testify on his own behalf would open him up to severe cross-examination about his many prior criminal acts.  In short, trial counsel "confronted a challenging penalty phase with an unsympathetic client, which limited their feasible mitigation strategies." *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1405 (2011).

The substance of Charles' federal habeas claim is that trial counsel did not investigate enough before deciding what would encourage the jurors to answer the special issues favorably. Describing trial counsel's efforts at crafting a defense as "pitiful, disjointed, and substandard," Charles claims that trial counsel's "negligible investigative efforts" involved a "scant pretrial investigation into a narrow and limited number of sources" and resulted in a "complete ignorance of his client's compelling social history."  [Doc. # 8 at 46, 47].  The record developed in state court amply provides a basis to assess trial counsel's efforts to comply with their constitutionally compelled duties.

## IV.   Trial Counsel's Investigation into Mitigation Evidence

Capital defense attorneys shoulder a heavy burden in identifying and

developing evidence to mitigate against a sentence of death.  *See Florida v. Nixon*, 543 U.S. 175, 191 (2004).  Although the Constitution does not "require defense counsel to present mitigating evidence . . . in every case," *Wiggins*, 539 U.S. at 533-34, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332 (5th Cir. 1983)).  A cursory effort will not suffice; defense counsel must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potentially mitigating themes.  Charles alleges that trial counsel did little to explore his background and gave the jury only a thumbnail sketch of available evidence.

The record provides insight into trial counsel's efforts to defend Charles against a death sentence.[4]  Trial counsel began preparing their punishment-phase defense soon after their appointment in July 2002.  In a pre-trial hearing, Mr. Williams assured the trial court: "We started our mitigation investigation the minute you appointed me to this case." Tr. Vol. 2 at 4.  Trial counsel first met with Charles and made an informal

---

[4]    In addition to the substantial exploration into trial counsel's strategy on habeas review, the trial court held an *ex parte* hearing with trial counsel during the punishment phase in which they discussed trial counsel's preparation of mitigating evidence and strategy.  The trial court sealed that transcript.  The state habeas record, however, contains the transcript.  State Habeas Record at 127-31.

assessment of his intellect and comprehension.  State Habeas Hearing at 45.[5]  Trial

counsel read the State's file and reviewed school, TYC, and TDCJ records.  Also, trial

counsel "talked with [Charles] numerous times about the instant offense, potential

witnesses for guilt innocence and punishment, and the pending trial."  Trial counsel

specifically "talked to [Charles] about his background and life for potential mitigating

evidence."  State Habeas Record at 1058.  Two weeks after appointment, trial counsel

met with Charles' parents and discussed his background.  Tr. Vol. 22 at 13.  Trial

counsel's early interview with his parents focused on whether there were "any

aberrations in his character and all."  State Habeas Hearing at 45.  This was not their

only meeting; trial counsel met with Charles' "parents at [their] apartment and twice

in his office" before trial.  State Habeas Record at 56  Trial counsel's interaction with

Charles' parents allowed for an intimate perspective on his living conditions, familial

situation, and standard of living.  The defense team also spoke with other family

members, such as Charles' grandmother, uncle, aunt, and brother.

On July 27, 2002, trial counsel filed a motion for the appointment of Joe Patillo

as an investigator.  Clerk's Record at 8.[6]  Mr. Patillo interviewed many witnesses,

---

[5]   Mr. Williams estimated that he met with Charles "[m]aybe three times" before jury
     selection, but daily thereafter "over weeks and weeks."  State Habeas Hearing at 53.

[6]   On November 4, 2002, the trial court approved $1,000 for Mr. Patillo's investigation,
     noting that trial counsel "plan[ned] to ask for a mitigation specialist" and that they
     could "re-approach if additional funds [were] needed."  Clerk's Record at 10.  On that
     (continued...)

including Charles' grandmother, his parents, his former teachers, and his school peers. State Habeas Record at 1065. The results of these interviews would inform trial counsel's decisions.

About a month after their appointment, trial counsel filed a motion for the assistance of a psychologist. Clerk's Record at 11-12. Trial counsel sought expert psychological assistance from Dr. Jerome Brown "to evaluate [Charles], to see if he could find anything in his background that might indicate some mental aberration; to test him and to make any other finding." State Habeas Hearing at 45. Dr. Brown, in fact, understood that "the purpose of the evaluation was to determine if any information could be developed that might be mitigating to [Charles'] punishment." State Habeas Record at 1199. Dr. Brown interviewed Charles' mother and stepfather; reviewed school and TYC records;[7] obtained records from the Harris County Medical Examiner's Office; and reviewed Charles' written statement. Dr. Brown personally

---

[6]     (...continued)
same date, the trial court set trial for May 5, 2003. Clerk's Record at 17. In a February 26, 2003, hearing, Mr. Williams informed the court that his co-counsel, Mr. Crowley, was "working on some parts of the mitigation" and was "looking to the possibility of getting . . . some mitigation specialist to assist us with that process[.]" Tr. Vol. 2 at 4. The parties did not provide any explanation in state court from Mr. Crowley about his participation in a mitigation investigation. Trial counsel, however, relied on their own efforts and those of Mr. Patillo without retaining a dedicated mitigation investigator. Ultimately, trial counsel stated that "[a]fter conducting the investigation [into mitigating evidence], the defense determined that hiring a mitigation specialist was not necessary." State Habeas Record at 1065.

[7]     By March 27, 2003, trial counsel had received copies of Charles' school and TYC records from the State. Tr. Vol. 3 at 46-47.

interviewed Charles' mother and stepfather but found no "possibility of brain tissue trauma, childhood abuse, deprivation, or traumatic life events." State Habeas Record at 1199. Dr. Brown interviewed Charles on December 11, 2002, and administered a battery of psychological examinations on April 18, 2003. Dr. Brown prepared a report that gave the defense little hope that psychological theories could help secure a life sentence:

> Unfortunately, the information now available does not provide any evidence that might be considered mitigating in this examiner's opinion. Beyond a possible diagnosis of Attention Deficit Disorder, he does not reveal any evidence of mental illness or other types of mental disorder or mental defect that might be offered on his behalf. The possibility of mental retardation was investigated but this was contra-indicated by school records, the psychological test results, and the reports from his parents concerning his adaptive skills. The defendant was unable to explain his motivation for commission of the offenses beyond his being intoxicated on street drugs (smoking marijuana laced with embalming fluid), which was voluntary on his part. He did not reveal any meaningful remorse about his actions except to state that he did not see himself as the kind of person who would do such a thing. There was nothing else offered in his history by the defendant or by his parents that would be of use in his defense, including the possibility of brain tissue trauma, childhood abuse, deprivation, or traumatic life events. Because of this, you were advised that any testimony I might offer on the defendant's behalf would be minimal or unhelpful at best, and that crossexamination might prove damaging to the defendant.

State Habeas Record at 1199-1200.[8] From his review, Dr. Brown also concluded that

---

[8]      Dr. Brown gave counsel a report on May 14, 2003, the day the trial court sentenced Charles to death. In the state evidentiary hearing trial counsel explained that, while Dr. Brown had not given them a written report, they had discussed his findings before that date. State Habeas Hearing at 47-48.

Charles was not a candidate for rehabilitation because he "would kill again under the proper circumstances[.]"  Tr. Vol. 22 at 7-8; State Habeas Record at 1028, 1199.

With that background, trial counsel considered calling four family members as witnesses – Charles' mother, stepfather, grandmother, and aunt.  Mr. Williams gave detailed reasons for not calling each family member.[9]  Given the weak mitigation evidence and the comparatively minor violence in Charles' prior crimes, his trial attorneys decided to focus on proving that Charles would not be a future societal threat.  As Charles observed on state habeas review, "[n]o one could seriously contend that [his] past criminal record or acts of misconduct were indicators of an obviously violent nature, or even that his past suggested that it was likely that he would commit serious violent acts in the future[.]"  State Habeas Record at 8.

Choosing to emphasize the future-dangerousness issue, however, did not preclude the defense from adducing any mitigating evidence.  The two special issue questions are not mutually exclusive; a successful capital defense may seek favorable

---

[9]    In addition, Mr. Williams explained:

> I'm an experienced lawyer.  I have been a prosecutor.  I have participated in some 35 capital murder trials, actual trials.  I know how the cross-examination of these witnesses goes.  I know when they will be confronted about the plunger being placed into the vagina and anal opening of the dead lady, and all the other things that can be said, and how witnesses will respond and the only response they can give.  So, for that reason, not having anything really good to say, I didn't call them.

Tr. Vol. 22 at 12.

answers to both special issues.  In his later legal challenges, Charles would equate trial counsel's strategy with a decision to forgo presenting any mitigation evidence.  For instance, Charles has asserted that "the defense provided no mitigating evidence at trial."  State Habeas Record at 12.  Trial counsel, however, affirmed that "[t]he defense made no determination that mitigating evidence would not be presented."  State Habeas Record at 1066.  While certainly not its focus, a review of the punishment phase shows that trial counsel's strategy took both special issues into account.

## V.   **The Case Presented by the Defense**

Trial counsel began the defense's case for a life sentence during the cross-examination of the State's witnesses. Trial counsel's cross-examination revealed that Charles was young, was remorseful for the murders, only acted aggressively when provoked by others, had committed only minor infractions while in TYC custody, had never assaulted correctional officers, and was generally a good inmate.  State Habeas Record at 1024.  Also, trial counsel elicited testimony that one victim's sister forgave Charles for the murders.  State Habeas Record at 1024.

Trial counsel affirmatively presented punishment phase testimony through four witnesses.  Trial counsel called Dr. Walter Quijano, a psychologist who often testified in capital murder trials, to describe how prison security measures and classification

systems would lessen Charles' future dangerousness.[10]   Trial counsel supported Dr.

Quijano's testimony with testimony from a correctional officer who explained that,

since his arrest for capital murder, Charles had only committed two minor infractions

of jail rules.   The defense also solicited testimony to counter the State's negative

evidence from two juvenile corrections officers from TYC who described Charles as

a likeable youth and good student whose behavior improved while in custody.   Trial

counsel focused closing arguments on showing that Charles would not be a future

danger to society.

The jury answered Texas' special issue questions in a manner requiring the

imposition of a death sentence.   The Texas Court of Criminal Appeals affirmed

Charles' conviction and sentence on direct appeal.   *Charles v. State*, 2005 WL 283598

(Tex. Crim. App. 2005) (unpublished).

## VI.   <u>The State Habeas Action</u>

In Charles' state habeas application, he claimed that: trial counsel provided

deficient representation in the presentation of mitigating evidence; mental retardation

precluded his execution under *Atkins v. Virginia*, 536 U.S. 304 (2002); and the Texas

death penalty scheme violated the federal constitution on various grounds.   With

---

[10]   Dr. Quijano, however, provided the jury with little information about Charles as an individual.   Trial counsel accurately described his testimony: "[H]is testimony was not personalized testimony, it was generic testimony about recidivism rates and not anything specific about [Charles]."   State Habeas Record at 128.

relevance to the instant proceeding, Charles identified three areas in which his attorneys allegedly performed deficiently:

- Drug Use - Charles alleged that trial counsel failed to explore the possibility that he was under the influence of drugs when he killed the three victims. State Habeas Record at 35-40. Charles provided an unsworn declaration explaining that he smoked a marijuana cigar before the murders which gave him a "rush of energy," made him feel "unstoppable," "crazy," and "really violent." He suspected that the marijuana was laced with some other substance. State Habeas Record at 132-33. He also submitted a letter from a medical doctor describing the effects of smoking a marijuana cigar laced with phencyclidine (PCP). State Habeas Record at 111-15

- Family Members - Charles argued that trial counsel ineptly investigated witnesses who could describe his troubled background. State Habeas Record at 32-35. Charles supported his argument with an affidavit from his stepfather, Leroy Phillips, transcripts of what purport to be interviews an investigator had with Charles and his mother, and an unsworn statement Charles provided. As the only piece of admissible evidence describing his background, Charles understandably relied most heavily on his stepfather's affidavit. Mr. Phillips described how Charles was born premature, his natural father abandoned them, he had two seizures at about 4 months and 6 months, was prescribed Ritalin at a young age because "he could not control himself," was hospitalized at age 10 because he could not sleep, was hospitalized again at age 13 for depression, and was slow in school. His mother suffered from paranoid schizophrenia, which caused violent outbursts. She once had stabbed Mr. Phillips in the groin. Her mental illness also affected her parenting skills and left her unable to supervise her children. The family frequently relied on welfare and "moved around a lot because [they] got evicted." State Habeas Record at 56-58.

- Hospital Records - Charles emphasized most strongly that trial counsel failed to obtain medical records from Charles' hospitalization at Gulf Pines Hospital for two days when he was 10 (in 1993) and for 17 days when he was 13 (in 1995). State Habeas Record at 28-32. Trial counsel knew of the treatment, but his investigator and the State of Texas could

18

not find the records because the hospital had shut down.  A state habeas investigator, nonetheless, tracked down the treating physician, Dr. Lawrence D. Ginsberg, and acquired the records with some ease.  Dr. Ginsberg provided an affidavit summarizing the records, particularly noting how he had diagnosed Charles with Major Depression and Oppositional Defiant Disorder.   Dr. Ginsberg treated Charles with antidepressant medication and individual psychotherapy.  State Habeas Record at 59.  Charles argued that the hospital records would have encouraged trial counsel to seek additional neuropsychological testing.

State Habeas Record at 41-42.

Charles relied in the state habeas proceedings on several documents relating to mental-health concerns: (1) records from the Gulf Pines Hospital and from his treating physician, State Habeas Record at 59-110; (2) an affidavit from a mitigation specialist explaining the ease with which she obtained Charles' previously undiscovered medical records, State Habeas Record at 1134; (3) an affidavit from trial counsel opining that the Gulf Pines Hospital records "may have been used in mitigation of punishment" had they been discovered previously, State Habeas Record at 139; and (4) an affidavit from a doctor explaining that insufficient tests were previously done to determine whether Charles had structural brain problems, State Habeas Record at 135.  The only additional evidentiary support Charles provided for this habeas claim was an affidavit from an attorney giving his opinion that trial counsel provided ineffective assistance, State Habeas Record at 116-17, the transcript of an *ex parte* hearing in which the trial court asked the trial attorneys to explain their punishment-phase strategy, State Habeas Record at 127-31, and an affidavit from an alternate juror

19

describing how he would have responded if he had been a juror and had known about additional mitigating evidence. State Habeas Record at 136-38.

With its answer, the State adduced an affidavit from the trial prosecutor who affirmed that the State had tried to obtain Charles' Gulf Pines Hospital records but could not. State Habeas Record at 587-89. Charles initially presented only selections from the Gulf Pines records. The State provided a more complete copy of the records with its answer. Also, the State introduced voluminous additional records. Additionally, the State provided an affidavit from Mr. Williams explaining his reasons for not presenting the information Charles claims he should have put before the jury. State Habeas Record at 581-85. Charles obtained a court order requiring Mr. Williams to provide a second affidavit. State Habeas Record at 859-62.[11] The Court ordered a third affidavit, which Mr. Williams provided before the evidentiary hearing. State Habeas Record at 876-80.

The lower state habeas court authorized both parties to engage in additional exploration into the possibility that Charles suffered from mental retardation. State Habeas Record at 895, 900. The State's expert witness concluded that Charles did not suffer from mental retardation, but also that no evidence existed which would suggest

---

[11]   Charles had moved to have trial counsel submit another affidavit because the first two did not address his knowledge about the hospitalizations, the failure to retain a dedicated mitigation investigator, and the failure to present some of the mitigating evidence. State Habeas Record at 860-61.

brain damage.  State Habeas Record at 928.  Charles retained an expert, Dr. Susana A. Rosin, who also evaluated Charles and agreed that he did not suffer from mental retardation.  However, she also reviewed and summarized the evidence which Charles had presented in support of his ineffective-assistance-for-not-presenting-mitigating-evidence claim.  State Habeas Record at 947-48, 960-61.  Dr. Rosin accepted the possibility that Charles may have an underlying "brain lesion or defect" and recommended more testing.  Also, she thought that ingestion of PCP around the time of the murder could have caused him to lose control of himself.  State Habeas Record at 962.

The state habeas court held a limited live evidentiary hearing on Charles' ineffective-assistance claim.  Trial counsel Williams was the only witness.  The parties then submitted proposed findings of fact and conclusions of law.  The state habeas court signed the District Attorney's proposed findings and conclusions without alteration.  The state court's recommendation divided Charles' ineffective-assistance claim into four categories: testimony from family members about Charles' background; discovery of the Gulf Pines Hospital Records; the possibility that Charles suffered brain damage; and the allegation that drugs influenced the murders.  In many places tracking the statements Mr. Williams made in his third affidavit, the state court found that trial counsel made a strategic decision to omit the proffered mitigation evidence.  Also, the state habeas court found no *Strickland* prejudice.

With three exceptions, the Court of Criminal Appeals adopted the lower court's

findings and conclusions as its own.  The Court of Criminal Appeals explained:

> This Court has reviewed the record with respect to the allegations made
> by [Charles]. We agree with the trial court's recommendation and adopt
> the trial judge's findings and conclusions with the following exceptions:
> the portion of Finding of Fact Number 52 stating, "[T]rial counsel
> exercised due diligence in attempting to locate the applicant's Gulf Pines
> Hospital records;" Finding of Fact Number 119; and Conclusion of Law
> Number 9.

*Ex parte Charles*, 2008 WL 556015 (Tex. Crim. App. 2008) (unpublished).  The

Court of Criminal Appeals denied habeas relief.  *Ex parte Charles*, 2008 WL 556015

(Tex. Crim. App. 2008) (unpublished).  Federal review followed.

## CHARLES' FEDERAL HABEAS ACTION, THE AEDPA & LIMITS OF FEDERAL HABEAS REVIEW

Through appointed counsel, Charles filed a federal petition for a writ of habeas

corpus raising only his *Strickland* claim.  He has also amended his petition.  Charles

supports his amended petition with voluminous records, affidavits, and other material,

much of which he brings forth for the first time in federal court.  Charles' amended

petition summarizes the information he wishes that trial counsel had presented as

follows:

- Derrick Charles was born premature[ly] and suffered from
  seizures during infancy;

- Derrick Charles' biological father abandoned him;

- There was a multi-generational pattern of severe mental illness, cognitive deficits, seizure disorder, and substance abuse in Derrick Charle's [*sic*] family;

- Derrick Charles' mother suffered from severe mental illness which included psychosis, psychotic behavior, and depression during Derrick Charles' childhood;

- Derrick Charles himse[lf] suffered from serious mental illness requiring two psychiatric hospitalizations as a child;

- Derrick Charlees [*sic*] had long-standing and severe cognitive impairments;

- Derrick Charles exhibited long term and significant limitations in academic functioning;

- Derrick Charles' childhood was marked by poverty and instability;

- Derrick Charles witnessed serious incidents of domestic violence between his mother and stepfather, who both drank heavily;

- Derrick Charles was the victim of physical and emotional abuse at the hands of his stefpfather [*sic*];

- Derrick Charles' family, including his mentally ill mother, failed to protect him from childhood abuse and neglect; and

- On the night of the underlying offense, Mr. Charles was under the influence of a highly potent dissociative drug, which can cause violent and unpredictable behavior[.]

[Doc. # 8 at 4].

By way of contrast, in a section of his state habeas application entitled "evidence which counsel did not see prior to making his strategic decision to forgo a

mtiigation [*sic*] case," Charles identified the theories and evidence on which he relied: (1) psychiatric and hospital records from 1993; (2) psychiatric and hospital records from 1995; and (3) other mitigation evidence for which he only emphasized (a) his troubled background (relying almost exclusively on his stepfather's affidavit) and (b) the possibility that he committed the murders while high.  State Habeas Record at 26-40.

Respondent has filed an answer and motion for summary judgment.  [Doc. # 17].  Respondent also argues that the application of the AEDPA forecloses habeas relief.  Charles has filed a reply.  [Doc. # 28].  Pursuant to court order, the parties have supplied additional briefing on the application of the AEDPA to Charles' claims. Charles does not ask the Court to hold an evidentiary hearing or otherwise allow additional factual development.  Charles' petition is ripe for adjudication.

The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence.  *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions.").  The AEDPA, which "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," codifies the traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review.  *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) (quotations

omitted).  With particular applicability to the instant case, the AEDPA confines both the nature and scope of federal habeas review.

The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Richter*, ___ U.S. at ___, 131 S. Ct. at 784.  As previously mentioned, the Court of Criminal Appeals adjudicated Charles' *Strickland* claim on habeas review.  This Court, therefore, can only grant relief if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Thus, the AEDPA serves as a "guard against extreme malfunctions in the state criminal justice systems," not as a vehicle for error correction.  *Richter*, ___ U.S. at ___, 131 S. Ct. at 786 (citation omitted); *see also Wilson v. Cain*, 641 F.3d 96, 100 (5th Cir. 2011).  "If this standard is difficult to meet, that is because it was meant to be."  *Richter*, ___ U.S. at ___, 131 S. Ct. at 786.

The AEDPA's deferential standard not only changes how a federal habeas court considers a state inmate's claim, but also channels what evidence and arguments it may consider. Charles presented his sole federal claim in state court. In both state court and in this forum, Charles has supported his habeas claim with evidence, though he has now heavily augmented the information he had previously placed before state courts.[12] The Supreme Court, however, has recently "emphasize[d] that review under § 2254(d)(1) focuses on what a state court knew and did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011). Reasoning that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that

---

[12]     Specifically, Respondent argues that Charles did not present the following material to the state courts: his mother's medical, social security, medicaid, and mental-health records showing her mental illness (PX B, C; O, P, Q); his grandfather's death certificate and autopsy report showing that he had been shot (according to Charles by his wife) and had a high alcohol blood level at the time of his death (PX H, I); the records showing that his maternal aunts and a cousin suffered from mental illness (PX K, SS, TT); records from TYC showing that he did not need medication for hyperactivity (PX S, T); a payment voucher submitted by co-counsel Sid Crowley showing that he spent 143 hours working on Charles' case (PX Z); records showing deficient performance and a public reprimand against Mr. Crowley (PX BB, CC, DD); materials suggesting that every capital attorney should utilize a mitigation investigator and develop their client's social history (PX KK, LL); a declaration by Charles' maternal aunt discussing the family's mental-heath problems and opining that Charles felt rejected all of his life and did not get the love he needed at home (PX NN, RR); a declaration by Charles' maternal uncle describing the turbulent, impoverished, and neglected environment that both Charles and his mother experienced as children (PX OO); a declaration by Charles' cousin describing the beatings Charles received from his stepfather and the effect of alcoholism and mental-illness in their household (PX PP); a declaration from Charles' half-brother describing the fighting that accompanied his parents' drinking and the abuse Charles suffered at their hands (PX QQ); and records from other capital cases to demonstrate Mr. Williams' deficient performance (PX UU, VV, WW, XX, YY, ZZ, AAA).

unreasonably applied federal law to facts not before the state court," *Pinholster* explicitly held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at ___, 131 S. Ct. at 1399, 1400. Thus, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at ___, 131 S. Ct. at 1400.

Under *Pinholster*, Charles defined the scope of his federal *Strickland* claim through his state habeas litigation. Much of the evidence Charles relies on in his federal habeas action ranges far from that adduced in state habeas court. For instance, the state habeas record mentioned Charles' troubled background but did not ask the state courts to find that trial counsel should have presented evidence of intergenerational mental illness and abuse, as he now does.[13] This Court's review "is

---

[13]    Respondent initially argued that Charles has violated the exhaustion doctrine. *See* 28 U.S.C. § 2254(b)(1). Because habeas procedure "respect[s] the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as all factual allegations supporting those grounds," *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989), the exhaustion requirement traditionally "is not satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court." *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (footnote omitted); *see also Anderson v. Harless*, 459 U.S. 4, 6-7 (1982); *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). The state habeas court provided Charles with ample opportunities to develop his *Strickland* claim. The state habeas court authorized Charles to retain a mitigation specialist and, although he did not take advantage of it, an investigator. The state habeas court allowed Charles to retain expert witnesses. Charles, however, relied primarily on the evidence he attached to his state habeas application. Charles' circumscribed state habeas claim caused the state court to focus on trial counsel's reasons for not presenting information about
(continued...)

limited to the record in existence at [the time of the state court decision] *i.e.*, the record before the state court." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1398.  With those limitations in mind, the Court turns to the question of whether the state court's adjudication of failure-to-present mitigating evidence claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

*Strickland* represents the clearly established federal law in this case.  As previously mentioned, "[t]o establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009)).  "Surmounting *Strickland*'s high bar is never an easy task[.]" *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010).  When the state courts have already adjudicated the merits of a *Strickland* claim, "[a] state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785.  Under the AEDPA, federal courts employ a "doubly deferential judicial review," that gives wide latitude to state adjudications. *Knowles*, 556 U.S. at

---

[13]   (...continued)
which he already knew.  In contrast, his federal habeas claim primarily faults counsel for not engaging in a more probing investigation.  Charles' federal habeas petition emphasizes the scope of trial counsel's investigation, not the reasonableness of their decisions.  Had Charles relied on his new theories in state court, trial counsel could have discussed them in his affidavits or habeas testimony.

___, 129 S. Ct. at 1420; *see also Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1410 (2011). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.*" Harrington v. Richter*, ___ U.S. ___. 131 S. Ct. 770, 788 (2011).

### *STRICKLAND* CLAIM

Charles' federal petition argues that trial counsel failed to investigate and prepare mitigating evidence, pointing particularly to his drug use before the murders, testimony from family members, and hospital records. However, this is certainly not a case where the defense "did not even take the first step of interviewing witnesses or requesting records." *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447, 453 (2009). As discussed below, the record plainly shows that trial counsel's investigation followed many of the same themes as the mitigating evidence Charles adduced in his state habeas proceedings. While not eschewing all mitigating evidence, trial counsel focused on securing a favorable answer to the future-dangerousness special issue. In addition to issuing specific factual findings with regard to each category of unpresented mitigation evidence, the state habeas court broadly concluded that

> [t]rial counsel are not ineffective for their reasonable, plausible trial decision, made after thorough investigation, to concentrate on the future dangerousness special issue and not to present the testimony of [Charles'] family that would be more harmful than beneficial to [him] . . . [the] Gulf Pine Hospital records whose slight mitigating value, if any, would have been lost amidst the harmful information contained in the records about the [Charles'] anger, hostile behavior, and . . . evidence of

alleged brain damage or alleged ingestion of phencyclidine hours prior
to the instant offense.

State Habeas Record at 1049-50.  Keeping in mind the deference reviewing courts pay

to trial counsel's efforts, the Court turns to the question of whether trial counsel made

reasonable decisions in forming punishment-phase strategy.  The Court then will

address the question of *Strickland* prejudice, taking into consideration the cumulative

effect of Charles' mitigation evidence.  For the reasons discussed below, the Court

finds that the state habeas court's decision was not contrary to, or an unreasonable

application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## I.    The Unpresented Mitigation Evidence

### A.    Use of Drugs Before the Murder

Charles faults trial counsel for not relying on his alleged drug ingestion as a

mitigating factor.  In state habeas court, Charles submitted a statement alleging that

he smoked a marijuana cigarette (called a "swisher" or "sherm") at around 4:30 p.m.

on the day of the murders.  He claimed that the drugs "didn't affect [him] like any

marijuana [he] ever smoked before."  State Habeas Record at 132.  Charles also

submitted a letter written by Dr. Terry A. Rustin, a medical doctor with expertise in

addiction medicine, explaining that a "swisher" is a cigar in which the tobacco is

removed and replaced with marijuana, after which it may be immersed in a

phencyclidine ("PCP") solvent.  Dr. Rustin opined that PCP could have caused

Charles to act violently and unpredictably, in a manner consistent with his recollection of the killings. State Habeas Record at 111-15. Charles blames trial counsel for not seeking to mitigate his punishment by showing that drugs fueled the triple murder.

As an initial matter, Charles' inconsistent information about his drug use detracts from the credibility of an intoxication defense. Charles allegedly told the trial investigator that he did not usually smoke "embalming fluid," another reference to marijuana laced with PCP. State Habeas Record at 120. To his own mental health examiner who was evaluating him for mental retardation, Charles reported that "he had smoked cigarettes laced with 'embalming fluid' a 'handful of times' prior to the 2002 murders, and always 'exploded' and 'felt like a different person' afterward." State Habeas Record at 952. Charles told the State's habeas expert that "he regularly smoked marijuana cigarettes that were laced with PCP" which made it "likely he deliberately purchased a 'swisher.'" State Habeas Record at 1116-17.[14] According to the State's expert, Charles' regular use of that narcotic would (1) "mean[] that he is responsible for any consequences associated with its use" and (2) indicate that "Charles possessed the capacity to refrain from killing when he was under the

---

[14]  The State retained Dr. George C. Denkowski to evaluate Charles for mental retardation and comment on his other claims relating to his mental health. Dr. Denkowski's work in *Atkins* cases has drawn sharp criticism and professional discipline. *See Maldonado v. Thaler*, 625 F.3d 229, 234-35 (5th Cir. 2010); *Pierce v. Thaler*, 604 F.3d 197, 214-16 (5th Cir. 2010). As Charles does not raise an *Atkins* claim in this forum, the Court defers to the state habeas court's treatment of his findings.

influence of PCP."  State Habeas Record at 1117.  Charles now – inconsistently –

claims to have had no prior PCP use.  State Habeas Record at 132.

Labeling the proposed intoxication theory an "untenable defense," the state

habeas court provided three reasons why trial counsel did not violate Charles'

constitutional rights by not putting information about his alleged drug intoxication

before the jury.  State Habeas Record at 1031.  First, because "there were no witnesses

to the drug use," trial counsel could only advance a drug intoxication defense by

calling Charles to testify.  State Habeas Record at 1030.[15] Putting Charles on the stand

would have opened him up to wide-ranging and severe cross-examination.  Trial

counsel knew that the prosecution would undercut his testimony because Charles

initially "said he did not know if the [marijuana] cigarette had been laced with any

---

[15]     Charles now argues that trial counsel could have sidestepped calling him as a witness
by relying on Dr. Rustin or another witness to describe the effects of PCP.  Citing
several cases, Charles asserts that expert testimony about drug use is admissible in
Texas state court.  *See, e.g., Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App.
1999).  The cases on which Charles relies to support this proposition, however, deal
with the general mind-altering effects of drug use.  Here, the *effects* of drug use are
not in dispute so much as the factual question of *whether* Charles used drugs.  The
parties have not specifically briefed whether Texas law would allow an expert to
establish a question of fact in that manner.  *See Acevedo v. State*, 255 S.W.3d 162,
169-70 (Tex. App. -San Antonio 2003, pet. ref'd) (finding that an expert testifying
about the effects of drugs must know "how much, or precisely what, [the defendant]
ingested").  Dr. Rustin relied wholly on Charles' unsworn statement that he smoked
marijuana before the murders, speculating that he inadvertently ingested other
substances.  The state habeas court found that Dr. Rustin's conclusions were
"unsupported by evidence that [Charles] ingested phencyclidine, . . . or by evidence
of the effects of specific amounts of phencyclidine."  State Habeas Record at 1030.
Charles cannot verify that he actually used PCP hours before the offense.

substance" but only "stated this after he was charged with the murders." State Habeas Record at 1060. Also, the prosecution would surely pepper Charles with questions about his numerous prior bad acts and the viciousness with which he killed. For those reasons, during the state evidentiary hearing the state habeas judge remarked that: "because the facts of this case were so horrendous, I cannot imagine that any trial counsel would have called [him] to the stand." State Habeas Hearing at 8.

Trial counsel tried filing a motion to limit the State's cross-examination should Charles take the stand. The trial court denied that motion. Clerk's Record at 134-36; Tr. Vol. 4 at 27-30. Trial counsel chose not to call Charles as a witness and subject him to the inevitably rigorous cross-examination. The state habeas court found no deficient performance in that strategic decision.

Second, the state habeas court found that Charles' actions did not conform with Dr. Rustin's description of intoxication-driven murder. Charles' "actions were thoughtful and planned" and "not consistent with a person who was under the influence of a drug." State Habeas Record at 1060. Even if Charles could prove that PCP influenced the savage murder of the grandfather, Charles then waited several hours for Myeshia and her mother to return home. When they arrived, he methodically moved them to different locations in the house, killing them by strangulation and calculated force, rather than the impulsive fierceness anticipated by

Dr. Rustin's description of a PCP-fueled rage.  State Habeas Record at 1060.[16]

Finally, the state habeas court took a dim view of how the jury would consider evidence of intentional drug use.  The "speculative, unsupported nature of such allegations" would not sway the jury "in light of the horrific nature of [Charles'] triple murders, his ability to plan and orchestrate the disabling and killing of three people, his stated awareness of the wrongfulness of his actions, and his attempts to elude capture."  State Habeas Record at 1050.  Given trial counsel's informed strategic decisions and the unlikelihood that drug use could have been a viable defense, Charles has not shown that the state habeas court's analysis was contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d)(1).

## B.    Testimony About Charles' Troubled Background

Charles claims that the jury had a superficial and erroneous impression of his background.  The jury knew almost nothing of his prepubescent life.  What little they heard about his teenage years juxtaposed testimony about him being a likeable youth

---

[16]    In rejecting Charles' claim that he was mentally retarded, the state habeas court noted that his "commission of the instant offense shows forethought, planning and complex execution of purpose" because he "lay in wait for [the mother] and her daughter after killing the . . . elderly [grand]father," "moved Obie Bennett's body from sight of the front door  and covered the body with newspapers, so that [his former girlfriend and her mother] would not be alarmed when opening the door," "was careful to lock the door" when they entered the house, attached a power strip "after discovering that the television cord was too short to reach the bathtub during his attempted electrocution of [the mother]," and used "a slip knot . . . that tightened when he pulled on it in order to control the [mother]."  State Habeas Record at 1038.  In short, he "exhibited rational and appropriate conduct, albeit criminal[.]"  State Habeas Record at 1045.

against a long history of lawlessness.  Charles asserts that the jury had nothing with which to learn: "Who is Derrick Dewayne Charles?"  [Doc. # 8 at 7].

Charles argues that the evidence he adduced on state habeas review would have helped the jury answer that question.  Charles alleges that trial counsel "failed to interview even a fraction of the witnesses necessary to complete an accurate and thorough account of Derrick Charles' background."  [Doc. # 8 at 2].  According to Charles, because trial counsel "failed to conduct a social history investigation" the defense "erroneously believed that Derrick Charles came from a loving and supportive family which, though not well off, was possessed of sufficient resources to provide for everyone" and "suffered from no mental health problems and was simply a poorly behaved kid[.]"  [Doc. # 8 at 2, 3].  Charles argues that the evidence he amassed after trial "painted a very different picture [of his] life[.]"  [Doc. # 8 at 3].

To reiterate, Charles – who was born prematurely[17] and had two seizures as an infant – had a history of depression.  His mother's own undiagnosed schizophrenia made her an inattentive parent who sometimes failed to provide adequate food and clothing.  Instability, poverty, discord, and turbulence marked Charles' home life.  His mother's own mental problems allegedly prevented her from seeing to fruition Charles' treatment for depression.  Charles claims that trial counsel violated his

---

[17]     Charles' stepfather reported that he "was born a month premature, and weighed a little over 3 pounds."  State Habeas Record at 56.

constitutional rights by not developing and presenting evidence of his background.

When Charles raised this claim on state habeas review, he did not specify which lay witnesses should have testified. Instead, his state habeas application provided a general overview of undeveloped mitigating themes and only mentioned the affidavit from his stepfather, Mr. Phillips. Federal law requires specificity in complaints of uncalled witnesses. Recognizing that "the presentation of witnesses is generally a matter of trial strategy," the Fifth Circuit has often commented that "[c]laims that counsel failed to call witnesses are not favored on federal habeas review[.]" *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Even when an ia habeas petitioner identifies testimony that trial counsel allegedly should have adduced, "allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see also Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008); *O'Brien v. Dretke*, 156 F. App'x 724, 733 (5th Cir. 2005). A habeas petitioner, therefore, "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). A petitioner meets this requirement by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been

favorable to a particular defense." *Day*, 566 F.3d at 538; *see also Turner v. Epps*, 412 F. App'x 696, 706 (5th Cir. 2011); *Hooks v. Thaler*, 394 F. App'x 79, 82-83 (5th Cir. 2010); *Woodfox*, 609 F.3d at 808.   The Fifth Circuit anticipates that a habeas petitioner will adduce affidavits to establish the content of a witness' proposed testimony and their willingness to testify.  *See Gray v. Epps*, 616 F.3d 436, 443 (5th Cir. 2010); *Gregory*, 601 F.3d at 353; *Bruce v. Cockrell*, 74 F. App'x 326, 335 (5th Cir. 2003).

Trial counsel's affidavit and testimony showed that the defense met with Charles' parents at their apartment and investigated his family background.   The defense considered calling Charles' stepfather, mother, grandmother, and maternal aunt as witnesses.   On state habeas review, Charles did not provide any affidavit or other credible means of knowing what testimony his mother, grandmother, or aunt could provide.   *Cf. Harrison v. Quarterman*, 496 F.3d 419, 428 (5th Cir. 2007) ("Ordinarily, a defendant's failure to present some evidence from the uncalled witness regarding that witness's potential testimony and willingness to testify would be fatal[.]").   Instead, he attached to his state habeas application only unauthenticated copies of what purport to be an interview between the trial investigator and Charles' mother.   Such unverified evidence does not provide a reliable basis to conjecture how witnesses would have testified at trial.   Charles only relied on one piece of competent evidence – the "anecdotal evidence from [his] stepfather [Mr. Phillips]" – to support

his claim that trial counsel should have accentuated his troubled background. State Habeas Record at 39.

Because the defense team had interviewed Mr. Phillips, the state habeas adjudication centered on trial counsel's reasons for not calling him at trial. Trial counsel explained that Mr. Phillips' "testimony would not be helpful." State Habeas Record at 1058. Mr. Phillips had turned Charles' bloody clothing from the offense over to the police, had been assaulted by Charles, unsuccessfully "attempted to teach [Charles] right from wrong," had previously turned Charles into the police for burglary, and could not keep Charles from resisting police officers during an arrest. State Habeas Record at 1058, 1065. Additionally, Charles' "parents told [the trial investigator] that [Charles] was upset at the time the murders were committed, because they had asked him to move out of their house. They stated they were being evicted from their home because [Charles] had been accused of burglarizing their neighbor's home." State Habeas Record at 1025, 1065.

Because trial counsel's affidavits and testimony went beyond the allegations in Charles' habeas application, the state habeas court also discussed trial counsel's reasons for not calling other family members. Trial counsel told the court that he did not call Charles' mother because she "suffers from schizophrenia" and could not "handle cross-examination." Also, the State had obtained records where she said Charles "was physically abusive to her and her husband." Tr. Vol. 22 at 9. Trial

counsel did not want the jury to know that Charles was "hitting them and trying to hit them, his own parents." Tr. Vol. 22 at 9.[18]  His elderly grandmother could not testify because of illness.  Tr. Vol. 22 at 10-11.  Charles' maternal aunt would have related a "bizarre story about demonic possession" where Charles "looked in the mirror at himself and all he could see was himself as a totally black figure with eyes of fire" after killing the grandfather.  Tr. Vol. 22 at 11.  Trial counsel already unsuccessfully had "r[u]n [the aunt's potential testimony] by Dr. Brown . . . to see if it had any bearing on anything[.]"  Tr. Vol. 22 at 11. Charles' aunt otherwise did not "have anything to say positive."  Tr. Vol. 22 at 12.  Trial counsel also considered calling teachers and peers, but they "had nothing positive to say about him."  State Habeas Record at 1027.

The records thus suggest that trial counsel seriously deliberated before deciding not to call family members as witnesses.  In doing so, given what he had discovered, trial counsel did not ignore game-changing evidence.  Trial counsel searched but did not find any evidence of physical or sexual abuse, severe neglect, or pervasive mental impairment.  Charles' habeas evidence showed a somewhat turbulent childhood influenced negatively by poverty, conflict between his parents, and inattentive care from a mentally ill mother.

---

[18]     The prosecutor in this case affirmed that calling Charles' family members as witnesses would have opened them up to cross-examination about his violence toward the family members who tried to help him.  State Habeas Record at 1069.

Given the meager helpful information available from family members, trial counsel explained that the defense decided to focus on securing an "expert on future danger in hopes of obtaining a life sentence for the defendant." Trial counsel believed that the defense "had a chance of obtaining a life sentence for the defendant based on [Dr.] Quijano's testimony that the defendant could not be a future danger in prison." State Habeas Record at 1066. While the defense did not completely ignore mitigating evidence, counsel decided not to make it the focal point of their case. Given what Charles has described as a "criminal history devoid of any real violence" that "[n]o one could seriously contend" was an "indication[ ] of an obviously violent nature," State Habeas Record at 8, trial counsel decided to stress the future-dangerousness issue.

The state habeas court found that trial counsel arrived at a "reasonable, plausible decision, made after thorough investigation, to concentrate on the future dangerousness special issue and not to present the testimony of [Charles'] family that would be more harmful than beneficial[.]" State Habeas Record at 1049. The state habeas court found that

> any testimony that [Charles] was allegedly hospitalized for sleep deprivation and depression; that his family was poor; that his biological father was not involved in his life; and, that [Charles] allegedly witnessed violent behavior between his stepfather and his mother does not rise to the level of mitigating evidence so that a sentence of less than death was warranted and does not obviate trial counsels' reasonable strategic decision not to present the testimony of [his] family.

40

State Habeas Record at 1026.  The Texas Court of Criminal Appeals affirmed these findings and conclusions.  On habeas review, trial counsel's informed decisions are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690-91.[19]  The Court cannot conclude that the state  courts' decisions are unreasonable.

While a different attorney may have come to a different conclusion about the best approach to take in the punishment phase, "[t]here are countless ways to provide effective assistance in any given case[.]"  *Strickland*, 466 U.S. at 689.  "Even the best criminal defense attorneys would not defend a particular client in the same way."  *Id.*; *see also Pinholster*, ___ U.S. ___, 131 S. Ct. at 1403; *Richter*, ___ U.S. ___, 131 S. Ct. at 788-89.  Charles has not shown that the state habeas court was unreasonable in finding  no  constitutional  violation  from  trial  counsel's  strategy  with  regard  to

---

[19]    Charles' state habeas application also hinted that trial counsel had not provided Dr. Brown with enough information to uncover mitigating evidence.  Trial counsel retained Dr. Brown well before trial and provided him records.  Dr. Brown interviewed Charles, his mother, and stepfather.  From those interviews, he, like Dr. Denkowski, suspected that Charles had ADHD.  He noted Charles' low intelligence, but also recognized his successful adaptive abilities.  His examination of Charles did not record any other mental condition.  Possibly aside from not giving Dr. Brown the Gulf Pines Hospital records (which the Court discusses below), Charles has not shown that trial counsel failed to provide Dr. Brown with adequate resources to make a competent expert evaluation about mitigating evidence.  While Dr. Brown provided an affidavit on state habeas review explaining that additional information would have prompted additional exploration into organic brain damage, State Habeas Record at 978, he never retracted his opinion that "any testimony I might offer on [Charles'] behalf might be minimal or unhelpful at best, and that cross-examination might prove damaging to [Charles]."  State Habeas Record at 1199-1200.  Trial counsel made a strategic decision to seek a favorable finding on the future dangerousness special issue.  The Court does not conclude counsel was deficient in the preparation of Dr. Brown or the choice not to call him as a mitigation witness.

presenting evidence of his background.

### C.   <u>The Gulf Pines Hospital Records</u>

Charles' complaint that trial counsel should have uncovered and presented hospital records is his most troubling allegation of ineffective assistance. Charles faults trial counsel because "no records were ever introduced at trial, nor did Dr. Ginsburg or any other witness ever testify concerning any aspect of [Charles'] mental health history." State Habeas Record at 16. The Court will summarize the contents of the Gulf Pines Hospital records before turning to whether trial counsel's representation fell below constitutional requirements.[20]

### 1.   The Hospital Records

The lengthy and detailed hospital records that state habeas counsel uncovered provide much information about Charles' adolescent mental problems and background. On March 9, 1993, ten-year-old Charles was admitted for treatment at the Gulf Pines Hospital because of his "violent behavior as well as severe oppositional behavior" which had resulted in his suspension from school. State Habeas Record at 232, 244. The records described how:

> [Charles] had been violent towards his peers at home and at school. He had been depressed in school. [Charles] loses his temper, argues with adults, he refuses his chores, he is easily annoyed, he is angry, and

---

[20]   Charles submitted selections from his Gulf Pines Hospital records along with his state habeas application. State Habeas Record at 60-110. The State filed a more complete set of records with its response. State Habeas Record at 227-579.

> resentful and blames others for his actions.  He had witnessed violent
> behavior between mother and stepfather.[21] [Charles] has been suspended
> from school.  [Charles] was admitted because of serious dysfunctionality
> at home and at school.

State Habeas Record at 228 (footnote added).  Charles had been "assaultive at home
+ school."  State Habeas Record at 233.  In fact, he was "constantly fighting" at school
and had been expelled twice.  State Habeas Record at 256.  Charles also admitted that
he had "assaultive/homicidal thoughts."  State Habeas Record at 257.[22]  Admission
observations included risk of suicide, acutely deteriorating behavior, and mental
anguish.  State Habeas Record at 231.  Also, his history included seizures at eight
weeks of age, low birth weight and premature birth, and occasional stuttering when
stressed.  State Habeas Record at 244.

A psychosocial assessment noted that he "comes from a very deprived
background," mainly because "living in a bad area prevents him from the usual
socialization and involvement with other children" and he "does not get a lot of
opportunities to expand his leisure and recreational interests."  State Habeas Record
at 254.  While suspecting "some other significant problems at home," the interview
found Charles' family supportive, at least as far as they were able to be.  State Habeas

---

[21]    Another report, however, clarified that the reported violence consisted of "his father
had hit his mother on at least one occasion."  State Habeas Record at 252.

[22]    Records later described this admission as being for "explosive outbursts, fighting in
school."  State Habeas Record at 453.

Record at 254.  In fact, one of his strengths for treatment was a "supportive family." His weaknesses, though, included anger, disrespect, and defiance of authority.  State Habeas Record at 269.  Notations from his hospitalization describe his "very low self esteem" and "significant impairments in his cognitive processing."

Dr. Ginsburg recommended that Charles stay two or three weeks in the hospital. State Habeas Record at 232.  His mother removed him after two days.  State Habeas Record at 60-61, 322.  The discharge summary from his 1993 hospitalization recorded as final diagnoses "oppositional defiant disorder" and "depressive disorder, not otherwise specified."   State Habeas Record at 228.   The discharge records recommended that he continue medication and gave a prognosis of "fair with continued treatment."  State Habeas Record at 229.  On discharge, however, Charles' mother scheduled additional treatment through outpatient therapy.  State Habeas Record at 229, 230.

The record does not indicate an extensive treatment regimen after Charles' discharge, but hints that his parents made some halted efforts to handle his mental conditions. During the intervening years Dr. Ginsburg saw Charles occasionally for severe behavioral problems.  He prescribed an antidepressant.  Nevertheless, a psychologist subsequently noted that "[t]he family has not been consistent in coming in for outpatient therapy."  State Habeas Record at 369.

On September 20, 1995, thirteen-year-old Charles was again admitted to Gulf

Pines Hospital because of "depressed moods & episodes of violent behavior."  State

Habeas Record at 364.  Charles' mother and stepfather had separated before his

admission and he traveled back and forth between their apartments.  State Habeas

Record at 418.  His "explosive outbursts" had "escalated since [his] parents[']

separation."  State Habeas Record at 454.  One report summarized why his mother

admitted him:

> On the day of admission, the patient had been expelled from school for
> the fourth time.  He threatened to flatten the tires of a teacher's car.  He
> had been fighting and had been insultive at school.  He had been using
> profane language in school and had been very disruptive.  His mother
> noted he had decreased amounts of sleep, irritability, a labile mood,
> crying spells, impaired memory, and impaired concentration.  The
> patient had been charged by police with assault by threat.

State Habeas Record at 373, 376.  In fact, he had taken to "sleeping with [a] knife

under [his] bed."  State Habeas Record at 378.  He exhibited "violent behavior" and

"fights or screams when stressed or angry[.]"  State Habeas Record at 429.

The Gulf Pines Hospital records chronicle psychological examinations, group

counseling, and other efforts at treatment over the next few weeks.  Reports assessed

his mood as "depressed, angry, tearful, withdrawn."  State Habeas Record at 451.

During that time, a doctor again diagnosed him with depression.  State Habeas Record

at 363.  The report observed that he was "in special education classes in the seventh

grade," but he reported he was there "for behavior problems."  State Habeas Record

at 369-70.  He tested "in the intellectually deficient range of intelligence."  State

45

Habeas Record at 370.  The testing suggested the "strong possibility that he has some organic damage that is contributing to his behavior problems.  At the very least, he has a severe learning disability."  State Habeas Record at 371.  He "exhibit[ed] some signs of neurological problems . . . that may [have] be[en] contributing to problems with behavior control."  State Habeas Record at 459.  Seizures Charles experienced as a baby also encouraged an inquiry into possible brain damage.  Because there seemed to be "a neurological component to [his] acting out," a treating psychologist recommended "full neurological testing" including an EEG.  State Habeas Record at 372.  An EEG, however, came back within normal limits.  State Habeas Record at 374, 550.  While commenting that "it is unlikely that all of his current problems are explained by neurological problems," one psychologist still recommended additional neuropsychological testing.  State Habeas Record at 372.[23]

Charles' behavior while in treatment was not good.  Charles was "swearing + kicking on admission."  State Habeas Record at 420; *see also* State Habeas Record at 439 ("violent + hostile on admission").  During his stay, Charles was occasionally defiant, disruptive, destructive, and violent.  He swore at peers and engaged in name calling.  State Habeas Record at 481, 483, 485.  He destroyed property.  State Habeas

---

[23]     One report concluded that: (1) Charles needed medication to improve his depression and that individual therapy would be beneficial; (2) his parents would benefit from working with a therapist to help them understand his problems; (3) he would need a full neuropsychological examination; and (4) he needed to learn how to interact better with his peers.  State Habeas Record at 372.

Record at 478-79, 522.  He stole from his peers.  State Habeas Record at 487.  He often refused to participate in therapy sessions.  When he did, he was often disruptive, disengaged, or distracting to others.  One report described his attitude as "silly, vulgar, immature, superficial, disruptive, + non-working."  State Habeas Record at 513.  Over time, however, he became somewhat more compliant and at times "demonstrated confidence" and "redirection to constructive behaviors."  State Habeas Record at 515.

After about three weeks, he was discharged from the hospital.  Records described his parents as "very supportive" and his mother as "healthy + willing to follow direction."  State Habeas Record at 420.  The discharge report noted "a stabilization of mood and resolution of his depressive symptomatology."  State Habeas Record at 375.  Upon discharge, he was "stable" without "problems evident," demonstrating an "improved mood" with "positive statements."  State Habeas Record at 349.  Even though his "socioeconomic deprivation" was a deficiency, his mother's supportive attitude was listed as a strength.  State Habeas Record at 377.  Dr. Ginsburg apparently followed Charles' condition for several months after his discharge.  His interaction with Charles, however, ended in Spring 1996.

### 2.    Trial Counsel's Duty to Investigate

The issue is whether trial counsel's lack of further investigation into the Gulf Pines Hospital records was deficient performance under *Strickland*.  Trial counsel knew that Charles had been admitted to the Gulf Pines Hospital twice.  Tr. Vol. 22 at 6.[24]  Dr. Brown also knew that Charles had been hospitalized for depression.  Mr. Patillo unsuccessfully tried to find the Gulf Pines Hospital records.  Trial counsel discussed with Mr. Patillo several investigative avenues for finding the records, without any luck.  State Habeas Hearing at 27.  Trial counsel tried to find the records, but that effort was insufficient.  Charles acquired the records on state habeas review with little difficulty.

Professional standards suggest that a zealous attorney must do more than rely on an investigator to uncover difficult-to-find records.  The Court of Criminal Appeals refused to adopt the lower court's finding that "trial counsel exercised due diligence in attempting to locate [Charles'] Gulf Pines Hospital records."  Still, the Court of Criminal Appeals left intact the lower court's holding that trial counsel did not provide deficient representation in not presenting the records to the jury.  State Habeas Record at 1027-28.

---

[24]    As part of the colloquy when he pleaded guilty, Charles discussed the 1995 hospitalization for depression and affirmed that he had never been schizoprehic, never had psychotic  episodes, never hallucinated, and had only suffered from depression. Tr. Vol. 16 at 14-16.

This Court must independently weigh "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [his client's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523. "Any decision by counsel not to investigate is assessed for reasonableness under all the circumstances, with a heavy measure of deference to counsel's judgment." *Woodfox*, 609 F.3d at 806. Several factors may have discouraged a reasonable attorney from engaging in additional exploration into Charles' juvenile hospitalizations. *See Pinholster*, ___ U.S. at ____, 131 S. Ct. at 1407 (stating that a court must "not simply . . . give the attorneys the benefit of the doubt," but also "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did") (quotation omitted).

Trial counsel had little reason to think that the Gulf Pines Hospital records might benefit the defense.[25] Trial counsel attested: "The defense was told by [Charles'] family that [he] had been placed in a hospital for 'acting out'; however, [Charles'] family assured the defense it was nothing more than that, as did [Charles]." State Habeas Record at 1064; *see also* State Habeas Record at 129. Trial counsel already had uncovered records from a previous hospitalization where, after Charles

---

[25]  Trial counsel's third affidavit averred that the records "did not seem favorable to the defense. However, their use at trial would have depended on [Dr.] Brown's evaluation and analysis. [Dr.] Brown and I would have to balance any positive findings against the negative ones in the records. There were many notations in the records that the defense believes would not have been helpful in generating sympathy for the defense."

claimed to hear voices, the mental health experts "found no evidence of mental disorder of any kind, and suspected he was probably just covering his bad behavior with excuse of hearing voices."   Tr. Vol. 22 at 8.   Dr. Brown found no contemporaneous mental illness, calling into question the seriousness or pervasiveness of any earlier psychological condition.

The State's inability to procure the Gulf Pines Hospital records reinforced trial counsel's decision to forgo additional inquiry into the records.[26]  Also, trial counsel explained that he did not contact Dr. Ginsburg directly because it was his "experience . . . [that hospital records] are kept with the records of custodian at the facility where they are[,]" not with the treating psychologist.  State Habeas Hearing at 32.  Given "the length of time that the child had been with [Dr. Ginsburg] and what the parents reported to [him] were the findings," trial counsel decided not to contact Dr. Ginsburg personally.  State Habeas Hearing at 29.

Most importantly, trial counsel's discussions with Charles' family suggested that additional investigation would turn up harmful information.  Charles' family told trial counsel that his "hospital stay at Gulf Pines Hospital was a result of problems he

---

[26]    The trial prosecutor produced an affidavit for state habeas review in which he stated: "The State was aware that the defendant had previously been sent to Gulf Pines Hospital for depression, and we tried to obtain these records. My investigator, Charlie Propst, informed me that the hospital was closed. The State informed defense counsel of the unsuccessful efforts to locate the records. The State was aware that defense counsels' investigator, Joe Patillo, was also unsuccessful in his attempts to locate the records."  State Habeas Record at 1070.

caused at home[.]" State Habeas Record at 1027. They told trial counsel that "he was acting out and [they] attempted to put him somewhere and confine him for a couple of weeks. So they had him committed but it really didn't have anything to do with mental illness." Tr. Vol. 22 at 8; *see also* State Habeas Hearing at 21 ("They told me that on one occasion, he had been taken to a hospital for observation because of his behavior in school.").[27]

When an attorney has "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691 *see also Richter*, ___ U.S. ___, 131 S. Ct. at 789–90 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."); *Bobby v. Van Hook*, 558 U.S. ___, ____, 130 S. Ct. 13, 19 (2009) (finding that an attorney can avoid activities that appear "distractive from more important duties"). With Charles' future violence a key issue in the punishment hearing, trial counsel was understandably wary of information that might highlight previous violent acts. On balance, in light of the deference this Court must give to trial counsel's

---

[27]     Trial counsel confirmed that "[s]ince the defense was assured by the family that [Charles'] hospital placement was due to his behavior, that there were no significant findings of any illness, and that [he] was released after a couple of days and returned to school, the defense did not contact Dr. Lawrence Ginsberg." State Habeas Record at 1064. The hospital records confirm that, particularly with regard to his 1995 admission, Charles' family sought help for his violent behavior.

decisions, *Woodfox*, 609 F.3d at 806, and viewed through the lens of the applicable constitutional standard, the Court cannot conclude that Charles has shown that trial counsel did not "spend sufficient time investigating [his] case" or that he had blatantly ignored glaringly obvious leads or evidence. *Newbury v. Thaler*, ___ F. 3d ___, 2011 WL 2747301, *5 (5th Cir. 2011).

Some Supreme Court cases, however, have emphasized that an attorney's decision to forgo additional investigation must be well-informed. *See Rompilla v. Beard*, 545 U.S. 374, 386-87 (2005); *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). With the knowledge that psychological problems played some part in Charles' hospitalization, a zealous attorney could have done more to find the records. It is unquestionable that trial counsel did not interview Dr. Ginsburg and ask about Charles' records. Given the ease with which habeas counsel apparently uncovered those records, it appears trial counsel could also have found them with some effort if he had contacted Dr. Ginsburg. Nonetheless, the record's availability does not compel the conclusion that their omission at trial resulted in a constitutional violation. *See Richter*, ___ U.S. at ___, 131 S. Ct. at 790 (evaluating whether "it would be reasonable to conclude that a competent attorney might elect not to use" a particular defensive theory); *Wiggins*, 539 U.S. at 533 ("*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant

at sentencing.").

The Court next must decide whether the state habeas court was reasonable in finding "that the records, if located, would have contained information detrimental to [Charles]; and, that trial counsel cannot be considered ineffective for not presenting harmful information to the jury." State Habeas Record at 1027-28.

### 3.    Trial Counsel's Strategy

Charles argues that the Gulf Pines Hospital records would have resulted in the jury seeing a vastly different case. However, Charles has not shown that additional investigation would have changed trial counsel's strategy. The harmful information in the Gulf Pines Hospital records troubled the state habeas court. The state habeas court specifically found  with basis in the record

> that [Charles'] Gulf Pines Hospital records contained the following harmful information: [Charles] was violent toward his peers at home and school; [Charles] was charged with the offense of assault by threat; [Charles] lost his temper, refused to do his chores, blamed others for his actions, and argued with adults; and, the applicant was suspended from school.

State Habeas Record at 1027. Charles has not shown that it would be unreasonable, given that harmful information, for defense counsel to have decided not to present the mitigating evidence.

Charles' argument presupposes that trial counsel could have used the hospital records for two purposes: to inform expert inquiry into his psychological condition

and to augment the mitigation case.[28]  As to the first ground, the state habeas court found that Charles can only speculate how the records would influence any amplified psychological opinion.  State Habeas Record at 1028-29.  In state habeas court, Charles argued that, once trial counsel discovered the Gulf Pines Hospital records, he should have sought additional mental-health testing.[29]  The record contains an affidavit from Dr. Brown explaining that, had he reviewed "selected documents" from the newly discovered hospital records, he would have found "justification and support *for further evaluation to rule out the possibility* of organic brain damage and/or mental retardation."  State Habeas Record at 977 (emphasis added).  Given the records, Dr. Brown would have "requested additional funding and time from the court to conduct the additional testing and evaluation to pursue the reasonable possibility of these mitigating factors being present."  State Habeas Record at 978.  In her affidavit, Dr.

---

[28]    To the extent that Charles argues that the Gulf Pines Hospital records could provide mitigating evidence of his neglected upbringing and poverty, the records only contain inferential information about Charles' life.  Even then, the records hinted at family problems and poverty, but conversely show a supportive family ready to address Charles' problems.  Trial counsel could only verify the information contained in the records by calling his family members as witnesses.  The Court has already found that the state court was not unreasonable in finding no deficient performance by trial counsel for not calling Charles' family members to testify.  Mental-health concerns are the strongest mitigating thrust of the records.

[29]    Dr. Ginsburg provided a one-page affidavit in state court summarizing the mental illnesses he diagnosed Charles with and his treatment.  State Habeas Record at 59.  Dr. Ginsburg did not give any indication that he could provide testimony beyond that already in the records.  He did not elaborate on the nature of Charles' psychological difficulties, their impact on his life, or their persistence into adulthood.

Susana A. Rosin, the expert who examined Charles on state habeas review for mental retardation, agreed that the Gulf Pines Hospital records would have encouraged "a more in-depth and conclusive neurological examination[.]"  State Habeas Record at 962.[30]

Charles has never produced – contemporaneous with trial or afterward – any affirmative evidence of brain injury or psychological condition beyond that contained in the hospital records.  Even if the records raised some suspicion of brain damage, Charles has never shown that he actually has neurological impairments.  Charles did not ask the state habeas court to authorize funds for an additional psychiatric or neurological examination.   Charles can only conjecture that a more complete neurological examination would reveal something favorable and undisclosed.  Even if Dr. Brown had reviewed the 1995 hospital records, nothing suggests that he would have changed his opinions that "[Charles] would kill again under the proper circumstances . . .[,] found no evidence of mental retardation . . .[,] found no evidence

---

[30]     Specifically, Dr. Rosin stated that the negative EEG at age thirteen

> alone cannot be considered conclusive in ruling out more subtle neurological problems and lesions.  Therefore, it is possible that Mr. Charles may suffer from an undiagnosed brain lesion or defect that has not been properly diagnosed to date, and which may require more in-depth imaging studies, i.e., CT scan, MRI, computerized EEG, etc., in order for any of those potential suspected problems to be either conclusively diagnosed or not.

State Habeas Record at 962.

that [Charles] suffered from any mental illness . . .[,] and [found that Charles] exhibited no meaningful remorse about the offense." Tr. Vol. 22 at 7-8; State Habeas Record at 1028, 1199.

In essence, the inquiry before the Court is what impact the Gulf Coast Hospital records, particularly if there had been no expert embellishment, would have had on trial counsel's decision-making and the trial itself. Significantly, without the introduction of the records, the evidence showed that, before the murders, Charles broke the law but was not terribly violent and allowed the defense to argue that the killings were an aberration. As Charles observed in his state habeas application, "[n]o one could seriously contend that [his] past criminal record or acts of misconduct were indicators of an obviously violent nature, or even that his past suggested that it was likely that he would commit serious violent acts in the future[.]" State Habeas Record at 8.

Charles' records from the Gulf Pines Hospital, in contrast, portended of future societal danger. *See Mitchell v. Epps*, 641 F.3d 134, 152 (5th Cir. 2011) (finding no prejudice for failing to discover records when "some of those documents contained damaging information that would not have been helpful in attempting to persuade the jury to spare his life"). As noted by trial counsel, the Gulf Pines Hospital records show that Charles "was violent towards his peers at home and at school; had been charged with the offense of assault by threat; threatened to flatten a teacher's tires;

slept with a knife under his bed; was angry and would lose his temper; refused to do his chores and argued with adults; and, blamed others for his actions." State Habeas Record at 1065.

The possibility of mental-health concerns forms the strongest and best-developed potential mitigating thrust of the Gulf Pines Hospital records. However, upon analysis, the information is double-edged, if not harmful. The records contain two diagnoses: oppositional defiant disorder and depression. Aside from ascribing a psychological label to his bad behavior, Charles does not explain how the jury would find mitigating components in his oppositional defiant disorder. The records do not identify what caused him to have such a confrontational attitude, but more-than-amply show how it caused him to lash out at others. The hospital reports of Charles' defiant and aggressive personality may well have engulfed at trial any mitigating features of the depression diagnosis. Worse, as discussed below, the Gulf Pines Hospital records show that Charles' aggression and violence were not episodic, but a repeated theme in his life. It was not unreasonable for an attorney to conclude that, because introducing the records would put unfavorable and damaging information before the jury, it was better to focus on his future-dangerousness alone. As the Seventh Circuit has noted, sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is

appropriate to incapacitate." *Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (citation omitted).  As the Fifth Circuit has explained, a juror could see some mental conditions only as aggravating because they increase the likelihood that a defendant will act violently again.  *See Cantu v. Thaler*, ___ F.3d ___, 2011 WL 222986 at *5 (5th Cir. 2011); *Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006). Charles, therefore, has not shown that the state court was unreasonable in finding no deficient performance of counsel for not presenting the Gulf Pines Hospital records at his trial.

## II.   <u>Cumulative Actual Prejudice</u>

The Court will consider conjunctively the prejudice allegedly flowing from trial counsel's failure to present the three categories of mitigating evidence discussed above.  Before considering whether the absence of the new mitigating evidence prejudiced Charles' punishment-phase defense, the Court pauses to reiterate the limitations of federal habeas review.  At this stage, the Court's inquiry is not simply whether the petitioner has met *Strickland*'s prejudice standard.  The "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, ___ U.S. at ___, 131 S.Ct. at 785.  This Court must afford the state court's analysis "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Id.* at ___, 131 S. Ct. at 785.  This inquiry is exceedingly forgiving.  The Court must apply the "'doubly deferential'

standard of *Strickland* and AEDPA." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1411.
Thus, the Court may not determine whether the state court's reasoning is sound;
rather, "the only question for a federal habeas court is whether the state court's
determination is objectively unreasonable." *Neal*, 286 F.3d at 246.

In performing that review, the Court may not turn a blind eye to harmful
information that would have accompanied the new mitigation evidence. The Supreme
Court has instructed that "it is necessary to consider *all* the relevant evidence that the
jury would have had before it" if trial counsel "had pursued the different path"
suggested in state habeas court *Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 386
(2009). *Belmontes* requires a reviewing court to take "into account that certain
mitigating evidence would have exposed the petitioner to further aggravating
evidence." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1410.

Had the jury known the information that Charles presented to the state habeas
court, the jury would have learned much that could have reduced his chances for a life
sentence.  In contrast, at trial the jury knew little about Charles' life.  With the
amplified case developed after trial, the state habeas court found two defects in
Charles' argument that trial counsel should have presented more mitigating evidence:
the aggravating information accompanying the new evidence eclipsed any potential
benefit to the defense and Charles overestimated its mitigating value.

Trial counsel was aware that Charles had witnessed violence in his home,

suffered from depression, possibly had a head injury as a child, and had a troubled upbringing. The record suggests that Charles received successful treatment for his depression at age 13 and six years later, by the time of trial, had suffered no major setback because of that disorder. Trial counsel had to weigh that information against the risks of showing Charles as incorrigible, mean, unwilling to reform, and violent toward loved ones. The state habeas court emphasized "information detrimental to [Charles] found in the Gulf Pines Hospital records," such as that Charles was "violent toward his peers at home and school," "charged with the offense of assault by threat," "lost his temper," "refused to do his chores," "blamed others for his actions," "argued with adults," and "was suspended from school." State Habeas Record at 1027-28. Charles' aggressive behavior permeated his time in treatment, portending of his criminal acts. The state habeas court was not unreasonable in finding that the "slight mitigating value, if any, would have been lost amidst the harmful information contained in the records about [Charles'] anger, hostile behavior, and oppositional defiance[.]" State Habeas Record at 1049.

Trial counsel also feared that calling family members would result in more unhelpful information. Trial counsel knew that calling his stepfather Mr. Phillips would harm the defense because "the prosecution was aware that [Charles] had previously assaulted Mr. Phillips." State Habeas Record at 1065. Also, even though "Mr. Phillips attempted to teach [Charles] right from wrong," Charles ignored his

stepfather and continued in his lawlessness, which also included the physical assault of an uncle.  Cross-examination of family members would have reinforced the jury's knowledge of the aggression he exhibited while in treatment.

Charles' argument for *Strickland* prejudice significantly downplays his escalating history of lawlessness.  The prosecutor argued: "[Y]ou see what he is capable of.  You see where he started from and where he ended up.  Starts from a criminal trespass and he graduated all the way to a triple capital murder.  He did a lot of talking, a lot of threatening, a lot of violence, and he graduated from talking and threatening people to doing, to acting out."  Tr. Vol. 23 at 79.  His hospital records and affidavit from Mr. Phillips obtained post-trial, however, would have shown him "acting out" well before the murders.  Presenting that information to the jury could have confirmed that his violence was a life-long characteristic, not an episodic event.

Importantly, a reviewing court must place the mitigating evidence into context, including the crime a defendant has committed.  While, by their nature, all capital-murder cases involve terrible crimes, Supreme Court precedent plainly anticipates that the severity of the crime is a relevant factor in *Strickland* prejudice.  *See Smith v. Spisak*, ___ U.S. ___, 130 S. Ct. 676, 687 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime.");

*Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence."). Here, Charles killed three people over a several-hour period in a heartlessly brutal, calculated, and depraved manner.[31] The state habeas court, weighing all the mitigating evidence against that in aggravation, and emphasizing the extreme violence of Charles' crime, could reasonably find that he "fail[ed] to show that the results of the proceeding would have been different[.]" State Habeas Record at 1049.

Charles has not shown that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, ___ U.S. at ___, 131 S. Ct. at 786. The state habeas court was not unreasonable in finding no deficient performance and no prejudice flowing from counsel's halted inquiry into the mitigating evidence Charles championed on state habeas review.

## CONCLUSION AND CERTIFICATE OF APPEALABILITY

---

[31] The Fifth Circuit has found that the "horrific facts of the crime," *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007), the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) , or the "cruel manner in which [a defendant] killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir. 2003) , may weigh heavily against a finding of *Strickland* prejudice.

Claims of unpresented mitigating evidence are troubling on habeas review because they inherently second-guess a trial defense attorney's decision-making and presuppose a fair understanding of how a defendant's jury would respond to unpresented information. Without question, the jury did not have before it a full view of Charles' background and life experience. Charles provided a more detailed history of his life on state habeas review and he has substantially augmented the record on this subject in this federal forum. The limitations of federal review and the strong deference given to trial counsel's efforts, however, strictly cabin this Court's role, which is to assess the reasonableness of the state court's decision in light of the evidence before that court. Charles on federal habeas review has crafted a much more robust mitigation case than that presented to and considered by the state courts. Because of binding appellate precedent, this Court must turn a blind eye to significant and substantial mitigating evidence that was outside trial counsel's investigation. The strictures of federal law make that new information irrelevant to the Court's permitted review.

The Constitution mandates a probing investigation and somber analysis of defensive options. Undeniably, postconviction investigation in this case exceeded the rough outlines known by trial counsel. Had the additional evidence known to the state habeas court, let alone the even more fulsome information presented here, been known to trial counsel, that evidence may have caused reconsideration of the punishment-

phase approach that would best have served Charles' interests.  Nevertheless, the state habeas court fully reviewed the evidence before it, compared it to the trial record, and found no deficient performance or actual prejudice.  Based on this record, Charles has not shown that determination to be unreasonable.  This Court, therefore, will deny habeas relief.  *See* 28 U.S.C. § 2254(d).

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  While settled precedent forecloses relief on Charles' *Strickland* claim, the Court finds his arguments deserve "encouragement to proceed further."  *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).  This Court will certifies appellate review of the issues raised by Charles' petition.

For the reasons described above, the Court concludes that Charles has not shown entitlement to federal habeas relief.  It is therefore

**ORDERED** that Charles' petition for writ of habeas corpus is **DENIED**.  It is further

**ORDERED** that this case is **DISMISSED WITH PREJUDICE**.

The Court will issue a Certificate of Appealability.

SIGNED this 24th day of October, 2011, at Houston, Texas.

Nancy F. Atlas
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK DEWAYNE CHARLES, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:09-0592 |
| | § | |
| RICK THALER, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## FINAL JUDGMENT

This Court **DENIES** Derrick Dewayne Charles' petition for a writ of habeas

corpus and **DISMISSES** this case **with prejudice**.

SIGNED this 24th day of October, 2011, at Houston, Texas.

_____
NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE