**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DERRICK DEWAYNE CHARLES,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 09-0592** |
| | § | **\*\*CAPITAL LITIGANT\*\*** |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MOTION TO ALTER OR AMEND THE JUDGMENT

**THIS IS A DEATH PENALTY CASE.**

Respectfully submitted,

/s/ Randall O. Sorrels_____ _____
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

/s/ Julius Eric Junker_____ __ __
JULIUS ERIC JUNKER
Federal Bar No. 1096250

.                                         Texas Bar No. 2406416
                                          LAW OFFICE OF JULIUS ERIC JUNKER
                                          212 Jackson Street
                                          Richmond, Texas 77469
                                          281-342-9476 Telephone
                                          281-239-7503 Facsimile
                                          **Attorney for Petitioner**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **DERRICK DEWAYNE CHARLES,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 09-0592** |
| | § | **\*\*CAPITAL LITIGANT\*\*** |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## MOTION TO ALTER OR AMEND THE JUDGMENT

Petitioner, Derrick Dewayne Charles, respectfully moves this Court, pursuant to Rules 52 and 59(e) of the Rules of Civil Procedure, to alter or amend the judgment in this action denying Mr. Charles' petition for a writ of habeas corpus.   The Court's Memorandum and Order Denying Petition For A Writ of Habeas Corpus ("Order") contains factual and legal errors that, if corrected, will compel a finding that Mr. Charles was deprived of the effective assistance of counsel during the punishment phase of his capital murder trial.

## I.      This Court fundamentally misconstrued 28 U.S.C. § 2254(d).

Throughout its Order, the Court states that the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and the Supreme Court's interpretation of the AEDPA, restricts the scope of federal habeas corpus review.   *See e.g.* Order at 27 ("Under *Pinholster,* Charles defined the

scope of his federal *Strickland*[1] claim through his state habeas litigation."); *id*. at 26 ("The AEDPA's deferential standard not only changes how a federal habeas court considers a state inmate's claim, but also channels what evidence and arguments it may consider.").   The Court has erroneously collapsed§ 2254(d) together with § 2241(a), the provision of the statute that grants jurisdiction for federal habeas review.   The Court's error is critical because, by failing to observe the structure and function of § 2254(d), the Court has circumscribed its role as a federal habeas court to a far greater extent than required by AEDPA or *Pinholster*.

Section § 2254(d) is a limitation on, or pre-condition to, habeas corpus relief that, once satisfied, falls away.   *Pinholster* deals only with the scope of evidence relevant to the § 2254(d)(1) limitation on relief.   *Pinholster* does not alter the scope of § 2241, *Strickland*, or a federal petitioner's ability to supplement the federal record with additional evidence in support of a *Strickland* claim.   *Pinholster* holds only that the supplemental evidence is irrelevant to the § 2254(d)(1) limitation on relief.

As explained in Mr. Charles' Supplemental Briefing (Docket Entry # 37), *Pinholster* has no effect on this case because Mr. Charles' § 2254(d)(1) arguments—*i.e.* his explanation of the myriad ways in which the state court acted unreasonably—are all based on the state court record.  In other words, Mr. Charles does not assert that this Court must consider Mr. Charles' supplemental evidence when assessing whether the § 2254(d)(1) limitation of relief applies.

The Sixth Circuit recently provided precisely the same explanation of the structure and functions of the various provisions of the federal habeas statute that Mr. Charles outlined in his Supplemental Briefing, an understanding of the statute that this Court implicitly rejects in its

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

Order.  *See Rice v. White*, ___ F.3d ___, 2011 WL 5025906, at *7–*9 (6th Cir. Oct. 24, 2011).

The authority to grant habeas relief is located not in § 2254, but in § 2241:

> Section 2241 of Title 28 of the U.S. Code provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."  28 U.S.C. § 2241(a).  The statute is an affirmative grant of power to federal courts to issue writs of habeas corpus to prisoners being held "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c); *see also United States v. Mauro*, 436 U.S. 340, 357, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).  Federal courts have long treated § 2241 as a grant of general jurisdiction over habeas claims, and, until recently, federal courts would routinely exercise their "independent judgment when deciding both questions of constitutional law and mixed constitutional questions, . . . ow[ing] no deference to a state court's resolution of such questions of law or mixed questions."  *Williams v. Taylor*, 529 U.S. 362, 400, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring).

*Id.* at *7.  A federal court's ability to exercise independent judgment when deciding questions of

constitutional law and mixed questions

> changed with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (_AEDPA_), which imposed significant limitations on the authority of federal courts to grant writs of habeas corpus to state prisoners.  AEDPA, which is codified in relevant part at 28 U.S.C. § 2254, is *not a "separate source of habeas jurisdiction" from the grant of general jurisdiction in § 2241(a)*.  *Rittenberry v. Morgan*, 468 F.3d 331, 337 (6th Cir. 2006); *see also Williams*, 529 U.S. at 379, 120 S.Ct. 1495.  It instead "implement[s] [existing] authority with respect to state prisoners."  *Allen v. White*, 185 Fed.Appx. 487, 489 (6th Cir. 2006) (citing *Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003) (stating that AEDPA is "more in the nature of a limitation on authority than a grant of authority")).

*Id.* (emphasis added).   Section 2254(d) imposes several limitations on a federal court's authority

to grant relief under § 2254:

> Consistent with § 2241, § 2254(a) authorizes a federal court to "entertain only those applications alleging that a person is in custody 'in violation of the Constitution or laws or treaties of the United States.'"  *Id.* at 1398 (quoting 28 U.S.C. § 2254(a)); *Wilson v. Corcoran*, ___ U.S. ___, 131 S.Ct. 13, 17, 178 L.Ed.2d 276 (2010) (holding that habeas is not available for violations of state

–4–

law).  "Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies."  *Cullen*, 131 S.Ct. at 1398 (citing 28 U.S.C. § 2254(b), (c)).  Section 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

*Id*. at *8.  Like the other subsections of § 2254, § 2254(d) is a limitation on a federal court's power to grant relief on an otherwise meritorious habeas claim.  Subject to two exceptions, § 2254(d) bars the relitigation of claims that were "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); *see also Harrington v. Richter*, ___ U.S. ___ , 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011)."  *Id*.

Though "AEDPA deprives a federal court of authority to grant relief to a state prisoner on the basis that the federal court concludes, in its independent judgment, that a violation of federal law has occurred," *id*., it

"stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."  *Harrington*, 131 S.Ct. at 786.  *Federal courts retain statutory and constitutional authority, absent suspension of the writ, to remedy detentions by state authorities that violate federal law, so long as the procedural demands of AEDPA are satisfied.  See Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir.2008) ("[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 324, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003))).

*Id*. at *9 (footnote omitted) (emphasis added).  "Because AEDPA, read properly, is a limitation on the otherwise broad equitable power of federal courts to grant writs of habeas corpus, and is not itself an affirmative grant of authority, *the deference AEDPA demands is only as strong as the limitations it imposes*."  *Id*. (footnote omitted) (emphasis added).

Once the petitioner has satisfied "one of the exceptions to the relitigation bar of

§ 2254(d)," he is entitled to "a plenary review of the 'underlying [ ] claim . . . unencumbered by the deference AEDPA normally requires.'" *Id.* (quoting *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007). Likewise, once § 2254(d)(1) is satisfied, *Pinholster* has no application whatsoever. Supplementary evidence is properly before a federal court so long as it does not render the claim unexhausted. *Pinholster*, 131 S.Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *id.* at 1412 (Breyer, J., concurring) ("If the federal habeas court finds that the state-court decision fails [§ 2254](d)'s test (or if (d) does not apply), then an (e) hearing may be needed."); *Morris v. Thaler*, 2011 WL 1886096, slip op. at *9 n.1 (5th Cir. May 18, 2011) (unpublished) (an evidentiary hearing is permissible, and appropriate, after determining that § 2254(d)(1) is satisfied); *Hearn v. Ryan*, 2011 WL 1526912, slip op. at *2 (D.Ariz April 21, 2011) (denying State's motion, in light of *Pinholster*, to reconsider granting evidentiary hearing because, "[h]aving determined Petitioner's *Faretta* claim satisfied § 2254(d)(1), it fell to this Court to resolve the claim").

Thus, this Court was required to assess whether Mr. Charles satisfied one of the § 2254(d) exceptions. However, instead of addressing Mr. Charles' § 2254(d) arguments, which demonstrated that § 2254(d) was satisfied in numerous ways, the Court applied *Richter* and—based on a flawed review of the state court record containing numerous errors of omission and commission—erroneously determined there was nothing unreasonable about the state court decision. This was error.

**II.    This Court failed to perform the proper 28 U.S.C. § 2254(d) analysis which requires an assessment of whether the state court's *actual* findings and conclusions were unreasonable in light of the *entire* record before the state court.**

This Court's analysis of Mr. Charles' *Strickland* claim was far more deferential than

required by AEDPA or *Pinholster*.  First, this Court disregarded the state court's numerous unreasonable applications of controlling Supreme Court precedent and unreasonable determinations of fact and instead applied *Richter*.  Second, this Court's review of the record omits mention of nearly all evidence before the state court that was inconsistent with the state court decision and repeats many of the same clear factual errors committed by the state courts. AEDPA does not require this Court to accept the state court's unreasonable distorted and erroneous version of the state court record.

> **A.** **This Court erred applying *Richter* to a case in which the state court issued an explanation for its denial of relief; § 2254(d) analysis must focus on the stated reasons for denial.**

This Court assessed whether Mr. Charles satisfied any of the § 2254(d) prerequisites to relief under *Richter*'s standard for reviewing unexplained state court decisions: "'The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.' *Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 788 (2011)."  Order at 29.  This was error because the state court issued findings of fact and conclusions of law explaining its application of *Strickland*.  Thus, the question this Court should have answered is whether the state court's *actual* application of *Strickland* to Mr. Charles' claims was unreasonable pursuant to either § 2254(d)(1) or (d)(2).

The Supreme Court granted *certiorari* in *Richter* to resolve whether § 2254(d) applied to unexplained state court decisions:

> Under 28 U.S.C. § 2254(d), the availability of federal habeas relief is limited with respect to claims previously "adjudicated on the merits" in state court proceedings.  The first inquiry this case presents is whether that provision applies when state court relief is denied without an accompanying statement of reasons.

*Richter*, 131 S.Ct. at 780.   The Court answered this question in the affirmative:

> This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits."   Richter has failed to show that the California Supreme Court's decision did not involve a determination of the merits of his claim.   Section 2254(d) applies to his petition.

*Id*. at 785.

Thus, in framing the application of § 2254(d)(1) to the California court's unexplained denial of relief, the Supreme Court stated:

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, *as here, could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that *those* arguments or theories are inconsistent with the holding in a prior decision of this Court.

*Richter*, 131 S.Ct. at 786 (emphasis added).   The "as here, could have supported" language refers to cases, like Richter's, in which there is no explanation for the denial of habeas relief. The Court was clear, however, that federal habeas courts reviewing a reasoned state court decision "must determine what arguments or theories supported . . . the state court's decision" and then assess whether "*those* arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.

Post-*Richter* decisions reflect the common sense conclusion that the respect for state courts embodied in § 2254(d) does not compel federal courts to discard the state court decision and replace it with a hypothetical one:

> Because the state appeals court clearly explained its reasoning in denying Walker's claim of ineffective assistance of counsel, we need not apply the standard recently articulated by the Supreme Court in *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), which requires that a federal habeas court hypothesize as to the state court's reasoning where the state court has

remained silent.  *See id.* at 786 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [where the state court disposed of a claim in a summary order], could have supported, the state court's decision.").   Thus, our AEDPA review focuses on the reasoning given in the opinion of the Michigan Court of Appeals.

*Walker v. McQuiggan*, 656 F.3d 311, 318 (6th Cir. 2011).  *See also Sussman v. Jenkins*, 642 F.3d 532, 533 (7th Cir. 2011) ("*Harrington* is inapplicable to the present case" because "*Harrington* addresses the situation in which a state-court decision 'is unaccompanied by an explanation.'"); *Johnson v. Secretary, DOC*, 643 F.3d 907, 930 n.9 (11th Cir. 2011) ("The Supreme Court's recent decision in *Harrington v. Richter*, ___U.S. ___, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), where the state supreme court had issued a summary order denying relief, tells us that '[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'   The Court's instruction from *Harrington* does not apply here because the Florida Supreme Court did provide an explanation of its decision . . . .").

Thus, the § 2254(d) question before this Court is not "whether there is *any* reasonable argument" that Mr. Charles' trial counsel satisfied the Sixth Amendment guarantee of effective representation, it is whether the application of *Strickland* contained in the state court findings of fact and conclusions of law involved either an unreasonable application of clearly established law or based on an unreasonable determination of fact in light of the evidence before the state court.  As Mr. Charles demonstrated in his prior pleadings, and summarizes below, the state court decision was rife with unreasonable applications of clearly established Supreme Court precedent and unreasonable determinations of fact.   This Court, because it erroneously applied *Richter*, has yet to address Mr. Charles' arguments.

–9–

**B.** **The state court's arguments and theories for denying relief must be evaluated in light of the *entire* state court record. The Court's selective reading of the state court record omitted a raft of evidence rendering the state court's factual and legal conclusions unreasonable.**

This Court's review of the record largely adopted the distorted, partisan version of the state court record crafted by the Harris County District Attorney's Office and rubber-stamped by the state courts. Nothing in the AEDPA requires this Court to turn a blind eye to the portions of the state court record that refute the state court's decision. To the contrary, when applying § 2254(d), this Court *must* conduct an *independent* review of the state court record to determine whether the state court's decision involved an unreasonable application of clearly established law or unreasonably-found facts in light of the record before it. Evaluating the state court decision against only the state court's selectively edited version the record is precisely the abdication of judicial review that the Supreme Court has warned against:

> Even in the context of federal habeas, *deference does not imply abandonment or abdication of judicial review*. Deference does not by definition preclude relief. *A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.*

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("*Miller-El I*") (emphasis added). "The standard is demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("*Miller-El II*"). Often, as here, it is the state court's unreasonable view of the record that results in unreasonable factual or legal conclusions, and this Court owes no deference to an unreasonable determination of the facts:

> "[W]hen a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Id.*

−10−

(quotations, citations, and alterations omitted).  When a state court unreasonably
determines the facts relevant to a claim, "we do not owe the state court's findings
deference under AEDPA," and we "apply the pre–AEDPA *de novo* standard of
review" to the habeas claim.

*Cooper v. Secretary, Dept. of Corrections*, 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting *Jones*

*v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008)).

This Court's Order frequently tracks the state court's recitation of the record, which was

grossly distorted by both errors of omission and commission.  Absent from the state court's

discussion of the record are numerous facts that render the state court's factual conclusions

unreasonable.  When applying § 2254(d), federal courts are instructed to not consider evidence

presented for the first time in federal court.  The state court, and now this Court, have refused to

acknowledge reams of evidence that Mr. Charles presented to the *state* court.  This selective

approach has resulted in numerous material errors.  Mr. Charles will describe some of the most

egregious errors to illustrate the distorting effect of the Court's methodology, the following is by

no means an exhaustive list.

> **1.  Trial counsel gave numerous, conflicting statements under oath, all in
> the service of "doing what [he] could to assist the State in defeating
> [his] former client's habeas petition, even if it meant being less than
> candid."[2]  Any factual or legal conclusion premised on a finding that
> trial counsel's testimony was credible—and there were many—was
> unreasonable.**

The state court, and now this Court, repeatedly find lead trial counsel's testimony to be a

credible basis for factual and legal conclusions despite the fact that he repeatedly contradicted

himself under oath.  Lead counsel gave no less than four separate sworn accounts of his work in

his case, and offered a fifth account during trial when—in violation of his duties of

confidentiality and loyalty—he participated in an *ex parte* hearing during trial from which Mr. Charles was excluded.[3]   Though counsel's sworn testimony evolved with the post-conviction prosecutor's theory of the case, neither the state court nor this Court acknowledged trial counsel's flexibility with the facts.

For example, in his post-trial testimony defending his failure to call Derrick's treating physician at Gulf Pines hospital (whose name was supplied to him by Mr. Charles and his family) or otherwise obtain the hospital records, trial counsel averred that Mr. Charles' hospitalization "had *nothing* to do with mental illness" and/or that the hospital stay was *a brief two day visit*.   *See* Amended Petition at 53, n.10.   Despite the fact that these *post hoc* rationalizations are demonstrably false in light of trial counsel's on-the-record statements during trial, the state court signed the State's findings of fact crediting them.   And now this Court defers to them.   Order at 49.

During the trial, defense counsel stated on the record that Mr. Charles "was in a hospital *being treated for depression*. Your Honor, *for 15 days at one time*."   RR. XVI 14-15.   Mr. Williams further testified at the state habeas hearing that he considers major depression, which was one of Derrick's diagnoses, to be a mental disorder.   Thus, the record could not be any clearer that trial counsel knew at the time of trial that Mr. Charles had been hospitalized for over

---

[2]   *Richards v. Quarterman*, 566 F.3d 553, 560 (5th Cir. 2009).

[3]   Mr. Charles has strenuously criticized this proceeding.   Not only was he excluded, he was unrepresented and deprived of the opportunity to cross-examine witnesses.   Taking evidence in this manner *during* trial, explicitly for the purpose of inoculating the record against a later claim of ineffective assistance of counsel, violated the most fundamental guarantees of procedural due process: notice and an opportunity to be hearing.   Mr. Charles objects to this Court's heavy reliance on this highly improper, one-sided hearing.

two weeks for mental health reasons.

The state court unreasonably credited Mr. Williams' self-serving testimony rationalizing his failure to secure the Gulf Pines Hospital records, Respondent's Proposed Findings of Fact, Conclusions of Law and Order[4] ("FFCL") at 12, and turned a blind eye to the actual trial record. AEDPA does not require this Court to adopt the same blinkered view of the record before the state court.

More fundamentally, trial counsel's demonstrably false *post hoc* rationalizations for his investigative failures undermine any suggestion that trial counsel was a credible witness with respect to explaining his own actions.   Instead, the record is clear that trial counsel was   "doing what [he] could to assist the State in defeating [his] former client's habeas petition, even if it meant being less than candid."   *Richards*, 566 F.3d at 560.   The post-conviction prosecutor understandably authored numerous factual and legal conclusions predicated on trial counsel's post-conviction testimony assisting the State, and the state court rubber-stamped those findings. But this Court must evaluate those findings in light of the entire record.   "A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."   *Miller-El v. Cockrell*, 537 U.S. at 340.   The factual premise that trial counsel was a credible witness was unreasonably incorrect in light of his false, *post hoc* rationalizations of his failure to investigate.

---

[4]  Because the state court merely added her signature to the prosecution's pleading, there is no separately titled set of findings of fact and conclusions of law.

2.   **Trial counsel made no strategic decision to refrain from finding the Gulf Pines Hospital records, he was *actively* looking for them but failed to exercise due diligence.**

When addressing the performance prong of *Strickland*'s two-part ineffective-assistance-of-counsel analysis, this Court repeats the alleged strategic reasons relied upon by the state courts for trial counsel's failure to obtain the Gulf Pines Hospital records. Order at 48–53.   For example, the Court states that counsel may not have wanted to find the records because Mr. Charles' family allegedly told him that he hospital stay "didn't have anything to do with mental illness."   Order at 51.   However, the record is clear that trial counsel *never made a decision to not to seek the files.*   Counsel and his investigator tried to find them and failed.[5]

Trial counsel swore under oath that he did not obtain the Gulf Pines records because his investigator tried to get them but could not.   *See e.g.* Affidavit of Connie Williams dated 9/22/04 (attached to state habeas application as Exhibit Q).   Mr. Williams said that he "accept[ed] responsibility for not having discovered the records."   *Id.*   He did not say that he made any sort of strategic decision to not find them, he simply failed to find them.   Moreover, in the state habeas hearing, Mr. Williams testified that he knew that Dr. Ginsberg was a psychiatrist or psychologist who had treated Derrick at Gulf Pines, State Habeas Hearing at 28, and *there was no "trial strategy involved" in not calling Dr. Ginsberg to get the Gulf Pines records*.   *Id.* at 29.

This Court also suggests that counsel had reason to be wary about pursuing Mr. Charles'

---

[5] Even if trial counsel truly had made a decision to avoid his client's mental health records based on the family's description of hospitalization, that would have been unreasonable: "No reasonable lawyer would forgo examination of the [Gulf Pines Hospital] file thinking he could do as well by asking the defendant or family relations" about these documents.   *Rompilla v. Beard*, 545 U.S. 374, 389 (2005).

–14–

records because of potentially damaging information they may have contained.   Order at 51-52.

The Court goes so far as to say that counsel did not ignore "glaringly obvious leads."   *Id.* at 52.

Of course, trial counsel were wholly ignorant of the contents of the Gulf Pines records, so they

could not have made a strategic decision to avoid them based on their content.   What counsel

did know at the time of trial, based on his on-the-record representations to the trial court, is that

his client had been committed to a mental health facility for fifteen (15) days at the age of

thirteen for depression.   This is about as glaring a lead as any capital defense counsel could

confront.   Nor did counsel have reason to believe pursuing the records would be fruitless.

Order at 51.   Counsel knew at the time of trial that Mr. Charles was an indigent child committed

to a mental health facility for depression, a mental disorder.   There was every reason to expect

that the records would thus contain information about Mr. Charles' mental health.

The hypothetical, *post hoc* reasons for not finding the records are at odds with the record

before the state court: counsel *tried* to find the records and dispatched his investigator to get

them.   If counsel had a strategic reason to ignore his client's mental health records, he would not

have initiated the effort to retrieve them.   This is not a matter of counsel failing to seek his

client's mental health records, it was a matter of doing so ineptly.   It was unreasonable for the

state court to conclude there was a strategic reason for counsel's ineptitude, especially when

counsel himself testified that there was no strategic purpose behind failing to obtain the records.

This Court's review of the record failed to include counsel's sworn testimony that he had

no strategic reasons for failing to complete the search for the Gulf Pines records, or evaluate the

hypothetical reasons for counsel's omissions against the entire state court record.   "[C]ourts are

'not required to condone unreasonable decisions parading under the umbrella of strategy, or to

−15−

fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'" *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999)).   When assessing counsel's performance, courts "look at what might have been, not to judge the performance of trial counsel by failures of strategic decisions reasonable when made, but to meaningfully examine whether counsels' failure to investigate was based on a 'reasonable decision' that made such an investigation 'unnecessary.'" *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005).

### 3.   The Court's summary of the Gulf Pines Hospital records omits any reference to most of the mitigating information they contain while accentuating all of the allegedly aggravating aspects of the records.

When reviewing the Gulf Pines Hospital Records, the post-conviction prosecutor minimized the mitigating impact through both errors of omission and commission, and exaggerated the allegedly aggravating aspects (many of which were behavioral problems that were a direct result of the very mental health problems omitted from the state's review of the records).   The state courts adopted the prosecutor's inaccurate and distorted characterization of the records.   This Court's review of the records, Order at 42–47, mirrors the state court approach and is thus similarly an unreasonable representation of the records actually before the state courts.   The following is a non-exhaustive sampling of the unreasonably inaccurate and/or incomplete description of the Gulf Pines records.

### a.   Cognitive impairments.

The Court notes that hospital records reflect that Mr. Charles was in special education classes but states that "he reported he was there 'for behavioral problems.'" Order at 45.   Absent from this Court's Order is any discussion of Mr. Charles' severe cognitive impairments that are

described in the Gulf Pines records and which Mr. Charles emphasized in his state court briefing. Mr. Charles argued in the state court that trial counsel were ineffective for failing to obtain Mr. Charles' psychiatric records and that as a result, the jury did not learn that Mr. Charles' Full Scale IQ score was 77 when he was merely ten years of age.[6]   State Application at 28.   As argued by state habeas counsel, the jury never knew that Mr. Charles' IQ score placed him in the borderline range of intellectual functioning.   *Id.*   At the age of thirteen, Mr. Charles was evaluated by a psychologist, Dr. Michele Larrow at Gulf Pines Hospital.   *Id.* at 29.   Dr. Larrow measured Mr. Charles' IQ as *69.   Id.*   In arguing that Mr. Charles' trial counsel rendered ineffective assistance of counsel, state habeas counsel noted that although Dr. Larrow opined that Mr. Charles did not meet the diagnostic criteria for mental retardation because his adaptive behaviors were adequate, she concluded that Mr. Charles tested at "*an age equivalent of about 6 years*" (Mr. Charles was 13 years old during the evaluation).   *Id.*   As discussed in Mr. Charles' state application, Dr. Larrow further noted that Mr. Charles, who wrote his name upside-down, "exhibited extreme problems with integrating visual motor knowledge."   *Id.*   Dr. Larrow ultimately diagnosed Mr. Charles with Borderline Intellectual Functioning and questions of some organic brain injury.   *Id.*

The Gulf Pines records contain abundant evidence of Mr. Charles' cognitive impairments:

      a.      Mr. Charles failed first grade;

      b.      As a third grade student, Mr. Charles was placed in special

---

[6] This valid indicator of Mr. Charles' impaired intellectual functioning was corroborated by the State's post-conviction expert, Dr. George Denkowski, who also measured Mr. Charles' full scale IQ at 77.

education.  Despite the fact that he was receiving special education services, his grades were below average;

c.    Approximately six months into third grade, Mr. Charles was administered an educational assessment.  He scored below average on all subjects.    In Letter-Word Identification, Mr. Charles was functioning at the first garde level; in Passage Comprehension, Mr. Charles was functioning at the first grade level; in Calculation, Mr. Charles was functioning at a second grade level; in Math Reasoning, Mr. Charles was functioning at a second grade level; in Written Language, Mr. Charles was functioning at the second grade level; in Broad Reading, Mr. Charles was functioning at the second grade level; and in Broad Math, Mr. Charles was functioning at the second grade level.  The evaluator noted that Mr. Charles required special assistance in academic settings.

d.    As a sixth grade student, Mr. Charles failed to meet the minimum requirements for the "Math Mastery" as well as "Reading Mastery" of the TAAS test.

e.    Mr. Charles was in special education in seventh grade.  During the first semester of the 1995/1996 school year, his grades were consistently substandard.  He obtained the following grades: Science: 50; Reading: 80; Math: 50; Texas History: 70; English: 70; and Pre Voc: 50.

f.    On October 2, 1995, a Gulf Pines Hospital teacher noted that *Mr. Charles was functioning "well below grade level.*"

1995 Gulf Pines Hospital Records.

Contrary to this Court's suggestion, the Gulf Pines records prove that Mr. Charles academic difficulties were the result of a severe cognitive impairment.  This information was omitted from the Court's discussion of the Gulf Pines records.[7]

_____

[7] Having scrubbed the record of any accurate description of Mr. Charles' impaired cognitive functioning, the prosecutor's proposed findings of fact created the fiction that Mr. Charles was in fact some kind of criminal mastermind.  *See* FFCL at 35 (describing Mr. Charles' alleged ability to "plan and orchestrate" a crime that, on its face, was devoid of any planning or

b.      **Mr. Charles' diagnosis**.

The state court, and subsequently this one, found that Mr. Charles was diagnosed with oppositional defiant disorder ("ODD") after he was admitted to the Gulf Pines Hospital at age 10. Order at 44.   The finding is simply incorrect and based on a misreading of the record.

Mr. Charles was first hospitalized in 1993, and Dr. Ginsberg estimated treatment would take 2 or 3 weeks, but his mother terminated treatment after 2 days.   Amended Petition at 23. During that stay, the records reflect *an initial diagnostic impression* of ODD.   However, because he was checked out by his schizophrenic mother against the advice of the treating physician, Mr. Charles was never fully evaluated.   That did not happen until Mr. Charles' second hospitalization, which lasted 15 days and included a full evaluation, after which he received the following diagnosis:

> Axis I: Major Depressive Disorder, Recurrent, Severe Without Psychotic Features
> Axis II: Borderline Intellectual Functioning
> Axis III: Question of some organic brain injury
> Axis IV: Family conflict; separation of parents

Amended Petition at 27.   Thus, after he was fully evaluated, the initial diagnostic *impression* was *not* confirmed and Mr. Charles was *not* diagnosed with ODD.   Thus, *the Gulf Pines Hospital records actually show that ODD was ruled out* as a possible cause of Mr. Charles' problems.   The highly partisan state court findings omit any reference to Mr. Charles' *actual diagnosis* and thus, as in *Porter v. McCollum*, 130 S.Ct. 447, 455 (2010), "reflect[] a failure to engage with" Mr. Charles' mitigating evidence.   This Court's summary of the Gulf Pines records, Order at 42-47, likewise omits *any* reference to Mr. Charles' actual diagnoses and

---

orchestration").

–19–

erroneously reports that Mr. Charles was diagnosed with ODD.   This egregious omission alone undermines any fair assessment of mitigating impact of the Gulf Pines records.

### c.       Selective emphasis of "negative" behaviors.

The Court recounts numerous "negative" aspects of Mr. Charles' behavior in the hospital, though wholly decontextualized from his mental illness.   For example, the Court opines that Mr. Charles' "behavior while in treatment was not good," noting that he was "swearing + kicking on admission" in 1995.   Order at 46.   While it is true that swearing and kicking are not good behaviors, the Court fails to provide the full picture.

Mr. Charles was very mentally ill upon admission.   At intake, Derrick's mother informed psychiatric staff that her son had been exhibiting "decreased amounts of sleep, irritability, labile mood, crying spells, impaired memory, and impaired concentration."   Gulf Pines Records.   She also reported that Derrick would beat his head against the wall and would not respond to her. She had to hold Derrick's head until he stopped.   *Id.*   Dr. Ginsberg made the following observations of Derrick's mental status on admission, "Mr. Charles refused to talk.   He put his hands over his eyes to avoid me seeing that he was crying.   He also put his shirt over his head so that he could hide his tears.   He also had poor eye contact."   *Id.*   Nursing staff observed the following: "[Derrick] withdrawn, often with *hysterical crying*, and seldom verbalizes. Intermittently punches things/wall and bangs head when angry.   Crying loudly and fighting on admission."   *Id.* (emphasis added).

Where the records portray a seriously mentally ill, cognitively-impaired child with an Axis I diagnosis, this Court has followed the state court's lead and selectively edited them down to a portrait of a poorly behaved kid.   This demonstrably false but damaging story is refuted by a

plenary review of the Gulf Pines records.

### d.    Mr. Charles' family.

With respect to the capacity of Mr. Charles' family to care for a mentally ill child, the Court states that the Gulf Pines records show the family was "very supportive" and Derrick's mother was "healthy."   Order at 47; *id.* at 54 n. 28 (the Gulf Pines "records hinted at family problems and poverty, but conversely *show a supportive family ready to address Charles' problems*") (emphasis added).   This Court omits any reference to the larger portions of the Gulf Pines records that tell a very different story.   This is particularly egregious because a major thrust of Mr. Charles' arguments and evidence in the state courts was that Mr. Charles' family was too dysfunctional to care for him and were thus unable provide the much-needed follow-up care after Mr. Charles was discharged from the hospital.   None of this evidence is even acknowledged in the Court's review of the state court record.   Instead, the Court's Order reads as if the record uniformly confirms that Mr. Charles had a loving and supportive family.   Order at 43; 44; 47; 54.   This is an unreasonable determination of fact in light of the overwhelming evidence before the state court to the contrary.

The Gulf Pines records included documentation of persistent dysfunction within the family.   The following information regarding the family environment was noted in the records:

g.    An adult in the home did not know the whereabouts of the child: Sometimes;

h.    Family members argued a lot: Sometimes;

i.    Family members felt close to one another: *Never*;

j.    Family members got angry a lot or list their temper: *Often*;

k.    Family members could communicate or talk freely with one another: *Never*;

–21–

l.      Family members yelled, swore, or said mean things to each other: *Often*;

m.      Family members gave each other emotional support or helped each other out when things went wrong: *Never*;

n.      Family members found a way to solve their problems: *Never*;

o.      Family members got so angry that they hit, punched, or threw things at each other: *Often*; and

p.      Family members felt physically safe with one another: *Never*.

1995 Gulf Pines Hospital Records (emphasis added).

With respect to Derrick's relationship with his mother and father/father figure, the following notations were made:

q.      The child and parent did things together: Never;

r.      The child talked to the parent or asked for help with problems: Never; and

s.      The parent talked to the child or asked for help with problems: Never.

*Id.*

With respect to Nancy Phillips' functioning during the preceding three months, the following factors were noted:

t.      Abused drugs or alcohol;

u.      Was nervous or depressed a lot or had intense mood swings; and

v.      Was very distressed or upset by things that happened in his/her own life.

*Id.*   Thus, the portrait of a supportive family described by the Court is contradicted by the Gulf Pines records.

Dr. Susana A. Rosin, a psychologist, evaluated Mr. Charles during the state habeas

–22–

proceedings and her report was submitted to the state courts.  Based on the same Gulf Pines

records this Court construed as evidence of Mr. Charles' supportive family, Dr. Rosin described

the family environment as anything but supportive:

> 5. History of family dysfunction that included living in abject poverty, frequent moves and evictions, witnessing parental arguments and family, the stepfather's alcoholism, and the mother's untreated mental illness.  It appears that partly as the result of *family dysfunction*, Mr. Charles often lived in unsafe environments, witnessed repeated incidents of violence between his parents, and *failed to receive proper parenting and medical treatment for his problems*.  Mr. Charles, for instance, *was pulled out of the hospital by his mother against medical advice in 1993* only three days following admission.  Records indicated that *the parents failed to attend many group and family therapies during Mr. Charles' 1995 hospitalization and subsequently failed to continue much needed psychiatric treatment and medication for Mr. Charles after his discharge from the second psychiatric hospitalization.  Records indicate that the parents terminated Mr. Charles' treatment with Dr. Ginsberg in early 1996, in spite of the fact that Mr. Charles continued to exhibit very serious behavior and emotional difficulties* throughout his adolescence.  It is likely not coincidental that Mr. Charles' involvement with the law and Texas Youth Commission began approximately one year from the date he ceased to receive psychiatric help.  Also not coincidentally, this was also the period of time during which Mr. Charles' mother's psychosis worsened and first came to light.  Mr. Charles's mother and stepfather were reportedly separated ruing this period of time, Mr. Charles' brother was sent to live with the maternal grandparents, and *Mr. Charles left alone with his mentally ill mother who was reportedly exhibiting paranoid delusions, experiencing depression, chronic difficulties sleeping and hearing voices at the time* . . . .

*Id.* at 14, 15.  Both the Gulf Pines records and Dr. Rosin's report refute any suggestion that Mr.

Charles' mother was "healthy" and provided her son with the support necessary to get adequate

treatment for his mental illness.

Mr. Charles' stepfather, Leroy Phillips, provided an affidavit to the state courts stating

that Mr. Charles' mother, who was afflicted with schizophrenia, "had problems being a good

mother.  The boys were often without supervision from her.  It was not uncommon for them to

be without clean clothes to wear to school or enough to eat."  Affidavit of Leroy Phillips at 2.

Thus, not only was Mr. Charles' mother unable to care for her mentally ill son or get him the necessary treatment, she was unable to meet his most basic needs for food and clothing.

The overwhelming thrust of the evidence before the state courts, both in the Gulf Pines records and from other sources, was that Mr. Charles' family was too dysfunctional to meet his basic needs, much less secure adequate care for his debilitating mental illness.   But this evidence is missing from this Court's discussion of the state court record regarding the ability of Mr. Charles' family to care for and support him.   Thus, contrary to overwhelming evidence, all of which was before the state courts, this Court unreasonably determined that Mr. Charles came from "a supportive family ready to address Charles' problems."   Order at 54 n.28.   AEDPA does not require this Court to ignore the state court record and indulge this fiction.

* * * *

The above is a non-exhaustive list of examples of the extravagantly deferential review of the record from which the evidence inconsistent with the state court findings is largely omitted. Section 2254(d), however, requires federal courts to assess the reasonableness of the state court a decision in light of the whole record.   For example, given the overwhelming evidence that Mr. Charles' family could not and did not provide him with adequate care and support, it was unreasonable to conclude that he had a supportive family, even if there was a stray remark to that effect somewhere in the record.   Because this same overly narrow focus permeates the Court's review of the record, Mr. Charles respectfully requests that this Court revisit its § 2254(d) analysis.   As demonstrated below, doing so will result in a finding that Mr. Charles has satisfied the § 2254(d) preconditions to relief.

**III.    Mr. Charles identified numerous instances of unreasonableness—any one of which satisfied § 2254(d)—but this Court wholly failed address Mr. Charles' arguments. Because § 2254(d) is satisfied, this Court is required to address Mr. Charles' claim for relief and my not turn a blind eye to his evidentiary support.**

The proper application of § 2254(d) under *Richter* requires this Court to first identify the arguments or theories that supported the state court decision, and then assess whether *those* arguments or theories are inconsistent with the holding of a prior decision of the Supreme Court. *Richter*, 131 S.Ct. at 786.   Likewise, § 2254(d) mandates that this Court assess whether the state court decision was predicated on an unreasonable determination of fact in light of the evidence before the state court.   As described above, if a petitioner satisfies either § 2254(d)(1) or (d)(2), then the Court evaluates the claim for relief according to pre-AEDPA standards and, in doing so, may consider any evidence offered in federal court that permissibly supplements the claim.

Mr. Charles identified numerous ways in which the state court decision was legally and factually unreasonable, any one of which satisfy § 2254(d).   *See* Reply to Respondent's Answer and Motion for Summary Judgment at 83–91.[8]   Based on its overly deferential approach, this Court has repeated many of the same unreasonable errors committed by the state courts.

For example, Mr. Charles identified as unreasonable the state court's failure to even acknowledge the vast amount of mitigating evidence in the Gulf Pines records, and instead narrowly focus on the allegedly aggravating evidence of Mr. Charles' behavior while mentally ill.  Reply at 86–88.   This led the state court to unreasonably conclude that the mitigating value of

---

[8] Further, Mr. Charles argued that because the Court of Criminal Appeals rejected the trial court's finding that trial counsel were diligent in their search for the Gulf Pines Hospital records, this aspect of counsel's performance—one of the most critical fact issues in this

the Gulf Pines records would have been "slight" and "lost amidst the harmful information contained" in them.   FFCL at 34.   Of course, having excised any reference to Mr. Charles' actual diagnoses, his cognitive impairments, and the rest of the most powerful mitigating evidence contained in the Gulf Pines records, the state court's conclusion was inescapable.   But it was also an unreasonable determination of fact in light the state court record, and thus satisfies § 2254(d)(2) with respect to both the performance and prejudice prongs of the *Strickland* analysis.[9]

The state court's blinkered approach to the evidence was also an unreasonable application of *Strickland*, and inconsistent with other decisions the Supreme Court, thus satisfying § 2254(d)(1).   The Supreme Court rejected this same mode of side-stepping mitigating evidence in *Porter*: "It is also unreasonable to conclude that Porter's military service would be reduced to 'inconsequential proportions,' 788 So.2d, at 925, simply because the jury would also have learned that Porter went AWOL on more than one occasion."   *Porter*, at 130 S.Ct. 455.   As the Court explained,

> the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter. []   The evidence that he was AWOL is consistent with this theory of mitigation and does not impeach or diminish the evidence of his service.   To conclude otherwise reflects a failure to engage with what Porter actually went through in Korea.

*Id*. at 455 (footnote omitted).   Likewise, to conclude that references to Derrick's anger and

---

case—must be reviewed *de novo* in this Court.

[9] This is true because the state court relied on this unreasonable factual determination when assessing both counsel's performance and the prejudice from counsel's omissions.   *See* FFCL at 34–35.

hostile behavior would diminish the impact of his chaotic, abusive, and impoverished upbringing, his cognitive impairments, and his guardians' inability to secure adequate treatment for him, reflects a failure to engage the evidence of Mr. Charles tragic childhood.   As in *Porter*, Mr. Charles' anger and behavioral problems are consistent with, and do not diminish, his tragic circumstances.   It would be extraordinary if a child immersed in these circumstances failed to act out, or if untreated mental illness resulted in no symptoms classifiable as aggravating.   As the Supreme Court recently observed, competent counsel can account for these facts:

> Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, *post,* at 3271, given that counsel's initial mitigation investigation was constitutionally inadequate.   Competent counsel should have been able to turn some of the adverse evidence into a positive – perhaps in support of a cognitive deficiency mitigation theory.   In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, *ibid.,* were features, in another well-credentialed expert's view, [] of a "profound personality disorder."   1 Record 104.   This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears, and his horrendous acts – especially in light of his purportedly stable upbringing.

*Sears v. Upton*, 130 S.Ct. 3259, 3264 (2010).

Likewise, because the state court failed to even acknowledge the mitigating evidence in the records before it, it failed to evaluate the totality of the circumstances when assessing prejudice.   *See Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) ("the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation.").

The state court's assessment of the performance prong, as well as this Court's analysis, was also unreasonable for multiple reasons.   For example, the Court failed to assess trial

counsel's performance against the contemporary, local standard of care.  Mr. Charles' case was tried in Houston, Texas, in the year 2003, three years after *Williams v. Taylor*, 529 U.S. 362 (2000), and well after the local contemporary standard of care *required* hiring a professional mitigation specialist.  Even though the standard of care was known to the state courts, Mr. Charles submitted proof of the contemporaneous standard of care through the affidavit of a Houston attorney.  *See* State Habeas Application at Exhibit I ("the prevailing professional norms for the representation of capital murder defendants in Harris County, Texas, including the time period that this case was tried, *mandate[d] the use of a mitigation specialist*.") (emphasis added).  Mr. Williams also acknowledged, during post-conviction proceedings, being aware that a mitigation specialist possesses a "level of expertise" *greater than* "what an investigator may have to see if there are some mitigation issues."  State Habeas Hearing at 34.  Counsel's appreciation that defense investigator Joe Patillo was not a mitigation specialist, *and not functioning as one*, is also evident from the fact that on February 26, 2003, trial counsel informed the trial court that he had yet to hire a mitigation specialist.  Mr. Patillo began his work on the case in July of 2002.  Indeed, hiring a mitigation specialist was so clearly the contemporaneous standard of care that the trial judge—after defense counsel revealed in February of 2003 that he had yet to hire a mitigation specialist just 32 days before the trial—authorized $5000.00 funding for a mitigation specialist *even though counsel never asked for one*.  Amended Petition at 56.  This was not a *sua sponte* act of largesse on the part court, it was a recognition that the standard of care required counsel to use a mitigation specialist and that, as of 32 days before trial, the defense was without one.

Neither the state court nor this Court acknowledged the contemporaneous standard of

–28–

care that applied to Mr. Charles' trial, yet that is the only yardstick by which trial counsel's conduct of the investigation and trial may be measured.   This omission derails the entire performance prong analysis.   For example, trial counsel's failure to conduct a meaningful mitigation investigation is not excused because *the prosecution* similarly failed to find critical social history evidence like the Gulf Pines Hospital records.[10]   Order at 50.   The relevant question is what was required of Texas capital defense counsel in 2003.   The failure of the state court and this one to acknowledge the applicable standard of care necessarily impaired the courts' assessment of whether trial counsel's performance satisfied *that* standard or whether it was deficient.[11]

Additionally, the state court and this Court both excused counsel's deficient investigation with respect to the Gulf Pines records based on the contents of those records, even though counsel never saw them.   *See e.g.* Order at 53-58 (no deficient performance because the Gulf Pines records contained allegedly harmful information).   Even if this conclusion was not based on the overly partisan review of the records described, *supra*, the content of documents counsel never saw cannot be the basis for an informed strategic reason for failing to find them.

---

[10] The record is clear that Mr. Charles and his family supplied defense counsel with the name of the treating physician at the hospital, there is no evidence they supplied this information to the prosecution.

[11] This Court turned a blind eye to counsel's vouchers, which show among other things that the second chair lawyer, who was nominally in charge of preparing for the punishment phase,  devoted only *15 hours* of out-of-court time preparing for trial, *10* of which were spent reading the prosecution's file.   Amended Petition at 53-54.   Counsel's vouchers are in the state district clerk's file and were part of the record before the state court (indeed, the trial court reviewed the vouchers and paid counsel).   That Mr. Charles excerpted this portion of the state court record and attached it to the his federal pleading—in effort to ensure this Court saw this portion of the state court record—does not provide a basis for ignoring it.

The Fifth Circuit has "squarely rejected" *post hoc* rationalizations about the credibility of evidence trial counsel failed to discover as wholly irrelevant to the question of whether counsel complied with their duty to investigate:

> we squarely reject[] the argument made by the State here—that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses would not have been credible.   Acknowledging that a lack of credibility might support a strategic decision not to call a witness to *testify* at trial, we explained that a witness's character flaws cannot support a failure to *investigate.*   Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."

*Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) (quoting *Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994)) (emphasis in the original).

Likewise, because counsel never saw the Gulf Pines records, he was "ill-equipped to assess" their mitigating potential and could not have made an informed strategic decision to fail to find them.   "[C]ourts are 'not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all.'"   *Richards*, 566 F.3d at 564 (quoting *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999)).   This too was an unreasonable application of *Strickland*.

Mr. Charles re-urges all of his arguments that he has satisfied § 2254(d) several times over.   Reply at 84–91.   Because § 2254(d) is satisfied based on the record before state courts, this Court must assess Mr. Charles' whole claim for relief, including the evidence properly introduced in this Court for the first time.   A plenary review of Mr. Charles' claim will demonstrate that he has proven a Sixth Amendment violation under *Strickland* and, because § 2254(d) is satisfied, there is no bar to granting habeas corpus relief.

### Conclusion and Prayer for Relief

Wherefore, for all of the foregoing reasons and the arguments and evidence set forth in Petitioner's prior submissions, this Court should alter or amend its judgment, and enter a new order determining that Mr. Charles has satisfied § 2254(d).   This Court should then review Mr. Charles' whole case for habeas corpus relief.

Respectfully submitted,

/s/ Randall O. Sorrels_____
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

.

/s/ Julius Eric Junker_____
JULIUS ERIC JUNKER
Federal Bar No. 1096250
Texas Bar No. 2406416
LAW OFFICE OF JULIUS ERIC JUNKER
212 Jackson Street
Richmond, Texas 77469
281-342-9476 Telephone
281-239-7503 Facsimile
**Attorney for Petitioner**

## CERTIFICATE OF SERVICE

I hereby certify that on this November 21, 2011, a copy of this Motion to Alter or Amend The Judgment was served on the Respondent via Electronic Delivery at the following address:

Assistant Attorney General Fredericka Sargent
Office of the Attorney General
Capital Litigation Division
P.O. Box 12548
Austin TX, 78711-2548
fredericka.sargent@oag.state.tx.us

/s/ Randall O. Sorrels_____
RANDALL O. SORRELS
Federal Bar No. 11115
Texas Bar No. 18855350
ABRAHAM, WATKINS, NICHOLS,
SORRELS, & FRIEND
800 Commerce Street
Houston, Texas 77002
713-222-7211 Telephone
713-225-0827 Facsimile
**Attorney for Petitioner**

/s/ Julius Eric Junker_____
JULIUS ERIC JUNKER
Federal Bar No. 1096250
Texas Bar No. 2406416
LAW OFFICE OF JULIUS ERIC JUNKER
212 Jackson Street
Richmond, Texas 77469
281-342-9476 Telephone
281-239-7503 Facsimile
**Attorney for Petitioner**